# Exhibit

# 1

# CORONER'S REPORT

## New Orleans Forensic Center

### NO. CO-H-1822-11

**Name:** **GOETZEE, William** (originally reported as: Williams, Wesley)
**Age:** **48**
**Race:** **White**
**Sex:** **Male**

**Date & Time of Death:** **08/07/11 at 7:17 P.M.**
**Date & Time of Autopsy:** **08/08/11 at 10:00 A.M.**

---

### DIAGNOSES

1.0 Asphyxia secondary to airway obstruction by foreign body (bolus of toilet paper)
    1.1 Clinical history in available medical records of removal of "obstruction of toilet paper down esophagus and trachea" during first intubation attempt
    1.1 Residual masticated tissue paper in mouth, esophagus and stomach
2.0 Minor blunt force injuries
    2.1 Superficial abrasions, contusions, and subcutaneous hemorrhage on the extremities, back, abdomen and buttocks with mild hemorrhage in the soft tissue anterior to the pancreas
    2.2 Superficial abrasions and contusions on the face and head
3.0 Pulmonary congestion and edema
4.0 Acute visceral congestion
5.0 Diverticulosis of the large bowel
6.0 Therapeutic/resuscitative intervention
7.0 Post remote appendectomy

**Classification of Death:** _____ **SUICIDE** _____

**Frank Minyard, M.D.**
**Coroner**

TRUE COPY

# AUTOPSY PROTOCOL

### New Orleans Forensic Center
### 2612 Martin Luther King Jr. Boulevard
### New Orleans, LA. 70113

**GOETZEE, William**  (originally reported as:  Williams, Wesley)        **CO-H-1822-11**
**48-Year-Old White Male**
**Date & Time of Death:**        **08/07/11 at  7:17 P.M.**
**Date & Time of Autopsy:**      **08/08/11 at 10:00 A.M.**

## EXTERNAL EXAMINATION

The body, first viewed within a white plastic body bag and subsequently placed into a black plastic body bag, is that of a white male appearing his recorded age of 48 years and without clothing.  No jewelry is received with the body.  Also received loose within the white plastic body bag are three white flat bed sheets and a short-sleeved crew neck dark blue scrub top that is cut up the front with "Federal" in white letters on the back.  The top is retained with the body in the body bag.  The body is identified by New Orleans Forensic Center tags present about the black body bag and the left wrist, each bearing the name **"Goetzee, William."**  The body additionally has a white tag present about the white plastic body bag bearing the names "William Goetzee" and "Crisis Clove," a second white tag present about the white body bag bearing the names "William Goetzee" and "Crisis Clove," a green tag present about the white body bag with no identifier on it, a white tag present about the right great toe bearing the name of the deceased, a tan tag present about the left wrist bearing the words "In Custody," and a plastic prison identification tag present on the right wrist bearing a picture of the deceased with the words and numbers "William, Wesley G  000068562".  The body is 5' 8", 198 pounds and cold to the touch due to prior refrigeration.  There is moderate rigidity that is broken with some force, and there is posterior blanching lividity with contact sparing on the upper back, buttocks, and posterior calves regions.  The top of the head is bald and there is approximately 1 cm of scant black hair about the sides and back of the head.  There is a short growth of hair stubble in the mustache and beard distribution.  The pupils are 4 mm, round and equal.  The sclerae and corneas are clear.  The conjunctivae are tan-pink, and without petechiae.  The irides are brown.  The ears are unremarkable and, other than injuries to be described subsequently, the nose is unremarkable.  The dentition is natural and in good condition.  The neck is unremarkable.  The chest is

NO000011

CO-H-1822-11
Page - 2 -

symmetrical and there is a 5.5 x 3.0 cm faint, yellow to light brown, remote contusion on the left upper chest. The abdomen is rounded and there is a 6 cm horizontal linear surgical scar on the right lower quadrant of the abdomen. There is a 6.5 cm linear diagonally oriented blue-colored surgical scar on the anterior aspect of the right lower thigh. There is a very remote 3.0 x 0.5 cm abrasion with surrounding scar tissue on the left knee. There is a 5.5 cm linear diagonally oriented remote superficial abrasion with eschar formation and scant scarring about the edges on the posterior aspect of the left upper forearm, and multiple 0.5 to 2.2 cm linear diagonally oriented remote abrasions with eschar formation and scant scarring about the edges on the posterior aspect of the lower left forearm to wrist region. There is a 1.0 x 1.0 x 1.0 cm nodularity on the right back that on cut section is consistent with an epidural inclusion cyst. There are multiple 0.2 to 0.9 cm brown, round to oval, firm skin papules with remote and resolving linear excoriations located in a 12.0 x 5.0 cm area of the left back, 8.0 x 7.0 cm area of the right back, and scantly on the right posterior upper arm. There is a 0.5 x 0.5 cm remote ulcer with scarring on the lateral aspect of the left lower hip to buttock region, and a 1.4 x 1.0 cm resolving ulcer on the left lateral hip with eschar formation, granulation tissue centrally, and scant resolving subcutaneous hemorrhage. There is a 4.0 x 2.0 cm area of remote healed abrasions on the right elbow with superimposed recent abrasions and avulsion of the well-formed eschar which will be described subsequently. The external genitalia are male, the penis is circumcised, and the testes are descended into the scrotal sac.

**Evidence of Therapy**
A cervical collar is in place about the neck. There are six cardiac monitor pads present about the right and left upper chest, the left lower chest, the left lower lateral chest, and the lateral aspect of the left side of the abdomen. There are numerous tan to light brown postmortem to perimortem abrasions and scant subcutaneous hemorrhage overlying the lower sternum along with a linear horizontal fracture of the sternum at the level of the fourth intercostal spaces, as commonly seen with resuscitative efforts. This is associated with scant hemorrhage anterior to the pericardial sac within the subcutaneous tissue, as well as linear fractures with scant surrounding soft tissue hemorrhage involving the 4th through 6th anterolateral right ribs, the 4th and 5th anterior left ribs at the sternum, and the 3rd through 6th anterolateral left ribs, as commonly seen with resuscitative efforts. An intraosseous line is in place in the bone of the right upper anterior tibia. There is a puncture with surrounding purple contusion in the medial aspect of the left antecubital fossa. There is sticky residue on the skin surface of the left lower lateral chest wall and the posterior aspect of the lower left forearm. An endotracheal tube is held in place at the mouth by a white and blue fabric strap and a white and blue plastic holder with scant fluid blood within the mouth and faint perimortem contusions each measuring 0.5 x 0.5 cm located on the upper and lower inner lips adjacent to the location of the endotracheal tube where it is held at the mouth. The tip of the endotracheal tube is located approximately 1 cm above the carina. There is mucosal hemorrhage at the anterior aspect of the carina and patchy mucosal hemorrhage throughout the remainder of the trachea with bloody mucus within the tracheal lumen, as can be seen with endotracheal intubation.

NO000012

CO-H-1822-11
Page - 3 -


**Evidence of Injury**   (see 1-page diagram for illustrations)

There are several *minor blunt force injuries* identifiable on the skin surfaces as follows:
a 2.8 x 2.8 cm area of raised pink-red contusion/hematoma on the left forehead; a 5.5 x 1.2 cm area of several 0.2 to 3.2 cm linear and irregularly shaped pink-red abrasions at the top of the forehead with early healing about the edges and scattered superimposed more recently abraded areas; a 1.5 x 1.0 cm superficial faint pink perimortem abrasion with scant hemorrhage in the subcutaneous tissue at the vertex of the head; a 1.0 x 0.5 cm faint, superficial, irregularly shaped, tan-light pink, resolving abrasion above the right eyebrow; a 1.0 x 0.6 cm faint, superficial, irregularly shaped, tan-light pink, resolving abrasion on the right upper forehead; two 0.2 x 0.1 cm red-brown irregularly shaped depressed abrasions on the bridge of the nose just left of midline; a 4.0 x 2.0 cm area of fresh/resent abrasions on the right elbow partially displacing the eschar formation of a healed/old area of abrasions on the right elbow; a 4.0 x 2.0 cm area of red-pink contusions on the posteromedial aspect of the right elbow; a 1.0 x 0.2 cm linear horizontal area of purple-red contusion on the posteromedial aspect of the right upper forearm; a 5.5 x 1.5 cm area of red, tan and pink resolving abrasions with early eschar formation and granulation tissue on the posterior aspect of the right hand with multiple superimposed 0.2 to 0.5 cm more recent red abrasions and surrounding pink contusion within the same area; a 3.0 cm linear roughly horizontal resolving abrasion with eschar formation on the left forearm with an 8.0 x 5.0 cm area of surrounding brown, red and yellow resolving contusion extending into the adjacent deep subcutaneous tissue; a 2.0 x 0.5 cm red-purple contusion on the anterior aspect of the left lower forearm to wrist region; a 5.0 x 4.0 cm pink contusion on the superolateral aspect of the left elbow; a 1.0 x 0.7 cm superficial tan-pink abrasion with a 3.0 x 1.5 cm area of red-purple surrounding contusion on the inferomedial aspect of the left elbow; a 4.0 x 2.0 cm pink contusion on the posteromedial aspect of the left forearm; a 2.5 x 2.0 cm red contusion overlying the right knee; a 2.0 x 2.0 cm red contusion overlying the left knee; a 0.5 x 0.5 cm red irregularly shaped abrasion with a 1.5 x 1.5 cm surrounding red contusion on the inferolateral aspect of the left knee; a 6.0 x 3.5 cm red-pink contusion on the posterior right upper calf region below the popliteal fossa; a 5.0 x 4.0 cm red-pink contusion on the lateral aspect of the right calf; an 8.0 x 3.0 cm red-pink contusion on the top of the left foot; and a 1.0 x 1.0 cm purple contusion on the lateral aspect of the left foot.

The chest, abdomen, back, buttocks, extremities and posterior neck are incised and the subcutaneous tissue is dissected at the time of autopsy to reveal additional areas of *minor blunt force injuries* as follows:
a 21.0 x 5.0 cm area of subcutaneous hemorrhage involving the anterior and lateral aspect of the right shin to calf region; a 6.0 x 4.0 cm area of subcutaneous hemorrhage on the anterior aspect of the left ankle; a 3.5 x 2.2 cm area of subcutaneous hemorrhage on the lateral aspect of the left ankle; the previously described 8.0 x 5.0 cm area of surrounding brown, red and yellow resolving contusion extending into the adjacent deep subcutaneous tissue adjacent to the abrasion with eschar formation on the left forearm; a 4.0 x 2.0 cm area of scant red subcutaneous hemorrhage in the lower abdominal wall just left of

NO000013

CO-H-1822-11
Page - 4 -

midline; a 2.5 x 2.0 cm area of scant red-maroon subcutaneous hemorrhage present in the upper back area near the base of the neck in midline; a 2.5 x 1.0 cm area of scant brown resolving hemorrhage in the deep subcutaneous tissue of the left back; a 4.0 x 9.0 x 1.0 cm area of resolving brown scattered subcutaneous hemorrhage deeply situated in the right upper buttock region; and an 8.0 x 3.0 x 1.0 cm area of resolving to remote scant brown-maroon hemorrhage in the deep subcutaneous tissue of the left lower buttock to left hip region. Upon palpation, there are no associated fractures of the extremities.

A layer-wise dissection of the neck musculature is performed at the time of autopsy to reveal no evidence of trauma in this region. The testes are reflected out of the scrotal sac at the time of autopsy to reveal no injury to the testes or to the scrotal sac. The posterior and lateral parietal pleura are reflected at the time of autopsy to reveal no posterior or lateral rib fractures. There are the previously described fractures of the sternum and ribs as well as hemorrhage in the anterior aspect of the pericardial sac secondary to recent therapeutic intervention. The posterior lower pelvic musculature is reflected at the time of autopsy to reveal no pelvic fractures or fractures of the lumber transverse processes, and no hemorrhage into the adjacent musculature. There is no hemorrhage in the posterior neck musculature, which is incised at the time of autopsy.

There is an 8.0 x 0.5 cm area of patchy soft tissue hemorrhage anterior to the pancreas, but not involving the parenchyma of the pancreas, and with no injury to the pancreas itself. It is unclear as to whether this is the result of blunt force trauma due to injury or therapeutic intervention. There is no free blood within the peritoneal cavity.

Medical records available at the time of autopsy are limited, but reveal removal of "obstruction of toilet paper down esophagus and trachea" during the first intubation attempt. There is no residual foreign material including toilet paper within the trachea or main bronchi; however, there is masticated somewhat bloody white soft toilet paper present within the mouth between the teeth and cheek areas bilaterally, within the esophagus, and within the stomach. A portion of the toilet paper recovered from the mouth, esophagus, and stomach is placed into a container and retained with the formalin-fixed tissue. The tracheal mucosa has patchy areas of mucosal hemorrhage along its length, which may be the result of intubation or other resuscitative attempts including removal of the bolus of tissue paper at the time of intubation attempt.

## INTERNAL EXAMINATION

**Body Cavities**
The body is opened with the standard Y-shaped incision along with dissection of the subcutaneous tissue to reveal the previously described area of faint subcutaneous hemorrhage on the abdominal wall. The subcutaneous fat midway between the xiphoid and umbilicus is 3.0 cm thick. There are no abnormal fluid collections or adhesions in the peritoneal, pericardial or pleural cavities. The hemidiaphragms are intact. There is a scant amount of soft tissue

NO000014

CO-H-1822-11
Page - 5 -

hemorrhage anterior to the pancreas as previously described with no free blood within the peritoneal cavity.

**Organs of the Neck**
The thyroid is normal in size and free of nodules. The parenchyma is firm, glistening, dark brown and homogenous. The parathyroids are not identified. The carotid arteries follow their normal courses and are without evidence of trauma. The tracheal mucosa is tan, pink and red with patchy areas of mucosal hemorrhage and mucosal hemorrhage at the carina, as well as minimal fluid blood within the mouth and tracheal lumen, which are not occlusive. The tracheal and laryngeal lumens are not obstructed and contain no gastric contents. There is the previously described masticated tissue paper present within the mouth, esophagus and stomach but no residual obstruction by this masticated tissue paper. There is no edema of the tracheal or laryngeal mucosa. There is the previously described faint contusions adjacent to the endotracheal tube within the upper and lower inner lips. The vocal cords and hyoid bone are intact. The tongue has no focal lesions or evidence of trauma.

**Heart**
The heart is 480 grams. The coronary arteries are serially sectioned to reveal scattered regions of 10% to 20% eccentric narrowing by firm atherosclerotic plaque in the main coronary arteries with no occlusive lesions. The left ventricle is 1.4 cm in thickness, and the right ventricle is 0.4 cm in thickness. The coronary arterial system is right dominant. The atria and ventricles are not dilated, and there are no mural thrombi in the heart chambers. The cardiac valve leaflets are thin, delicate, intact, and without vegetations. The cardiac valve circumferences are as follows: tricuspid valve of 12.5 cm, pulmonary valve of 8.0 cm, mitral valve of 12.0 cm, and aortic valve of 7.8 cm. On cut section, the myocardium is brown to red, and without visible infarct. The aorta is opened longitudinally in situ to reveal scant scattered atherosclerotic plaque.

**Lungs**
The right lung is 650 grams; the left lung, 660 grams. The pulmonary arteries are free of antemortem thrombi and subpleural anthracosis is scant. The lung surfaces are pink, purple-maroon, scantly gray-black, shiny, smooth and glistening. The posterior segments of both lungs are firm and uniformly maroon. On cut section, non-dependent areas of the lungs are red, purple-maroon, slightly congested, and exude a minimal to moderate amount of red-pink edema fluid. No nodules are present, and no exudate is expressed from the cut surfaces. Some thin slightly foamy edema fluid is present in the bronchial radicals but there are no obstructive lesions.

**Liver**
The liver is 2160 grams. The capsule is intact with a smooth surface and rounded inferior edge. On cut section, the parenchyma is purple to brown and congested, but without focal lesion. A large amount of bloody fluid exudes from the cut surfaces. On palpation, there is no increase in consistency or fibrosis. The gallbladder contains approximately 20 cc of dark green bile without calculi or distinct lesions. The bile ducts are not dilated, and the portal vein is not distended.

NO000015

CO-H-1822-11
Page - 6 -

**Spleen**

The spleen is 230 grams. The capsule is gray, smooth, and intact. On cut section, the parenchyma is deep red and congested with faintly identifiable red and white pulp. There are no focal lesions present.

**Pancreas**

The pancreas is in its normal position and, other than the small amount of hemorrhage in the soft tissue anterior to it, it is free of necrosis, nodules, or other focal lesions with no injuries to the parenchyma itself.

**Adrenals**

Both adrenals are in their normal positions and free of nodules or infiltrates. The cortices are golden brown and the medullae are deep brown.

**Kidneys**

The right kidney is 180 grams; the left kidney, 210 grams. The capsules strip with ease and the cortical surfaces are smooth. On cut section, the parenchyma is tan-brown, congested and the cortices average 0.6 cm in thickness. The medullary pyramids are unremarkable. The pelves and ureters are not distended, and there are no renal calculi present.

**Urinary Bladder and Prostate**

The bladder mucosa is tan-white with approximately 12 cc of clear yellow urine present within the lumen. The prostate is of normal size, firm and uniform in shape. On cut section, the parenchyma is tan and without nodules or focal lesions.

**Gastrointestinal Tract**

No esophageal lesions are present, but there is the previously described masticated tissue paper in the esophageal lumen. The stomach contains scant bloody mucus and the previously described scant masticated tissue paper in its lumen. The gastric mucosa is tan-brown and thrown into low rugal folds. There are no ulcers or other focal lesions present within the stomach or duodenal mucosa. There are no pill or tablet fragments identified within the stomach contents. The small bowel contains soft green material, and is otherwise unremarkable. The large bowel contains firm green fecal material and multiple intact diverticula that are mostly concentrated in the rectal and sigmoid regions. The appendix is remotely absent.

**Musculoskeletal System**

There are the previously described postmortem incisions with dissection disclosing injuries with the remainder of the soft tissue and musculature away from the areas of injury being of normal color and consistency. Other than the fractures of the sternum and ribs secondary to therapeutic intervention, there is also calcified callus formation of the 5th right rib anteriorly, as can be seen with a remote fracture. The vertebral column is intact, and there are no fractures of the extremities upon manipulation.

NO000016

CO-H-1822-11
Page - 7 -

**Scalp, Skull and Brain**
The scalp and subcutaneous tissue are reflected in the usual manner and other than scant amount of superficial subcutaneous hemorrhage adjacent to the abrasions on the scalp and contusion on the left forehead, are otherwise unremarkable. The skull is unremarkable; specifically there are no fractures evident. There are no epidural, subdural, or subarachnoid hemorrhages. The dura and dural venous sinuses are unremarkable. The leptomeninges are thin, delicate, and transparent. The brain is 1530 grams. The cerebral hemispheres are symmetrical with no abnormal gyral or sulcal patterns. There is minimal uncal grooving and minimal cerebellar tonsillar coning with no obvious herniation. Examination of the base of the brain reveals scant scattered atherosclerotic change in the vessels of the Circle of Willis, and in the basilar and vertebral arteries. Sectioning through the cerebrum, brain stem and cerebellum reveals no focal lesions or evidence of trauma.

**Specimens**
Retained specimens include femoral blood, vitreous, urine, liver tissue, femoral blood on an FTA card for DNA, and formalin-fixed tissue. Vitreous electrolytes are requested.

## PROVISIONAL ANATOMICAL DIAGNOSES:

1.0   Asphyxia secondary to choking on bolus of toilet paper
    1.1   Clinical history in available medical records of removal of "obstruction of toilet paper down esophagus and trachea" during first intubation attempt
    1.1   Residual masticated tissue paper in mouth, esophagus and stomach
2.0   Minor blunt force injuries
    2.1   Superficial abrasions, contusions, and subcutaneous hemorrhage on the extremities, back, abdomen and buttocks with mild hemorrhage in the soft tissue anterior to the pancreas
    2.2   Superficial abrasions and contusions on the face and head
3.0   Pulmonary congestion and edema
4.0   Acute visceral congestion
5.0   Diverticulosis of the large bowel
6.0   Therapeutic/resuscitative intervention
7.0   Post remote appendectomy

## MICROSCOPIC DESCRIPTION

HEART and AORTA (A, H): There are minimal scattered regions of thickened (hypertrophic) cardiomyocytes with an occasional "box car" shaped nuclei. There is no significant histopathology of the epicardium, endocardium, or vasculature. No infarcts, myocarditis or pericarditis are present. The aorta has intimal thickening with scattered intracellular and extracellular lipid.

NO000017

CO-H-1822-11
Page - 8 -

LUNGS and TRACHEA (B, H):  Some alveoli contain sloughed type II pneumocytes, non-foamy macrophages, and red blood cells.  There is marked vascular congestion and scattered intra-alveolar edema fluid.  The inter-alveolar septae are not thickened by inflammation.  There is normal arteriole and bronchiole distribution.  There is no bronchopneumonia, pleuritis or viral changes seen.  There is scant patchy postmortem sloughing of bronchial epithelium, and scant emphysematous change.  No foreign material is identified.  The tracheal section reveals superficial mucosal autolysis with postmortem sloughing of most of the epithelium, and there are focal areas of submucosal hemorrhage.

THYROID (C):  There is marked vascular congestion, but no other significant histopathology present.

LIVER and GALLBLADDER (C, H):  There is marked acute sinusoidal and vascular congestion present.  There are scattered collections macro- and microsteatosis that are most concentrated around the terminal hepatic venules where there is also an increase in hepatocellular cholestasis.  Some hepatocytes have a glassy nucleus.  There is no other significant histopathology present in the remaining parenchyma.  There is autolysis of the gallbladder mucosa but no significant histopathology is identified.

SPLEEN (C):  The parenchyma is congested, but no other significant histopathology is present.

PANCREAS (C):  There is autolysis present, but otherwise no significant histopathology.

KIDNEY (D):  There is marked vascular congestion present and a few minute calcifications within glomeruli.  There are minimal scattered pigment casts and a few hyaline casts present.  There are no crystals or polarizable material in the tubules.  There is no other significant histopathology present of the remainder of the parenchyma.

ADRENAL GLANDS (D):  There is vascular congestion, and no other significant histopathology present.  No viral changes are seen.

GASTROINTESTINAL TRACT (G):  The epithelium of the esophagus in the gastroesophageal section is poorly oriented but the better oriented regions have changes suggestive of low grade, mild reflux esophagitis.  There is vascular congestion in the sections, scattered mild epithelial autolysis of the small and large bowel sections, and an intact shallow early diverticulum in the large bowel section, but no other significant histopathology present in the remainder of the sections.

PROSTATE and URINARY BLADDER (I):  The urothelium is sloughed off the bladder section but the remainder of the wall is without significant histopathology.  There is a focal acute prostatitis present with numerous prostatic concretions present and numerous glands have sloughed epithelium.

NO000018

CO-H-1822-11
Page - 9 -

BONE MARROW, RIB (J): There is trilineage marrow present with approximately 70% overall cellularity, a slight increase in the amount of megakaryocytes, and unremarkable bone. There are no focal lesions present.

CEREBRUM, CEREBELLUM and BRAINSTEM (E, F): There is vascular congestion within the meninges and parenchyma. The meninges, cerebrum, cerebellum and brainstem have no other significant histopathology.

## MICROSCOPIC DIAGNOSES

1.0 Minimal scattered thickened (hypertrophic) cardiomyocytes
2.0 Pulmonary congestion and edema
3.0 Focal areas of tracheal submucosal hemorrhage
4.0 Scattered hepatic steatosis
5.0 Acute prostatitis
6.0 Shallow large bowel diverticulum
7.0 Acute visceral congestion

_____ Date Signed: 07/23/2011
Samantha Huber, M.D., Pathologist
dgs

TRUE COPY

# NEW ORLEANS CORONER'S OFFICE



**Name** William Goetzee          **Autopsy No.** CO-H-1822-11

**Color** W M   **Age** 78 y/o      **Date** 08/08/2011 at 10:00 AM

Minor
Blunt Force Injuries

NO000020

St. Louis University Toxicology Laboratory Report
6039 Helen Ave, Berkeley, Missouri 63134

Name: GOETZEE, WILLIAM                                        Tox # 2011-5789
   Age: 48 years                    Race: White               Sex: Male

   Requesting Agency: NEW ORLEANS PARISH CORONER
==================================================================================
 Blood:

   Alcohol:
      Ethanol:                                                Negative
      Acetone:                                                Negative
      Isopropanol:                                            Negative
      Methanol:                                               Negative

   Blood Drug Screen:
      Amphetamines:                                           Negative
      Antidepressants:                                        Negative
      Barbiturates:                                           Negative
      Benzodiazepines:                                        Negative
      Cannabinoids (THC):                                     Negative
      Cocaine/Metabolites:                                    Negative
      Lidocaine:                                              Negative
      Methadone:                                              Negative
      Non-Opiate Narcotic Analgesic:                          Negative
      Opiates:                                                Negative
      Phencyclidine:                                          Negative
      Phenothiazines:                                         Negative
      Propoxyphene:                                           Negative
      Acetaminophen:                                          Negative
      Salicylates:                                            Negative
      Oxycodone:                                              Negative
      Fentanyl:                                               Negative
      Oxymorphone:                                            Negative

==================================================================================

Requested by: DR. HUBER                    Date: 08/09/11

Received in Lab:                           Date/Time: 08/10/2011//09:15 AM

Report by: DR. CHRISTOPHER LONG            Date/Time: 08/18/2011//06:02 AM

TRUE COPY

# Exhibit

# 2

# STATE OF LOUISIANA

THIS RECORD IS VALID FOR DEATH ONLY

1344496

IMPORTANT: PRINT or TYPE, black ink or ribbon mandatory

1473413

STATE OF LOUISIANA
**CERTIFICATE OF DEATH**

2011 22 578

BIRTH No. ____ FILE No. 117 ____

**DECEDENT**

| Field | Entry |
|---|---|
| 1A. Last name of decedent | Goetzee |
| 1B. First name | William |
| 1C. Middle name | Wesley |
| 2A. Date of death | August 07, 2011 |
| 2B. Hour of death | 1917 |
| 3. Sex | Male |
| 4. Race | White |
| 5. Marital status | Never Married |
| 6. Surviving spouse | |
| 7. Date of birth | November 14, 1962 |
| 8A. Age (years) | 48 |
| 9. Birthplace | Plainfield, New Jersey |
| 10. Usual occupation | Environmental Protection Specialist |
| 11. Kind of business/industry | U.S. Coast Guard Dept. of Homeland Security |
| 12. Of Hispanic origin | No |
| 13. Ever in U.S. Armed Forces | Yes |
| 14. Social Security Number | 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 |
| 15. Decedent's education (College) | 5+ |

**PLACE OF DEATH**

| Field | Entry |
|---|---|
| 16A. Place of death | Hospital: ER/Outpatient |
| 16B. Name of facility | LSU Interim Hospital |
| 16C. Place of death in city limits? | Yes |
| 17A. City, town or location of death | New Orleans |
| 17B. Parish of death | Orleans |

**RESIDENCE**

| Field | Entry |
|---|---|
| 18A. Street address | 116 Lakewood Drive |
| 18B. Parish of residence | St John The Baptist |
| 18C. State of residence | Louisiana |
| 18D. Usual residence of decedent | Laplace |
| 18E. Zip code | 70068 |
| 18F. Residence inside city limits? | No |

**PARENTS**

| Field | Last | First | Middle | Place of birth | State |
|---|---|---|---|---|---|
| 19A. Father | Goetzee | John | | Dobbs Ferry | New York |
| 20A. Mother's maiden name | Seman | Helen | Claudia | Hastings-on-Hudson | New York |

**INFORMANT**

| Field | Entry |
|---|---|
| 21A. Name of informant | Donna M. Gauthier |
| 21B. Informant's address | 116 Lakewood Drive, Laplace, Louisiana 70068 |
| 21C. Date | August 16, 2011 |

**DISPOSITION**

| Field | Entry |
|---|---|
| 22A. Method of disposition | [X] Cremation |
| 22B. Date thereof | 08/29/2011 |
| 22C. Name and location of cemetery or crematorium | Metairie Cremalory, New Orleans, Louisiana 70124 |
| 23A. Signature and address of funeral director | Lake Lawn Metairie Funeral Home, 5100 Pontchartrain Boulevard, New Orleans, Louisiana 70124 [signature] |
| 23B. Facility number | 2745 |
| 23C. License number | E2411 |
| 23D. Alterations | [illegible handwriting] |

**REGISTRAR**

| Field | Entry |
|---|---|
| 24A. Burial transit permit | S307213 |
| 24B. Parish of issue | Jefferson |
| 24C. Date of issue | 08-17-2011 |
| 24D. Signature of local registrar | [signature] |

**MANNER OF DEATH**

| Field | Entry |
|---|---|
| 25. Manner of death | [X] Suicide; [X] Pending investigation |
| 26A. Date of injury | 8-7-2011 |
| 26B. Time of injury | unk |
| 26C. Injury at work | No |
| 26D. Describe how injury occurred | Stuffed paper in mouth |
| 26E. Place of injury | Prison Cell |
| 26F. Location | 2735 Perdido St New Orleans La, Orleans |

**CERTIFIER**

| Field | Entry |
|---|---|
| 27A. I certify that I attended the decedent | New Orleans Coroner's Office |
| 27B. Signature of physician or coroner | [signature] |
| 27C. Date | 09/09/2011 |
| 27D. Name and title of physician or coroner | Frank Minyard, MD, Coroner |
| 27E. Address of physician or coroner | 2612 Martin Luther King Blvd., New Orleans, LA 70113 |

**CAUSE OF DEATH**

30. Part I.
- Immediate cause: Asphyxiation secondary to Airway
- Due to (or as a consequence of): Obstruction by foreign body
- Due to (or as a consequence of):

33. Part II. Other significant conditions contributing to death: [X] Other — minor blunt force Trauma injuries

31. If deceased was female 10-49, was she pregnant in the last 90 days? [ ] Yes [ ] No [ ] Unk.

32A. Was an autopsy performed? [X] Yes

32B. Were autopsy findings available prior to completion of cause of death? [X] Yes

PHS 15 - (REV. 04/04)

OFFICE OF PUBLIC HEALTH - VITAL RECORDS REGISTRY

JAN 31 2012

DHH-OPH · VITAL RECORDS REGISTRY · LOUISIANA

I CERTIFY THAT THIS IS A TRUE AND CORRECT COPY OF A CERTIFICATE OR DOCUMENT REGISTERED WITH THE VITAL RECORDS REGISTRY OF THE STATE OF LOUISIANA, PURSUANT TO LSA — R.S.40:32, ET SEQ.

Darlene W. Smith [signature]

STATE REGISTRAR

NO000045

WARNING: It is illegal to alter or counterfeit this copy

# Exhibit

# 3

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

MARGARET GOETZEE NAGLE                    CIVIL ACTION NO. 12-1910
and JOHN ERIC GOETZEE

VERSUS                                    DIVISION "R"
                                          JUDGE SARAH S. VANCE
SHERIFF MARLIN GUSMAN, ET AL
                                          MAGISTRATE (2)
                                          JUDGE JOSEPH C. WILKINSON, JR

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSION
## TO SHERIFF MARLIN GUSMAN

Plaintiffs Margaret Goetzee Nagle and John Eric Goetzee, by counsel, pursuant to Rule

36 of the Federal Rules of Civil Procedure, hereby serve the following requests for admission

upon Defendants Sheriff Marlin N. Gusman, the Sheriff of Orleans Parish, Dr. Samuel Gore, Dr.

Charles Higgins, Dr. Jose Ham, Mary Anne Benitez, Darryl Jackson, LPN Wallace, S Pembo, S.

Batiste, David Schaible, E. Bargky, C. Johnson, Warden Carlos Louque, Sgt. Nicole Harris, Sgt.

Everett Marshall, Deputy Michael Williams, and Deputy Shelia Crader.

## REQUESTS FOR ADMISSION

1. Marlin Gusman was elected Criminal Sheriff of Orleans Parish on Nov. 2, 2004.

Response to Request for Admission No. 1:

Admitted

2. In 2006 and 2010, Marlin Gusman was re-elected as Criminal Sheriff of Orleans

Parish.

Response to Request for Admission No. 2:

Admitted.

3. The separate Criminal and Civil Sheriffs of Orleans Parish and their offices were merged into one Orleans Parish Sheriff by law in 2010.

Response to Request for Admission No. 3:

Admitted.

4. The office of Orleans Parish Sheriff is the successor to the office of Orleans Parish Criminal Sheriff.

Response to Request for Admission No. 4:

Admitted

5. Marlin Gusman was Sheriff of Orleans Parish, State of Louisiana in August 2011.

Response to Request for Admission No. 5:

Admitted

6. As Orleans Parish Criminal Sheriff, Marlin Gusman was the final policymaker for the Orleans Parish Criminal Sheriff's Office.

Response to Request for Admission No. 6:

Admitted

7. As Orleans Parish Sheriff, Marlin Gusman is the final policymaker for the Orleans Parish Sheriff's Office.

Response to Request for Admission No. 7:

Admitted

8. The Orleans Parish Prison (OPP) is a jail complex consisting of various facilities, all operated by the Sheriff of Orleans Parish.

Response to Request for Admission No. 8:

Admitted

9. In August 2011, the House of Detention (HOD) was part of the OPP complex.

Response to Request for Admission No. 9:

Admitted

10. In August 2011, male prisoners at the OPP who were on suicide watch were housed on the 10th floor of HOD.

Response to Request for Admission No. 10:

Admitted

11. From August 2, 2011 to August 7, 2011, Defendant William A. Thompson was employed by Orleans Parish Sheriff Marlin Gusman.

Response to Request for Admission No. 11:

Admitted to the extent that this request does not seek an admission that these are the only dates on which William A. Thompson was employed.

12. On August 7, 2011, William Thompson was assigned to work on the 10th floor of HOD.

Response to Request for Admission No. 12:

Admitted

13. On August 7, 2011, the standard shift for corrections officers and deputies working in HOD, 10th floor, was 12 hours.

Response to Request for Admission No. 13:

Admitted.

14. On August 7, 2011 William Thompson was assigned to work a 12 hour shift on the 10th floor, HOD.

Response to Request for Admission No. 14:

Admitted.

15. William Thompson's regular duties and assignments when assigned to work at the 10th floor of the HOD included monitoring the tiers for inmate and staff safety.

Response to Request for Admission No. 15:

Admitted.

16. William Thompson's regular duties and assignments when assigned to work at the 10th floor of HOD included direct supervision of inmates placed on suicide watch.

Response to Request for Admission No. 16:

Admitted.

17. William Thompson's regular duties and assignments when assigned to work on the 10th floor of HOD included assisting other deputies and jail staff.

Response to Request for Admission No. 17:

Admitted.

18. William Thompson's regular duties and assignments when assigned to work on the 10th floor of HOD included distributing meals to inmates ("feed up").

Response to Request for Admission No. 18:

Admitted.

19. William Thompson's regular duties and assignments when assigned to work at the 10th floor of HOD included communicating with other deputies and jail staff, including nurses and medical staff.

Response to Request for Admission No. 19:

Admitted only to the extent that this request seeks an admission that his duties could have included such communication, but not to any extent that his duties on that date required

communication on any particular date.

20. William Thompson's regular duties and assignments when assigned to work at the 10th floor of HOD included creating written reports, including an "Observation or Restraint Checklist."

Response to Request for Admission No. 20:

See Admission Response 19.

21. William Thompson's regular duties and assignments when assigned to work at the 10th floor of HOD included reporting to his supervisors regarding assignments.

Response to Request for Admission No. 21:

Admitted.

22. On the morning of August 7, 2011, William Thompson was assigned to conduct direct supervision of William Goetzee, who was on suicide watch on the 10th Floor of HOD.

Response to Request for Admission No. 22:

Admitted.

23. Direct supervision of inmates on suicide watch at HOD, 10th floor in August, 2011, required that an Orleans Parish Sheriff's Office (OPSO) employee maintain direct and constant observation of the inmate at all times.

Response to Request for Admission No. 23:

Admitted.

24. As part of his assignment to directly supervise William Goetzee, William Thompson was required to note William Goetzee's status every 15 minutes on an Observation or Restraint Checklist.

Response to Request for Admission No. 24:

Admitted.

25. At some point during August 7, 2011, during the period of time in which William Thompson was assigned to monitor William Goetzee, William Thompson left his post and helped another Sheriff's employee distribute meals ("feed up") to inmates other than William Goetzee.

Response to Request for Admission No. 25:

Admitted.

26. During the time that William Thompson was helping another Sheriff's employee distribute meals, no other staff was assigned to take William Thompson's place directly observing William Goetzee.

Response to Request for Admission No. 26:

Admitted that no other staff was assigned, but Denied to any extent that this request seeks an admission that the Orleans Parish Sheriff's Office had any knowledge of William Thompson's actions, or that there was a request for backup made, sufficient to allow for assignment of other staff to directly observe William Goetzee.

27. At some point during August 7, 2011, during the period of time in which William Thompson was assigned to monitor William Goetzee, William Thompson took a restroom break.

Response to Request for Admission No. 27:

Admitted.

28. During the time that William Thompson took a restroom break, no other staff was assigned to take his place directly observing William Goetzee.

Response to Request for Admission No. 28:

Admitted that no other staff was assigned, but Denied to any extent that this request seeks an admission that the Orleans Parish Sheriff's Office had any knowledge of William Thompson's actions, or that there was a request for backup made, sufficient to allow for assignment of other staff to directly observe William Goetzee.

29. At some point during August 7, 2011, during the period of time in which William Thompson was assigned to monitor William Goetzee, William Thompson went to the nurses' station.

Response to Request for Admission No. 29:

Admitted.

30. During the time that William Thompson was in the nurse's station, no other staff was assigned to take his place directly observing William Goetzee.

Response to Request for Admission No. 30:

Admitted that no other staff was assigned, but Denied to any extent that this request seeks an admission that the Orleans Parish Sheriff's Office had any knowledge of William Thompson's actions, or that there was a request for backup made, sufficient to allow for assignment of other staff to directly observe William Goetzee.

31. At some point during August 7, 2011, during the period of time in which William Thompson was assigned to monitor William Goetzee, William Thompson spoke to nurses and other medical staff in the nurses' station.

Response to Request for Admission No. 31:

Denied for lack of information sufficient upon which to admit or deny.

32. During the time that William Thompson was in the nurses' station speaking to

nurses and other medical staff, no other staff was assigned to take his place directly observing William Goetzee.

Response to Request for Admission No. 32:

Denied for lack of information sufficient upon which to admit or deny.

33. The Orleans Parish Sheriff's Office's regular practice following the death of an inmate is to conduct an investigation.

Response to Request for Admission No. 33:

Admitted.

34. The Orleans Parish Sheriff's Office regular practice is to create a record of any investigation conducted into the death of an inmate.

Response to Request for Admission No. 34:

Admitted.

35. The Special Operations Division (SOD) is the section of the Sheriff's Office that conducts investigations into the death of an inmate.

Response to Request for Admission No. 35:

Admitted.

36. Following the death of William Goetzee, Deputy Jerry Martin, a member of the Orleans Parish Sheriff's Office assigned to the Special Operations Division, investigated the death of William Goetzee.

Response to Request for Admission No. 36:

Admitted.

37. As part of his investigation into the death of William Goetzee, Deputy Jerry Martin conducted an interview with William Thompson, among others, on August 8, 2011.

Response to Request for Admission No. 37:

Admitted.

38. Following his investigation into the death of William Goetzee, Deputy Jerry Martin prepared an Incident Report that recorded the substance of his interviews with William Thompson, among others, attached as Exhibit 1.

Response to Request for Admission No. 38:

Admitted.

39. The Incident Report, Ex. 1, in which Deputy Jerry Martin recorded the substance of his interviews in his investigation of the death of William Goetzee was made at or near the time of those interviews.

Response to Request for Admission No. 39:

Admitted.

40. The Incident Report, Ex. 1, in which Deputy Jerry Martin recorded the substance of his interviews in his investigation of the death of William Goetzee was created in the course of a regularly conducted activity of the Orleans Parish Sheriff's Office.

Response to Request for Admission No. 40:

Admitted.

41. The Incident Report, Ex. 1, in which Deputy Jerry Martin recorded the substance of his interviews in his investigation of the death of William Goetzee was prepared in the course and scope of Jerry Martin's employment with the Orleans Parish Sheriff's Office.

Response to Request for Admission No. 41:

Admitted.

42. Deputy Jerry Martin's Incident Report, Ex. 1, regarding the death of William

Goetzee at HOD on August 7, 2011, is a business record.

Response to Request for Admission No. 42:

Admitted.

43. Following an inmate's death, the Orleans Parish Sheriff's Office Medical Department's regular practice is to conduct a mortality review.

Response to Request for Admission No. 43:

Admitted.

44. The Orleans Parish Sheriff's Office Medical Department's regular practice is to create a record of a mortality review.

Response to Request for Admission No. 44:

Admitted.

45. Defendant Samuel Gore is the medical director of the Orleans Parish Sheriff's Office.

Response to Request for Admission No. 45:

Admitted.

46. Samuel Gore conducted a mortality review following William Goetzce's death.

Response to Request for Admission No. 46:

Admitted.

47. Samuel Gore created a record of his mortality review dated September 2, 2011, attached as Exhibit 2.

Response to Request for Admission No. 47:

Defendant objects, as this request is vague and appears to be duplicative of Request 46.

48. Samuel Gore created a record of his mortality review dated September 2, 2011,

Ex. 2, at or near the time that be conducted the mortality review.

Response to Request for Admission No. 48:

Same objection lodged in Response 47.

49. Samuel Gore's record of his mortality review, Ex. 2, was created in the course of a regularly conducted activity of the Orleans Parish Sheriff's Office.

Response to Request for Admission No. 49:

Admitted.

50. Samuel Gore created his mortality review regarding William Goetzee's death, dated September 2, 2011, see Ex. 2, in the course and scope of his employment as medical director of the Orleans Parish Sheriff's Office.

Response to Request for Admission No. 50:

Admitted.

51. Samuel Gore's mortality review regarding William Gotzee's death dated September 2, 2011, see Ex. 2, is a business record.

Response to Request for Admission No. 51:

Admitted.

52. In his mortality review dated September 2, 2011, Samuel Gore concluded that there was "substandard suicide monitoring" of William Goetzee. *See* Ex. 2.

Response to Request for Admission No. 52:

Objection to the extent that this request seeks Defendant to admit the existence of quoted phrases in a document which Defendant has already admitted is a business record and which speaks for itself.

53. In his mortality review dated September 2, 2011, Samuel Gore concluded that

there were areas of improvement, listing "suicide watch ineffective: deputy providing direct, continuous observation left the tier." *See* Ex. 2

Response to Request for Admission No. 53:

Objection to the extent that this request seeks Defendant to admit the existence of quoted phrases in a document which Defendant has already admitted is a business record and which speaks for itself.

54. In his mortality review dated September 2, 2011, Samuel Gore concluded that there were "Corrective actions necessary": "Improvements in suicide watch mechanisms." See Ex. 2.

Response to Request for Admission No. 54:

Objection to the extent that this request seeks Defendant to admit the existence of quoted phrases in a document which Defendant has already admitted is a business record and which speaks for itself.

55. Following an inmate's death, the Orleans Parish Sheriff's Office Medical Department's regular practice is to conduct a psychological autopsy.

Response to Request for Admission No. 55:

Denied. Admitted only to the extent that such action is taken following a suicide.

56. The Orleans Parish Sheriff's Office Medical Department's regular practice is to create a record of the psychological autopsy.

Response to Request for Admission No. 56:

Admitted.

57. Defendant Michael Higgins is employed as the director of psychiatric services for the Orleans Parish Sheriff's Office.

Response to Request for Admission No. 57:

Admitted.

58. Michael Higgins prepared a psychological autopsy report following William Goetzee's death, attached as Exhibit 3.

Response to Request for Admission No. 58:

Admitted.

59. Micbael Higgins created a record of his psychological autopsy regarding William Goetzee's death, Ex. 3, at or near the time that he conducted the psychological autopsy.

Response to Request for Admission No. 59:

Admitted.

60. Michael Higgins' psychological autopsy following William Goetzee's death, Ex. 3, was created in the course of a regularly conducted activity of the Orleans Parish Sheriff's Office.

Response to Request for Admission No. 60:

Admitted.

61. Michael Higgins's psychological autopsy regarding William Goetzee's death, Ex. 3, is a business record.

Response to Request for Admission No. 61:

Admitted.

62. In his psychological autopsy following the death of William Goetzee, Michael Higgins concluded that "Medical had continued the order for direct observation up until the time of [William Goetzee's] death; however, security failed to provide the continuous observation allowing William Goetzee to kill himself." *See* Ex. 3.

Response to Request for Admission No. 62:

Objection to the extent that this request seeks Defendant to admit the existence of quoted phrases in a document which Defendant has already admitted is a business record and which speaks for itself.

63. At some point during August 7, 2011, William Thompson filled out an Observation or Restraint Checklist for William Goetzee for the date of August 7, 2011, attached as Exhibit 4.

Response to Request for Admission No. 63:

Admitted, but denied to any extent that this request seeks an admission that any document was filled out properly, timely, or in accordance with the OPSO policy and procedures.

64. The Observation or Restraint Checklist form has four spaces per hour (15 minute intervals) for OPSO employees to fill in with their observations of an inmate's status. *See* Ex. 4.

Response to Request for Admission No. 64:

Objection to the extent that this request seeks Defendant to admit Plaintiff's description of a document which is attached and thus speaks for itself.

65. In the August 7, 2011 Observation or Restraint Checklist regarding William Goetzee, William Thompson filled out the 15 minute intervals between 10:22 a.m. and 6:15 p.m., with one exception at 2:00 p.m. *See* Ex. 4.

Response to Request for Admission No. 65:

Objection to the extent that this request seeks Defendant to admit Plaintiff's description of a document which is attached and thus speaks for itself.

66. On August 7, 2011, between approximately 4:30 p.m. and 6:30 p.m., William Thompson was sitting in the nurses' station.

Response to Request for Admission No.66:

Denied for lack of information sufficient upon which to admit or deny the requested period of time.

67. The nurses' station at HOD, 10th floor is located in an area where it is not possible to be in that station and be able to simultaneously maintain direct, continuous observation of an inmate in the cell where William Goetzee was housed on August 7, 2011.

Response to Request for Admission No. 67:

Admitted.

68. William Thompson was not observing William Goetzee between approximately 4:30 p.m. and 6:30 p.m. on August 7, 2011.

Response to Request for Admission No. 68:

Denied for lack of information sufficient upon which to admit or deny the requested period of time.

69. On June 15, 2012, William Thompson pleaded guilty to the charge of malfeasance in office in case number 510-225, State of Louisiana versus William A. Thompson.

Response to Request for Admission No. 69:

Admitted.

70. When William Thompson pleaded guilty to malfeasance in office he admitted that be left bis post—to directly supervise William Goetzee on August 7, 2011—three times, for one and a half hours, 15 minutes, and two hours, respectively. *See* Exhibit 5 (Thompson's Plea Transcript).

Response to Request for Admission No. 70:

Denied. Defendant was not present at the time that William Thompson pled guilty, and

the attached transcript is not a record which is generated by or maintained by Defendant.

71. When William Thompson pleaded guilty to malfeasance in office he admitted to submitting an observation or restraint checklist that indicated falsely that he had viewed William Goetzee continuously from 10:22 a.m. until 6:15 p.m. *See* Exhibit 5.

Response to Request for Admission No. 71:

Denied. Defendant was not present at the time that William Thompson pled guilty, and the attached transcript is not a record which is generated by or maintained by Defendant.

72. When William Thompson pleaded guilty to malfeasance in office, he admitted that William Goetzee was found unconscious by a fellow inmate at about 5:45 p.m. *See* Exhibit 5.

Response to Request for Admission No. 72:

Denied. Defendant was not present at the time that William Thompson pled guilty, and the attached transcript is not a record which is generated by or maintained by Defendant.

73. When William Thompson pleaded guilty to malfeasance in office, he admitted that he had falsified an entry on the observation or restraint checklist for 6:15 p.m., which was after the time that William Goetzee was found unconscious. *See* Exhibit 5.

Response to Request for Admission No. 73:

Denied. Defendant was not present at the time that William Thompson pled guilty, and the attached transcript is not a record which is generated by or maintained by Defendant.

74. New Orleans Emergency Medical Services (EMS) regular practice is to provide emergency medical and ambulance services.

Response to Request for Admission No. 74:

Denied for lack of information sufficient upon which to justify an admission or denial as

to what New Orleans Emergency Medical Services' "regular practice" is.

75. After providing emergency medical and ambulance services, a regular activity of the New Orleans EMS is to create a Patient Care Report.

Response to Request for Admission No. 75:

Denied for lack of information sufficient upon which to justify an admission or denial as to what New Orleans Emergency Medical Services generates after providing medical and ambulance services.

76. Anthony Calvin and Nicholas Manning were the New Orleans EMS staff who responded to William Goetzee on August 7, 2011 and provided him with emergency medical care.

Response to Request for Admission No. 76:

Admitted.

77. Following Mr. Calvin and Mr. Manning's treatment of William Goetzee on August 7, 2011, Mr. Calvin and Mr. Manning created a Patient Care Report, attached as Exhibit 6.

Response to Request for Admission No. 77:

Denied for lack of information sufficient upon which to justify an admission or denial.

78. Mr. Calvin and Mr. Manning's Patient Care Report for William Goetzee's treatment, Ex. 6, was created at or near the time that they provided emergency medical services to William Goetzee on August 7, 2011.

Response to Request for Admission No. 78:

Denied for lack of information sufficient upon which to justify an admission or denial

79. Mr. Calvin and Mr. Manning's Patient Care Report for William Goetzee's

treatment on August 7, 2011, Ex. 6, was created in the course of a regularly conducted activity of the New Orleans EMS.

Response to Request for Admission No. 79:

Denied for lack of information sufficient upon which to justify an admission or denial.

80. The New Orleans EMS Patient Care Report created by Mr. Calvin and Mr. Manning regarding their treatment of William Goetzee on August 7, 2011, Ex. 6, is a business record.

Response to Request for Admission No. 80:

Denied for lack of information sufficient upon which to justify an admission or denial.

81. On August 7, 2011, New Orleans EMS reached William Goetzee at approximately 6:41 p.m. *See* Ex. 6.

Response to Request for Admission No. 81:

Admitted.

82. At all times between when William Thompson arrived at the Orleans Parish Prison on the morning of August 7, 2011, and when New Orleans EMS reached William Goetzee at approximately 6:41 p.m. that day, William Thompson was wearing the uniform that had been issued to him hy his employer, Orleans Parish Sheriff Marlin Gusman.

Response to Request for Admission No. 82:

Denied for lack of information sufficient upon which to justify an admission or denial.

83. At all times between when William Thompson arrived at the Orleans Parish Prison on the morning of August 7, 2011, and when New Orleans EMS reached William Goetzee at approximately 6:41 p.m. that day, William Thompson was acting in the course and scope of his employment with Orleans Parish Sheriff Marlin Gusman.

Response to Request for Admission No. 83:

Denied. William Thompson left the course and scope of his employment at the times in which he violated policy and left his assigned post.

84. Orleans Parish Sheriff Marlin Gusman is vicariously liable for William Thompson's actions taken in the course and scope of his employment on August 7, 2011.

Response to Request for Admission No. 84:

Denied.

Respectfully submitted,

USRY, WEEKS & MATTHEWS

By: s/Blake J. Arcuri
FREEMAN R. MATTHEWS, (LSBN 9050)
TIMOTHY R. RICHARDSON, (LSBN 27625)
BLAKE J. ARCURI, (LSBN 32322)
1615 Poydras Street, Suite 1250
New Orleans, Louisiana 70112
Tel: (504) 592-4600 Fax: (504) 592-4641
Attorneys for Defendants

-PUBLIC ENTITY/FEE EXEMPT-
(See R.S. 13:4521 & 13:5112)

## CERTIFICATE OF SERVICE

I do hereby certify that on this 3rd day of December, 2013, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent by operation of the court's electronic filing system. I also certify that a copy of the foregoing will be sent to all non-CM/ECF participants by United States Mail, properly addressed and postage prepaid.

By: s/Blake J. Arcuri

# Exhibit

# 4

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| MARGARET GOETZEE NAGLE, ET AL., | * | CIVIL ACTION |
| Plaintiffs | * | |
| VERSUS | * | NUMBER: 12-1910 |
| | * | |
| SHERIFF MARLIN GUSMAN, ET AL., | * | SECTION: "R" |
| Defendants | * | |
| | * | JUDGE: Sarah S. Vance |
| | * | |
| | * | MAG. 2: Joseph C. Wilkinson, Jr. |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

### DECLARATION OF PLAINTIFF MARGARET GOETZEE NAGLE

I, MARGARET GOETZEE NAGLE, hereby declare under penalty of perjury pursuant to 28 U.S.C. 1746 that the following statements are true and correct.

1.      My brother William Wesley Goetzee ("Mr. Goetzee") was a Commander in the U.S. Coast Guard reserve and civilian employee of the Coast Guard at the time of his death on August 7, 2011.

2.      At the time of his death, Mr. Goetzee left no spouse, child, or parent surviving.

3.      John Eric Goetzee and I, the Plaintiffs in this action, are Mr. Goetzee's siblings and legal next of kin.

Dated:   _2 April 2014_

_Scotch Plains_, New Jersey

By:

_Margaret Goetzee Nagle_
Margaret Goetzee Nagle
*Plaintiff*

# Exhibit

# 5



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| MARGARET GOETZEE NAGLE and<br>JOHN ERIC GOETZEE | * | CIVIL ACTION |
| | * | NUMBER: |
| VERSUS | * | SECTION: **12-1910** |
| SHERIFF MARLIN GUSMAN,<br>DR. SAMUEL GORE,<br>DR. CHARLES "MIKE" HIGGINS, | * | JUDGE: **SECT. R MAG. 2** |
| DR. JOSE HAM,<br>MARY ANNE BENITEZ,<br>DARRYL JACKSON,<br>LPN WALLACE,<br>S. PEMBO, S. BATISTE, | * | MAGISTRATE: |
| DAVID SCHAIBLE, E. BARGKY,<br>C. JOHNSON, FNP,<br>WARDEN CARLOS LOUQUE,<br>HOD WATCH COMMANDERS JOHN | * | CIVIL RIGHTS |
| DOES I and II, SGT. NICOLE HARRIS,<br>SGT EVERETT MARSHALL,<br>DEPUTY WILLIAM THOMPSON, | * | |
| DEPUTY MICHAEL WILLIAMS and<br>DEPUTY SHELIA CRADER | * | JURY TRIAL DEMANDED |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## COMPLAINT

### I.   INTRODUCTION

1.      This case involves the tragic death on August 7, 2011 of U.S. Coast

Guard Commander William ("Bill") Goetzee, a 48-year-old federal career civilian

1

employee of the U.S. Coast Guard and active member and Commander of the U.S. Coast Guard Reserves, who, while working in highly responsible and high-stress positions with the Coast Guard, including duties related to the BP oil spill, experienced a profound mental health crisis and breakdown. This breakdown manifested in a desperate attempt by Commander Goetzee to commit suicide on August 2, 2011 by attempting to grab the gun of a federal protective officer in order to kill himself. As a result of this dire crisis, Commander Goetzee was arrested, transported and placed in the custody of the defendants, all of whom had responsibility for his care and safety in his time of need.

2.    Instead of providing adequate, appropriate and necessary care and treatment to Commander Goetzee, the defendants failed in their professional duties and their legal obligations. Commander Goetzee was treated by the defendants in a callous, harsh and indifferent manner, resulting in his death by suicide in a barren cell on the tenth floor "mental health" unit of the House of Detention (HOD), an outmoded, dangerous and completely inadequate facility which, at all relevant times, was a critical part of the Orleans Parish Prison (OPP) complex and which was not a reasonable accommodation for a person suffering from Mr. Goetzee's illness and disability and in his condition. The OPP complex was operated and supervised by the Orleans Parish Sheriff's Office (OPSO), under the leadership of Sheriff Marlin Gusman, at all relevant times.

3.    Commander Goetzee was not properly diagnosed, treated or cared for

2

while in the custody of the defendants. He was denied appropriate and necessary medical, psychiatric, nursing and therapeutic care, treatment and supervision. Instead, he was confined in a hostile, barren and isolated environment that exacerbated and aggravated his condition, which was fragile and precarious to begin with. Defendants and their staff provided Commander Goetzee with access to materials to harm himself while in an acute state of emotional and psychological crisis. The mistreatment of Commander Goetzee by the defendants and their staff in this facility was in contravention of the community standard of care and violated applicable federal and state constitutional and statutory standards.

4.    The defendants' actions and omissions, manifested in inadequate medical screening and intake, inadequate staffing, inadequate training and supervision of staff, inadequate facilities, inadequate policies and procedures relating to diagnosis and treatment of mentally ill and suicidal persons in custody, as well as inadequate care, treatment, and monitoring of Commander Goetzee, were directly and causally related to Commander Goetzee's death.

5.    For too many years there have been numerous other similar, avoidable, unnecessary and unconscionable injuries, sufferings and deaths of prisoners in the custody of the Orleans Parish Sheriff's Office related to the denial of adequate medical care, inadequate supervision and training of staff, and lack of reasonable accommodations for individuals with disabilities, mental illness in particular. The instant case represents yet another instance of a shocking degree of callous and inexcusable

3

disregard for the serious medical needs of a prisoner at OPP, in this instance, Commander Goetzee, by those very persons who were responsible for his care.

## II. JURISDICTION

6.   This action is brought pursuant to 42 U.S.C. 1983, pursuant to the First, Fourth, and Fourteenth Amendments to the United States Constitution, Section 504 of the Rehabilitation Act of 1973 which authorizes actions to redress discrimination based on disability and handicap, Title II of the Americans with Disabilities Act of 1990, 42 USC 12131, 42 USC 1988 and 42 USC 12205, et seq.   Jurisdiction is founded on 28 U.S.C. Sections 1331 and 1343 and the aforementioned statutory and constitutional provisions. Plaintiff further invokes the pendant jurisdiction of this Court to consider claims arising under state law pursuant to 28 USC Section 1367.  A jury trial is requested.

## III. PARTY PLAINTIFF

7.   Margaret Goetzee Nagle is the sister and John Eric Goetzee is the brother of William "Bill" Goetzee, who died while under the custody and care of the defendants as further described herein. Margaret Nagle is a person of the full age of majority, who resides in Scotch Plains, New Jersey. John Eric Goetzee is a person of the full age of majority, who resides in Winfield Park, New Jersey. At the time of his death, William "Bill" Goetzee was unmarried, had no children and was pre-deceased by both of his parents. He was a resident of LaPlace, Louisiana.

4

## IV. PARTY DEFENDANTS

8.    Defendant Sheriff Marlin Gusman was Sheriff of Orleans Parish at all times described herein, and, as such, is responsible for the hiring, training, supervision, discipline and control of the employees of the OPSO, including medical and correctional staff.  He is also responsible for the supervision, administration, policies, practices, customs and operations of the OPSO and its correctional facilities.  He is a final policymaker. He is liable both directly and vicariously for the actions complained of herein.  He is sued in his individual and in his official capacity for those acts and omissions, which occurred while he was Sheriff.  As Sheriff of Orleans Parish, defendant Sheriff Gusman accepts federal funds and is charged with providing custodial care to prisoners in custody of the Orleans Parish jail and directed all medical providers in the care of William Goetzee, deceased.   He is a person of the full age of majority and, on information and belief, a resident of the Eastern District of Louisiana.

9.    Defendant Dr. Samuel Gore is the Medical Director of the Orleans Parish Sheriff's Office and is an employee of the OPSO. At all pertinent times herein, he was responsible for the provision of medical care and health care services for persons incarcerated in OPSO facilities, both directly and as a supervisor. He was responsible for recommending and hiring qualified health care professionals and staff, insuring adequate staffing for the medical needs of prisoners, for the supervision, training, discipline and oversight of personnel and provision of medical services at OPSO correctional facilities and was responsible to insure access and provision of reasonable

5

and adequate health care for persons in custody at the jail. He is responsible for supervising the devalopment and revision of policies, procedures, and protocols concerning the delivery of medical and mental health services at the jail. He is also responsible for monitoring compliance with all health services policies, procedures and protocols. He negotiates and monitors contracts with outside agencies involved in providing health care services to persons in custody of the OPSO. All matters of medical and mental health judgment are the sole province of the Medical Director. He is a final policymaker with regard to the provision of madical and psychiatric services to persons in the custody of the OPSO. He was responsible for the direction, supervision and discipline of the medical/psychiatric defendants named herein as well as medical/security co-ordination and training and supervision of correctional employees in health-related matters. He is sued in his individual and official capacity. He is a person of full age of majority and, on information and belief, is a resident of the Eastern District of Louisiana.

10.    Defendant Dr. Michael Higgins is the Mental Health Director for OPP and is an employee of the OPSO. At all pertinent times herein, he was responsible for the provision of psychiatric services for persons incarcerated in OPSO facilities, both directly and as a supervisor. He was responsible for recommending and hiring qualified mental health care professionals and staff, insuring adequate staffing for the medical needs of prisoners, for the supervision, training, discipline and oversight of personnel and provision of mental health services at OPSO correctional facilities, and was

6

responsible to insure access and provision of reasonable and adequate health care for persons in custody at the jail. He is responsible for supervising the development and revision of policies, procedures, and protocols concerning the delivery of mental health services at the jail.  He is also responsible for monitoring compliance with all health services policies, procedures and protocols. He negotiates and monitors contracts with outside agencies involved in providing health care services to persons in custody of the OPSO.  All matters of mental health judgment are within his duties as Mental Health Director. He is a final policymaker with regard to the provision of medical and psychiatric services to persons in the custody of the OPSO. He was responsible for the direction, supervision and discipline of the medical/psychiatric defendants named herein as well as medical/security co-ordination and training and supervision of correctional employees in health-related matters.  He is sued in his individual and official capacity.  He is a person of full age and majority and, on information and belief, is a resident of the Eastern District of Louisiana.

11.    Defendant Mary Anne Benitez performed duties relating to health services administration for the OPSO, at all pertinent times herein, and was responsible for assisting with supervising daily administrative operations within the department including quality control, review of medical records, establishing and maintaining functional information systems within the medical department and between medical and security personnel.  She was also responsible for oversight, training and supervision of medical employees and health care training for correctional officers, as well as

7

coordination between medical and security personnel. She was responsible for insuring the provision and adequacy of care and safety of William Goetzee at the time of Mr. Goetzee's incarceration and death. She was responsible for insuring that appropriate and adequate medical, psychiatric and nursing care was given to persons at risk for suicide in the custody of the OPSO. She is sued in her individual and official capacity. She is a person of the full age of majority and, on information and belief, is a resident of the Eastern District of Louisiana.

13.     Defendant Dwayne Johnson was the Director of Nursing (DON) for the OPSO at all pertinent times herein and as such was responsible for hiring, training, supervision, discipline and co-ordination of nursing services, including co-ordinating physician/nursing sick call and follow-up care, staffing and implementation of appropriate nursing standards and procedures. He was responsible for insuring that appropriate and adequate nursing care was given to persons at risk for suicide at OPP including intake procedures and those being held on HOD-10 at OPP.

13.     Defendant Dr. Jose Ham is a medical doctor employed by OPSO, who was the Health Services Administrator at all pertinent times herein, and was responsible for assisting with supervising daily administrative operations within the department including quality control, review of medical records, establishing and maintaining functional information systems within the medical department and between medical and security personnel. He was also responsible for oversight, training and supervision of medical employees and health care training for correctional officers, as well as

8

coordination between medical and security personnel. On information and belief, he was responsible for co-ordinating the medical care for Mr. Goetzee and assisted in the care and treatment of Mr. Goetzee. He was responsible for insuring that appropriate and adequate medical, psychiatric and nursing care was given to persons at risk for suicide in the custody of the OPSO. At all pertinent times herein he was responsible for providing appropriate and adequate medical care to persons in custody of the OPSO, including William Goetzee. He had supervisory responsibilities over other medical staff as well as correctional officers and medically trained personnel who had responsibilities related to patient care. He also was responsible for reviewing charts and doing quality control regarding the standards and practices of the Medical Department at OPP. He is sued in his individual and official capacity. He is a person of the full age of majority and, on information and belief, is a resident of the Eastern District of Louisiana.

14.     Defendant Dr. Marcus Dileo is a medical doctor employed by OPSO, who provided medical services to William Goetzee. At all pertinent times herein he was responsible for providing appropriate and adequate medical care to persons in custody of the OPSO, including William Goetzee. He was responsible for medical care and treatment of William Goetzee as described herein. He had supervisory responsibilities over other medical staff as well as correctional officers and medically trained personnel who had responsibilities related to patient care. He is sued in his individual and official capacity. He is a person of the full age of majority and, on information and belief, is a resident of the Eastern District of Louisiana.

9

15.    Defendant LPN Wallace was an employee of the OPSO in the position of Licensed Practical Nurse (LPN) and at all pertinent times herein, was responsible for providing reasonable and adequate medical care to persons held in the custody of the OPSO and in particular, in medical screening, evaluation and care of individuals as they were booked into the jail. She was directly involved in the screening, evaluation and care of William Goetzee as described herein. She is sued in her individual and official capacity. She is a person of the full age of majority and, on information and belief, is a resident of the Eastern District of Louisiana.

16.    Defendant C. Johnson, FNP was an employee of the OPSO in the position of Nurse Practitioner (FNP) and at all pertinent times herein, was responsible for providing appropriate and adequate medical care to persons held in the custody of the OPSO. She had direct involvement in the evaluation and care of William Goetzee as described herein. She had supervisory responsibilities regarding other medical personnel employed by the OPSO, including Licensed Practical Nurses (LPN) and Medical Assistants (MA). She is sued in his individual and official capacity. She is a person of the full age of majority and, on information and belief, is a resident of the Eastern District of Louisiana.

17.    Defendants S. Pembo, S. Batiste, David Schaible, and E Bargky were each employees of the OPSO, licensed and employed as LPNs, at all pertinent times herein, and were responsible for providing appropriate and adequate nursing care, including documentation and paperwork necessary for continuity of care of persons in

10

the custody of the OPSO, including assessing and monitoring the medical and psychiatric condition, health and safety of William Goetzee and providing appropriate and adequate nursing care and assessments for him, with proper documentation of same. Defendants Pembo, Batiste, Schaible and Bargky had the authority and responsibility to monitor and make regular and periodic checks relative to William Goetzee's physical and mental status, including the duty to insure that he was in a safe, appropriate environment and that he was not held in conditions that would exacerbate or worsen his medical and mental conditions. These defendants are sued in their individual and official capacities. These defendants are persons of the full age of majority, and on information and belief, are residents of the Eastern District of Louisiana.

18.    Defendant Carlos Louque was employed by the OPSO as Warden of HOD where William Goetzee was held, and at all pertinent times was responsible for training, supervising, monitoring and disciplining OPSO deputies at HOD, including those named as defendants herein and overseeing the security and well-being of persons held on HOD-10. He was also responsible for co-ordination between security officers and medical personnel regarding prisoners in need of medical care, including William Goetzee.  He is sued in his individual and official capacity.  He is a person of the full age of majority and, on information and belief, he is a resident of the Eastern District of Louisiana.

11

19.    Defendants HOD Watch Commanders on Duty August 5-7, 2011 John Does I and II were employed by the OPSO as Watch Commanders of HOD where William Goetzee was held, and at all pertinent times were responsible for training, supervising, monitoring and disciplining of OPSO deputies, including those named as defendants herein and overseeing the security and well-being of persons held on HOD-10. These Watch Commanders were also responsible for co-ordination between security officers and medical personnel regarding prisoners in need of medical care, including William Goetzee.   They are each sued in their individual and official capacity. They are each persons of the full age of majority and, on information and belief, are each residents of the Eastern District of Louisiana.

20.    Defendants Sgt. Everett Marshall and Sgt. Nicole Harris were each employed by the OPSO as correctional officers and were each supervisors, assigned to the House of Detention (HOD) of the Orleans Parish jail. At all pertinent times herein each defendant supervisor was responsible for observing and communicating reported or obvious medical needs of prisoners, including William Goetzee, to medical staff and for properly supervising, monitoring, training and overseeing the proper job performance of OPSO employees under their supervision, including the defendant deputies in this matter.  Each was responsible for monitoring, checking on, and supervising the condition of William Goetzee, and those employees responsible for his care and safety, while Mr. Goetzee was held at HOD, and for insuring that Mr. Goetzee was in a safe environment and was being properly monitored.  They were each responsible for

12

insuring that proper documentation was done for the observation of Mr. Goetzee on "suicide watch", as well as being responsible for the supervision and training of defendant deputies, both named and unnamed, who had responsibilities relative to the care and custody of William Goetzee. They are each persons of the full age of majority and, on information and belief, are each residents of the Eastern District of Louisiana. They are each sued in their official and individual capacities.

21.     Defendants OPSO Deputies William Thompson, Michael Williams and Shelia Crader were all employed by the OPSO as correctional officers.  At all pertinent times herein they were each responsible for insuring that there was appropriate and constant monitoring of William Goetzee while he was on "suicide watch" and of communicating reported or obvious medical needs of prisoners, including William Goetzee to appropriate persons.  They were responsible for monitoring, checking on, and supervising the condition of William Goetzee as described herein.  They each also had the duty to report and to intervene if and when they became aware that other deputies or employees of the OPSO were not properly performing their duties relative to William Goetzee. They are each sued in their official and individual capacities.  They are each of full age of majority and, on information and belief, they are each residents of the Eastern District of Louisiana.

## V. STATEMENT OF FACTS

22.  ، On Tuesday, August 2, 2011, William ("Bill") Goetzee, a 48- year- old civilian employee and Commander, U.S. Coast Guard Reserves, experienced a severe

13

mental breakdown during which time he attempted to commit suicide by trying to grab a gun from a federal protective officer in order to kill himself. Commander Goetzee had been on extended sick leave as a result of an automobile accident in June, 2011, where he was injured. He had been suffering from symptoms from extreme exhaustion, chronic insomnia, stress, and mental illness, which had seriously impacted his ability to function properly. He was treated in an emergency room with prednisone for injuries from the accident, which resulted in an episode of "prednisone induced psychosis" which required in-patient treatment in a local mental health facility. He was under physician's care and was being treated for depression, chronic insomnia and other manifestations of mental illness. He was still under treatment and in a state of physical and mental exhaustion and illness, when he returned to work on August 2, 2011 and tried to kill himself outside the federal courthouse.

23.    After he was subdued by federal agents, Mr. Goetzee was taken by ambulance to Tulane Medical Center (TMC), where he was treated for physical injuries, including contusions to his forehead, related to his scuffle with the federal officers. It was clear that Mr. Goetzee was attempting to harm himself, not the federal officer. At TMC Mr. Goetzee was treated for his physical injuries but he was not evaluated by a psychiatrist nor did he receive appropriate mental health care. Instead, he was released by TMC. Preparations were being made by his fiancée to transport him to East Jefferson hospital, which has an in-patient psychiatric unit, for appropriate medical and psychiatric care. However, en route to East Jefferson, Mr. Goetzee was stopped and

14

arrested by federal agents who took him to the Orleans Parish Prison, operated by defendant Sheriff Marlin Gusman and the Orleans Parish Sheriff's Office. This facility housed federal prisoners in the custody of the U.S. Marshall's Office, which was Mr. Goetzee's status when he arrived at the jail.

24.    Upon arrival at the Intake and Processing Center (IPC) of the Orleans Parish Prison, Mr. Goetzee was seriously mentally ill, suicidal, and in need of medical and psychiatric care in an appropriate setting, which the OPP could not provide. Instead of referring Mr. Goetzee for appropriate medical care, Mr. Goetzee was booked into the jail. As part of that process, defendant LPN Wallace conducted the OPSO Medical Intake Screening, which is used to determine the medical status and appropriate housing for arrestees.

25.    Defendant LPN Wallace failed to adequately assess, evaluate or document Mr. Goetzee's serious medical condition, failed to provide adequate medical care or treatment for him, failed to adequately or properly record or report his condition, or to properly alert other medical and correctional personnel so as to insure that Mr. Goetzee would receive adequate medical care for his serious medical needs.

26.    The medical intake screening questionnaire has two sections, one for visual observations by medical intake screening personnel and the other involving "questions for all inmates". The intake form specifically requires the intake screener to note any obvious injury, including wounds, on the arrested subject. Defendant LPN Wallace failed to note that Mr. Goetzee had contusions on his forehead which had been

15

documented at Tulane Medical Center earlier that afternoon, injuries resulting from his efforts to kill himself that morning.

27.    In response to the question, "Does the inmate "appear despondent or depressed or voice suicidal ideation?" defendant LPN Wallace marked "N" for "No". Yet in the sections where the arrestee is asked to respond to questions, in response to the questions "Are you currently taking any medications including medications for mental illness or bad nerves?" defendant Wallace noted "states takes and (sic) anti-anxiety name unk". In response to the question "How are you feeling right now" defendant LPN Wallace noted : "OK", yet in response to the following question "Do you have any mental health problems or have you been under the care of a psychiatrist within the last year?" the following is noted: "Yes. River Oaks 6/11 states have racing thoughts, mind reading manic thoughts." River Oaks is a well-known mental health clinic and in-patient treatment facility. When asked "have you recently thought about hurting or killing yourself?" the response was recorded as "Yes. This AM last suicide thought". When asked if he had "ever tried" to commit suicide, the response is recorded as "No". When asked "do you feel like you might hurt someone else now" the response is recorded as "No." Mr. Goetzee is not asked whether he felt like he might want to hurt himself now, a logical question in light of his admission that he had suicidal thoughts that morning, as well as "racing thoughts, mind reading, manic thoughts." Defendant LPN Wallace reported that Mr. Goetzee "denies any S.I. or H.I." which is obviously contradicted by his own admission to suicidal thoughts that same morning. Defendant LPN Wallace cleared

16

Mr. Goetzee for "general population" while also recommending "contact psychiatrist for disposition". There is no record that defendant LPN Wallace followed up or that any psychiatrist was ever contacted or saw Mr. Goetzee to assess his condition or the appropriateness of his admission to the jail or the adequacy of the jail's facilities and staff to provide appropriate care and reasonable accommodation for his condition. On information and belief, defendant LPN Wallace had the authority to request an immediate physical and mental examination of Mr. Wallace by appropriately trained medical personnel, which she failed to do.

28.    In addition, there is no indication that vital signs were taken or that any physician or other appropriately trained medical personnel conducted a physical examination of Mr. Goetzee at any time during the booking process or while he was being admitted to the jail, to determine whether he was in adequate physical or mental condition for admission to the jail. On information and belief, no assessment was made to determine whether his condition required hospitalization or whether he should be assigned to any infirmary or specialized medical or mental health unit within the jail for treatment and/or observation. Defendant LPN Wallace didn't even refer him for the next psychiatric or medical sick call. No steps were taken to obtain further information regarding his medications or to contact River Oaks.

29.    The Medical Intake Screening form itself was inadequate and failed to provide for pertinent questions regarding mental and physical health of arrestees or suicidality. Defendant LPN Wallace failed to take appropriate or necessary steps to

17

properly screen, evaluate or refer Mr. Goetzee for psychiatric evaluation, diagnosis or treatment. Defendant LPN Wallace failed to properly or adequately address Mr. Goetzee's report of recent suicidal thoughts, his need for medication, or his obvious physical injury.   Defendant LPN Wallace was aware, must have been aware, or should have been aware, that Mr. Goetzee was psychologically fragile, required psychiatric evaluation, intervention and review of his medication status, yet failed to take appropriate steps to insure that would occur.

30.    Despite Mr. Goetzee's condition, defendant LPN Wallace referred Mr. Goetzee for housing in "general population".   Defendant LPN Wallace knew, must have known or should have known, at Mr. Goetzee was at high risk of serious harm due to his disability and his medical condition and that the jail lacked adequate and appropriately trained staff and facilities to properly tend to Mr. Goetzee's medical needs or to provide reasonable accommodations for his disabilities. Yet she failed to take necessary and appropriate steps to insure that he was either referred to a hospital for treatment or for medical clearance as to the appropriateness of housing him at the jail, or, if to be admitted to the jail, that he was adequately and reasonably examined, housed and treated and afforded reasonable accommodation for his disability and his condition.

31.    Mr. Goetzee was booked into OPP and taken to Templeman V, the "federal tier". The following morning he appeared in federal court for a first appearance hearing. His medical and psychiatric condition had deteriorated overnight and he was

18

delusional, combative, disoriented and non-responsive. He had to be physically restrained in a wheelchair. At some point he was tased. He had spent the night in the jail with no medical treatment, no medication and no appropriate intervention or accommodation for his condition, thereby aggravating and worsening his condition. On information and belief, various deputies and other employees of the defendant Sheriff, acting in the course and scope of their employment,  knew, must have known or should have known that Mr. Goetzee was in serious need of medical attention, yet failed to report or seek appropriate care for him during this time.

32.    Mr. Goetzee was removed from federal court and returned to the jail, where he received a "Psychiatric Nursing/MA Assessment" for the first time while in custody, due to "suicidal ideation", and referred to University Hospital by defendant Dr. Higgins, through a verbal order to defendant E. Bargky, LPN,  to "Rule Out Delirium". By that time, he had blood pressure of 181/122, a pulse rate of 128, respiration rate of 20 and a temperature of 100.1. His allergy to prednisone was noted at this time, as was the fact that he was without any medication.  His skin was warm and moist to touch. He was described as oriented OX1, oriented as to name only, a marked deterioration of the AAOX3 orientation described at Intake by defendant LPN Wallace. The Nurse Notes completed by defendant Bargky identified his name as "William Wesley", despite the booking information which gave his name as "Goetzee, William W." This error regarding his name persisted through his hospitalization at University and when he returned to the jail, causing confusion and inconsistencies in his medical treatment. He

19

was described as semi-alert, with bizarre behavior, a loud speech pattern and unclear thought processes and judgment/insight. He is also described as verbalizing "inappropriately".

33.    Upon admission to University hospital, he was diagnosed as suffering from acute psychosis, rhabdomyolysis, hypertension, chest pain and hypokalemia. He was found to have suicidal ideation and auditory and visual hallucinations. It was noted that his behavior and speech were bizarre. He was given an i.v. of Ativan, which sedated him. He was transferred to a medical floor to address his medical condition. He was also the subject of an emergency commitment, a 72 hour PEC (Physician's Emergency Commitment) due to his obvious psychotic and suicidal state.

34.    On August 4, 2011, a psychiatric consultation was performed at University hospital. At that time Mr. Goetzee told the University psychiatrist that, on August 2, 2011, he had grabbed the gun of the federal officer at the courthouse, with the intention to commit suicide so that "China will stop reading his thoughts." He stated that "he feels China has the technology to read his thoughts and that suicide was the only way to make them stop." He was positive for suicidal ideation but denied having a plan. It was noted that he "laughs inappropriately". He reported that his work was stressful, that he was suffering from chronic insomnia and that he believed that sleep deprivation had put him into a "manic and psychotic state." He is described as being "acutely psychotic with anxiety stemming from paranoia". He was reported as having a GAF (Global Assessment of Functioning) score of 20. He was medicated with

20

Risperdal, Vistaril for anxiety and Lisinipril for blood pressure.

35.    On August 4, 2011, University hospital personnel requested an examination by a representative of the Coroner's office to determine whether Mr. Goetzee should be committed by the Coroner for an additional 14 days. He was discharged from University Hospital on August 5, 2011, before the Coroner's office had the opportunity to examine him.

36.    Shortly after midnight, on August 5, 2011. Mr. Goetzee became agitated and pulled out the catheter and grabbed at a nurse. He was found, upon examination, to be disoriented and trying to get out of bed, despite being handcuffed to the bed. He was placed in 4 point restraints and given Ativan as a sedative. The restraints were discontinued at 6:50 A.M. as he was "sleeping peacefully". When he was interviewed by a psychiatrist later that morning, he stated that he "didn't want to be tortured when he died" and was not able to answer questions logically. It was noted that he remained on the Risperdal and Visteril but still had "intermittent agitation" . At 1335 (1:35 pm) it was noted that he "remains delusional" . It was also noted that he was showing "gradual improvement" on his current medication.

37.    On August 5, 2011, University discharged him to the care of defendant Dr. Higgins, with recommended prescribed medications of Risperdal, Visteril and Lisinipril, all medications which he been receiving at University.

38.    Mr. Goetzee was still very ill and delusional when transferred, on Friday afternoon, August 5, 2011,  to the jail from University hospital. His diagnosis upon

21

transfer to the jail was: (1) Psychosis NOS (2) Rhabdomyolysis-mild (3) HTN (hypertension) (4) Chest Pain (5) Hypokalemia and (6) Macrocylic Anemia. The discharge papers from University hospital stated "Needs Psych Follow Up ASAP". Recommended treatment was Risperdal, Lisinopril and Vistaril. These recommendations were duly noted in the OPP Medical Department records. However, immediately upon arriving back at the jail, these recommendations were disregarded. The prescription for Vistaril, the anti-anxiety medication, was discontinued with no explanation. The last time Mr. Goetzee received it was at 2:00 pm on August 5, 2011, at University, shortly before being transferred back to the jail. It had been prescribed at University for three times a day and as needed. Instead, the defendants withheld this medication from Mr. Goetzee, despite his diagnosis, condition and the obvious need for continuity of care. No anti-anxiety medication was prescribed by the defendants or given to Mr. Goetzee from the time he arrived at the jail until he died. Meanwhile, Mr. Goetzee remained in a state of acute psychosis, delusion, paranoia and suicidal ideation, without adequate or appropriate care or medication.

39. On information and belief, the defendants, and especially defendant Higgins, have a policy and practice of withholding and not prescribing anti-anxiety medications for persons in custody, even when the need for the medication is clearly evident, is medically indicated and when it has been prescribed by the inmate's treating physician. On information and belief, defendants knew, must have known or should have known that it would cause detrimental effects upon an individual in Mr. Goetzee's

22

condition, to deprive him of medication which would help to calm him and provide some relief from his acute anxiety, particularly given the conditions in which he was confined. On information and belief, the defendants were involved with and/or aware of the general policies and practices in this regard as well as the decision to deprive Mr. Goetzee of the recommended anti-anxiety medication or any other similar, anti-anxiety medication or treatment. The defendants knew, must have known, or should have known that withholding anti-anxiety medication could cause undue suffering, trauma and serious harm to a patient in Mr. Goetzee's situation.

40.    Defendants as well as other staff and employees of the OPSO not named herein but acting in the course and scope of their employment, also knew, must have known, or should have known that the facilities, staff and operations at HOD were grossly inadequate and incapable of adequately, properly or humanely providing reasonable accommodations, adequate treatment, monitoring or care for Mr. Goetzee, especially on a weekend when staffing and supervision were minimal, and that there was a serious risk of harm or self-harm to accept him back into the jail in his condition. The defendants knew, must have known or should have known that he would be placed in a barren cell and hostile environment on HOD-10, which was not a therapeutic or appropriate placement for an acutely psychotic, suicidal individual in Mr. Goetzee's situation. The defendants knew, must have known or should have known that he would more likely than not be required to sit and sleep on the floor, without any of the basic comforts provided in a hospital, such as a bed, covers, appropriate clothing, and

23

appropriate medical attention.  The defendants knew, must have known, or should have known, that the HOD-10 lacked the capacity to provide appropriate medications, such as Ativan or any other similar sedatives via i.v., treatment which he had received in the hospital when he became disoriented and needed sedation.

41.     The defendants also knew, must have known or should have known that there was a problem with the air conditioning on the 10th floor, in August, and that the physical conditions would be challenging, uncomfortable and difficult, particularly for an individual who was actively delusional, psychotic and suicidal.

42.     The defendants also knew, must have known, or should have known, that, while confined on HOD-10, Mr. Goetzee would not have access to a telephone or to visits from attorneys or others, particularly over the weekend, and that he would basically be held in isolation and incommunicado from friends, family, loved ones and professional, legal and spiritual advisors. They also knew, must have known or should have known that, more likely than not, Mr. Goetzee would be stripped of his clothing and made to wear a "suicide smock" or "turtle suit" as it was sometimes called, as a suicide prevention method, an ordeal that Mr. Goetzee would not be subject to had he remained in the hospital for his care. Nevertheless, the defendants re-admitted Mr. Goetzee to the jail, and sent him to HOD-10, stripped also of anti-anxiety medication to help him through this ordeal.

43.     Defendant nurses also knew, must have known or should have known, that the conditions under which a suicidal and psychotic patient like Mr. Goetzee would

24

be held on HOD-10, were not conducive to appropriate or adequate medical or nursing care or treatment for a person in his condition and were not a reasonable accommodation for his disability. Defendant nurses knew, must have known or should have known that the anti-anxiety medication prescribed at University Hospital had been discontinued by the doctors at the jail. They knew, must have known, or should have known that HOD-10 was not adequately staffed or supervised. They also knew, must have known or should have known that the conditions under which Mr. Goetzee were being held were not therapeutic and would in fact exacerbate and worsen his condition, and contribute to the severe feelings of isolation and despair that he was experiencing. Defendant nurses knew, must have known , or should have known that, unlike at the hospital, suicide monitoring was not conducted by licensed health care professionals but by security guards. The nurses knew, must have known, or should have known that compliance by deputies with orders for direct, continuous monitoring and observation by correctional staff of suicidal patients on the 10th floor of HOD, was inconsistent and was frequently completely lacking or absent. Defendant nurses violated their ethical and professional duties and standards of care by failing to report, intervene or take appropriate or necessary measures to insure that Mr. Goetzee's treatment would be adequate, humane and appropriate for his condition and his situation.

44.     Nevertheless, when Mr. Goetzee was brought back to the jail, he was accepted and admitted to the jail, as per instructions from defendant Dr. Dileo and defendant S. Pembo, despite the fact that Dr. Dileo and Nurse Pembo knew that he

25

remained positive for suicidal ideation and was not responsive to questions. On information and belief, Dr. Dileo and Nurse Pembo failed to take necessary and appropriate steps to obtain more information about Mr. Goetzee's condition or the circumstances of his hospitalization at University Hospital. They failed to request or review the mental health assessments which were performed at University hospital or related records. There is also no indication that the August 2, 2011 jail medical intake records were reviewed or the computer checked for medications. Documentation regarding the appropriateness of Mr. Goetzee's re-admission to the jail from the hospital, as handled by defendants and other staff at the jail, was sparse, inadequate and lackadaisical, reflecting a lack of care and professional responsibility regarding the seriousness of Mr. Goetzee's condition. This same attitude persisted throughout Mr. Goetzee's tragic confinement at the jail, reflected even in the persistent disregard for his correct name and his allergy to prednisone.

45.     Defendant S. Batiste, an LPN, performed the first "Medical Assessment: Suicide Watch" by trained medical personnel of Mr. Goetzee on August 5, 2011 at 2000 (8:00 pm), hours after his re-admission to the jail. Mr. Goetzee was reported to be "lying on the floor in uniform". He is described as positive for suicidal ideation though no description or other information is provided. Nevertheless, she described his comfort level as "fair". No vital signs were taken, despite the fact that he was recently discharged from the hospital with hypertension and rhabdomyolysis. There is no documentation of any comfort care or any effort to provide him with

26

encouragement or therapeutic support. There is no indication that defendant Batiste took any steps to intervene or to inform any appropriate authorities that the conditions under which Mr. Goetzee was being held were unacceptable and medically contra-indicated for a person in Mr. Goetzee's condition and mental state. Nor did she attempt any intervention during the entire period of time for which she was responsible for his care.  Her conduct in this regard was mirrored by the actions of the other LPN's involved in Mr. Goetzee's "care" at the jail.

46.    Precisely two hours later, at 2200, (10 pm) Defendant S. Batiste reported that Mr. Goetzee was "lying on floor eyes open to verbal stimuli". He was positive for suicidal ideation. He was "alert, orient and awake". His "comfort level" was described as "fair". There was no documentation of any therapeutic interventions. No vital signs were taken.

47.    Precisely four hours later, at 0200, ( 2 a.m.) defendant S. Batiste reported again on Mr. Goetzee. At this time she failed to give any description of Mr. Goetzee's appearance. She reported that he still had suicidal ideation, was oriented and that his comfort level was  "fair." There was no indication of any therapeutic intervention. No vital signs were taken

48.    Precisely three hours later, at 0500, ( 5 a.m.) defendant S. Batiste described Mr. Goetzee's appearance as "lying on the floor awake talking to himself". He had suicidal ideation. He was alert. His comfort level was "WNL" (within normal limits).. For the first time there was an "additional comment": "I/M (inmate) moaning stating he

27

wants to die". Again, there was no indication of any therapeutic intervention by defendant nurse S. Batiste. No vital signs were taken.

49. There was no indication in any of defendant Batiste's notes or indeed of any of the nurse defendants who later performed similar functions, of the presence of any correctional officers who were supposed to be monitoring Mr. Goetzee, or that any of the nurses reviewed any of the observation records which were supposedly being filled out by the deputies on a continuous basis, every 15 minutes, regarding Mr. Goetzee's condition.

50. On August 6 at 0602 am, defendant Dr. Higgins conducted an "Initial Psychiatric Evaluation" of Mr. Goetzee at which time Dr. Higgins noted that Mr. Goetzee was suicidal, that he had come to the jail from University, where he had been treated for "delirium vs psychosis". He was aware that Mr. Goetzee had previously been on anti-anxiety and anti-insomnia medication. Despite this information, he did not prescribe any medication to Mr. Goetzee to treat either his anxiety or insomnia and discontinued the anti-anxiety medication, Vistaril, which Mr. Goetzee had been prescribed at the hospital. Dr. Higgin's "Psychiatric Treatment Plan" was to continue Mr. Goetzee on Risperdal and to place him on the "Mental health tier", under "watch" with "direct observation" and a "suicide smock" and to follow up the next day.

51. Dr. Higgins knew, must have known or should have known that Mr. Goetzee was at serious risk of suicide. He knew, must have known, or should have known that the monitoring and assessments that Mr. Goetzee would receive on HOD-

28

10, particularly on a weekend, would be of poor quality, with superficial and incomplete accounts, erratic documentation and no therapy or comfort care. He knew, must have known or should have known that the staffing, facilities, housing conditions, and the type and quality of care which Mr. Goetzee would receive at the jail would be inadequate for his needs and significantly deficient compared to treatment he would receive in a hospital. He knew, must have known or should have known that the jail was not an appropriate place for Mr. Goetzee, given his condition and his disability.   Dr. Higgins knew, must have known or should have known of a number of other deaths by suicide of mentally ill patients at the jail, and at HOD-10, which were related to inadequate care, treatment and monitoring. In a number of instances, those prisoners who committed suicide or who died on HOD-10 were under Dr. Higgins care.   Yet he made no effort to return Mr. Goetzee to the hospital for appropriate care. He gave no orders to increase the frequency or improve the quality of Mr. Goetzee's medical assessments  or to insure that medical and correctional staff would be vigilant in observing and monitoring Mr. Goetzee. He gave no orders to monitor Mr. Goetzee's vital signs though he knew, must have known or should have known that he had recently been released from the hospital with hypertension and rhabdomyolosis and that untreated anxiety can trigger panic attacks which can be manifested in increases in blood pressure, heart rate and pulse rate.  He made no effort to obtain the psychiatric consults and records from University hospital, which would have provided important information as to Mr. Goetzee's condition.  He knew the jail could not provide necessary

29

and appropriate care for Mr. Goetzee and that the standard of care at the jail for mentally ill, suicidal patients was not consistent with the standard of care in the community yet he failed to take any appropriate measures to address this problem.

52.    On August 6, 2011, at 0715 am, defendant E. Bargky, who had been involved with the transfer of Mr. Goetzee to University hospital on August 3, 2011 to "rule out delirium", reportedly conducted a "Medical Assessment: Suicide Watch" assessment of Mr. Goetzee while Mr. Goetzee remained in a cell on HOD-10.  Mr. Goetzee was reported to be "awake, sitting on the floor". He is described as positive for suicidal ideation though no description or other information is provided. Nevertheless, his comfort level is "fair". As with all of defendant Bargky's "assessments" of Mr. Goetzee, no vital signs were taken. There is no documentation of any comfort care or any effort to provide him with encouragement or therapeutic support. There is no indication that defendant Bargky took any steps to intervene or to inform any appropriate authorities that the conditions under which Mr. Goetzee were being held were unacceptable and medically contra-indicated for a person in Mr. Goetzee's condition and mental state. Nor did she attempt any intervention during the weekend when she was responsible for his care.

53.    According to OPSO records, Defendant Bargky conducted an assessment at 1615 (4:15 pm) where Mr. Goetzee was "awake, standing at the gate". She failed to document whether or not he was continuing to experience suicidal ideation. He was reported, however, to be oriented, with no complaints voiced.

30

Defendant Bargky reportedly did another assessment at some undocumented time on August 6, 2011, where Mr. Goetzee was reported to be "awake, standing at the gate". At that unknown time, according to defendant Bargky, Mr. Goetzee did not have suicidal ideation, although there is no description of his behavior or further information given to substantiate that assessment. There was no assessment of his "LOC" (Level of Consciousness) while his comfort level was reported as "fair" with no complaints "voiced". Again, no vitals were taken.

54.     Defendant David Schaible, the nurse who was on duty at HOD-10 on "night shift" on August 6-7, 2011, apparently prepared his "suicide watch assessments" on a computer, as they are neatly typed and printed out, covering four entries beginning on 8/6/11 at 21:00 (9:00 pm) and continuing on 8/7/11 at 00:01 am, 3:00 am and 6:00 am. All four reports are identical, with no comments, no descriptions, no information except that apparently Mr. Goetzee was in the cell, his appearance was "NADN" (No apparent distress noted), he was suicidal, he was oriented X 3, he voiced "no complaints" end his comfort level was "okay". There is no documentation of what Mr. Goetzee was saying or doing. Vital signs were not recorded.

55.     Every defendant nurse who checked on Mr. Goetzee from August 5-7, 2011, over a 48-hour period, reported thet he was awake everytime he was checked. However, there is no inquiry made by any of them as to whether he was suffering from insomnia, which he had reported to Dr. Higgins as a chronic problem, and no treatment or intervention was provided to enable him to get some sleep. The defendant nurses

31

and Dr. Higgins knew, must heve known, or should have known that Mr. Goetzee had a history of insomnia, and had previously taken anti-insomnia medication, which was not currently being prescribed or given to him at the jail. The defendant nurses and Dr. Higgins knew, must have known or should have known that chronic lack of sleep can have a serious impact on an individual's judgment, thought processes and mental status, yet nothing was done for Mr. Goetzee to provide relief or treatment for this serious condition.

56. There is no documentation of any efforts by any of the nurse defendants to seek additional medical intervention or medications for Mr. Goetzee during this entire time. There is no documentation that he was offered any comfort care or that there were any efforts to provide him with encouragement or therapeutic support. There is no indication that any of the nurse defendants or any other staff at the jail took any steps to intervene or to inform any appropriate authorities that the conditions under which Mr. Goetzee were being held were unacceptable and medically contra-indicated for a person in Mr. Goetzee's condition and mental state. The nurses also failed to provide adequate documentation regarding Mr. Goetzee's condition and behavior.

57. There is no indication on any of defendant nurses' reports that any supervisor ever checked their reports or participated in or reviewed the monitoring of Mr. Goetzee during the time he was confined at the jail. Defendant Daryl Jackson, the Director of Nursing, was responsible to insure adequate training and supervision of nursing staff and failed to do so. Defendants Jose Ham and Mary Ann Benitez were

32

responsible to do quality control and to review medical charts and to see that nurses were properly performing their duties consistent with professional standards and the standard of care in this community. They failed to do so.

58.    Defendants Dr. Gore and Dr. Higgins, as the medical and psychiatric directors at the jail, respectively, each had responsibility for training, supervising and overseeing the services provided by medical staff including nurses, as well as correctional officers assigned to HOD-10. All of the defendants who were in supervisory positions with oversight responsibilities failed to properly carry out their responsibilities.

59.    On information and belief, none of the OPSO nursing or medical staff, including the defendants, were disciplined for their acts or omissions regarding the events described herein.

60.    On Sunday, August 7, 2011, defendant Nurse Bargky resumed "suicide watch" for Mr. Goetzee. At 0800 (8 am) and over six hours later at 1410 (2:10 pm) defendant Bargky reported that Mr. Goetzee was "awake, sitting on the floor". At 0800 he is reported as having suicidal ideation, with no further information as to how that condition manifested itself, while at 1410 (2:10 pm) he had no suicidal ideation, again with no explanation reported. There is also no explanation for the six-hour delay between assessments.

61.    At 2:20 pm, 10 minutes after defendant Bargky reported that Mr. Goetzee no longer had suicidal ideation, he was evaluated by defendant C. Johnson, FNP, who, as a nurse practitioner, had more training, a higher level of professional

33

licensing and more responsibility than the LPNs. For the first time in over 24 hours, there is a minimal narrative account of what Mr. Goetzee is saying: "states he 'has things he hears in his head that may convince him to harm himself'. The "Impression/Assessment & Plan" is "suicide assessment" which, on information and belief, is to continue what had been going on already. For "medications" defendant Johnson ordered "continue suicidal direct observation with smock." She failed to prescribe or recommend any anti-anxiety, anti-insomnia, or other medication. There is no documentation that Mr. Goetzee was offered any comfort care or that there were any efforts to provide him with encouragement or therapeutic support. There is no indication that defendant Johnson took any steps to intervene or to inform any appropriate authorities that the conditions under which Mr. Goetzee were being held were unacceptable and medically contra-indicated for a person in Mr. Goetzee's condition and mental state. Instead, she merely ordered that he be followed up the next day by Dr. Higgins, for him to conduct another "eval suicidal assessment."

62.    At 1615 (4:15 pm) defendant Bargky documented that Mr. Goetzee was "awake standing at the cell gate" and once again he was reported by defendant nurse Bargky as having "no" suicidal ideation. There is no documentation of any therapeutic intervention, care, or treatment for Mr. Goetzee.

63.    Approximately 2 hours and 15 minutes later, at about 1836 (6:36 pm), deputies were informed, on information and belief by another inmate, that Mr. Goetzee was on the floor of his cell, unresponsive. Deputies informed defendant nurse Bargky,

34

and a "code" was called, and resuscitation efforts were initiated. During resuscitation efforts it was discovered that Mr. Goetzee had toilet tissue stuffed down his throat, blocking his airway.  On information and belief, Mr. Goetzee had been given access to toilet paper, which was not otherwise provided in his cell, by OPP staff, including defendant nurses and deputies, which allowed him to collect a sufficient quantity of the paper so as to kill himself.

64.     Placing a prisoner on "Direct observation" under "Suicide watch" at HOD-10 required that the patient would be under continuous, direct supervision at all times. On August 7, 2011, defendant former deputy William Thompson was assigned to perform "direct observation" of William Goetzee. Deputy Thompson was to sit in a chair, outside Mr. Goetzee's cell, and watch him. He was to fill out, every fifteen minutes, an observation sheet of Mr. Goetzee's behavior and activities.

65.     The OPSO suicide watch procedures, using a checklist filled out by deputies, is a poorly designed, inadequately monitored procedure which fails to ensure adequate observation of suicidal prisoners and which facilitates the entry of false and/or misleading information.  The defendants knew, must have known, or should have known that the practice of deputies failing to maintain direct, continuous observation of suicidal prisoners was widespread, as was falsification of these checklists.  Yet the defendants failed to take appropriate or necessary steps to intervene or to ensure that direct, continuous observation by qualified, medically trained staff, with accurate and meaningful documentation of suicidal prisoners took place. In addition, medical

35

personnel were not required to review these documents, they were not routinely made a part of the prisoners' medical records and as e result, there was no effective monitoring program to ensure accurate and truthful documentation relevant to the diegnosis and treatment of prisoners on "direct observation suicide watch".

66.     Defendants knew, must have known or should have known that the monitoring of Mr. Goetzee for August 5-7, 2011, was not being properly performed, documented or reviewed, yet failed to report or intervene. Defendant former deputy William Thompson was assigned on August 7, 2011, to provide continuous, direct monitoring of Mr. Goetzee.  Defendant deputies Williams and Crader were also assigned to HOD-10 on August 7, 2011.  Deputy Thompson showed up late for his assignment and left his post on at least three different occasions. On one occasion he was with defendant deputy Williams, assisting with "feed-up". Defendant deputies Williams and Crader knew, must have known or should have known that defendant Thompson had abandoned his post to directly and continuously observe Mr. Goetzee, yet they failed to teke any action to report that abandonment or to take appropriate steps to ensure that Mr. Goetzee was being observed at all times.  In addition, defendant Thompson left his post to go to the restroom, without having anyone fill his place, a practice that was common and known to be common among OPSO staff who worked at HOD, including deputies, nurses, doctors, supervisors, watch commanders and the warden.

67.     Defendant Thompson also left his required duties to provide direct,

36

continuous observation of Mr. Goetzee, for a period of time of approximately 2-3 hours, complaining that it was "too hot" to maintain his assigned post. During that time, on information and belief, defendant Thompson was visiting and/or napping in the nurse's office. Defendant Bargky, other defendants and OPSO staff, were aware that defendant Thompson was "hanging out" in the air conditioned nurses' office and that he had abandoned his post. Despite this flagrant act, no defendants or any other OPSO staff who were aware of defendant Thompson's actions, reported him or intervened in any way to insure that direct, continuous observation of Mr. Goetzee would be maintained.

68.    In addition, supervisor Sgt. Nicole Harris and Assistant Watch Commander Sgt. Everrett Marshall knew, must have known or should have known that, on August 7, 2011, defendant Deputy Thompson was derelict in his duties and was not at his post on the 10th floor directly observing Mr. Goetzee on a continuous basis. On information and belief, the morning of August 7, 2011, Sgt. Harris telephoned the 10th floor to check on defendant Thompson. He was not at his post, which was confirmed by Deputy Crader. Deputy Crader knew, must have known or should have known, that defendant Thompson was not at his post yet she failed to intervene or report it. Sgt. Harris located defendant Thompson and told him to return to his post. On information and belief, Sgt. Harris had previously had problems with defendant Thompson failing to perform his duties as he was instructed. She knew, must have known or should have known that defendant Thompson was unreliable and that he himself required close monitoring and supervision to ensure that he was properly performing his duties. On information and

37

belief, defendant Sgt. Marshall was also aware of the problems regarding defendant Thompson. Defendants Sgt. Harris and Sgt. Marshall failed to properly supervise and monitor defendant Thompson's behavior or to take appropriate disciplinary action against him. It was during defendant Thompson's absence from duty on August 7, 2011, that Mr. Goetzee killed himself.

69.     On information and belief, the practice of deputies abandoning the assigned post of direct, continuous observation of suicidal prisoners on HOD-10, was widespread and customary and was known, must have been known or should have been known by the defendants herein, as well as other OPSO staff. The defendants knew, must have known or should have known that any reasonable evaluation of staffing levels and job duties at HOD-10 would reveal that it would be highly unlikely that direct, continuous observation of prisoners on suicide watch at HOD-10 could be sustained.

70.     On June 15, 2012, defendant former deputy William Thompson pled guilty in Orleans Parish Criminal District Court to one felony count of malfeasance, a violation of La. R.S. 14:134, for violating his duty to maintain direct, continuous observation of William Goetzee on August 7, 2011, and for falsifying OPSO direct observation records. At all relevant times he was acting in the course and scope of his employment as a deputy sheriff with the Orleans Parish Sheriff's Office and defendant Sheriff Gusman is vicariously liable for his acts and omissions.

71.     In addition, defendants HOD Warden Carlos Louque, HOD Watch

38

Commanders John Does I and II, Assistant Watch Commander Sgt. Everett Marshall and Sgt. Nicole Harris, immediate supervisor of defendant former deputy William Thompson, all had supervisory responsibilities relating to defendant Thompson and failed to properly exercise those responsibilities.

72.    During the time Mr. Goetzee was held at HOD-10, he was essentially held incommunicado. There was no telephone in his cell and he had no access to a phone to make calls. He was denied visits by his attorney and the Coast Guard chaplain. No medical or security personnel intervened with him in any meaningful or medically appropriate way to adequately assess his physical condition or mental status. His anti-anxiety medication was taken away and he was not prescribed anything for anxiety or insomnia. He was even denied a bed, and the most basic comforts and therapeutic interventions, such as soothing.

73.    Prior to his death, William Goetzee endured significant pre-death physical, mental and emotional pain and suffering, anxiety, pain and terror due to the actions and omissions of the defendants as described herein.

74.    The defendants knew, must have known or should have known that OPP had a history of serious injuries and deaths of prisoners due to the lack of adequate medical and correctional treatment and care of prisoners suffering from an acute mental health crises and suicidal ideation. As with Mr. Goetzee, OPSO staff failed to take appropriate or necessary action with regard to these prisoners, resulting in their deaths, serious injuries and/or suffering, as described below:

39

1.  On March 27, 1995, in the case entitled William P. DeMouy, Sr., v Foti, Docket No. 94-423, the prisoner survived but judgment was entered against then-Orleans Parish Criminal Sheriff Charles C. Foti, Jr. and a deputy for improper monitoring and inadequate care of a suicidal prisoner placed in 5 point restraints on the psych floor of the OPCSO.

2.  On Nov. 29, 1996, Regie S. Hargrove, an inmate who was supposedly being monitored for suicide, hung himself with a bed sheet in a cell which was out of the line of vision of the nurses and deputies stations and which had numerous "anchor" or "tie-off" points.  Mr. Hargrove had also been the subject of improper use of restraints and inadequate monitoring and care while in restraints.

3.  On August 10, 2001, Shawn Duncan Sr., an arrestee charged with DWI, reckless driving and other traffic offenses, who was alleged to have suicidal/homicidal ideation, died of dehydration on HOD-10 after having been in 5 point restraints for 42 hours and given inadequate food, water and medical care to sustain life.

4.  On April 3, 2004, Matthew Bonnette, a young man who was arrested after a car accident, professed suicidal ideation, was placed in 4-point restraints and was on "suicide watch". On April 4, 2004, while in 4-point restraints, Mr. Bonnette hanged himself on HOD-10, using the 5-point restraint belt which had been left in his cell, after deputies failed to consistently monitor him.

5.  On August 29, 2007, Julio Sortes hanged himself with a telephone cord in his cell.  There is no evidence that he was referred for a psychiatric assessment or treated for his illness.

6.  On October 3, 2008, Louis Prince was found dead in his cell on HOD-10.  Mr. Prince had been arrested in New Orleans on September 26, 2008 and had been held on the sixth floor of HOD.  Even after reports of escalating bizarre behavior, Mr. Prince was never placed on suicide watch, and he ultimately hung himself in his cell on October 3, 2008.

40

7.    On January 5, 2009, Cayne Miceli, a 43-year-old woman with a history of asthma, panic attacks and depression, died on HOD-10 as a result of being tied down in 5-point restraints for over four hours and being denied medication and appropriate treatment.

8.    On or about July 18, 2010, Jose Nelson Reyes Zelaya committed suicide at OPP.

9.    On or about June 8, 2011, an ICE (Immigration) detainee whose name is unknown at this time, committed suicide at the jail.

75.    The deliberate indifference of defendants to the serious medical needs of prisoners at OPP is also reflected in the failure of defendants to provide adequate medical and correctional care of arrestees at intake, including inadequate screening, assessment, monitoring and treatment. The failure of defendants to provide adequate medical treatment during the intake process resulted in serious injury and death in the following incidents:

1.    On January 12, 2009, John Sanchez was found dead in an isolation cell after being booked into the jail in an extremely intoxicated state.  Despite the potential for fatal medical complications associated with alcohol withdrawal, Mr. Sanchez was inadequately monitored, diagnosed or treated.

2.    On February 6, 2009, Richard Rowzee was not adequately assessed when he entered the jail and  was booked into the jail despite significant medical problems in part related to alcohol withdrawal.  Deputies reported to the medical department that he was attempting to kill himself and was beating himself against the wall.  By the time the medical department intervened, Mr. Rowzee had given himself a black eye.  Ultimately, Mr. Rowzee was routed to University, where he died, because of potential brain injury and complications from delirium tremens.

3.    On April 16, 2010, 32-year-old Michael Hitzman, was in the intake and processing center, being booked, when he

41

informed OPSO staff that he had ingested drugs. He was treated with charcoal and placed in isolation where he was not properly monitored and hung himself.

76. At the time of the admission and retention of William Goetzee in the Orleans Parish jail, the defendants knew, must have known or should have known of serious deficiencies in the policies, practices and procedures at the jail related to medical and psychiatric screening on intake and on HDD-10 for the treatment, care and observation of prisoners who were in need of mental health care and those being monitored for suicide prevention. Defendants were also well aware of the inadequate staffing and inadequate training and supervision of medical and correctional staff with regard to medical and psychiatric problems of prisoners. Despite their knowledge of these serious deficiencies, the defendants failed to take appropriate actions to make necessary changes to policies, procedures, training, supervision or staffing or to intervene to see that Mr. Goetzee and others in their custody, were provided with adequate care and treatment for serious medical needs.

77. On information and belief, defendants herein have been involved in other incidents involving inadequate care and treatment for prisoners with serious medical needs, which resulted in serious harm, injury, suffering and/or death to inmates in their care. Yet none of these defendants, nor other OPSO staff who were similarly derelict in their duties, were appropriately disciplined or held accountable for their acts or omissions. In addition, those responsible for training and supervising OPSO staff who have failed in their own responsibilities to provide adequate care to prisoners, have not

42

themselves been subject to disciplinary action or accountability for failing their supervisory and/or training responsibilities. On information and belief, other than defendant former deputy William Thompson, no OPSO staff were disciplined or held accountable for the mistreatment and lack of adequate care for Mr Goetzee as described herein.

78. Defendant Gusman, Orleans Parish Sheriff, at all relevant times herein knew, must have known or should have known of these serious deficiencies yet failed to take necessary or appropriate actions to address and correct them.

79. On October 10, 2008, a report was submitted to defendant Sheriff Marlin Gusman entitled "An Operational Review of the Orleans Parish Jail" funded by the National Institute of Corrections. This report documented significant, pervasive and serious problems at the jail relating to the lack of adequate and trained staff, the poor quality of the physical facilities (including HOD) and poor staff-inmate relations. The report also found "the mental health program in the jails is dramatically understaffed and the program is much too limited in scope". At the time of that report, the jail had experienced only one suicide in the three years since Katrina. The jail also had a substantially smaller population during that time. Since that time, on information and belief, there have now been at least 6 known suicides, a marked increase since the NIC report was completed. On information and belief, Sheriff Gusman receives reports regarding each suicide that occurs in the jail and knew, must have known or should have known, of the number and problematic circumstances of suicides at the jail The

43

NIC report also reported that the jail lacked adequate therapeutic services for mentally ill prisoners. The report recommended that prisoners who are "deemed actively suicidal should be refused intake, and the police should transport them directly to Charity Hospital, per policy".

80.     On September 11, 2009, the U.S. Department of Justice, Civil Rights Division, issued a "findings letter" addressed to defendant, Sheriff Marlin Gusman regarding the Orleans Parish Prison system. The Department of Justice, after conducting an investigation for approximately 18 months, found that "OPP fails to provide inmates with adequate mental health care that complies with constitutional standards." The Department of Justice found that the following deficiencies existed:

        a.  Inadequate suicide prevention;

        b.  Inadequate intake and referral process;

        c.  Inadequate staffing;

        d.  Inadequate assessment and treatment; and

        e.  Inadequate quality assurance review.

81.     In addition, the Department of Justice findings letter of September 11, 2009 found that "suicide prevention practices" at OPP were grossly inadequate. The Department of Justice found that the OPP suicide prevention policy requiring direct observation by staff practices deviated from generally accepted standards and that the actual practice deviated from the stated policy. The Department of Justice also found that there were "an alarmingly high number of inmates with mental health issues,

including past mental health treatment, history of suicidal behavior attempts and/or being on psychotropic medications, who consistently were not referred to mental health service providers at Intake. The Department of Justice noted that "inmates who were not timely referred remained untreated and have suffered from a worsening of their symptoms, including suicidal and homicidal ideation".

82.     The Department of Justice September 11, 2009 findings letter also stated that "OPP fails to employ sufficient mental health staff to insure that inmates receive adequate services". In addition, the report found that "OPP fails to appropriately and timely assess and treat inmates with mental illness". The Department of Justice also found that the failure of the OPP to have multi-disciplinary treatment teams contributed to the failure of the mental health program to meet general accepted professional standards.   In addition, the DOJ investigation revealed a "lack of attention to past mental health information and a failure to provide timely psychiatric assessment and treatment. These failures are inconsistent with generally accepted professional standards and resulted in mental health deterioration and unnecessary suffering".

83.   The Department of Justice September 11, 2009 findings letter also found that "OPP fails to engage in consistent, effective quality assurance review in order to monitor and assess the quality of mental health offered at the facility".

84.     The defendants were aware of these findings by the National Institute of Corrections and the Department of Justice. However, the defendants, and in particular defendants Gusman, Dr. Gore and Dr. Higgins, failed to take necessary and appropriate

45

actions to address these issues or to insure that the mental health services at the Orleans Parish jail conformed with community standards and constitutional standards.

85.     On April 23, 2012, the Department of Justice issued a second findings letter, based on an on-going and renewed investigation of the Orleans Parish jail and documented continued serious constitutional violations and policies and practices which violated generally accepted standards of care with regard to the provision of medical and  mental health services at the Orleans Parish Prison.

86.     In the April 23, 2012 findings letter the Department of Justice found that "suicide prevention measures at OPP are grossly inadequate, resulting in unnecessary suffering, and very likely leading to at least 5 suicides since our findings letter in 2009. The jail has inadequate mechanisms to identify suicidal prisoners, inadequate treatment and staffing and poor training of officers. The Department of Justice found that prisoners at OPP identified as being at risk of self-harm were subjected to inhumane treatment.

87.     In its April 23, 2012 findings letter, the Department of Justice found that "the Orleans Parish Prison is deliberately indifferent to prisoners with serious medical and mental health needs.  The jail has inadequate mechanisms to identify prisoners with mental illness and too few  treatment staff to address urgent and chronic conditions".  The Department of Justice also found that as a result of the policies and practices of the Orleans Parish Prison, prisoners suffered during their incarceration and were returned to the community, in far too many cases, sicker and less equipped to avoid future involvement with the criminal justice system than when they entered.

46

88.    The findings of the Department of Justice in April, 2012, were consistent with the findings in Sept., 2009, that the operations of the Orleans Parish jail were deliberately indifferent to the risk of serious harm to prisoners who were seriously mentally ill and suicidal. The Department of Justice findings letters of April 23, 2012, found that in two of the five completed suicides which had occurred since 2009, "deficient monitoring contributed to the prisoners suicides".

89.    The Department of Justice also found, in the April 23, 2012 findings letter, that the practice of "placing suicidal prisoners in a "turtle suit" and placing them in a cell with no toilet, beds, blankets, sink or telephone, constituted inhumane conditions which would exacerbate mental illness. In addition, the Department of Justice found that "once prisoners were placed on suicide watch, the mental health evaluations were cursory and rarely addressed suicide risk issues". The findings letter also concluded that "prisoners did not receive meaningful treatment, aside from being medicated and monitored".

90.    The Department of Justice findings on April 23, 2012 found that "OPP fails to adequately monitor its prisoners on suicide watch". The Department of Justice observed and found clear violations of the defendants' own policies with regard to direct observation of prisoners on suicide watch.

91.    The conclusion of the Department of Justice in April, 2012, after having investigated the OPP facility for over a three year period, which included the time period when Mr.Goetzee was confined at the jail, was that OPP continued to lack the

47

appropriate staffing structure to provide constitutionally adequate mental health care. "OPP's mental health services continue to be deficient in the following areas: (1) evaluation and screening; (2) staffing; (3) assessment and treatment; (4) treatment planning; and (5) quality assurance review. These deficient OPP practices cause prisoners serious harm and create an unreasonable risk of harm."

92.    Defendants Gusman, Gore and Higgins knew, must have known or should have known of these deficient conditions yet they failed to take adequate steps to insure that appropriate and necessary changes in policies, procedures, staffing, training and/or facilities were taken in order to provide adequate care to suicidal and mentally ill patients on HOD-10, and on admission to the jail. These defendants also failed to insure that appropriate supervision and disciplinary action was taken in situations where prisoners suffered or died as the result of inadequate or inappropriate care or treatment by OPSO staff.

93.    The defendants knew, must have known or should have known of the dangers and obvious risk of serious harm to mentally ill and suicidal prisoners at OPP because of inadequate and improper monitoring and care of patients experiencing an acute mental health crisis and on suicide precautions, yet failed to take appropriate and necessary steps to insure that reasonable and adequate care was provided. On information and belief, other than the discipline of defendant William Thompson after the death of Mr. William Goetzee, none of the individuals responsible for the care and safety of Shawn Duncan, Regie Hargrove, William DeMouy, Sr., Matthew Bonnette,

48

Louis Prince, Julio Sotres, Cayne Miceli, Richard Rowzee, John Sanchez, Michael

Hitzman, Jose Nelson Reyes Zelaya, William Goetzee, or any other suicidal prisoners at

OPSO who received inadequate, improper or harmful treatment, were disciplined or

held accountable for their acts or omissions. The defendants ratified or condoned acts

or omissions by OPSO staff which caused serious harm, suffering and death to

prisoners at OPP, and maintained a custom and practice whereby there was no

accountability for OPP staff who mistreated prisoners or who violated policies,

procedures or standards of care for prisoners in need of adequate care for serious

medical needs.

94.    In addition to the reports from the National Institute of Corrections and the

Department of Justice, the defendants were aware of the deficiencies in the physical

facilities and HOD-10 in particular, through the monitoring and oversight of the

psychiatric department of the Orleans Parish jail from 1992 through 2008, by the federal

court in the proceedings entitled Hamilton v Morial, No. 69-2443. Defendants Gusman,

Gore and Higgins were aware, prior to William Goetzee's death, that the physical

facilities in which severely mentally ill and suicidal prisoners were being held, which

included HOD-10, were inadequate, dangerous, un-safe and posed an obvious risk of

serious harm to prisoners held there. They were aware that the cells for confinement of

inmates who were suicidal did not meet acceptable or community standards of care,

that the conditions in which the suicidal prisoners were being held was inhumane and

anti-therapeutic and that these conditions presented an obvious risk of serious harm to

49

mentally ill and suicidal prisoners. Yet defendants continued to accept and house prisoners, such as Mr. Goetzee, whose serious medical needs could not be met under these conditions and in fact, whose mental and medical condition would deteriorate if confined at HOD-10.

95.     Defendants knew, must have known, or should have known, that the standard of care for suicidal patients and those experiencing an acute mental health crisis, could not be met by the policies, procedures, staffing or physical facilities of the OPSO but failed to order or to take appropriate steps to see that Mr. Goetzee or other prisoners in similar situations, were transferred and admitted to a hospital where they could receive appropriate and adequate care in accordance with community standards of care.

96.     On information and belief, there are other instances where prisoners who were mentally ill and suicidal, suffered harm due to inadequate medical care and monitoring by the defendants and other OPSO staff, yet there was little or no accountability, consequence or discipline imposed on said staff.

97     Defendants Dr. Gore, Dr. Higgins, Benitez, Dr. Ham and Jackson were the supervisors and trainers of defendant nurses, and were responsible to properly train and supervise them and to insure that the nurses under their training and supervision gave proper treatment and monitoring of prisoners, including William Goetzee, which they failed to do.

50

98.    Defendants Gusman, Dr. Gore, Dr. Higgins, Benitez, Dr. Ham and Jackson, at all pertinent times herein, were responsible for the hiring, training, supervision and discipline of OPSO medical personnel and were responsible for the policies, procedures and customs of the medical and psychiatric departments and medical personnel of the OPSO, including medical training of correctional staff at HOD-10. They failed to properly or adequately fulfill their responsibilities.

99.    Defendants Dr. Gore, Dr. Higgins, Dr. Dileo, Benitez, Or. Ham and Jackson, were all persons with the responsibility and duty for oversight, review, monitoring, supervision and evaluation of prisoners' medical and psychiatric needs and the policies and procedures governing the provision of adequate medical care. On information and belief, these defendants were also responsible for the training and supervision of medical and correctional staff, which they failed to adequately perform and also failed themselves to provide adequate medical care. They, along with the defendant Sheriff, were also responsible for receiving and reviewing daily and regular reports regarding persons on suicide watch at the jail and of reviewing and correcting any improper, abusive or inadequate treatment of suicidal prisoners, which they failed to do. These defendants also had the responsibility to conduct thorough and reliable mortality reviews of all deaths of prisoners who were in custody of the OPSO in order to take corrective action, as needed, to prevent further deaths, injury and harm, yet they failed to properly fulfill that duty.

51

100.    Defendants deputies Thompson, William and Crader each had the responsibility and duty to properly monitor Mr. Goetzee while he was on suicide watch, and to communicate his medical needs to the appropriate medical staff for treatment. They were also responsible to insure that he was in a safe and secure environment. They each failed their responsibilities as described herein.

101.    Defendants Warden Louque, HOD Watch Commanders John Does I and II, Sgt. Harris and Sgt. Marshall all had responsibility for the training and supervision of defendant deputies and other correctional staff assigned to HOD-10 yet failed in their responsibilities, as described herein.

102.    There was no reasonable justification for the manner in which Mr. Goetzee was treated at OPP or for the denial of appropriate treatment, medication and comfort for his serious mental illness, suicidal ideation and anxiety. There was an obvious risk of harm in placing a person with the history and condition of Mr. Goetzee in such conditions as existed at the Orleans Parish jail. The risk of serious harm caused by withholding anti-anxiety medication was obvious. This risk was greatly compounded by failing to properly monitor or evaluate him and withholding appropriate and necessary medical treatment and care from him.   The conditions of confinement of Mr. Goetzee constituted punishment, not treatment.  In addition, the actions of the defendant deputies and nurses, in ignoring Mr. Goetzee's obvious distress and then essentially abandoning him, was deliberate and cruel and directly contributed to his suffering, pre-death terror and death.

103.   Defendants Sheriff Gusman, Dr. Gore, Dr. Higgins, Benitez, Dr. Dileo, Dr. Ham and Jackson, as well as defendant nurses, knew, must have known, or should have known, that the policies and procedures of the jail for providing medical services and treatment of psychiatric patients, including the "suicide watch" procedures, facilities and staff, were seriously deficient and inadequate and posed a serious risk of harm to the serious medical and psychiatric needs of prisoners so confined, yet they failed to take appropriate or necessary steps to correct them.

104.   The defendants Sheriff Gusman, Dr. Gore, Dr. Higgins, Benitez, Dr. Dileo, Dr. Ham and Jackson, knew, must have known, or should have known of the serious inadequacies of the policies, procedures, customs and practices at the OPSO jail relating to prisoners who were suicidal, had the obligation and ability to correct these deficiencies but failed to do so.

105.   On information and belief, defendants Sheriff Gusman, Dr. Gore, Dr. Higgins, Benitez, Dr. Dileo, Dr. Ham and Jackson, participated in a "mortality review" of the circumstances of Mr. Goetzee's death which sought to cover-up and hide the deficiencies in the policies, customs and practices of the OPSO and inadequate care and treatment provided to Mr. Goetzee while he was in their custody and care, in order to excuse, condone, and ratify their own actions as well as that of their subordinates, and to avoid liability or responsibility for Mr. Goetzee's death.

106.   On information and belief, Defendant Gusman knew, must have known or should have known that the defendants were providing false, incorrect and/or

53

misleading information in order to obfuscate and avoid accountability for their actions and those of others involved in providing inadequate medical care to Mr. Goetzee, as well as other prisoners, yet defendant Gusman failed to take any reasonable or necessary actions to uncover the true facts and instead excused, condoned and ratified their acts and omissions.

107.    The risk of serious harm and/or death to Mr. Goetzee was known, must have been known or should have been known to the defendants, who failed to take appropriate and necessary measures to protect and preserve his life and safety, as set forth herein.

108.    The actions of the defendants as set forth herein, resulted in the suffering and death of Mr. Goetzee.

109.    The acts and omissions of the defendants, as described herein, were under color of law and in the course and scope of their employment.

## VI. FIRST CAUSE OF ACTION

110.    Plaintiffs repeat and re-allege each and every allegation of the complaint.

111.    The defendants, acting individually and together, and under the color of law, engaged in a course of conduct and conspired to engage in a course of conduct which acted to deprive William Goetzee of his constitutional rights and did deprive him of said rights, specifically, the right of William Goetzee to reasonable and adequate medical care, the right to be free from cruel and unusual punishment, the right to be free from unreasonable search and seizures, the right to liberty, the right to be free from

54

undue bodily restraint, and the right to due process and equal protection of the laws as protected by the First, Fourth, and Fourteenth Amendments of the United States Constitution and 42 U.S.C. 1983.

112.    At all times pertinent herein the defendants, acting individually and collectively, acted unreasonably, recklessly and with deliberate indifference and disregard for the constitutional and civil rights and life and serious medical needs of the deceased, William Goetzee.

113.    The defendants' actions were reckless, willful, wanton and malicious.

114.    Defendants, individually and collectively, had the duty and ability to intervene to prevent the violations of the rights of William Goetzee, deceased, described herein, but failed to do so.

115.    Plaintiffs further allege that such acts and omissions as stated herein were the proximate cause and cause in fact of the injuries sustained and the death of William Goetzee and the damages incurred thereby.

## VII.  SECOND CAUSE OF ACTION

116.    Plaintiffs repeat and re-allege each and every allegation of the complaint.

117.    Defendants Sheriff Gusman, Dr. Gore, Dr. Higgins, Benitez, Dr. Ham and Jackson, acting individually and collectively, established, condoned, ratified and encouraged customs, policies, patterns and practices at the Orleans Parish Prison which directly and proximately caused the deprivation of the civil and constitutional rights of the deceased as alleged herein, and the injuries and damages described

55

herein, in violation of the First, Fourth and Fourteenth Amendments to the U.S. Constitution and 42 USC 1983.

118.    These written and unwritten policies, customs and practices included, among others:

1.    Inadequate, improper and unreasonable screening, treatment, monitoring and supervision of the serious medical and psychiatric needs of persons in custody.

2.    Inadequate and unreasonable sick call, referral and followup procedures relative to the serious medical and psychiatric needs of persons in custody.

3.    Inadequate and unreasonable on-site medical and psychiatric staffing and coverage.

4.    Hiring of inadequately trained persons to render medical and psychiatric treatment to persons in custody.

5.    Inadequate training, supervision and discipline of medical personnel responsible for furnishing medical and psychiatric treatment and services to persons in custody.

6.    Inadequate hiring, training, supervision and discipline of deputies and supervisors responsible for the observation and monitoring of suicidal prisoners and the identification and communication of serious medical needs of persons in custody to appropriate medical

56

personnel.

7. A pattem and practice of deputies and medical personnel ignoring prisoners' requests and needs for medical and/or psychiatric attention so that prisoners' serious medical and psychiatric needs were frequently ignored and, in those instances where medical and/or psychiatric treatment was ultimately obtained, it was often unreasonably delayed and inadequate to the medical and psychiatric needs of the prisoners, causing serious pain, suffering, injury and/or death.

8. Inadequate and unacceptable policies, procedures and practices relating to placing persons on suicide watch, including but not limited to the following:

    a. Failing to require regular, frequent and meaningful assessment of the physical and mental status and condition of suicidal prisoners.

    b. Failing to require regular, frequent, meaningful and proper documentation of prisoners under suicide watch by nurses and/or qualified medically trained personnel which include but are not limited to conducting meaningful assessments, taking vital signs, and providing therapeutic care.

57

c. Failing to require that policies, procedures and practices in the jail for treatment of suicidal and mentally ill prisoners comport with medically accepted standards in the community.

d. Inadequate training, supervision and discipline of deputies who are required to observe and monitor prisoners on "suicide watch" and report and record accurately their observations.

e. Failing to require adequate physical and mental evaluations of inmates to determine whether the use of "suicide watch" procedures were effective.

f. Allowing prisoners to be held in "suicide watch" for unreasonable periods of time without requiring adequate physical and psychiatric examinations by a physician, psychiatrist or other appropriately licensed and trained medical personnel.

g. Permitting and condoning violations by medical and security personnel of written policies and procedures regarding medical and psychiatric care of persons who were suicidal or in acute mental health distress, resulting in significant discrepancies between written

58

policies and procedures and actual practice and custom, with no meaningful discipline, consequence or accountability for said violations or discrepancies, to the detriment of the health, safety and welfare of the prisoners in their care.

h. Inadequate review or quality control of suicide watch orders, procedures and conditions to insure that they are being properly implemented and monitored.

i. Inadequate documentation and record keeping of suicide watch observation forms of individuals who are under "suicide watch" by failing to adequately train personnel who fill out these reports, failing to require detailed, content-based reporting, failing to make these reports an integral part of the prisoner's medical records, and failing to require or insure frequent, regular review of these documents by medically trained personnel, among other deficiencies.

j. Failing to provide adequate staffing for monitoring, evaluating and treating prisoners under "suicide watch".

k. Improper use of "suicide watch" as punishment and

59

discipline.

l.   Allowing medical and security personnel to prepare inadequate progress notes and records regarding the condition of prisoners who are suicidal or experiencing acute mental health crisis, without appropriate discipline or accountability.

9. Inadequate and unacceptable policies, procedures and practices relating to treatment, observation and monitoring of persons who are suicidal or in need of care for serious medical issues, including but not limited to the following:

a.   Accepting prisoners into the jail who are suicidal when the facility lacks appropriate and safe facilities, and has inadequate staff, policies and procedures for their care and safety.

b.   Designing and implementing a "Suicide Watch" program that is dehumanizing, counter-productive, anti-therapeutic, harmful and ineffective.

c.   Allowing, condoning, permitting and/or ratifying

60

untrained and undisciplined correctional officers to do monitoring and observation of suicidal prisoners.

d.  Allowing, condoning, permitting and/or ratifying the practice of correctional officers not properly or truthfully filling out OPSO Suicide Watch Observation Checklists contemporaneously with the observation.

e.  Accepting prisoners into OPSO who have serious medical and psychiatric conditions, when the facility lacks appropriate and safe conditions, and had inadequate staff, policies and procedures for the care and safety of the prisoners.

10.  Inadequate, deficient or non-existent treatment plans for patients who were suicidal and experiencing an acute mental health crisis.

11.  Inadequate quality control policies, procedures and practices, inadequate critical incident review, inadequate mortality reviews and inadequate identification and correction of serious deficiencies in policy and practices affecting the delivery and quality of medical and psychiatric services.

61

119. At all times pertinent herein the defendants acted unreasonably and with deliberate indifference and disregard for the constitutional and civil rights and life and safety of the deceased, William Goetzee. The actions of the defendants were malicious, willful, wanton and reckless.

120. Plaintiffs further allege that such acts and omissions as alleged herein were the proximate cause and cause in fact of the injuries sustained, the death of William Goetzee and the damages incurred.

## VII. THIRD CAUSE OF ACTION

121. Plaintiffs repeat and re-allege each and every allegation of the complaint.

122. William Goetzee was a person with a disability under Section 504 and the Americans with Disabilities Act (ADA). He suffered from mental illness, psychosis, paranoia, acute anxiety and was at high risk of suicide.

123 Defendant Sheriff Marlin Gusman is in charge of the Orleans Parish Sheriff's Office and is a public entity that must comply with Section 504 and the Americans with Disabilities Act.

124. Plaintiffs are entitled to relief against the defendant Sheriff Marlin Gusman, as he and the Orleans Parish Sheriff's Office had notice of William Goetzee's disability, had the means to reasonably accommodate his disability, and failed to make that reasonable accommodation.

125. Section 504 of the Rehabilitation Act requires recipients of federal funds, including defendant Sheriff Marlin Gusman and the Orleans Parish Sheriff's Office, to

62

reasonably accommodate persons with disabilities in their facilities, program activities and services. It further requires such recipients to modify such facilities, services and programs as necessary to accomplish this purpose. Defendant Sheriff Marlin Gusman and the Orleans Parish Sheriff's Office have been and are recipients of federal funds.

126.    The ADA defines discrimination as the failure to take necessary steps to ensure that no individual with a disability is excluded, denied services, segregated, or otherwise treated differently than other individuals because of the absence of services for the disabled. Such services include, inter alia, provisions necessary to achieve effective mental health care and protect a person from suicide.

127.    Instead of accommodating William Goetzee's needs, defendant Sheriff Gusman and the Orleans Parish Sheriff's Office denied Mr. Goetzee services and programs available to others, including but not limited to access to appropriate medication, access to attorney-client and spiritual/religious visits, family contact, access to a telephone, and access to appropriate care and treatment that could have protected him from suicide and could have reduced the risk of harm of suicide. The failure to accommodate William Goetzee's disability was intentional and/or deliberately indifferent to William Goetzee's rights under Section 504 and Title II of the ADA and was a proximate cause of his death.

## IX. FOURTH CAUSE OF ACTION

128.    Plaintiffs repeat and re-allege each and every allegation of the complaint.

129.    The pendant jurisdiction of the Court is invoked for all claims under state

63

law.

130.   At all times described herein, the defendants, individually and collectively, acted negligently, with gross negligence and/or intentionally in denying reasonable, adequate and  necessary medical care to William Goetzee, confining him in unsafe, unreasonable and dangerous conditions providing him with access to material with which to harm himself and inflicting physical injury and severe emotional, mental and physical pain and suffering upon him, in violation of Louisiana law.

131.   The actions of the defendants also caused the wrongful death of William Goetzee.  At all pertinent times the defendant employees of the OPSO were acting in the course and scope of their employment and the defendant sheriff Gusman in his official capacity is vicariously liable for the injuries sustained and damages incurred herein as a result of their actions.

132.   The defendants Dr. Gore, Dr. Higgins, Dr. Dileo, Dr. Ham, Jackson, Wallace, Pembo, Batiste, Schaible, Bargky, and Johnson each acted in derogation of their duties as medical professionals and their treatment of William Goetzee was beneath the community standard of care.

133.   The defendants are liable for the wrongs complained of herein by virtue of encouraging, aiding, abetting, counseling, ratifying and condoning the commission of the afore described acts, by their failure to properly administer, organize and staff the medical and correctional program at the jail and for the failure to properly screen, hire,

64

train, supervise and discipline persons under their supervision and control whose acts and omissions contributed to the injuries sustained and the death of William Goetzee.

134.   The defendants are liable individually and jointly for their actions as alleged herein.

135.   Plaintiffs further allege that the above described acts and omissions were the proximate cause and cause in fact of the injuries described  herein.

## X.  DAMAGES

136.   As a result of the actions of the defendants as described above, damages have been incurred as follows:

1.   William Goetzee (deceased) suffered conscious and severe physical, mental and emotional distress, pain and suffering and pre-death terror prior to his death and lost his life.

2.   Margaret Goetzee Nagle, the sister of William Goetzee, John Eric Goetzee, the brother of William Goetzee, suffered emotional pain and suffering, past, present and future, and suffered the loss of love, affection, and companionship of their brother, William Goetzee.

3.   Funeral and burial expenses in excess of $11,000.00 were incurred as a result of the actions alleged herein.

## XI.  PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray that after due proceedings there be judgment rendered herein in plaintiffs' favor and against all defendants individually and jointly,  as follows:

1.   Compensatory and punitive damages as prayed for herein;

2.   Reasonable attorneys fees, all costs of these proceedings including expert witness fees under 42 USC 1988 and 12205, et seq. and legal interest;

3.   That this matter be tried by jury; and

4.   All other relief that this Honorable Court deems just and proper.

Respectfully submitted,

Mary E. Howell, LSBA #7030
Trial Attorney
316 S. Dorgenois Street
New Orleans, LA 70119
(504) 822-4455

Goetzee.Complaint20July2012

66

# Exhibit

# 6

OAO91 (Rev. 12/03)  Criminal Complaint

# UNITED STATES DISTRICT COURT

EASTERN    DISTRICT OF    LOUISIANA

UNITED STATES OF AMERICA
V.

William Goetzee

CRIMINAL COMPLAINT

Case Number: 11- 93 MAG

(Name and Address of Defendant)

I, the undersigned complainant state that the following is true and correct to the best of my knowledge and belief. On or about _____8/2/2011_____ in _____Orleans_____ County, in
                                        (Date)
the _____Eastern_____ District of _____Louisiana_____ defendant(s) did,

(Track Statutory Language of Offense)
forcibly assault, resist, oppose, impede, intimidate, and interfere with an officer of the Federal Protective Service, an employee of an agency of the United States Government, while such officer was engaged in the performance of his official duties where such acts involved physical contact with the officer.

in violation of Title ___18___ United States Code, Section(s) ___111 and 1114___ .
I further state that I am a(n) ___Special Agent of the F.B.I.___ and that this complaint is based on the
                                              Official Title
following facts:

See Attached Affidavit

Fee_____
Process_____
Dkld._____
CtRmDep_____
Doc. No._____

Continued on the attached sheet and made a part of this complaint:    ☒ Yes    ☐ No

_____
Signature of Complainant

Patrick Strawn, Special Agent-F.B.I.
Printed Name of Complainant

Sworn to before me and signed in my presence,

8/2/2011                                              at    New Orleans,    Louisiana
Date                                                        City            State

Daniel Knowles, III          U.S. Magistrate Judge      _____
Name of Judge                Title of Judge              Signature of Judge

NO001240

## AFFIDAVIT IN SWORN OF COMPLAINT AND ARREST WARRANT

I, PATRICK STRAWN, being duly sworn, do hereby depose and state:

1. I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI), and have been employed in that capacity for 9 years. I am currently assigned to the New Orleans Violent Crimes Task Force. My duties include but are not limited to the investigation of bank robberies, kidnapping matters, fugitives, crimes aboard aircraft, and assaults against federal agents.

2. The information contained in this affidavit is based upon an investigation conducted by the FBI, and other federal and local law enforcement officials in connection with the assault on Federal Protective Service Officer William Watson in New Orleans, LA on August 2, 2011. Since this affidavit is submitted only for the limited purpose of securing a criminal complaint, I have not set forth each and every fact known to me concerning this investigation. I have included what I believe are the facts sufficient to establish probable cause for the complaint sought.

3. On August 2, 2011, at approximately 10:55 a.m., a single white male, identified as William Goetzee, date of birth November 14, 1962, approached the passenger side of a Federal Protective Services fully marked patrol vehicle. Officer Watson, wearing full police uniform and sitting in the drivers side of the vehicle, believed the subject was approaching to ask him a question, and rolled down the front passenger window.

4. After approaching the marked patrol vehicle, Goetzee opened the front passenger side door, entered the vehicle, and sat down in the front passenger seat. Watson inquired why Goetzee thought he could just sit down in his patrol vehicle.

5. Upon being questioned by Watson, Goetzee took a couple of deep breaths, lunged towards Watson, grabbed Watson's service weapon, and attempted to remove the weapon from

NO001241

it's holster. During the course of the struggle, which included physical contact on Watson by Goetzee, Goetzee exclaimed, "I want to kill myself, give me your gun."

6. Watson struggled to maintain control of his weapon, and during the struggle the weapon's magazine became dislodged. While struggling with Goetzee, Watson called out to a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) who was standing nearby requesting help.

7. The ATF Special Agent grabbed Goetzee through the front passenger window, in an attempt to restrain him, at which time Watson was able to exit the vehicle and run around to the passenger's side. Around that same time, another Federal Protective Service Officer came to provide assistance with apprehending Goetzee. Goetzee was forcibly removed from the vehicle and placed in handcuffs.

8. Based on the above facts, your Affaint has reason to believe that on August 2, 2011, William Goetzee committed an act in violation of Title 18 United States Code 111, Assault on a Federal Officer.

PATRICK B. STRAWN
Special Agent
Federal Bureau of Investigation

Subscribed to and sworn before me this ___ day of August, 2011

HONORABLE DANIEL E. KNOWLES, III
United States Magistrate Judge

2

NO001242

# Exhibit

# 7

## Patient Care Report

**Incident Number:** 01-H-0287-11
**Date of Service:** 08/02/2011
**Chief Complaint:** OD / ETOH abuse -
Sleeping Pills
**Unit/Crew:** 3161 - Esther Swan I0643114,
Titus Carriere P0994093



### Patient Information

**Last Name: Goetzee First Nama: William MI:**        **DOB:** 11/14/1962 **Age:** 48

| | | | | |
|---|---|---|---|---|
| Sex: Male | Race: | Phone: UTO SSN: UTO | DL#: | Height: |
| Address: UTO | City: | State: Zip: UTO | County: Orleans Weight: 220lbs | |

**Insurance:** Private Insurance - Company Name: Blue Cross / Blue Shield Subscriber ID: R59528076 Group Number: 65006500 Insurance Phone: (800) 523-6435 ,

**Patient Medications:** UTO |
**Patient Allergies: Medications** - Unknown
**Alerts:** None
**Patient History: Cardio** - Unknown **Cancer** - Unknown **Neuro** - Unknown **GI** - Unknown
**Genitourinary** - Unknown **Infectious** - Unknown **Metabolic / Endocrine** - Unknown **Respiratory** - Unknown **Psych** - Unknown **Womens Health** - Unknown
**Patient Symptoms:**
**Secondary Complaint:** Behavorial / Psychiatric Disorder

### Patient Assessment
### Assessment:
**Injury:** Onset Provocation - Quality - Radiation - Time -

### Vitals

| Time | HR | RR | BPSys | BPDia | SPO2 | ETCO2 | CBG mg\dL | Temp | Position | EKG | GCS | RTS | DoneBy |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11:32:06 | 155 | 24 | 82 | 65 | 95 | | 214 | | Semi Fowlers | Sinus Tachycardia | 6/4/4 | 11 | Carriere, Titus |
| 11:39:11 | 135 | 22 | 122 | 76 | 98 | | | | Semi Fowlers | Sinus Tachycardia | 6/4/4 | 12 | Carriere, Titus |

### Treatments

| Time | Treatment | Details |
|---|---|---|
| 11:33:29 | IV | Side: Left Site: Hand Successful: Yes Attempts: 1 Size (gauge): 18 Setup: Macro Fluid: Normal Saline Rate: Bolus Performed By: Total Volume Infused: 200 |
| 11:37:28 | Oxygen Adminis | Type: Nasal Cannula Rate: 4 Performed By: Esther Swan Notes: |

### Protocols

| Time | Protocol |
|---|---|
| | |

### Comments

**Narrative:** Arrived to find PT at the above location with a C/C of overdose. The PT was found sitting in the back of PDs car in hand cuffs. The PT states he took some sleeping pills before coming to the court house. PD states that the PT attempted to grab a gun from one of the officers in an attempt to harm himself. The PT was placed in custody and EMS was activated.
Upon arrival, GCS was 14, no LOC occured. + PERL, C-spine non tender to palp, TRACH mid -line, no JVD. Denies chest pain or SOB, BBS clear and equal bilaterally, equal chest rise, no accessory muscle

lse. ABD soft and non tender, non distended, no rebound tenderness, no N/V. Spine non tender to palp; PMS x4.

PT remained Sinus TACH throughout care and was initially hypotensive. An 18 g IV was established to the left hand and a fluid bolus of normal saline was adminstered. PTS CBG was 214. The PT was unable o provide much information on his Hx but a phone number for his doctor at River Oaks Hospital was obtained. PT was transported to Tulane Medical Center in custody and accompanied by PD in the unit. PT eport left with staff upon arrival.

## Incident Information

**Location:** 500 POYDRAS ST, NOLouisiana70130

**Type:** **Dispatch Complaint:** ASSAULT-UNK STATUS / OTHER CODES NOT APPLICABLE

## Outcome: Patient Transported

**Destination:** Tulane Hospital, 1415 Tulane Ave, New Orleans, LA, 70112
**Condition on Arrival** - Same
Mileage - 1.0

## Call Times

| Dispatched | EnRoute | At Scene | At Patient | Depart Scene | Destination | Transfer Care | Unit Clear |
|------------|---------|----------|------------|--------------|-------------|---------------|------------|
| 11:19:50 | 11:20:25 | 11:22:46 | 11:23:25 | 11:40:04 | 11:45:28 | 12:01:48 | 12:08:48 |

## Signatures

No PT Signature - Patient Unwilling to Sign - No PT Signature - Patient Unwilling to Sign

Primary Medic Carriere, Titus - Carriere, Titus

Receiving RN / Doctor

Provider Info: New Orleans EMS New Orleans LA

RescueMedic - All rights reserved 2008

PCR Status: Date/Time Created:

# Exhibit

# 8

1/04/12 11:04:26        Online Bookin  nquiry System     OPADEV0050   BK1I010
Folder # Last N▉6000ON  First Name     R / S   D.O.B.   Type --Location--A/
____58562 GOETZEE_____  WILLIAM_____  M M / M 11/14/1962 PEN_ HOD NO _ 03_ I
lias: BILL BILL_____ A#: _____ Bond: _____ DNA: No_
       Accepted: _8/02/2011 21:32:60    Booked: _8/02/2011 21:03:17
          CCN: _____  B of I #: _____  Sec/Ctl: A / 1
elease: _8/07/2011 19:37:04 _SEE FILE_____
  Disposition/Date    Court Magist# Sc Arrear #  _____ Sentence _____
    Stat. Violation     Sub/P Docket# Sc Arr. Date Yrs Mon Day Other      Date
Option: 6-Magistrate Docket  7-CDC Docket

F3=Exit  F5=MOTION  F12=Previous

# Exhibit

# 9



UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

RECEIVED

JUL 17 2012

U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
DEPUTY CLERK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | Criminal Action |
| | * | Mag. No. 11-093 |
| Plaintiff, | * | |
| | * | New Orleans, Louisiana |
| v. | * | August 3, 2011 |
| | * | |
| WILLIAM GOETZEE, | * | |
| | * | |
| Defendant. | * | |

* * * * * * * * * * * * * * * * * *

### INITIAL APPEARANCE,
### BEFORE THE HONORABLE DANIEL E. KNOWLES, III,
### UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Government:        United States Attorney's Office
                          By:  FREDERICK W. VETERS, ESQ.
                          650 Poydras Street, Suite 1600
                          New Orleans, Louisiana 70130

Court Audio Operator:      (Magistrate Clerical)

Transcriptionist:          Ann B. Schleismann
                          c/o U.S. District Court
                          500 Poydras Street, Room C151
                          New Orleans, Louisiana 70130
                          (504) 589-7721

Proceedings recorded by electronic sound recording,

transcript produced by transcription service.

NO000455



DEPUTY CLERK

EASTERN DISTRICT OF LOUISIANA
U.S. DISTRICT COURT

RECEIVED

NO000456

2

P R O C E E D I N G S

(Wednesday, August 3, 2011)

THE CLERK:  Criminal Action Number 11-93, United States of America v William Goetzee set for an initial appearance on a complaint.

THE COURT:  Thank you very much.

Counsel?

MR. VETERS:  Rick Veters on behalf of the Government, Your Honor.

THE COURT:  All right, Mr. Goetzee, you are Mr. William Goetzee?

DEFENDANT GOETZEE:  Yes.

THE COURT:  Am I pronouncing that correctly?

DEFENDANT GOETZEE:  Yes, sir.

THE COURT:  All right, okay.

MR. VETERS:  Your Honor?

THE COURT:  Yes?

MR. VETERS:  May I approach?

THE COURT:  Certainly.

(Discussion at side bar, on the record)

MR. LAMY:  I first met Mr. Goetzee this morning and he didn't say anything as to how to pronounce it this morning.

THE COURT:  All right.

MR. LAMY:  He was unresponsive and obviously having mental issues.  I think you can look at about the nature of the

NO000457

case.

THE COURT: All right.

MR. LAMY: I tried to speak to him again before court to see if he can fill out a financial affidavit and we weren't able to make very good headway. He could answer some questions, but other times it seemed he was maybe responding to hallucinations or something. So, just so you know that we don't have a financial affidavit prepared, but --

THE COURT: Mr. Veters, what I'm probably going to do is appoint him an attorney provisionally --

MR. VETERS: Certainly.

THE COURT: -- and let them help him fill out the application.

MR. VETERS: Sure. Okay.

(End of side bar discussion)

THE COURT: All right, Mr. Goetzee, we are basically here to inform you of your rights, sir. This is simply an initial appearance, not an adversarial appearance at all, sir. You understand that you have a right to counsel at all stages of the proceedings, sir?

DEFENDANT GOETZEE: Yes, sir.

THE COURT: And you understand that you have a right to remain silent and you cannot be forced to speak at any time? Do you understand that, sir?

DEFENDANT GOETZEE: Yes, sir.

4

THE COURT:  Okay, very good.

Let's swear in Mr. Goetzee, please.

**WILLIAM GOETZEE, DEFENDANT, SWORN**

THE CLERK:  Please state your name for the record.

DEFENDANT GOETZEE:  William Goetzee.

THE COURT:  Mr. Goetzee, how old are you, sir?

DEFENDANT GOETZEE:  Forty-eight.

THE COURT:  Thank you, sir.

All right, Counsel, would you tell Mr. Goetzee what he's charged with, please?

MR. VETERS:  Yes.

This is just a criminal complaint at this point. Regarding that criminal complaint there's been two statutes invoked; 18 USC 111, assault of a federal officer, and 18 USC 1114, an attempt to kill an employee of the U.S. Government.

As to 18 USC 111, the potential charges would be as such; you would face zero to eight years imprisonment, at least three years of supervised release, and up to a $250,000 fine.

As to 18 USC 1114, you could face a maximum of 20 years imprisonment, at least three years of supervised release, and up to a one million fine.

THE COURT:  Thank you, Counsel.

Mr. Goetzee, do you understand that, sir?

DEFENDANT GOETZEE:  I understand it, but I didn't

NO000459

5

attempt to kill any federal employee.

THE COURT: Oh, I understand, sir. We'll get to that in another proceeding. I'm just asking whether you understand what he said.

DEFENDANT GOETZEE: Yes.

THE COURT: Okay. Mr. Goetzee, would you like the Court to appoint you counsel in this matter?

DEFENDANT GOETZEE: Yes, sir.

THE COURT: All right. My understanding is that you attempted to fill out a financial affidavit earlier today but weren't able to do so. Under the circumstances I'm going to provisionally appoint you an attorney and the attorney that we appoint will help you fill out the financial affidavit and then submit it to the Court at a later date. All right, sir?

DEFENDANT GOETZEE: The part I don't understand is I tried to -- attempted to fill out a financial affidavit.

THE COURT: Yes.

DEFENDANT GOETZEE: Can you explain that, sir?

THE COURT: Well, my understanding is that there was a financial affidavit submitted to you and they asked you certain questions in connection with this affidavit and you were unable to fill them out. Is that correct or not?

DEFENDANT GOETZEE: No. Today I didn't fill out an affidavit ever --

THE COURT: Are you --

NO000460

6

MS. SCHLUETER: Judge, may I interrupt for just one moment?

THE COURT: Certainly, please do.

MS. SCHLUETER: I'm Virginia Schlueter with the Federal Public Defender's Office and this is Sam Scilitani with the Federal Public Defender's Office, the attorneys sitting at this table.

We would be happy, Your Honor, to assist the Court in getting those answers for --

DEFENDANT GOETZEE: Yeah, because I was in the hospital this morning and I don't think I filled out a financial affidavit in there.

MS. SCHLUETER: No, Mr. Goetzee, I think that the Pretrial Services Officer, Mr. Lamy, that you see in the back may have attempted to ask you a few questions. But in privacy, not in the open courtroom, we'll fill out that questionnaire and give to the Court after we have an opportunity to talk.

THE COURT: So, based on that, sir, I will go ahead and provisionally appoint you an attorney in connection with this matter.

All right, what's the situation regarding detention?

MR. VETERS: The Government is moving for detention, Your Honor.

THE COURT: All right, we will set a detention hearing then and, Mr. Goetzee, you'll have an opportunity to

7

discuss this with your attorney before the hearing, okay?

When will we do that?

DEFENDANT GOETZEE:  They're recommending I get detained?

THE COURT:  Yeah.  The Government has asked for it and we're going to have a hearing on it, sir, after you have a chance to have an attorney appointed and to discuss the case with the attorney.

MS. SCHLUETER:  And, Your Honor, before you move from this matter, we have some medicines that were provided to us by Ms. Donna Gauthier (phonetic), --

DEFENDANT GOETZEE:  Yes.

MS. SCHLUETER:  -- which I would like to give the Marshals.  I realize that they will have to -- I don't know where he will be housed, but they will have to confer with whoever the medical authority is there to see if it is appropriate, but we would like to tender them.  We've made a list of them --

THE COURT:  Mr. Veters, any objection?

MR. VETERS:  No objection, Your Honor.

THE COURT:  All right, that will be fine.  Let's do that.  We'll give them his mediation and, hopefully, you can take your medication, sir.

MS. SCHLUETER:  And do you know where he's going to be housed, Judge?

NO000462

8

THE COURT:  I do not know.  Does anyone know?

UNIDENTIFIED SPEAKER:  The Court Operations Supervisor will make that determination shortly once he gets back to the area.

THE COURT:  And they'll notify you.

MS. SCHLUETER:  And so we would be able to find out and --

UNIDENTIFIED SPEAKER:  We'll get word to you.

MS. SCHLUETER:  -- see him this evening?

UNIDENTIFIED SPEAKER:  Yes.

THE COURT:  All right.  When are we going to have the hearing?

DEFENDANT GOETZEE:  Are you going to force me to take medication?

THE COURT:  We're going to set the detention hearing Friday morning at 10:00 a.m. --

THE CLERK:  August 5th.

THE COURT:  -- and if we run into come difficulties and have to continue it we will, but let's shoot for Friday morning.

THE CLERK:  Do you want me to set a preliminary hearing?

THE COURT:  Okay.

THE CLERK:  That will be August 7th at 2:00 p.m.

DEFENDANT GOETZEE:  Do you say I had to take

NO000463

9

medication?

MS. SCHLUETER:  No, it was delivered to us.

DEFENDANT GOETZEE:  Oh, okay.

MS. SCHLUETER:  But a doctor --

DEFENDANT GOETZEE:  Yeah.

MS. SCHLUETER:  -- in the prison before you'll be given any medications a doctor will look at them for the correctness or the appropriateness of that medication.

THE COURT:  All right, I have nothing further.

Mr. Veters, is there anything else?

MR. VETERS:  Nothing further from the Government.

THE COURT:  All right.

DEFENDANT GOETZEE:  Who's the doctor?

THE COURT:  Thank you very much, Mr. Goetzee.

Okay, we are in recess.  Thank you, folks.

*    *    *    *    *

NO000464

NO000465

**C E R T I F I C A T E**

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceeding in the above-entitled matter.

Ann B. Schleismann
Ann B. Schleismann

7/17/12
Date

# Exhibit

# 10

Orleans Parish Sheriff's Office
**Medical Department**

Acct. #**10309021**
MRN:98324516
WESLEY, WILLIAM
11/14/1962        8/3/2011
1    M    J

Medical **ROUTE** Form

Name: _William Wesley_

D.O.B.: _11/14/1962_  Age: _48_

Race: _W_   Sex: _M_

Clinic: _Psych_

Medical Record #: _____

Location: _TPS A2_

Folder #: _68562_

Vital Signs:

B/P: _181/122_  P: _128_  SpO2: _____  R: _20_  Temp: _100.1_

Medications/Dosages:

1. _Ø_  2. _____

3. _____  4. _____

ALLERGIES: _Predrisone_

Reason for Route:

_R/O Delirium_

_C. Higgins M.D. / F. Barsky_
PRINTED Name of Staff Routing Patient

_C. Higgins / Gilley_
Physician/Medical Personnel Signature

_(504) 827-8519_
Phone # for Questions

_8/3/11_
Date

NOTICE:

THIS PATIENT IS **IN CUSTODY**. PLEASE **DO NOT** GIVE HIM/HER ANY
PRESCRIPTIONS, VERBAL DISCHARGE INSTRUCTIONS, ETC. ALSO, RETURN
APPOINTMENTS SHOULD BE ORDERED ONLY WHEN OUR STAFF PHYSICIAN
CANNOT PROVIDE ADEQUATE FOLLOW-UP. THANK YOU VERY MUCH!

NO000677
3/11

# Exhibit 11



# Office of the Sheriff
*Parish of Orleans ~ State of Louisiana*

## Marlin N. Gusman
*Sheriff*

**FOR IMMEDIATE RELEASE**

**CONTACT:**   Marc Ehrhardt, 504.558.1845, marc@theehrhardtgroup.com
Mary Martin Fein, 504.558.1815, mmartin@theehrhardtgroup.com

## OPSO STATEMENT REGARDING INMATE WILLIAM GOETZEE

**NEW ORLEANS** – Aug. 8, 2011 – William Goetzee, a 48-year-old male, asphyxiated himself with tissue paper Sunday evening and was pronounced dead at 7:17 p.m. at Interim LSU Hospital.

Inmate Goetzee was arrested Aug. 2, 2011, on charges involving the assault of a federal officer in an apparent attempt to commit suicide. While at OPSO, after being evaluated at Interim LSU Hospital, Mr. Goetzee had been housed on the Psychiatric Tier, receiving the treatment outlined by the hospital. Mr. Goetzee had reported episodes of suicidal ideation during his incarceration, but denied such during Sunday's sick call clinic. Later, during that afternoon's medication pass, at approximately 4:30p.m., Mr. Goetzee denied complaints and was pleasant. Soon afterward, he surreptitiously swallowed a wad of toilet tissue and asphyxiated.

At approximately 6:30p.m., he was found unresponsive by the deputy, who immediately notified the on-site medical staff. Resuscitation was immediately started by the nursing staff, soon to be assisted by New Orleans EMS and the New Orleans Fire Department. Mr. Goetzee, after a period of resuscitative efforts, was transferred to the Interim LSU Hospital where he was later pronounced dead at 7:17p.m. A full investigation into the nature of his death, in conjunction with the U.S. Marshals Service, is underway. A full autopsy is pending with the Orleans Parish Coroners Office.

### ###

819 South Broad Street, New Orleans, LA 70119 ~ www.opcso.org

Goetzee000055

# Exhibit

# 12

# MEDICAL CENTER OF LA AT NEW ORLEANS

1532 TULANE AVENUE - NEW ORLEANS, LA   70112
(504) 903-2311

Pt Name: WESLEY ,WILLIAM                          CI: 0011789318
MR#:        98324516        Nurs Sta:           Hosp Svc: EMR    Clinic: EMR
Pt#:        10309021        Room/Bed:              Pt Type: E    Pt Sts: ET    FC: J

## PATIENT INFO:
        SSN: 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   BirthDate: 11/14/1962   Race: 1   Sex: M   Mar Sts: S
        SSN Reason:      -                           Phone - Home: 504 - 000-0000
        0000                                                   Cell:       -
        NEW ORLEANS                          LA   70113   Work:       -

## GUARANTOR INFO:
        WESLEY ,WILLIAM
        Pt Rel: S    SSN: 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   Birthdate: 11/14/1962   Sex: M
        0000                                         Phone - Home: 504 - 000-0000
        NEW ORLEANS                          LA   70113   Cell:       -
                                                           Work:       -

## EMPLOYMENT INFORMATION:


        Phone:         -           Extension:

## PRIMARY EMERGENCY CONTACT:

                                            Pt Rel: N

        Phone:         -           Work Phone:       -

## INSURANCE INFO:
        Ins Code                              Policy#              P/V SubRe
        J90      PRISONER ST PARISH      142604132         L    1/Y    S
                                                                      /
                                                                      /
                                                                      /
PCP Name:                          PCP Phone#:         -

Admit Date/Time:  08/03/11    16:48      Admitted By:  JLOPE2  Adm Source: RB
Admitting Doctor:  51720   -  AVEGNO JENNIFER L
Attending Doctor:  51720   -  AVEGNO JENNIFER L
Complaint:  PYSCH EVAL

Privacy Notice:  P        Informed of Adv Dir:  N      Adv Dir on File:  N
Primary Language:                        Do you need an Interpreter?
Ethnicity:
Comments:

NO001009

# Exhibit

# 13

| Folder # | Inmate Name | Sex | Race | D.O.B | Dt Booked | Location |
|---|---|---|---|---|---|---|
| 68562 | WILLIAM W GOETZEE | M | W | 11/14/1962 | 8/02/2011 | HOD NO 03 |

SERVICE CALL INFORMATION

| S/C | Seq | Type | Date Requested | Date Received | Date Completed | Origin | Dest. | Status |
|---|---|---|---|---|---|---|---|---|
| 00001 | 000 | ME | 8/02/2011 | 8/02/2011 | 8/02/2011 | SCREEN | INTAKE | C Intake Screening |
| 00001 | 001 | PS | 8/03/2011 | 8/03/2011 | 8/03/2011 | PSYCH | SCREEN | C Intake Screening |
| 00001 | 002 | PS | 8/03/2011 | 8/03/2011 | 8/06/2011 | PSYCH | PSYCH | C REEVAL DX... |
| 00001 | 003 | PS | 8/06/2011 | 8/06/2011 | 8/07/2011 | PSYCH | PSYCH | C REEVAL ON WATCH |
| 00001 | 004 | PS | 8/07/2011 | 8/07/2011 | | PSYCH | PSYCH | R EVAL SUICIDE ASSESSMENT |
| 00002 | 000 | ME | 8/02/2011 | 8/02/2011 | | ICPPD | INTAKE | R 08/03/2011 I/M @ COURT PER DEPUTY PALMER |
| 00003 | 000 | ME | 8/02/2011 | 8/02/2011 | | HPEXAM | INTAKE | R Initial H&P Exam |
| 00004 | 000 | ME | 8/04/2011 | 8/04/2011 | 8/03/2011 | NURSE | WALKIN | C SUICIDAL IDEATIONS |
| 00004 | 001 | ME | 8/04/2011 | 8/04/2011 | 8/03/2011 | DOCTOR | NURSE | C ROUTE R/O DELIRIUM |
| 00005 | 000 | ME | 8/05/2011 | 8/05/2011 | 8/05/2011 | DOCTOR | DOCTOR | C HOSPITAL RETURN |
| 00005 | 001 | ME | 8/05/2011 | 8/05/2011 | | DOCTOR | DOCTOR | R F/U IN MD S/C IN 30D FOR BP CHECK |
| 00006 | 000 | ME | 8/08/2011 | 8/08/2011 | 8/07/2011 | NURSE | EMRGNC | C UNRESPONSIVE |

MEDICAL NOTES AND COMMENTS

| S/C | SEQ | Type | Date | Author | Comments or Notes |
|---|---|---|---|---|---|
| 00001 | 000 | RSN | 8/02/2011 | Intake Processing | Intake Screening |
| 00001 | 001 | RSN | 8/02/2011 | Intake Processing | Intake Screening |
| 00001 | 001 | DOC | 8/03/2011 | HIGGINS | R/O GAD<br>NO PSYCH MEDS NECESSARY AT THIS TIME<br>(REPORTS TAKING UNKNOWN PSYCH MED)<br>HOUSE IN GEN POP<br>HAVE IM SIGN RELEASE & SEND TO RIVER OAKS<br>PSYCH S/C 8/29/11 TO REVIEW RECORDS<br>MH |
| 00001 | 002 | RSN | 8/02/2011 | Intake Processing | REEVAL DX... |
| 00001 | 002 | DOC | 8/06/2011 | HIGGINS | MDE, PSYCHOSIS NOS<br>RISPERAL 1MG PO QAM & 2MG PO QPM X180D<br>HOUSE ON MENTAL HEALTH TIER<br>DIRECT OBS & SUICIDE SMOCK<br>F/U 8/7/11 TO REEVAL ON WATCH |
| 00001 | 003 | RSN | 8/02/2011 | Intake Processing | REEVAL ON WATCH |
| 00001 | 003 | DOC | 8/07/2011 | C.JOHNSON,FNP | A: SUICIDE ASSESSMENT |

Case 2:12-cv-01910-SSV-JCW   Document 68-4   Filed 05/23/14   Page 133 of 274

OPSO1968

Folder #   Inmate Name                      Sex Race  D.O.B    Dt Booked  Location

68562   WILLIAM W GOETZEE                    M   W  11/14/1962  8/02/2011 HOD NO    03

MEDICAL NOTES AND COMMENTS

| S/C | SEQ | Type | Date | Author | Comments or Notes |
|-----|-----|------|------|--------|-------------------|
| | | | | | P: HOD 10 PSYCH<br>CONTINUE SUICIDAL DIRECT OBSERVATION WIT<br>H SMOCK<br>F/U MD DR HIGGINS<br>EVAL SUICIDAL ASSESSMENT<br>CB |
| 00001 | 004 | RSN | 8/07/2011 | C.JOHNSON,FNP | EVAL SUICIDE ASSESSMENT<br>CB |
| 00002 | 000 | RSN | 8/02/2011 | Intake Processing | 08/03/2011 I/M @ COURT PER DEPUTY PALMER |
| 00003 | 000 | RSN | 8/02/2011 | Intake Processing | Initial H&P Exam |
| 00004 | 000 | RSN | 8/03/2011 | BARGKY,LPN | SUICIDAL IDEATIONS<br>CB |
| 00004 | 000 | NUR | 8/03/2011 | BARGKY,LPN | I/M WAS BROUGHT TO MEDICAL FOR DIRECT OB<br>SERVATION W/SUICIDAL SMOCK. I/M IS ORIEN<br>TED TO NAME ONLY, ANSWER QUESTIONS INAPP<br>ROPRIATELY. SKIN WARM, MOIST TO TOUCH.<br>B/P 181/122 P128 R20 T100.1 INMATE CONTI<br>NUES TO VERBALIZE INAPPROPRIATELY DR HIG<br>GINS WAS CALLED AND INFORMED OF ABOVE. D<br>R HIGGINS GAVE ORDER TO ROUTE TO UH TO R<br>/O DELIRIUM<br>CB |
| 00004 | 001 | RSN | 8/03/2011 | BARGKY,LPN | ROUTE R/O DELIRIUM<br>CB |
| 00004 | 001 | DOC | 8/03/2011 | DR HIGGINS | TRANSFER TO UH TO R/O DELIRIUM<br>T.O. DR HIGGINS/BARGKY,LPN<br>CB |
| 00005 | 000 | DOC | 8/05/2011 | DR. DILEO | HOSPITAL RETURN<br>PSYCHOSIS, HTN<br>TRANSFER TO HOD 10<br>LISINOPRIL 40MG PO QD X30D RFX5 |

OPSO1969

OPSO Medical System
Inmate Medical History Report

| Folder # | Inmate Name | Sex | Race | D.O.B | Dt Booked | Location |
|----------|-------------|-----|------|-------|-----------|----------|
| 68562 | WILLIAM W GOETZEE | M | W | 11/14/1962 | 8/02/2011 | HOD NO 03 |

MEDICAL NOTES AND COMMENTS

| S/C | SEQ | Type | Date | Author | Comments or Notes |
|-----|-----|------|------|--------|-------------------|
| | | | | | RISPERDAL 1MG PO QD X 30D RFX5<br>RISPERDAL 2MG PO QHS X 30D RFX5<br>F/U IN 30D FOR BP CHECK<br>SP |
| 00005 | 000 | RSN | 8/05/2011 | DR. DILEO | HOSPITAL RETURN<br>SP |
| 00005 | 000 | DOC | 8/05/2011 | DR DILEO | HOSP RETURN: PSYCHOSIS, HTN<br>LISINOPRIL 40MG PO QD X 30D 5RF<br>RISPERDAL M-TAB 1 MG -1 PO QAM AND 2 PO<br>QPM X 30D 5RF<br>TO PSYCH<br>F/U 30D BP CHECK<br>CB |
| 00005 | 000 | DOC | 8/05/2011 | MCNO | PSYCHOSIS NOS, RHAYDO?OLYSIS-MIL, HTN, C<br>HEST PAIN-SDE(-), HYPOKALEMIA, MACROCYLI<br>C ANEMIA, BROUGHT  INTO UH FOR BIZARRE B<br>EHAVIOR AFTER VIOLENT BEHAVIOR (+)SUICID<br>AL IDEATION, AUDITORY HALLUCINATIONS, NO<br> SOB/OP/N/N/HA<br>PSYCH CONSULT<br>AS ABOVE STABLE FOR D/C WITH NEGATIVE ST<br>RESS TEST. NEEDS PSYCH FOLLOW UP ASAP<br>RISPERDAL 1MG 1 AB IN AM 2 TABS IN PM<br>LISINOPRIL 40MG PO Q DAY<br>VISTASIL 50MG TID<br>PSYCHIATRY DR HIGGINS-NEXT AVAILABLE<br>CB |
| 00005 | 001 | RSN | 8/05/2011 | DR. DILEO | F/U IN MD S/C IN 30D FOR BP CHECK<br>SP |
| 00006 | 000 | RSN | 8/07/2011 | BARGKY,LPN | UNRESPONSIVE<br>CB |
| 00006 | 000 | NUR | 8/07/2011 | BARGKY,LPN | NOTIFIED BY DEPUTY WILLIAMS THAT AN I/M<br>IS LAYING ON THE FLOOR UNRESPONSIVE.<br>I ARRIVED TO HOD NO 3 LYING SUPINE UNRES<br>PONSIVE TO VERBAL OR TACTILE STIMULI. I |

Case 2:12-cv-01910-SSV-JCW   Document 68-4   Filed 05/23/14   Page 135 of 274

Folder #    Inmate Name                    Sex Race   D.O.B    Dt Booked  Location

    68562   **WILLIAM W GOETZEE**            M    W 11/14/1962  8/02/2011 HOD N0    03

MEDICAL NOTES AND COMMENTS

S/C   SEQ  Type  Date       Author                                    Comments or Notes
===== ===  ===  ==========  ======================================== ================================================

| S/C | SEQ | Type | Date | Author | Comments or Notes |
|---|---|---|---|---|---|
| | | | | | CHECKED FOR PULSE NONE WAS PALPABLE I IMMEDIATELY STARTED CHEST COMPRESSIONS, NOTED FOREIGN OBJECT IN HIS MOUTH. I DID A FINGER SWEEP AND WAS ABLE TO PULL OUT PIECES OF TISSUE OUT OF HIS MOUTH, CHEST COMPRESSIONS CONTINUED I ASKED DEPUTY CRADER TO CALL 911 AND OPP MEDICAL. I CONTINUED CHEST COMPRESSIONS WHILE SGT MARSHALL APPLYED THE AMBU BAG. I APPLIED THE AED; NO SHOCK ADVISED SO I CONTINUED CHEST COMPRESSIONS UNTIL I WAS RELIEVED BY EMTS. NURSE WILLIAMS AND NURSE WASHINGTON. DR HAM WAS CALLED AND INFORMED OF ABOVE. CB |
| 00006 | 000 | NUR | 8/07/2011 | NURSE WILLIAMS | S; DEPUTY CRADER CALLED OPP MEDICAL CLINIC AND STATED "NURSE BARKY LPN NEED HELP CODE BLUE ON THE 10TH FLOOR" SO NURSE L WASHINGTON LPN AND MYSELF RUSHED OUT OF OPP MEDICAL AND RESPONDED TO CALL O; NURSE L.WASHINTON LPN AND MYSELF ARRIVED TO THE 2ND FLOOR WAITING FOR THE ELEVATOR ONCE ELEVATOR ARRIVED EMS PARAMEDI AND FIRE FIGHTERS WAS ALREADY ON THE ELEVATOR SO NURSE WASHINGTION LPN MYSELF AND SGT MERREL GOT ON THE ELEVATOR BUT THERE WAS A DELAY BECAUSE THE ELEVAOR DOORS WOULDN'T CLOSE SO SGT MURREL HAD TO STAND IN THE DOORWAY OF THE ELEVATOR UNTIL A BUZZING SOUND IS HEARD AND THAT'S WHEN THE DOORS CLOSED AND THE ELEVATOR PROCEEDED TO THE 10TH FLOOR UPON ARRIVAL TO THE CELL THE INMATE WAS FOUND LAYING ON THE FLOOR IN A SUPOIN POSITION UNRESPONSIVE WITH NO SHIRT ON BUT HE DID HAVE A BLUE FEDERAL PANTS WITH AED PADS APPLIED TO HIS CHEST WHILE NURSE BARKY AND SGT MARSHALL PERFORM CPR EMS PARAMEDIC AND FIREFIGHTERS RELIEVED THEM SO THAT'S WHEN ONE PAREMEDIC GUY TRY TO INTUBATE THE INMATE HE WAS UNSESSFUL BECAUSE OF THE TOILET TISSUE THAT WAS IN HIS THROAT SO HE GOT A PAIR OF FORCEPS TO REMOVE THE TISSUE AND CLEAN THE AIRWAY I SEEN NURSE BARKY LPN CRYING AND STORM O |

Case 2:12-cv-01910-SSV-JCW   Document 68-4   Filed 05/23/14   Page 136 of 274

OPSO1971

| Folder # | Inmate Name | Sex | Race | D.O.B | Dt Booked | Location |
|---|---|---|---|---|---|---|
| 68562 | WILLIAM W GOETZEE | M | W | 11/14/1962 | 8/02/2011 | HOD NO 03 |

## MEDICAL NOTES AND COMMENTS

| S/C | SEQ | Type | Date | Author | Comments or Notes |
|---|---|---|---|---|---|
| | | | | | FF THE TIER SO WE (NURSE WASHINTON LNP AND MYSELF WENT TO CHECK ON HER)    AO |
| 00006 | 000 | NUR | 8/07/2011 | NURSE WASHINGTON | RECIEVED CALL FROM HOD CONTROL OF A CODE BLUE NURSE WILLIAMS AND I RESPONDED TO CALL NURSE WILLIAMS AND I ARRIVED ON 2ND FLOOR OF HOD WHERE WE ENTERED ELEVATOR EMS AND FIREFIGHTER WERE ALREADY ON THE ELEVATOR THERE WAS A DELAY WITH THE ELEVATOR DOOR CLOSING SGT MERREL HAD TO STAND BETWEEN ELEVATOR DOOR AND WAIT FOR A BUZZING SOUND TO START SO THE ELEVATOR DOORS WOULD CLOSE SO WE PROCEEDED TO THE 10TH FLOOR WE ARRIVED TO CELL ON HOD-10 I/M LAYING ON FLOOR IN A SUPINE POSITION WITH AED PADS ON CHEST AND NURSE BARKY AND SGT MARSHALL PERFORMING CPR EMS AND FIREFIGHTER BEGAN PERFORMING CPR PARAMEDICS TEMTED TO INTUBATE BUT WAS UNABLE TO INTUBATE BECAUSE TISSUE WAS IN THROAT PARMEDIC BEGAN USING A FORCEPT TO REMOVE TISSUE AND CLEAR AIRWAY NURSE BARGKY BEGAN CRYING AND STORMED OFF TIER AND NURSE WILLIAMS AND I WENT TO MAKE SURE NURSE BARGKY WAS OK    AO |

## MEDICAL DIAGNOSTIC CODES

| S/C | SEQ | Diagnostic | | | Descrition | Date Ordered | Date Performed | Date Admitted | Stat |
|---|---|---|---|---|---|---|---|---|---|
| 00001 | 002 | 296 | 20 | 000 | Major Depressive Disorder   (MDD OR MD | 8/06/2011 | 8/06/2011 | 8/06/2011 | A |
| 00001 | 002 | 298 | 9 | 000 | PSYCHOSIS NOS | 8/06/2011 | 8/06/2011 | 8/06/2011 | A |

## PRESCRIPTIONS RECEIVED

| Rx Date | Start Date | Stop Date | Rx No. | Seq | Drug | Drug Name | Drug Quantity and Method |
|---|---|---|---|---|---|---|---|
| 8/05/2011 | 8/08/2011 | 9/07/2011 | 009852326 | 000 | 002668 | RISPERIDONE | TAB 2MG 1 QHS PO |
| 8/05/2011 | 8/08/2011 | 9/07/2011 | 009852325 | 000 | 002668 | RISPERIDONE | TAB 1MG 1 QD PO |
| 8/05/2011 | 8/08/2011 | 9/07/2011 | 009852324 | 000 | 002216 | LISINOPRIL | TAB 40MG 1 QD PO |

# Exhibit

# 14



UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

**RECEIVED**

JUL 17 2012

U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
DEPUTY CLERK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | Criminal Action |
| | * | Mag. No. 11-093 |
| Plaintiff, | * | |
| | * | New Orleans, Louisiana |
| v. | * | August 5, 2011 |
| | * | |
| WILLIAM GOETZEE, | * | |
| | * | |
| Defendant. | * | |

* * * * * * * * * * * * * * * * *

HEARING,
BEFORE THE HONORABLE DANIEL E. KNOWLES, III,
UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

| | |
|---|---|
| For the Government: | United States Attorney's Office<br>By:  FREDERICK W. VETERS, ESQ.<br>650 Poydras Street, Suite 1600<br>New Orleans, Louisiana 70130 |
| For the Defendant: | U.S. Public Defender's Office<br>By:  SAMUEL SCILLITANI, ESQ.<br>Hale Boggs Federal Building<br>500 Poydras Street, Room 318<br>New Orleans, Louisiana 70130 |
| Court Audio Operator: | (Magistrate Clerical) |
| Transcriptionist: | Ann B. Schleismann<br>c/o U.S. District Court<br>500 Poydras Street, Room C151<br>New Orleans, Louisiana 70130<br>(504) 589-7721 |

Proceedings recorded by electronic sound recording,

transcript produced by transcription service.

NO000466



NO000467

RECEIVED

U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

DEPUTY CLERK

2

P R O C E E D I N G S

(Friday, August 5, 2011)

THE CLERK:  Criminal Action Number 2011-93, United States of America v William Goetzee.  Would Counsel make their appearance for the record, please?

MR. VETERS:  Rick Veters on behalf of the Government, Your Honor.

MR. SCILLITANI:  And Samuel Scillitani with Federal Public Defender's Office.

THE COURT:  Come up, gentlemen.

MR. SCILLITANI:  Samuel Scillitani with the Federal Public Defender's Office, Judge.  I've been recently appointed to Mr. Goetzee.  He is not present in court.

THE COURT:  What's going on, gentlemen?

MR. VETERS:  It's my understanding, Your Honor, that he's been hospitalized since our last court appearance.

THE COURT:  I talked to Mr. Boemo (phonetic) this morning earlier, Marshal Boemo, and he indicated to me that that's what's going on and that it would be some time before the psychiatric evaluation is done sufficiently to where they feel like he came come back to court.  That's fine with me.  That's where I would have inclined to send him anyway.  And I think we ought to just continue it for the time being and let's find out what goes on there and reschedule it when appropriate, unless anybody has any objections.

NO000469

3

MR. VETERS:  No, no objections.

MR. SCILLITANI:  No objections.

THE COURT:  All right, that's what we'll do.  Thank you all very much, folks.

MR. SCILLITANI:  Thank you.

\*    \*    \*    \*    \*

NO0004T0

## C E R T I F I C A T E

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceeding in the above-entitled matter.

_Ann B. Schleismann_
**Ann B. Schleismann**

7/17/12
Date

# Exhibit 15

## MEDICAL CENTER OF LA AT NEW ORLEANS
## MEDICAL DATA
### 1532 TULANE AVENUE - NEW ORLEANS, LA  70112
### (504) 903-2311

Pt Name: WESLEY ,WILLIAM                      Age:  48  DOB: 11/14/1962
#: 98324516      SSN: 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  Race: 1  Sex: M  Mar Sts: S  Religion: NON
Pt#:   10309021  Nrs Sta:      Rm/Bed:        PtType: E  HspSvc: EMR  FC: J
Address: 0000                                 Parish: 36
City: NEW ORLEANS                St: LA  Zip: 70113  Phone: 504 - 000-0000
Emg Contact:                                  PtRel: N  Ph:       -
Medicare#:                     Type:     Medicaid#:

---

Admit Date/Time: 08/03/11   16:48  Provisional DX: ACUTE PSYCHOSIS ABNORMAL E
Admit Dr: 56247 - GIAMBRONE NICOLE A
Attnd Dr: 56247 - GIAMBRONE NICOLE A

---

Discharge Date:  8/5/11        Number of Hospital Days:  2
Discharge: ✓Normal  Desertion  Transferred  Died        Autopsy:  Yes   N
PCP:        AUTH#:                                   MRSA:      VRE:
INFORMED OF AV DIR:  N    AV DIR IN CHART:  N   VISIT RESTRICTIONS:

| FINAL DIAGNOSIS (no abbreviations) | Code |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

| Date | Operative and Nonsurgical Procedure | Code |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

I certify that the narrative descriptions of the principal and secondary
diagnoses and the major procedures performed are accurate and complete to the
best of my knowledge.

| Intern/Resident | Date/Time | Attending Staff | Date/Time |
|---|---|---|---|

NO001006

# Exhibit

# 16

N0010008

## MEDICAL CENTER OF LOUISIANA
## AT NEW ORLEANS

DISCHARGE DIAGNOSES:
THE PATIENT IS BEING DISCHARGED WITH THE FOLLOWING DIAGNOSES;

1. PSYCHOSIS. NOT OTHERWISE SPECIFIED.
2. RHABDOMYOLYSIS. MILD AND RESOLVING.
3. HYPERTENSION.
4. CHEST PAIN WITH A NEGATIVE EXERCISE STRESS ECHOCARDIOGRAPHY.
5. HYPOKALEMIA.

DISPOSITION:
The patient is been discharged to custody of NOPD officers. He is on regular diet. Physical activity as tolerated. The patient was instructed to return to the emergency department if symptoms worsens. The patient is to follow up with Dr. Higgins, who is the psychiatrist in prison at the earliest possible convenience.

DISCHARGE MEDICATIONS:
The patient has been discharged on the following medications.

1. Vistaril 50 mg three times a day.
2. Lisinopril 40 mg 1 time per day.
3. Risperdal 1 mg 1 tab in the a.m. and 2 tablets in the p.m.

PATIENT IDENTIFICATION:
E:

AUTHENTICATION

I have verified and signed this report to authenticate the documentation. I am returning this report to the Medical Records Department for placement in the patient's chart. This will meet the requirement for chart completion.

William Claiborne, MD 08/09/2011 06:24 P
Dictated by:  William Claiborne, MD

cc:  William Claiborne, MD

edx/
D: 08/07/2011 04:50 P T: 08/08/2011 05:14 A
Edix Doc #:201108070990590400    SoftMed Doc #: 759125

# Exhibit 17

```
08/05/2011                         Inmate System                    USE146
16:16:40                        Re-assignment Form                   PEMBOS
                                                                     OPPMED08A
Folder #:     68562

Name:   GOETZEE, WILLIAM G                   Inmate Type: FED

Race:   W        Sex:  M      Date of Birth:  11/14/1962

Old Location:  Bldg:  TP5    Tier:  A2   Side:      Cell:  05

New Location:  Bldg:  HOD    Tier:  ___  Side:  _   Cell:  ___

Charge(s)                          Bond  ----- Sentence -----   Details
                                         Yrs  Mos  Dys  Other
```

Reason for Transfer:  PER DR. GORE / DR. DILEO

Person Authorizing Transfer:
Sign: _____
      DR. DILEO / S.PEMBOLPN

```
Transfer Completed:

Date:  _____/_____/_____      Time: _____ AM/PM (Specify)

Deputy Receiving Inmate on Tier:
_____

Notified Communications Officer:

Name: _____  Time: _____ AM/PM
```

**** IMMEDIATELY AFTER INMATE MOVE IS COMPLETED ****
   1. Fill in this form completely.
   2. Notify Communications at ext. 8505 of new location.
   3. Return this form to Communications at the end of your watch.

HOD 10

NO000674

# Exhibit

# 18

06/11/2012
Expiration Date

HT. _5'6"_ WT. _210_
HAIR _BLACK_ EYES _BROWN_
COMP. _BROWN_ BLOOD ____
BIRTH 09/26/1977 SEX _MALE_

And as such is charged with the duty of
investigating violations of the laws of the State of
Louisiana, collecting evidence in cases which the
State is or may be a party in interest and
performing other duties imposed on him by law.

WILLIAM K THOMPSON

## ORLEANS PARISH SHERIFF'S OFFICE
## TRAINING DIVISION
### Commission Renewal Slip

Name _William Thompson_

Date: _5-11-11_          Emp# _100346_

Score _97_

Signature: _____
Firearms Instructor

This Slip Must Be Taken To Personnel Before:

_5/30/11_

Personnel Office Hours:
Monday – Friday:  8am-11am & 1pm – 3pm

WT000264

06/28/2011
Expiration Date

HT. ___ 5'6" ___ WT. ___ 210

HAIR ___ BLACK ___ EYES ___ BROWN

COMP. ___ BROWN ___ BLOOD ___

BIRTH 03/22/1977 ___ SEX ___ MALE

WILLIAM R. THOMPSON

And as such is charged with the duty of
investigating violations of the laws of the State of
Louisiana, collecting evidence in cases which the
State is or may be a party in interest and
performing other duties imposed on him by law.

## Orleans Parish Criminal Sheriff's Office
## Training Division
## Commission Renewal Slip

Name: _William Thompson_

Date: _5/28/10_     Emp# _100346_

Score: (100)

Signature: _Capt. R. Sumell_

Firearms Instructor

This slip must be taken to Personnel before:

_6/11/10_

Personnel Hours:
Monday – Friday: 8am-11am & 1pm-3pm

WT000265

| | |
|---|---|
| HT. | 6'0" | WT. | 210 |
| HAIR | BLACK | EYES | BROWN |
| COMP. | BROWN | BLOOD | |
| BIRTH 03/28/1977 | SEX | MALE |

10/24/2009
Expiration Date

WILLIAM K THOMPSON

And as such is charged with the duty of investigating violations of the laws of the State of Louisiana, collecting evidence in cases which the State is or may be a party in interest and performing other duties imposed on him by law.

## Orleans Parish Criminal Sheriff's Office
### Training Division
#### Commission Renewal Slip

Name: William Thompson

Date: 10/24/08     Emp# 100346

Score (102)

Signature: _____
Capt. Robert Donnelly

This slip must be taken to Personnel before:
11/7/08

Commission renewal hours:
Thursday's Only 8am-11am/1pm-3pm

WT000268





State of Louisiana

16294

PARISH OF ORLEANS

SHERIFF

THIS IS TO CERTIFY THAT

WHOSE SIGNATURE AND PHOTO APPEAR BELOW IS A COMMISSIONED

WILLIAM A. THOMPSON

DEPUTY

OF THE CRIMINAL SHERIFF'S DEPARTMENT OF ORLEANS PARISH IN LOUISIANA

WT000270

# Exhibit 19

Orleans Parish Criminal Sheriff's Office
## Medical Department
## Medical Assessment: Suicide Watch

Name __Goetzee, William__                   Folder No: ____68562____

Allergies _____NKDA_____   R _W_  S _M_    DOB __11/14/1962__

Location: __HOD-10__     Date: __8/7/2011__     Time: __06:00__

Appearance: __NADN__

Suicidal Ideations: ( Yes ) or No

LOC: AA0 x 3

Comfort Level: "OK"

Complaints/Problems: No complaints voiced.

Additional Comments: __none__

Disposition:

☑ Maintain watch as previously ordered

☐ Discontinue watch due to signed contract for safety

☐ Call Psychiatrist on call due to: _____

☐ Call Physician on call due to: _____

☐ Other: _____

Name: ____David Schaible, LPN____   Signature: _____

2/09

NO000652

Orleans Parish Criminal Sheriff's Office
**Medical Department**
**Medical Assessment: Suicide Watch**

Name Goetzee, William                    Folder No:    68562

Allergies      NKDA        R  W  s  M      DOB   11/14/1962

Location:   HOD-10      Date:    8/7/2011      Time:   03:00

Appearance:   NADN

Suicidal Ideations:  ( Yes ) or  No

LOC: AA0 x 3

Comfort Level: "OK"

Complaints/Problems: No complaints voiced.

Additional Comments:  none

Disposition:

☑ Maintain watch as previously ordered

☐ Discontinue watch due to signed contract for safety

☐ Call Psychiatrist on call due to: _____

☐ Call Physician on call due to: _____

☐ Other: _____

Name:     David Schaible, LPN     Signature: _____

2/09

NO000653

Orleans Parish Criminal Sheriff's Office
**Medical Department**
**Medical Assessment: Suicide Watch**

Name Goetzee, William                              Folder No:    68562

Allergies        NKDA        R  W  S  M        DOB  11/14/1962

Location:    HOD-10        Date:    8/7/2011        Time:    00:01

Appearance:  NADN

---

Suicidal Ideations:  (Yes) or  No

LOC: AA0 x 3

Comfort Level: "OK"

Complaints/Problems: No complaints voiced.

---

Additional Comments:  none

---

Disposition:

☑ Maintain watch as previously ordered

☐ Discontinue watch due to signed contract for safety

☐ Call Psychiatrist on call due to: _____

☐ Call Physician on call due to: _____

☐ Other: _____

Name:    David Schaible, LPN    Signature: _____

2/09

NO000654

Orleans Parish Criminal Sheriff's Office
**Medical Department**
**Medical Assessment: Suicide Watch**

Name Goetzee, William                    Folder No: _____68562_____

Allergies _____NKDA_____ R __W__ s __M__ DOB __11/14/1962__

Location: __HOD-10__    Date: __8/6/2011__    Time: __21:00__

Appearance: __NADN__

Suicidal Ideations: ( Yes ) or No

LOC: AA0 x 3

Comfort Level: "OK"

Complaints/Problems: No complaints voiced.

Additional Comments: __none__

Disposition:

☑ Maintain watch as previously ordered

☐ Discontinue watch due to signed contract for safety

☐ Call Psychiatrist on call due to: _____

☐ Call Physician on call due to: _____

☐ Other: _____

Name: __David Schaible, LPN__    Signature: _____

2/09

NO000655

Orleans Parish Criminal Sheriff's Office
**Medical Department**

**Medical Assessment: Suicide Watch**

Name _William, Wesley_    Folder No: _68562_

Allergies _____  R _W_ s _M_    DOB _11/14/1962_

Location: _HODND3_    Date: _8/6/11_    Time: _____

Appearance: _Unruly, slanting at the gate_

Suicidal Ideations:    (Yes) or No

LOC: _____

Comfort Level: _Fair_

Complaints/Problems: _Hore Vocal_

Additional Comments: _____

Disposition:

☑ Maintain watch as previously ordered

☐ Discontinue watch due to signed contract for safety

☐ Call Psychiatrist on call due to: _____

☐ Call Physician on call due to: _____

☐ Other: _____

Name: _EBargly_    Signature: _____

2/09

NO000656

Orleans Parish Criminal Sheriff's Office
**Medical Department**

**Medical Assessment: Suicide Watch**

Name _William, Wesley_     Folder No: _68562_

Allergies _____ R _W_ s _M_     DOB _11/14/1962_

Location: _HODA03_     Date: _8/6/11_     Time: _1615_

Appearance: _male standy at the gate_

Suicidal Ideations:     Yes or No

LOC: _OX 3_

Comfort Level: _fair_

Complaints/Problems: _More Very_

Additional Comments: _____

Disposition:

☐ Maintain watch as previously ordered

☐ Discontinue watch due to signed contract for safety

☐ Call Psychiatrist on call due to: _____

☐ Call Physician on call due to: _____

☐ Other: _____

Name: _____     Signature: _____

2/09

NO000657

Orleans Parish Criminal Sheriff's Office
**Medical Department**

**Medical Assessment: Suicide Watch**

Name _William, Wesley_     Folder No: _68562_

Allergies _____ R _W_ s _M_   DOB _11/14/1962_

Location: _HODND3_   Date: _8/6/11_   Time: _0715_

Appearance: _Anxiety, sitting on the floor_

Suicidal Ideations:   (Yes) or  No

LOC: _____

Comfort Level: _fair_

Complaints/Problems: _None Voiced_

Additional Comments: _____

Disposition:

☑ Maintain watch as previously ordered

☐ Discontinue watch due to signed contract for safety

☐ Call Psychiatrist on call due to: _____

☐ Call Physician on call due to: _____

☐ Other: _____

Name: _E Bergly_     Signature: _WB_

2/09

NO000658

## Orleans Parish Criminal Sheriff's Office
### Medical Department

## Medical Assessment: Suicide Watch

Name _Coetzee, Westley Williams_    Folder No: _68562_

Allergies _____    R _N_ s _M_    DOB _11/14/62_

Location: _____    Date: _8/6/11_    Time: _0500_

Appearance: _Lying on the flor awake talking to himself_

Suicidal Ideations: (Yes) or No

LOC: _alert_

Comfort Level: _WNL_

Complaints/Problems: _Non-Too None Voiced._

Additional Comments: _I/m moaning Stating he wants to die._

Disposition:

☑ Maintain watch as previously ordered

☐ Discontinue watch due to signed contract for safety

☐ Call Psychiatrist on call due to: _____

☐ Call Physician on call due to: _____

☐ Other: _____

Name: _SBatiste LPN_    Signature: _____

2/09

NO000659

Orleans Parish Criminal Sheriff's Office
**Medical Department**

**Medical Assessment: Suicide Watch**

Name _Coetzee, Westley, Williams_    Folder No: _68562_

Allergies _____    R _N_ s _M_    DOB _11/14/62_

Location: _HOD 10_    Date: _8/6/11_    Time: _0200_

Appearance: _____

Suicidal Ideations:  (Yes) or No

LOC: _AAO x3_

Comfort Level: _fair_

Complaints/Problems: _none voiced_

Additional Comments: _____

Disposition:

☑ Maintain watch as previously ordered

☐ Discontinue watch due to signed contract for safety

☐ Call Psychiatrist on call due to: _____

☐ Call Physician on call due to: _____

☐ Other: _____

Name: _S Batiste_ _____    Signature: _____

2/09

NO000660

Orleans Parish Criminal Sheriff's Office
**Medical Department**

**Medical Assessment: Suicide Watch**

Name _Goetzee, William Wotley_    Folder No: _68562_

Allergies _____    R _W_ S _M_    DOB _11/14/62_

Location: _HOD 10_    Date: ~~####~~ _8/5/11_    Time: _2200_

Appearance: _lying on flon eyes open to verbal stimuli_

Suicidal Ideations: (Yes) or No

LOC: _Alert, orient, x awake_

Comfort Level: _fair_

Complaints/Problems: _none noised_

Additional Comments: _____

Disposition:

☑ Maintain watch as previously ordered

☐ Discontinue watch due to signed contract for safety

☐ Call Psychiatrist on call due to: _____

☐ Call Physician on call due to: _____

☐ Other: _____

Name: _SBatist LPN_    Signature: _____

2/09

NO000661

Orleans Parish Criminal Sheriff's Office
**Medical Department**

## Medical Assessment: Suicide Watch

Name _William, Wesley, GOETZEE_ Folder No: _68562_

Allergies _____ R _W_ S _A_ DOB _11/14/62_

Location: _HOD 10_ Date: _8/5/11_ Time: _2000_

Appearance: _lying on the floor in uniform_

Suicidal Ideations: _Yes_ or No

LOC: _AAO ×3_

Comfort Level: _fair_

Complaints/Problems: _non voiced_

Additional Comments: _____

Disposition:

☑ Maintain watch as previously ordered

☐ Discontinue watch due to signed contract for safety

☐ Call Psychiatrist on call due to: _____

☐ Call Physician on call due to: _____

☐ Other: _____

Name: _SBatiste_ Signature: _____

2/09

NO000662

# Exhibit

# 20

| POST Curriculum<br><br>*Shaded Lines are Totals for the Block.*<br>*Un-Shaded Lines are Breakdowns of Blocks.* | Level 3<br>Correctional<br>Officer<br>90-hour | Transition<br>Level 3 to<br>Level 2<br>190-hour | Level 2<br>Basic<br>Correctional<br>Peace Officer<br>249-hour | Transition<br>Level 2 to<br>Level 1<br>170-hour | Level 1<br>Basic Peace<br>Officer<br>360-hour | Level 1 AND<br>Level 3<br>Combo<br>413-hour |
|---|---|---|---|---|---|---|
| **Basic Issues (TOTAL)** | **8** | **4** | **12** | **0** | **4** | **12** |
| History of Corrections | 1 | 0 | 1 | 0 | 0 | 1 |
| Function of the Jail | 1 | 0 | 1 | 0 | 0 | 1 |
| Role of the Correctional Officer | 2 | 0 | 2 | 0 | 0 | 2 |
| Stress | 1 | 0 | 1 | 0 | 0 | 1 |
| LSA/DOC Jail Guidelines | 3 | 0 | 3 | 0 | 0 | 3 |
| Orientation to Criminal Justice (Entire Block) | 0 | 4 | 4 | 0 | 4 | 4 |
| **Supervision of Inmates (TOTAL)** | **7** | **0** | **7** | **0** | **0** | **7** |
| Principles/Skills of Supervision | 2 | 0 | 2 | 0 | 0 | 2 |
| Staff/Inmate Relations | 2 | 0 | 2 | 0 | 0 | 2 |
| Supervision of Inmate Activities | 3 | 0 | 3 | 0 | 0 | 3 |
| **Inmate Discipline & Administrative Remedy Procedures (TOTAL)** | **4** | **0** | **4** | **0** | **0** | **4** |
| Disciplinary Procedures | 2 | 0 | 2 | 0 | 0 | 2 |
| Administrative Remedy Procedures | 2 | 0 | 2 | 0 | 0 | 2 |
| **Law & the Correctional Officer (TOTAL)** | **7** | **40** | **43** | **0** | **40** | **43** |
| Legal Aspects (Entire Block) | 0 | **40 | **40 | 0 | 40 | 40 |
| Inmate Rights | 2 | 0 | 2 | 0 | 0 | 2 |
| Officer Liability | 1 | 0 | *** | 0 | *** | * |
| LA Criminal Code & Code of Criminal Procedure | 3 | 0 | *** | 0 | *** | * |
| Courtroom Demeanor | 1 | 0 | 1 | 0 | *** | 1 |
| **Security (TOTAL)** | **16** | **0** | **16** | **0** | **0** | **16** |
| Booking, Classification, & Release | 2 | 0 | 2 | 0 | 0 | 2 |
| Principles of Jail Security, Security Checks, & Hardware | 2 | 0 | 2 | 0 | 0 | 2 |
| Tool, Key, & Weapon Control | 1 | 0 | 1 | 0 | 0 | 1 |
| Fire Emergency | 4 | 0 | 4 | 0 | 0 | 4 |
| Searches – Cell & Body | 3 | 0 | 3 | 0 | 0 | 3 |
| Emergency Procedures | 2 | 0 | 2 | 0 | 0 | 2 |
| Transporting Inmates | 2 | 0 | 2 | 0 | 0 | 2 |
| **Special Procedures (TOTAL)** | **17** | **8** | **17** | **0** | **8** | **17** |
| First Aid & Adult CPR | 8 | 8 | 8 | 0 | 8 | 8 |
| Medical Treatment | 2 | 0 | 2 | 0 | 0 | 2 |

OPS01516

| POST Curriculum<br><br>*Shaded Lines are Totals for the Block.*<br>*Un-Shaded Lines are Breakdowns of Blocks.* | Level 3 Correctional Officer 90-hour | Transition Level 3 to Level 2 190-hour | Level 2 Basic Correctional Peace Officer 249-hour | Transition Level 2 to Level 1 170-hour | Level 1 Basic Peace Officer 360-hour | Level 1 AND Level 3 Combo 413-hour |
|---|---|---|---|---|---|---|
| Special Inmates | 1 | 0 | 1 | 0 | 0 | 1 |
| Health, Sanitation, & Food Service | 1 | 0 | 1 | 0 | 0 | 1 |
| Suicide Prevention | 3 | 0 | 3 | 0 | 0 | 3 |
| Blood Borne Pathogens | 2 | 0 | 2 | 0 | 0 | 2 |
| **Inmate Services (TOTAL)** | 2 | 0 | 2 | 0 | 0 | 2 |
| Mail, Telephones, Work Release Programs, Education, Canteen | 2 | 0 | 2 | 0 | 0 | 2 |
| **Report Writing (TOTAL)** | 4 | 12 | 12 | 0 | 12 | 12 |
| Report Writing | 4 | **12 | **12 | 0 | 12 | 12 |
| **Officer Survival (TOTAL)** | 14 | **40 | **40 | 0 | 40 | 40 |
| Level 3 (Baton Handling, Hand Techniques, & Handcuffing Techniques) | 14 | * | * | * | * | * |
| Level 1 & Level 2 (Entire Block) | 0 | **40 | **40 | 0 | 40 | 40 |
| **Firearms (TOTAL)** | 6 | ●40 | ●40 | ●0 | ●40 | ●40 |
| Level 3 (Orientation to Shotguns) | 6 | * | * | 0 | * | * |
| Level 1 & Level 2 (Entire Block) | 0 | **40 | **40 | 0 | **40 | **40 |
| **Certification in the Use of Chemical Agent (TOTAL)** | 4 | 0 | 4 | 0 | 0 | 4 |
| Certification in the Use of Chemical Agent | 4 | 0 | 4 | 0 | 0 | 4 |
| **Investigations (TOTAL)** | 0 | 24 | 24 | 0 | 24 | 24 |
| Entire Block | 0 | 24 | 24 | 0 | 24 | 24 |
| **Traffic Services (TOTAL)** | 0 | 0 | 0 | 18 | 18 | 18 |
| Entire Block | 0 | 0 | 0 | 18 | 18 | 18 |
| **Patrol Activities (TOTAL)** | 0 | 0 | 0 | 24 | 24 | 24 |
| Entire Block | 0 | 0 | 0 | 24 | 24 | 24 |
| **Specialized Activities (TOTAL)** | 0 | 0 | 0 | 16 | 16 | 16 |
| Entire Block | 0 | 0 | 0 | 16 | 16 | 16 |
| **Becoming a Professional Peace Officer (TOTAL)** | 0 | 0 | 0 | 10 | 10 | 10 |
| Entire Block | 0 | 0 | 0 | 10 | 10 | 10 |
| **Domestic and Family Matters (TOTAL)** | 0 | 0 | 0 | 12 | 12 | 12 |
| Entire Block | 0 | 0 | 0 | 12 | 12 | 12 |
| **Physical Training (TOTAL)** | 0 | 10 | 16 | 10 | 24 | 24 |
| Based on Weeks of Training | 0 | 10 | 16 | 10 | 24 | 24 |

OPS01517

| POST Curriculum<br><br>*Shaded Lines are Totals for the Block.*<br>*Un-Shaded Lines are Breakdowns of Blocks.* | Level 3<br>*Correctional*<br>*Officer*<br>**90-hour** | Transition<br>*Level 3 to*<br>*Level 2*<br>**190-hour** | Level 2<br>*Basic*<br>*Correctional*<br>*Peace Officer*<br>**249-hour** | Transition<br>*Level 2 to*<br>*Level 1*<br>**170-hour** | Level 1<br>*Basic Peace*<br>*Officer*<br>**360-hour** | Level 1 AND<br>Level 3<br>*Combo*<br>**413-hour** |
|---|---|---|---|---|---|---|
| **Use of Force (TOTAL)** | **0** | **8** | **8** | **0** | **8** | **8** |
| Entire Block | 0 | 8 | 8 | 0 | 8 | 8 |
| **Electives (TOTAL)** | **1** | **4** | **4** | **80** | **80** | **80** |
| Different for Each Level | 1 | 4 | 4 | 80 | 80 | 80 |
| **TOTAL of TOTALS** | **90** | **190** | **249** | **170** | **360** | **413** |

*90 hours = Correctional Officer Certification Course (Level 3)*
*190 hours = Transition Course From Level 3 to Level 2*
*249 hours = Basic Correctional Peace Officer Certification Course (Level 2)*
*170 hours = Transition Course From Level 2 to Level 1*
*360 hours = Basic Peace Officer Certification Course (Level 1)*
*413 hours = Dual Certification Course (Level 1 and Level 3 combined)*

*\* Included in the full POST course*
*\*\* Must complete full POST course hours, prior partial credit hours not countable*
*\*\*\*Included in another POST course area*
*● Includes MANDATORY academy firearms qualification on the Official POST Qualification Course.*

OPS01518

# Exhibit

# 21

# ORLEANS PARISH SHERIFF'S OFFICE

# SPECIAL OPERATIONS DIVISION

# INTER-OFFICE MEMORADUM

Date:        August 7, 2011

To:          Major Michael R. Laughlin
             Special Operations Division

From:        Deputy Mark E. Jones, Sr.
             Lieutenant William D. Short, Jr.
             Special Operations Division

Subject:     Death of Inmate William Goetzee

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

On Monday, August 7, 2011, at approximately 1845 hours, Deputy Mark Jones, Sr. and Lieutenant William Short, Jr., both members of the Orleans Parish Sheriff's Office (O.P.S.O.), assigned to the Special Operations Division (S.O.D.), were advised by Major Michael Laughlin, who is also a member of the O.P.S.O., assigned as the Commander of S.O.D., of a possible suicide at the House of Detention Facility (H.O.D.). The detectives were informed the incident occurred on the tenth floor H.O.D. North tier, cell three. The detectives were instructed to conduct a full investigation into the matter.

The detectives immediately proceeded to the aforementioned location and were informed inmate William Goetzee (W/M, D.O.B. 11/14/1962, F# 68562) had been housed in that cell. At this time, the detectives observed the cell to be unoccupied, with wet toilet paper bunched together and all over the floor of the cell. The detectives obtained photographs of cell three and the rest of the H.O.D. North tier. The detectives then proceeded to University Hospital, first ordering cell three be locked down and left untouched until they returned for further investigation. It should be noted here when the detectives did return from the hospital, the cell was locked, but had been cleaned.

The detectives proceeded to University Hospital, where they were informed inmate Goetzee had been pronounced dead by Emergency Room Medical Doctor Mackey at 1917 hours.

The detectives then returned to the H.O.D. Facility and conducted an interview with Deputy Michael Williams, who is also a member of the O.P.S.D., assigned to H.O.D., and who was detailed to the tenth floor of the facility at the time of this incident. Deputy Williams stated at approximately 1824 hours, inmate Kaled Hamdam (W/M, D.D.B. 08/04/1974, F# 2287090) approached the front security gate of the H.D.D. North tier and notified him (Williams) of an unresponsive inmate lying on the floor in cell three, later identified as inmate William Goetzee. Deputy Williams further stated he immediately notified Licensed Practical Nurse (LPN) Esma Bargky, who is also a member of the D.P.S.D., assigned to the Medical Department and detailed to the 10th floor, of the unresponsive inmate. Deputy Williams stated he was instructed by Nurse Bargky to request Emergency Medical Service (E.M.S.) for assistance. Deputy Williams went on to state he then immediately notified Deputy Keyon Stamps, who is also a member of the O.P.S.D., assigned H.D.D. and detailed to Control, of the situation. Deputy Williams further stated Deputy William Thomson, who is also a member of the O.P.S.D., assigned to H.D.D. and detailed to the 10th floor H.O.D. North side, was assigned to sit in front of cell three for direct observation of inmates Goetzee and Warren Baker (B/M, D.D.B. 6/11/1972, F#2298492). Deputy Williams further stated Deputy Thompson was not in his assigned area at the time of the incident. Deputy Williams also stated Deputy Thompson had only been in his assigned area for approximately twenty minutes, and had been in the nurse's station the rest of the time until the incident took place.

The detectives then obtained copies of the control and tier log books for entries relative to this incident, which will be attached and mede a part of this report.

The detectives then met and conducted an interview with Sergeant Everett Marshall, who is also a member of the D.P.S.O., assigned as a Watch Commander for the H.D.D. Facility. Sergeant Marshall stated at approximately 1828 hours, he was ootified via telephone by control Deputy Stamps stating an inmate was found unresponsive on the tenth floor and E.M.S. was being requested. Sergeant Marshall further stated he then informed Sergeant Nicole Harris, who is also a member of the D.P.S.O., assigned to H.D.D. as Assistant Watch Commander, of the situation and they immediately proceeded to the tenth floor accompanied by Deputies Stamps and Brian Sennett, who is also a member of the D.P.S.D., assigned to H.O.D. Sergeant Marshall further stated upon arrival to the tenth floor H.O.D. North tier, Deputy Shelia Crader, who is also a member of the D.P.S.D., assigned to the H.O.D. and detailed to the tenth floor C.L.U. side of the building, was standing at the H.D.D. North side tier gate along with Deputy Thompson, at which time Sergeant Marshall stated he entered the tier and assisted Nurse Bargky with Cardiopulmonary Resuscitation (C.P.R.) procedure on inmate Goetzee. Sergeant Marshall ended by stating he continued assisting Nurse Bargky with C.P.R. procedures until the E.M.S. technicians arrived on the tier at approximately 1835 hours.

The detectives then met and conducted an interview with Sergeant Harris. Sergeant Harris stated she was notified by Sergeant Marshall there was an unresponsive inmate on the tenth floor, and she proceeded immediately to thet location with Sergeant Marshall. Sergeant Harris stated upon arrival, she observed Nurse Bargky administering C.P.R. on inmate Goetzee, at which time she notified Chief Earl Weaver, who is also a

member of the O.P.S.O., assigned as the Chief of Security, and Major Laughlin of the situation.

The detectives also met and conducted an interview with Deputy William Thompson. Deputy Thompson stated at approximately 1300 hours, he left the tier to get something to drink but did not return to his assigned detail for the rest of his shift. Deputy Thompson ended by stating he was in the nurse's station for the remainder of his shift.

The detectives also met with and conducted an interview with Deputy Crader. Deputy Crader stated she was notified by Deputy Williams at approximately 1825 hours of the situation and was asked to assist. Deputy Crader stated she then proceeded to the H.O.D. side of the facility, and upon arrival was instructed by Nurse Bargky to notify the Orleans Parish Prison (O.P.P.) Medical Department and make them aware of the situation. Deputy Crader ended by stating she did as she was instructed, then returned to the C.L.U. side of the facility to continue watch on her detailed location when the rest of the back-up arrived to deal with the situation.

The detectives also met and conducted an interview with Deputy Stamps. Deputy Stamps stated she received a phone call at approximately 1828 hours from deputy Williams notifying her there was an unresponsive inmate on the tenth floor and E.M.S. was needed. Deputy Stamps stated she then notified Communications and Sergeant Marshall of the situation. Deputy Stamps went on to state she informed Deputy Sennett of the situation and proceeded with Deputy Sennett to the tenth floor to assist with the situation. Deputy Stamps further stated upon arrival to the tenth floor, she assisted Nurse Bargky with obtaining medical supplies from the nurse's station. Deputy Stamps ended by stating she assisted Nurse Bargky until E.M.S. arrived on the tier and took over resuscitation procedures.

The detective also met and conducted an interview with Deputy Sennett. Deputy Sennett stated at approximately 1828 hours he was informed about an unresponsive inmate on the tenth floor by Deputy Stamps. Deputy Sennett then stated he and Deputy Stamps immediately proceeded to the tenth floor H.O.D. North tier of the building to assist with the situation. Deputy Sennett stated upon arrival, he entered the tier were he observed Nurse Bargky and Sergeant Marshall administering C.P.R. to inmate Goetzee. Deputy Sennett further stated he observed Nurse Bargky and Sergeant Marshall administering C.P.R. for approximately several minutes until Nurse Bargky then asked him (Sennett) to take over the chest compressions while she rested her arms for a few minutes. Deputy Sennett went on to state he and Sergeant Marshall continued to administer C.P.R. while Nurse Bargky observed them until E.M.S. arrived on the tier and took over resuscitation procedures.

After completing the interviews with the O.P.S.O. security staff, the detectives then conducted interviews with the inmates who were assigned to the tenth floor H.O.D. North tier.

OPSO005117

The detectives conducted an interview with inmate Warren Baker, who was inmate Goetzee's cell mate in cell three. Inmate Baker stated he noticed inmate Goetzee did not look well at approximately 1820 hours, at which time inmate Baker asked inmate Goetzee if he was ok, but inmate Goetzee did not respond. Inmate Baker also stated he checked inmate Goetzee's pulse and discovered toilet paper stuffed in both of inmate Goetzee's nostrils and his mouth.

Inmate Baker further stated he then removed some of the toilet paper from inmate Goetzee's mouth and right nostril. Inmate Baker went on to state after he felt his (Goetzee) pulse, which was faint, he called for help, at which time inmate Kaled Hamdam approached him (Baker) to see what was wrong. Inmate Baker ended by stating he informed inmate Hamdam his cellmate was in need of help and to call for the deputy on duty.

The detectives then interviewed inmate Devin Adams (B/M, D.O.B. 08/25/1981, F# 2293203) who is the tier representative assigned to cell six. Inmate Adams began by stating he was not familiar with inmate Goetzee. Inmate Adams further stated he did see inmate Goetzee eating toilet paper earlier that day while he was cleaning up the tier. Inmate Adams added he slept throughout the night. Inmate Adams ended by stating when he awoke, bis cellmate Kaled Hamdam told him an inmate bad died.

The detectives then interviewed inmate Kaled Hamdam, who is assigned to cell six. Inmate Hamdam stated he was in his cell when he beard someone call for help, at which time he left his cell to see what was going on. Inmate Hamdam further stated he approached cell three, and upon approach observed inmate Goetzee was down and unresponsive and inmate Baker informed him belp was needed and to get the attention of the deputy on duty. Inmate Hamdam went on to state he then approached the tier gate and called for Deputy Williams, who immediately approached the front gate and asked him what was wrong. Inmate Hamdam ended by stating he informed Deputy Williams about inmate Goetzee and soon after Nurse Bargky arrived and began medical procedures.

The detectives then interviewed inmate Michael Johnson (B/M, D.O.B. 09/11/1991, F# 2286343) who is assigned to cell five. Inmate Johnson stated he did not know or speak with inmate Goetzee. Inmate Johnson ended by stating he was asleep all day and night and did not see or hear anything.

The detectives then interviewed inmate George Ladd (B/M, D.O.B. 07/20/1968, F# 2293759) who is assigned to cell four. Inmate Ladd stated he did not know or speak with inmate Goetzee. Inmate Ladd ended hy stating he was asleep all day and night and did not see or bear anything.

The detectives then interviewed inmate Kenneth Dennis (B/M, D.O.B. 12/31/1961, F# 2298739) who is assigned to cell two. Inmate Denis stated he did not know or speak with inmate Goetzee. Inmate Denis ended by stating he was asleep all day and night and did not see or hear anything.

The detectives then interviewed inmate Lee Allen (B/M, D.O.B. 07/09/1992, F# 2269323) who is assigned to cell seven. Inmate Allen stated he did not know or speak with inmate Goetzee. Inmate Allen ended by stating he was asleep all day and night and did not see or hear anything.

The detective then interviewed inmate Jonathan Oomigue (B/M, D.O.B. 12/16/1990 F# 2252736) who is assigned to cell eight. Inmate Allen stated he did not know or speak with inmate Goetzee. Inmate Domigue ended by stating he was asleep all day and night and did not see or hear anything.

The detective then interviewed inmate Cortez Massey (B/M, D.O.B. 10/26/1990 F# 2292807) who is assigned to cell eight. Inmate Massey stated he did not know or speak with inmate Ooetzee. Inmate Massey ended by stating he was asleep all day and night and did not see or hear anything.

The detective then interviewed inmate Raynell Tapo (B/M, D.O.B. 10/10/1981) who is assigned to cell eight. Inmate Tapo stated he was asleep when N.O.E.M.S. arrived on the tier and did not know or speak with inmate Goetzee.

The detective then interviewed inmate Michael Mitcbell (B/M, O.O.B. 01/13/1955 F# 2299133) who is assigned to cell eight. Inmate Mitchell stated he heard wben the O.P.S.O. nurses entered the tier to check on one of the inmates but was not paying any attention to anything else.

The detective then interviewed inmate Chaz Tapp (B/M, O.O.B. 09/05/1989 F# 2297694) who is assigned to cell eight. Inmate Tapp stated he was laying in his bunk watching television when N.O.E.M.S. arrived on the tier to attend to another inmate, at which time inmate Tapp stated he then fell back to sleep. Inmate Tapp ended by stating he did not know or speak to inmate Goetzee.

The detectives then interviewed inmate Kernell Sanchez (B/M, D.O.B. 04/19/1991 F# 2274170) who is assigned to cell eight. Inmate Sanchez stated he was in his cell conversing with another inmate when be heard another inmate from cell three calling for help, and Deputy Williams entered the tier a few moments later. Inmate Sanchez went on to state he then observed E.M.S. arrive on the tier at approximately 1830 hours. Inmate Sanchez ended by stating he did not know or speak to inmate Goetzee.

The detectives attempted to conduct interviews with inmates Oavid Johnson (B/M, D.O.B. 11/24/53, F# 2288657) and Eric Ballard (B/M, O.O.B. 01/31/1988), but were unsuccessful due to their mental statuses.

The detectives then met with Nurse Esma Bargky. Nurse Bargky stated she was notified by Deputy Williams there was an unresponsive inmate on the H.O.O. north side, and she immediately proceeded to the tier where she observed inmate Goetzee lying on his back in the cell. Nurse Bargky further stated she then began C.P.R. procedures on inmate Goetzee and requesting for someone to notify H.O.O. control

OPSO005119

E.M.S. would be needed. Nurse Bargky ended by stating she also stated she continued overseeing the treatment of inmate Goetzee until the E.M.S. unit arrived and took over.

The detectives then conducted an interview with Nurse Eddie Williams, who is also a member of the O.P.S.O., assigned to the Medical Department. Nurse Williams stated he was notified at O.P.P. Medical Office Nurse Bargky was in need of assistance with an inmate at the H.O.D. Facility. Nurse Williams then stated after receiving this information, he proceeded to the tenth floor, where upon arrival he observed Nurse Bargky administering C.P.R. to inmate Goetzee until E.M.S. arrived and took over the process.

The detectives then conducted an interview with Nurse Lesia Washington, who is also a member of the O.P.S.O., assigned to the Medical Department. Nurse Washington stated she proceeded to the H.O.D. Facility after receiving information Nurse Bargky was in need of assistance with an inmate who was found unresponsive in the H.O.D. Facility. Nurse Washington further stated upon arrival she observed Nurse Bargky rendering C.P.R. to inmate Goetzee until E.M.S. arrived on the floor and took over treatment. Nurse Washington then stated that after extensive C.P.R., E.M.S. placed inmate Goetzee on a stretcher and escorted him to the University Hospital emergency room for further treatment.

The detectives were later informed the initial findings from the Orleans Parish Coroner's Office stated inmate Goetzee's cause of death was from suffocation from over-consumption of toilet paper, and excessive amounts of toilet paper had been found in the inmate's stomach and throat. A final report on inmate Goetzee's autopsy will be obtained and made a part of this report.

An investigation into the misconduct of Deputy William Thompson will be conducted by Deputy Jerry Martin, who is also a member of the O.P.S.O., assigned to S.O.D. The findings of that investigation will be attached and made a part of this report.

A copy of any photographs and paperwork relative to this investigation will be attached and made part of this report. Any additional information obtained will result in a supplemental report.

Deputy Mark E. Jones, Sr.
O.P.S.O., Special Operations Division

OPSO005120

# Exhibit

# 22

## ORLEANS PARISH SHERIFF'S OFFICE

| ☒ INCIDENT REPORT | ITEM NUMBER |
|---|---|
| ☐ SUPPLEMENTAL REPORT  PAGE 1 OF 2 | H-25910-11 |

**EVENT**

| SIGNAL | INCIDENT | DATE/TIME OCCURRED | DIST/ZONE/SUB | STATUS | BULLETIN REQUIRED |
|---|---|---|---|---|---|
| 134 | Malfeasance in Office | August 8, 2011 | 1KO1 | ☐ OPEN ☒ CLEARED BY ARREST ☐ CLEARED BY EXCEPT. ☐ WARRANT ISSUED ☐ UNFOUNDED | ☐ YES ☒ NO |
| LOCATION OF OCCURANCE | | DATE/TIME OF REPORT | LIGHTING | | |
| 2735 Perdido | | August 8, 2011 | | | |

**VICTIM/REPORTING PERSON**

| ☒ VICTIM  ☐ WITNESS  ☐ REPORTING PERSON  ☐ INTERVIEW | | DATE OF BIRTH OR AGE | RACE | SEX | VICTIM TYPE | VICTIM # |
|---|---|---|---|---|---|---|
| The State of Louisiana | | X | X | X | L | 1 |
| HOME ADDRESS | ZIP CODE | HOME PHONE | SOCIAL SECURITY NUMBER | SOBRIETY | INJURY | TREATED |
| X | X | X | X | X | X | X |
| BUSINESS ADDRESS | ZIP CODE | BUSINESS PHONE | DRIVERS LICENSE NUMBER | OCCUPATION | | |
| X | X | X | X | X | | |

| ☐ VICTIM  ☐ WITNESS  ☒ REPORTING PERSON  ☒ INTERVIEW | | DATE OF BIRTH OR AGE | RACE | SEX | VICTIM TYPE | VICTIM # |
|---|---|---|---|---|---|---|
| X | | X | X | X | X | X |
| HOME ADDRESS | ZIP CODE | HOME PHONE | SOCIAL SECURITY NUMBER | SOBRIETY | INJURY | TREATED |
| X | X | X | X | X | X | X |
| BUSINESS ADDRESS | ZIP CODE | BUSINESS PHONE | DRIVERS LICENSE NUMBER | OCCUPATION | | |
| X | X | X | X | X | | |

**OFFENDER NO. 0**

| ☒ ARRESTED  ☐ WANTED  ☐ MISSING  ☐ RUNAWAY | | DATE OF BIRTH OR AGE | RACE | SEX | HEIGHT | WEIGHT |
|---|---|---|---|---|---|---|
| William Thompson | | 3-28-1977 | B | M | 5'5 | 150 |
| HOME ADDRESS | ZIP CODE | DATE/TIME OF ARREST | ARREST CREDIT | SOBRIETY | INJURY | TREATED |
| 3020 Rue Par Fontine | 70131 | August 8, 2011 | 94 | S | N | N/A |
| ARREST LOCATION | | SOCIAL SECURITY NUMBER | DRIVERS LICENSE NUMBER | DIST/ZONE/SUB | RIGHTS WAIVED FORM # | |
| 731 South Dupre | | | X | 1KO1 | | |
| ALIAS/NICKNAME | | MAGISTRATE DATE/TIME | | TRANSPORTED BY | | UNIT |
| | | T.B.S. | | | | |

| ARRESTEE ARMED AT TIME OF ARREST | ARREST TYPE | RESIDENT STATUS | JUVENILE DISPOSITION |
|---|---|---|---|
| ☐ UNARMED  ☐ SHOTGUN  ☐ KNIFE  ☐ AUTOMATIC  ☐ HANDGUN  ☐ RIFLE  ☐ OTHER WEAPON  ☐ SEMI-AUTOMATIC | ☐ ON VIEW  ☒ SUMMONS  ☐ EXISTING WARRANT | ☒ ORLEANS RESIDENT  ☐ NON-RESIDENT | ☐ RELEASED TO PARENT  ☐ HELD FOR COURT |

| CHARGES | VICTIM # | RELATIONSHIP |
|---|---|---|
| RS: 14:134 Relative to Malfeasance in Office | 1 | O |

**DESCRIPTION**

[Checklist boxes: 01-BUILD, 02-ODDITIES, 03-SCARS, 04-TATTOOS, 05-APPAREL, 06-SPEECH, 07-ACCENT, 08-FACIAL ODDITIES, 09-EYES, 10-NOSE, 11-TEETH, 12-HAIR COLOR, 13-HAIR STYLE, 14-FACIAL HAIR, 15-COMPLEXION]

ADDITIONAL DESCRIPTION

**CODES**

| RACE | VICTIM TYPE | SOBRIETY | INJURY | TREATED | VICTIM RELATIONSHIP TO OFFENDER (VICTIM WAS:) |
|---|---|---|---|---|---|

**ADM**

| DETECTIVE | CRIME LAB | OTHER | REPORTING CAR # |
|---|---|---|---|
| | | | |

| REPORTING OFFICER | BADGE | REPORTING OFFICER | BADGE | SUPERVISOR | BADGE |
|---|---|---|---|---|---|
| Jerry Martin | | | | Major Michael Laughlin   NO000722 | 223 |

| Signal : 134 | Orleans Parish Sheriff's Office Motor Vehicle Accident Report And Incident Report Continuation Sheet | State Computer # |
|---|---|---|
| Page of  2    4 | | N.O.P.D Item Number H-25910-11 |
| | Description | |

Deputy Jerry Martin, a member of the Orleans Parish Sheriff's Office (O.P.S.O.), assigned to the Special Operations Division (S.O.D), respectfully submits the following report relative to the events surrounding the misconduct of Deputy William Thompson, who is also a member of the O.P.S.O., assigned to the House of Detention (H.O.D.) Facility, in relation to the death of inmate William Goetzee (W/M, D.O.B. 11-14-1962, F# 68562).

## NARRATIVE

On Monday, August 8, 2011 the detective met with Major Michael Laughlin, who is also a member of the O.P.S.O., assigned as Commander of S.O.D., and who informed the detective inmate Gotezee expired at the H.O.D. Facility. Major Laughlin further stated inmate Gotezee expired while he was housed on the tenth floor of the H.O.D. Facility. Major Laughlin went on to state at the time of inmate Gotezee's death, he (Gotezee) was on suicide watch under direct supervision. Major Laughlin then stated Deputy William Thompson was assigned to the tenth floor, detailed to the direct observation of suicide-watch inmates, when inmate Gotezee was found unresponsive. Major Laughlin ended by instructing the detective to conduct a full investigation into inmate Gotezee's death.

The detective then conducted an audio/video recorded interview with Deputy Thompson. Prior to the interview, the detective advised Deputy Thompson of his Constitutional Rights per Rights of an Arrestee or Suspect Form Number 100979. Deputy Thompson acknowledged he understood his rights, signed the form and agreed to cooperate with the investigation. Deputy Thompson began by stating he was assigned to H.O.D. tenth floor when inmate Gotezee was found unresponsive. When asked who assigned him to the tent floor, Deputy Thompson stated Sergeant Nicole Harris, who is also a member of the O.P.S.O., assigned as Assistant Watch Commander. Deputy Thompson then stated his assignment was to conduct direct supervision of inmate Gotezee. When asked about his arrival time to the tenth floor, Deputy Thompson stated he arrive on the tenth floor at or about 1030 hours. When asked if he conducted a roll-call prior to taking command of his assignment, Deputy Thompson stated he did not.

When asked if any other O.P.S.O. members were assigned to the floor, Deputy Thompson stated Deputies Michael Williams and Shelia Crader, who are also members of the O.P.S.O., assigned to H.O.D., were assigned to the tenth floor. Deputy Thompson also stated License Practical Nurse (L.P.N.) Esma Bargky, who is also a member of the O.P.S.O., assigned to the Medical Division, and who was detailed to tenth floor medical clinic. Deputy Thompson then stated he conducted his first security check at or about 1022 hours. When asked about inmate Gotezee's demeanor, Deputy Thompson stated inmate Gotezee periodically came to his cell door and asked him to provide him with a gun.

Deputy Thompson went on to admit he left the tier three times during his tour of duty. When asked to elaborate, Deputy Thompson stated he first left the tier to assist Deputy Williams with feed-up, which took about an hour to an hour and a half. Deputy Thompson then stated the second time he exited the tier was to use the restroom, which took about fifteen minutes. Deputy Thompson further stated he exited the tier a third time from about 1630 hours to about 1830 hours. When asked to explain, Deputy Thompson stated he sat inside the nurses' station because he was hot sitting on the tier.

Deputy Thompson further stated while sitting inside of the nurses' station, Deputy Williams alerted him inmate Goetzee had been found unresponsive. Deputy Thompson then explained he immediately proceeded down the tier to assist Deputy Williams in rendering aid to inmate Goetzee. Deputy Thompson went on to explain upon their arrival, he and Deputy Williams observed inmate Gotezee lying on the floor unresponsive. Deputy Thompson ended by stating he then alerted Nurse Bargky, but he did not assist in resuscitation procedures because he was not medical staff.

NO000723

The detective then conducted an audin/video recorded interview with Sergeant Nicole Harris. During the course of the interview, Sergeant Harris stated on Sunday, August 7, 2011, at or about 0930 hours, she instructed Deputy Thomson to proceed to H.O.D. tenth floor. Sergeant Harris then stated Deputy Thompson's assignment on the tenth floor was to conduct direct supervisinn nf inmate Goetzee. Sergeant Harris went nn to state at or about 1100 hours she phnned the tenth floor in an effnrt to cbeck on Deputy Thompson. Sergeant Harris further stated during the call she spoke with Deputy Crader, who advised ber Deputy Thomson was not nn the tier conducting direct supervisinn. Sergeant Harris explained she then spoke with Deputy Thompson and nrdered him to immediately return to the tier to conduct direct supervision. Sergeant Harris ended by stating she has had previous problems with Deputy Thompson staying on assigned tasks.

The detective was then advised by Major Laughlin he received information from Orleans Parish Coroner's Office Chief Examiner Jnhn Gagliano, advising him the initial autopsy findings revealed toilet paper inside nf inmate Goetzee's stomach.

The detective then conducted an audio/video recorded interview with Deputy Crader. Deputy Crader recalled nn the date in questinns, Deputy Thomas had left his assigned post nf direct nbservatinn and Sergeant Harris having to call and instruct him to return to his post. Deputy Crader then stated Deputy Thomas complied with the order, however, after twenty or thirty minutes, Deputy Thompson left the tier again and did not return until inmate Goetzee had been fnund unresponsive.

The detective then reviewed the inmate roll sheet fnr Sunday, August 7, 2011. After reviewing the document, the detective learned inmate Warren Baker (B/M, D.O.B. 06-11-1972, F# 2298492) was housed inside of cell two with inmate Goetzee during the time of Goetzee's death.

The detective then conducted an audio/vidco recorded interview with inmate Baker, who agreed to cooperate with the investigatinn. Inmate Baker stated he was housed in the same cell with inmate Goetzee at the time Goetzee was found to be unresponsive. When asked about inmate Gotezee's actions throughout the day, inmate Baker stated inmate Gotezee was talking to himself a lot. Inmate Baker then stated he did not knnw how inmate Goetzee nbtained toilet paper, but during the course nf the day, Gotezee continuously swallnwed bits nf the toilet paper. Inmate Baker continued stating during a fifteen minute period while Deputy Thnmpson was gone, inmate Gotezee began to swallnw large amnunts nf toilet paper. Inmate Baker then stated he fell asleep on his bunk for a while, and when he woke up, be fnund inmate Goetzee laying unresponsive on the floor.

The detective then conducted an audin/video recorded interview with Deputy Williams. Deputy Williams began by stating at approximately 0930 hours, Deputy Thompson arrived nn the tenth floor to provide direct supervision nf cell two on the H.O.D. Nnrth tier. Deputy Williams then stated after twenty nr thirty minutes, Deputy Thompson left his assigned post. Deputy Williams then stated minutes later, Sergeant Harris phoned the tenth floor and instructed Deputy Thnmpson to return to the tier. Deputy Williams went nn to state Deputy Thompson immediately went back to the tier; however, a few minutes later he left the tier again to use the restroom and nbtain a soft drink. Deputy Williams further stated Deputy Thompson then proceed to count the inmate feed up patties. When asked if Deputy Thompson completed an inmate observatinn checklist, Deputy Williams stated he did not. Deputy Williams then explained upon completinn nf feed-up, Deputy Thompson sat inside the nurse's station fnr several hours. Deputy Williams further explained he was later alerted by inmate Baker yelling an inmate was unresponsive inside nf his cell and be discovered inmate Goetzee laying unresponsive in cell two.

The detective then conducted an audio/video recorded interview with Sergeant Everett Marshall, who is also a member nf the O.P.S.O., assigned as assistant watch commander fnr the H.O.D. Facility. Sergeant Marshall began by stating inmate Gotezee was bnused on the tenth floor because he was suicidal. When asked who was assigned to direct nbservation of inmate Gotezee, Sergeant Marshall stated it was Deputy Thompson. Sergeant Marshall went on to state Deputy Thnmpson did not fill nut a direct observatinn checklist sheet. Sergeant Marshall ended by stating when be arrived to the tenth floor for the back-up call, Deputy Thompson was not on the floor.

NO000724

Upon completion, Major Laughlin advised the detective he received a direct supervision sheet from Doctor Samuel Gore, who is also a member of the O.P.S.O., assigned as Director of Medical Services, which was allegedly completed by Deputy Thompson. Major Laughlin ended by stating although the document was complete, it was not signed by a member of the H.O.D. rank.

On Tuesday, August 9, 2011, the detective conducted a second audio/video recorded interview with Deputy Thompson. Prior to the interview, the detective again advised Deputy Thompson of his Constitutional Rights per Rights of an Arrestee or Suspect Form Number 100980. Deputy Thompson acknowledged he understood his rights, signed the form and agreed to cooperate with the investigation. When asked if he completed a direct supervision log sheet Deputy Thompson stated he had. The detective then provided Deputy Thompson with the document. The detective then inquired about the rank signature. After reviewing the document, Deputy Thompson stated be did not know why the document was not signed. The detective then reviewed the document along with Deputy Thompson. After reviewing the document, Deputy Thompson admitted he was not on the tier for over two hours throughout the course of the day, and therefore had falsified the document.

After reviewing the facts and circumstances surrounding this case, it was decided Deputy Thomas would be placed under arrest for violation of Louisiana Revised Statutes (L.A.R.S.) 14:134, relative to Malfeasance in Office, and 14:132, relative to Injuring Public Record. From the dates of Thursday, August 11, 2011 until Tuesday, August 16, 2011, the detective made several attempts to contact Deputy Thompson via telephone, but to no avail. The detective then proceeded to Deputy Thompson's apartment to affect the arrest, but again to no avail.

The detective then obtained a warrant for the arrest of Deputy Thompson for the above-mentioned charges. The warrant was signed by Magistrate Judge Gerald Hanson of the Orleans Parish Criminal District Court.

On Thursday, August 18th, 2011, Deputy Thompson presented himself to the O.P.S.O. Intake and Processing Center to turn himself in. Deputy Thompson was booked according to the above-mentioned charges, and released on a $15,000 bond.

A copy of all photographs and paperwork will be attached and made part of this report. Any additional information obtained will result in a supplemental report.

**\*THE OFFICE OF THE HONORABLE DISTRICT ATTORNEY TO BE CONSULTED\***

| Reporting Officer    Badge | Reporting Officer    Badge | N.O.P.D Access Number |
|---|---|---|
| J. Martin | | |

NO000725

# Exhibit

# 23



## Orleans Parish Criminal Sheriff's Office
## Medical Department

## Psychological Autopsy

| | |
|---|---|
| Patient: | William Goetzee |
| Folder#: | 68562 |
| DOB: | 11/14/62 |

| | |
|---|---|
| Date of Incarceration: | 8/2/11 |
| Date of Death: | 8/7/11 |

| | |
|---|---|
| Reviewer: | C. Michael Higgins, MD |

| | |
|---|---|
| Information Sources: | Medical/Psychiatric Records |
| | FBI Special Agent Report |
| | Medical Staff |

### Description of Act

Mr. Goetzee was found unresponsive in his cell on 8/7/11 at approximately 1830. He had apparently stuffed toilet paper down his throat in order to commit suicide. Mr. Goetzee did this while on suicide watch and house with a cellmate.

### Background Information

Mr. Goetzee was a 48-year-old Caucasian male. He was single male. He was a citizen of the United States with a master's degree in Occupational Health & Safety Engineering. He worked for the Coast Guard.

Mr. Goetzee was in custody for charges of Assault on a Federal Officer. He had entered an occupied Federal Protective Services patrol vehicle, struggled with the officer for his gun, and exclaimed "I want to kill myself, give me your gun."

### Suicide Risk Factors

Mr. Goetzee was transferred to the Acute Mental Health Tier on 8/3/11. He was not answering questions appropriately, was oriented to person only, and had elevated vital signs. He was routed to LSU Interim Hospital to rule out Delirium. He returned from the hospital on 8/5/11 with diagnoses of Psychosis and Hypertension. He was started on

Lisinopril and Risperdal, transferred back to the Acute Mental Health Tier, and was placed on Direct Observation watch. He reported on the *Initial Psychiatric Evaluation* that he was depressed, hopeless, had anhedonia and suicidal ideations. He had one previous psychiatric hospitalization at River Oaks in June of 2011. He had last been seen as an outpatient io July of 2011 also at River Oaks. He stated that he was not compliant with his mental health medications prior to his arrest. His stressors included his current charges and family problems.

Final Observations/Conclusions

Mr. Goetzee was treated appropriately by the OPSO Medical Department. He was ordered Direct Observation with a Suicide Smock. He had medications ordered as suggested by LSU Interim Hospital for his medical and mental health needs. Medical had continued the order for direct observation up until the time of his death; however, security failed to provide the continuous observation allowing Mr. Goetzee to kill himself.

Plans are in place to improve the training of the deputies providiog the direct observation. The Medical Department will train the deputies with emphasis on the importance of their job and risk factors for suicide. The goal will be to have a small group of deputies who will help provide care to the inmates oo watch.

C. Michael Higgins, MD
Director of Psychiatric Services
OPCSO

OPS00350

# Exhibit

# 24

CRIMINAL OISTRICT COURT FOR THE PARISH OF
ORLEANS

STATE OF LOUISIANA        CASE NUMBER: 510-225
VERSUS
WILLIAM THOMPSON

Transcript of the Boykin Examination
Hearing in the above entitled Matter, as
Heard before the Honorable Camille Buras,
Judge presiding under the date of June 15,
2012.

APPEARANCES:
FOR THE STATE:
Alex Calenda, Esq., ADA

FOR THE OEFENSE:
Robert Jenkins, Esq.

Linda B. Legaux, CCR

```
              I N D E X
         TYPE OF EXAMINATION              PAGE #
Court Boykinizes Defendant                  4


Court sets sentencing date                 12



Reporter's certificate                     14
```

Linda Legaux
Certified Court Reporter

NO001286

P R O C E E D I N G S

THE COURT:

This is case number 510-225, State of Louisiana versus William A. Thompson.

MR. CALENDA:

Your Honor, the State is just making a brief amendment to the Bill of Information. There's an error as regard to the date in this Matter. The date is actually August the 7th of 2011, and the State is amending the Bill to reflect that date.

MR. JENKINS:

That's correct, Your Honor. Your Honor, as the Court said, this is case number 510-225. At this time, Mr. William Thompson would like to withdraw his earlier plea of not guilty, and enter a plea of guilty to the charge of malfeasance In Office. I've gone over the form and he's initialed. Are these your initials?

THE DEFENDANT:

Yes.

MR. JENKINS:

And did you sign it?

THE DEFENDANT:

Yes.

MR. JENKINS:

And I've signed it as well, as his attorney, too.

THE COURT:

All right, Mr. Thompson, can you raise your right hand.

***THE DEFENDANT WAS SwORN BY THE MINUTE CLERK.***

THE COURT:

Mr. Thompson, could you state your full name and your date of birth for the Record?

THE DEFENDANT:

William A. Thompson.  3-28-1977.

THE COURT:

Mr. Thompson, you're charged with Malfeasance in office.  That is a felony offense under Louisiana law, and it carries a penalty of not more than five years with or without hard labor, and/or a fine of up to $5,000.  Do you understand both the charge and the sentencing range that it carries?

THE DEFENDANT:

Yes.

THE COURT:

Pursuant to discussions with the State and the Defense, the Court is not imposing your sentence today.  This sentence will be predicated on the results of the pre-sentence investigation after a full Sentencing Hearing where the victims are allowed to make impact statement, and therefore, there is no guarantee what the sentence may be.  It may be probation.  It may be

Linda Legaux
Certified Court Reporter

NO001288

jail time.  It may be a combination of both.  Do you understand that there is no guarantee as to what the sentencing will be in this case, Mr. Thompson?

THE DEFENDANT:

Yes.

THE COURT:

I'm going to go through your constitutional Rights with you.  You need to let me know that you do understand the Rights, and that you do agree to give your Rights up.  If at any time you wish to stop the Plea of Guilty, you can, or I'll answer any questions that you may have.

If at any time you want to stop this Plea of Guilty, you can, or I'll answer any questions, of course.

Do you understand you have the right to a trial by Judge or a jury?

THE DEFENDANT:

Yes.

THE COURT:

Do you understand that you are presumed innocent until the District Attorney proves your guilt beyond a reasonable doubt?

THE DEFENDANT:

Yes.

THE CDURT:

Do you understand the District Attorney would be forced to call

witnesses who, under oath, would have to testify against you at trial, and your attorney would have the right to ask questions of each of those witnesses?

THE DEFENDANT:

Yes.

THE COURT:

Do you understand that you would have the right to testify at trial if you chose to do so, or you could remain silent if you chose not to testify, and your silence would not be held against you, or be considered as evidence of your guilt?

THE DEFENDANT:

Yes.

THE COURT:

Do you understand you would have the right to present any witness who would testify for you, and/or present evidence that would be helpful or favorable to you?

THE DEFENDANT:

Yes.

THE COURT:

Do you understand you have the right to take any appeal of any verdicts of guilty that might be returned against you at trial?

THE DEFENDANT:

Yes.

THE COURT:

Do you understand if you had decided to go to trial and could not have afforded a lawyer, I'd have appointed a lawyer to represent you for purposes of all of your pre-trial hearings, your trial and your appeal?

THE DEFENDANT:

Yes.

THE COURT:

Has anyone, in any way, forced you, coerced you or threatened you into entering a guilty plea?

THE DEFENDANT:

No.

THE COURT:

Are you satisfied with the way Mr. Jenkins and the Court has handled your case for you?

THE DEFENDANT:

Yes.

THE COURT:

Is this your signature down here at the bottom?

THE DEFENDANT:

Yes.

THE COURT:

And your initials W.T. in different places on the form?

THE DEFENDANT:

Yes.

THE COURT:

Did Mr. Jenkins go over this form

with you and explain it to you before you signed it?

THE OEFENDANT:

Yes.

THE COURT:

oo you have any questions about the Plea Form, or questions about anything that's happened to you, not just today in court, but anytime you've been in court?

THE DEFENOANT:

No.

THE COURT:

Factual basis for the Plea, State.

MR. CALENOA:

Your Honor, Mr. William Getsee (phonetically) was arrested on August the 2nd, 2011, and booked into the orleans Parish Criminal Sheriff's custody. Mr. Getsee, a Coast Guard Corporal, was arrested after attempting to take a gun from a Federal Agent outside the Federal courthouse on Poydras Street.

During that exchange, Mr. Getsee made a statement that he wanted to kill himself. Once booked into O.P.P., Mr. Getsee was transferred to the House of Detention, 10th floor, and placed under suicide watch.

Criminal Sheriff's policy of suicide patients dictates that a deputy

continuously monitor the inmate, complete observations and a restraint checklist.

The Defendant, Mr. Thompson, a sheriff's deputy, was assigned to constantly monitor Mr. Getsee on August the 7th beginning at 10:20 a.m. At approximately 5:45 p.m., a fellow inmate awoke to find Mr. Getsee unconscious in the cell. The inmate yelled for help.

An additional deputy, Deputy Michael Williams arrived first and alerted the nurse on charge. Mr. Thompson, who was in the nurse's station at the time, followed the nurse to the cell. Medical staff attempted to revive Mr. Getsee, without success. Mr. Getsee died from asphyxiation as result of swallowing toilet paper throughout the day.

During a taped interview, the Defendant admitted to leaving his post three times for one and a half hours, 15 minutes, and two hours, respectfully. The Defendant also submitted the observation or restraint checklist, indicating falsely that he viewed Getsee continuously from 10:22 a.m. until 6:15 p.m.

In the second recorded interview, Defendant Thompson admitted to submitting a timesheet, and that it contained false information.

THE COURT:

Mr. Thompson, those are the facts as the State alleges them against you. Those are what the State would show in a trial in this Matter. Again, those are the allegations in the State's presentation of their case. Do you understand the allegations made against you in this case?

THE DEFENDANT:

Yes.

THE CDURT:

And you've discussed that with Mr. Jenkins, your counsel?

THE DEFENDANT:

Yes.

THE COURT:

Asking you, are you pleading guilty to malfeasance In Dffice because, in fact, you are guilty of that charge?

THE DEFENDANT:

Yes.

MR. JENKINS:

Judge, may we approach for a moment?

THE COURT:

Yes.

***AN DFF THE RECORD SIDEBAR DISCUSSION TDDK PLACE. ***

THE COURT:

Mr. Thompson, this is a felony offense. Under Revised Statute 15:529.1, the State of Louisiana regards

this felony conviction today, that they can use it under that statute, which is a Louisiana Habitual Offender Law. In other words, if you commit another felony offense in the future, this plea today, this conviction obtained today can be used against you by the District Attorney's office to charge you as a repeat offender. Do you understand that consequence?

THE DEFENDANT:

Yes.

THE COURT:

Your Post-Conviction Rights under Article 930.A, the Code of Criminal Procedure provide you with Post-Conviction protections. Those Post-Conviction Rights state that you have two-years from final judgment to exercise your Post-Conviction protections. Failing to exercise the Rights within that time-period may mean that you lose your right to do so. Do you understand your Post-Conviction Rights?

THE DEFENDANT:

Yes.

THE COURT:

Do you have any questions at all about anything that's happened to you, not just today in court, but any time you've been in court?

THE DEFENDANT:

No.

THE COURT:

At this time, the Court believes the Defendant understand the processes that are occurring, knows the facts of this case, the law that applies thereto, and the consequences of his guilty plea. He has freely and voluntarily entered this guilty plea, and freely, and voluntarily and knowingly waived his Constitutional Rights.

He is satisfied with representation of counsel, and for pretrial discussions with the State and the Defense, the Court feels the guilty plea is based in fact, evidence and law, and the Court accepts the Guilty Plea.

The Court is going to order a Pre-Sentence Investigation into this Matter. We'll set Sentencing, if both the State and the Defense agree?

MR. CALENDA:

Your Honor, after consultation with all parties involved, we ask for a date of September 7th.

THE COURT:

Okay. September the 7th it is, 9-7. Mr. Thompson, please get a subpoena for September 7th. With both sides advising their clients and the victims that Department of Corrections Probation and

Parole agent will be contacting them for input for this Pre-Sentence investigation. And Mr. Jenkins, you can counsel your client as to whether or not he wants to speak with them or not. I'll see everybody on September the 7th, 2012.

MR. CALENDA:

Thank you, Your Honor.


(end of this proceeding)

Linda Legaux
Certified Court Reporter

NO001297
13

C E R T I F I C A T E

I, Linda B. Legaux, Certified Court Reporter, do hereby certify that the foregoing transcript consisting of 13 pages is a true and accurate transcript, in the matter of the State of Louisiana versus William Thompson, Docket number 510-225, as heard before the Honorable Camille Buras, Judge presiding under the date of June 15, 2012, and is transcribed to the best of my ability, knowledge and understanding.

_____

Linda B. Legaux,
Criminal District Court
Parish of Orleans
State of Louisiana

# Exhibit

# 25

West's Louisiana Statutes Annotated
Louisiana Revised Statutes
Title 14. Criminal Law
Chapter 1. Criminal Code (Refs & Annos)
Part VII. Offenses Affecting Organized Government
Subpart F. Official Misconduct and Corrupt Practices (Refs & Annos)

LSA-R.S. 14:134

§ 134. Malfeasance in office

Effective: August 15, 2011

Currentness

A. Malfeasance in office is committed when any public officer or public employee shall:

(1) Intentionally refuse or fail to perform any duty lawfully required of him, as such officer or employee; or

(2) Intentionally perform any such duty in an unlawful manner; or

(3) Knowingly permit any other public officer or public employee, under his authority, to intentionally refuse or fail to perform any duty lawfully required of him, or to perform any such duty in an unlawful manner.

B. Any duty lawfully required of a public officer or public employee when delegated by him to a public officer or public employee shall be deemed to be a lawful duty of such public officer or employee. The delegation of such lawful duty shall not relieve the public officer or employee of his lawful duty.

C. (1) Whoever commits the crime of malfeasance in office shall be imprisoned for not more than five years with or without hard labor or shall be fined not more than five thousand dollars, or both.

(2) In addition to the penalty provided for in Paragraph (1) of this Subsection, a person convicted of the provisions of this Section may be ordered to pay restitution to the state if the state suffered a loss as a result of the offense. Restitution shall include the payment of legal interest at the rate provided in R.S. 13:4202.

**Credits**
Amended by Acts 1980, No. 454, § 1; Acts 2010, No. 811, § 1, eff. Aug. 15, 2011.

**Editors' Notes**

**REPORTER'S COMMENT--1950**

Louisiana statutes covered:

Acts 1912, No. 254, § 1 (general malfeasance in office provision).

R.S.1870, § 872 (failure of officer to perform duty).

Source and scope:

The first paragraph, defining those coming within the section, is broader than the former Louisiana statute, in that it includes employees.

Subdivisions (1), (2) and (3) have been substantially copied from our former Louisiana statute, Acts 1912, No. 254, § 1. Minor changes in phraseology were largely induced by a consideration of the New York statute. N.Y.Pen.Law (McKinney, 1938) § 1841.

Duty need not be "required by law":

The former Louisiana statute limited malfeasance in office to cases where the duty in question was "required of him, personally by law." A similar phrase, "enjoyed by law," in the New York statute has been limited to those duties imposed by statute. In People v. McCann, 151 Misc. 792, 273 N.Y.S. 839 (1934), aff'd 242 App.Div. 515, 275 N.Y.S. 887 (1934), it was held that a duty prescribed by the rules of the department of correction of the city of New York is not "a duty enjoyed by law"; and that the wilful omission by the warden of the New York County Penitentiary to perform such duty was not within the neglect of duty statute.

By phrasing the present section, "lawfully required of him," the offense should include the neglect or wrongful performance of any properly required duty, using the word "lawful" in the broad sense to include such administrative rules as were involved in the McCann case. This is believed to be a necessary change in view of the large number of important duties placed upon officers and employees of the state by departmental rules not having the force and effect of law.

Notes of Decisions (121)

LSA-R.S. 14:134, LA R.S. 14:134
Current through the 2013 Regular Session.

End of Document                                      © 2014 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit

# 26

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

MARGARET GOETZEE NAGLE,          CIVIL ACTION NO. 12-1910
ET AL

VERSUS                           SECTION:   "R"

SHERIFF MARLIN GUSMAN,           JUDGE:   Sarah S. Vance
ET AL
                          MAG. 2:   Joseph C. Wilkinson, Jr.

DEPOSITION OF WILLIAM THOMPSON, given in the above-entitled cause, before Raynel E. Schule, Certified Shorthand Reporter in and for the State of Louisiana, at the Law Offices of Mary E. Howell, 316 S. Dorgenois Street, New Orleans, Louisiana, 70119, commencing at 10:15 o'clock a.m., on Monday, the 13th day of January, 2014.

a1ceb32d-fd7e-4986-a966-e99ff4772eec

Page 26

want to go off the record for a minute?

MR. BRUSTIN:

Yeah.

(Off the record.)

BY MR. BRUSTIN:

Q.   Here we go.  All right.  So I'm showing what has been marked as -- so this is in "Plaintiff's 1," and it's Page NO12928, okay, and this is where the Court is going through the factual scenario of what happened with Mr. Goetzee for you to acknowledge and consider in connection with your plea.  You understand?

A.   Yes.

Q.   That's -- that's a correct description of what happened?  Let's go through it.  So on Page 12928, it says -- and this is the prosecutor, "Your Honor, Mr. William Getsee (phonetically) was arrested on August the 2nd, 2011, and booked into the Orleans Parish Criminal Sheriff's custody.  Mr. Getsee, a Coast Guard Corporal, was arrested after attempting to take a gun from a Federal Agent outside the Federal courthouse on Poydras Street."  Okay.  You

SOUTHERN COURT REPORTERS, INC.
(504)488-1112

a1ceb32d-fd7e-4986-a966-e99ff4772eec

understood that at the time, correct?

A.   Yes.

Q.   You knew that to be true at the time of your -- of your plea?

A.   Yes.

Q.   Okay.

A.   Of the plea, yes.

Q.   Okay, but at the time that you were involved with -- first of all, at the time you were involved with Mr. Goetzee, you didn't know him personally, correct?

A.   I didn't know him.

Q.   You had no personal animosity towards him, did you?

A.   No.

Q.   None whatsoever, correct?

A.   No.

Q.   You had never met him before, correct?

A.   No.

Q.   Now, at the time that you were involved with Mr. Goetzee, did you know he had been arrested after attempting to take a gun from a Federal Agent?

A.   No.

Q.   Not even generally?

a1ceb32d-fd7e-4986-a966-e99ff4772eec

A.   No.

Q.   All right.  Now, let's take a look at the next sentence.  It says, "Criminal Sheriff's policy of suicide patients" -- that same page, Line 31, "Criminal Sheriff's policy of suicide patients dictates that a deputy continuously monitor the inmate, complete observations and a restraint checklist."  Now, you understood that this was the written policy of the Sheriff's Department, correct?

A.   Yes.

Q.   We're going to go into it much later -- we're going to go into quite a bit later about whether it was actually followed by anybody, but that was the written policy, right?

A.   Yes.

Q.   All right.  Now, it says, "The Defendant, Mr. Thompson, a sheriff's deputy, was assigned to constantly monitor Mr. Getsee on August the 7th beginning at 10:20 a.m."  That's correct, right?

A.   Yes.

Q.   That's an accurate statement of the facts?

a1ceb32d-fd7e-4986-a966-e99ff4772eec

Page 29

A.   Yes.

Q.   And "At approximately 5:45 p.m., a fellow
     inmate awoke to find Mr. Getsee unconscious
     in the cell."  That's correct, right?

A.   Yes.

Q.   All right.  Let's go further down.  It
     says, "Mr. Getsee died from asphyxiation as
     a result of swallowing" -- swallowing --
     I'm sorry.  I'll give you line.

A.   I found it.  I found it.

Q.   It say, "Mr. Getsee died from asphyxiation
     as a result of swallowing toilet paper
     throughout the day."  That's an accurate
     description of what happened, correct?

A.   Yes.

Q.   That's your understanding of it, correct?

A.   Yes.

Q.   And then on Line 20 it says,
     "During a taped interview, the Defendant,"
     that's you, "admitted to leaving his post
     three times for one and a half hours, 15
     minutes, and two hours respectfully."  Is
     that correct?

A.   Yes.

Q.   It should say respect -- respectively, but

a1ceb32d-fd7e-4986-a966-e99ff4772eec

it says respectfully.  But that's what happened, correct?  That's what you said on tape, correct?

A.   Yes.

Q.   And that's accurate, correct?

A.   Yes.

Q.   That's an accurate statement of what happened?

A.   Yes.

Q.   Correct?

A.   Yes.

Q.   Then it says, "The Defendant also submitted the observation or restraint checklist, indicating falsely that he viewed Getsee continuously from 10:22 a.m. until 6:15 p.m."  That's also an accurate statement of the facts, correct?  As you -- as you agreed to under oath?

A.   Yes.

Q.   Now, this says also in the second recorded interview that you gave, you admitted to submitting a time sheet, and that it contained false information.  That's also accurate, correct?

A.   Yes.

a1ceb32d-fd7e-4986-a966-e99ff4772eec

Q.    You admitted when questioned about it that you had falsified -- falsified a time record?

A.    Yes.

Q.    You didn't try to hide it.  You told them the truth, right?

A.    Yes.

Q.    And, in fact, you had falsified a time report, correct?

A.    Yes.

MR. BRUSTIN:

Okay.  Let's take a look at -- let's mark this, please, as "Plaintiff's 3."

BY MR. BRUSTIN:

Q.    Let's keep all this -- we're probably going to need this again, so we'll keep that here.  We'll put that here.

MR. BRUSTIN:

Mark this as 4, please.

(Break in proceedings.)

BY MR. BRUSTIN:

Q.    Okay.  So let's first take a minute and look at "Plaintiff's Exhibit 3," and this is entitled, "Interoffice Memorandum."

a1ceb32d-fd7e-4986-a966-e99ff4772eec

Page 32

It's dated October 15th, 2007, and the subject is "Observation of Suicidal Inmates," and I wanted to show you this because this is the policy we were discussing earlier, the written policy for the Sheriff's Department. I want to make sure that you -- you agree with that. This policy says, and this is from 2007, "Starting immediately, all inmates with active suicidal ideation are" -- "are to be directly observed by the Security staff at all times." You recall that being the policy, correct?

A.   Yes.

Q.   And it says, "Inmates who've expressed the intent to harm themselves can do so in a matter of minutes." You understood that was the policy, correct?

A.   Yes.

Q.   And "Physical restraints are" -- "are occasionally an adequate solution, as determined inmates can free themselves enough to do harm." You're aware of that as well?

A.   (Witness shakes head.)

SOUTHERN COURT REPORTERS, INC.
(504)488-1112

Q. You don't -- you don't remember that part?

A. No. I -- I remember it.

Q. Okay, and this is the important part. It says, "Periodic monitoring is also a suboptimal solution ... the few moments required to successfully commit suicide necessitates continuous direct observation." You understood that that was the written policy, correct?

A. Yes.

Q. And then it says, "Any time an inmate is deemed 'suicidal', direct observation must commence immediately." You understood certainly at the time of this incident that was the written policy, correct?

A. Yes.

Q. And it says further down, "When encountering a possible suicidal inmate, immediately involve the Medical Staff for evaluation." You understood that to be the policy --

A. Yes.

Q. -- by 2007?

A. Yes.

Q. Okay, and then it says, "Initiate direct

a1ceb32d-fd7e-4986-a966-e99ff4772eec

Page 34

observation at that time ... and continue until a physician or psychiatrist concludes the inmate is no longer actively suicidal." You understood that to be the policy, correct?

A.   Yes.

Q.   And then it says, "While under direct observation, restrained inmates must receive the current routine monitoring with the appropriate documentation," correct?

A.   Yes.

Q.   And that includes observation logs, correct?

A.   Yes.

Q.   You understood that in 2007, correct?

A.   Yes.

Q.   And you understood that was the written policy in 2011?  In other words, you understood the policy hadn't -- the written policy hadn't changed, correct?

A.   Yes, yes.

Q.   And we're going to get into again whether or not anybody followed that policy, but that was the written policy, correct?

A.   Yes.

SOUTHERN COURT REPORTERS, INC.
(504)488-1112

a1ceb32d-fd7e-4986-a966-e99ff4772eec

Page 38

the bottom there?

A.   Yes.

Q.   This is -- this is him asking you this question.  "When asked about inmate Gotezee's demeanor, Deputy Thompson stated inmate Gotezee periodically came to his cell door and asked him to provide him with a gun."  That's -- that's an accurate description of what you told him, correct?

A.   Yes.

Q.   Okay.  Now, tell me -- so in other words, what happened was during the times when you were present with Mr. -- Mr. Goetzee on August 7th, he would periodically come to his cell door and ask you to give him a gun so he could kill himself, correct?

A.   He didn't ask many times.  He only asked, like, twice.

Q.   Okay.  So it could --

A.   Most of the time he was just lying down.

Q.   Okay, but it could have been more than twice?  Fair to say?  It could have been two or three times?

A.   No.

Q.   You think it was twice?

a1ceb32d-fd7e-4986-a966-e99ff4772eec

Page 39

A.    It wasn't that many times.

Q.    All right.  So two times on August 7th, Mr. Goetzee came to the cell door and asked you to give him a gun so that he could kill himself, correct?

A.    Yes.  He didn't say he wanted to kill himself.  He just asked for a gun.

Q.    Okay, and you understood, given that he was on suicide watch, you understood -- you understood it in your mind to mean that he was asking for a gun so that he could kill himself, correct?  Is that how you understood it?

A.    It could have been many scenarios honestly.

Q.    One -- fair -- fair enough.  One of the scenarios you understood was that he could use the gun to kill himself, correct?  That was one of the scenarios?

A.    Yes.

Q.    You certainly understood that might be -- that might be one of things he was asking to do, right?

A.    Could have been.

Q.    Okay, and given that he was on suicide watch, direct observation, fair to say that

a1ceb32d-fd7e-4986-a966-e99ff4772eec

Page 43

A.   Well, from what I learned, he wasn't supposed to be in the cell with him anyway because Baker was a State inmate, and Goetzee was a Federal inmate.

Q.   Okay.  When did you learn that?

A.   After this incident.

Q.   And do you remember who told you that?

A.   No, I don't.  If -- there was so much going on, but I heard it.

Q.   Okay, but you learned all that later?

A.   Yes.

Q.   All right, but at the time you understood that Inmate Baker like inmate -- like Mr. Goetzee was on direct observation?

A.   Yes.

Q.   Okay, and it says here, "Inmate Baker stated he witnessed inmate Goetzee chewing and swallowing toilet paper throughout the day."  Is that consistent with your understanding of how Mr. Goetzee died?

A.   Reword it, please.

Q.   Sure.  You've already told us that there were many hours when you were not watching Mr. Goetzee, correct?

A.   Yes.

SOUTHERN COURT REPORTERS, INC.
(504)488-1112

a1ceb32d-fd7e-4986-a966-e99ff4772eec

Page 45

A.   No.

Q.   You don't know one way or another?

A.   No.

Q.    Is that correct?  You just don't know one
way or another?

A.    No, that's not correct.  I don't -- I don't
think he was chewing it throughout the day.
That's what I'm saying.

Q.    Okay.  You think it was a period -- it may
have been a period of hours, but it wasn't
throughout the day?

A.    Yes.

Q.    Okay.  Now, again, we're going to get into
very soon who actually followed the policy,
what other people did or didn't do, but I
want to just finish up with your -- with
your involvement.  Now, pursuant to the
policy we just talked about that -- that
patients -- that inmates could kill
themselves very quickly when on suicide
watch, you knew on August 7th of 2011, that
anyone on suicide watch had the potential
risk of killing themselves, correct?

A.    Yes.

Q.    You knew it could happen quickly if you

a1ceb32d-fd7e-4986-a966-e99ff4772eec

Page 46

weren't watching, correct?

A.   Yes.

Q.   You knew as you've told us that -- that Mr.
Goetzee asked you for a gun on at least two
occasions, correct?

A.   Yes.

Q.   You knew that Mr. Goetzee had tried to kill
himself previously or he wouldn't be on
suicide watch, correct?

A.   No.

Q.   You knew Mr. Goetzee had at least
threatened to kill himself or he wouldn't
be on suicide watch, correct?

A.   No.

Q.   Well --

A.   My --

Q.   Go ahead.

A.   My understanding is he said he was
suicidal, and he was put on suicide watch.
I wasn't given anything more specific than
that.

Q.   Okay, and so you knew that sometimes when
you were told that general information that
could mean that somebody had tried to kill
themselves five times or not at all, right?

a1ceb32d-fd7e-4986-a966-e99ff4772eec

Page 47

A. Yes.

Q. You didn't know one way or the other?

A. No.

Q. All you knew was that there was a risk that this person could actually kill themselves, correct?

A. Yes.

Q. And given that Mr. Goetzee had asked for a gun twice, you knew that Mr. Goetzee was at substantial risk of hurting or killing himself if allowed, correct?

A. He could have honestly.

Q. Okay, and you understood that the only way to make sure that Mr. Goetzee if he was, in fact, suicidal, didn't kill himself was to watch him constantly, correct?

A. Yes.

Q. And you did not watch him constantly that day, correct?

A. Yes.

Q. And at least at some -- during some portion of the day you chose to go to the nurses station, correct?

A. Yes.

Q. And when you chose to go to the nurses

a1ceb32d-fd7e-4986-a966-e99ff4772eec

Page 48

station, you chose not to watch Mr. Goetzee, correct?

A.   That's not black and white.

Q.   Well, I'm going to get into other reasons why you left your post, but at some point during the day, you went to the nurses station to be in the air conditioning, correct?

A.   No.  I went to eat.

Q.   Okay.  All right.  Fair enough.  We're going to get into the reasons why you left. I'm going to give you full opportunity to do that, but you chose during the day not to watch Mr. Goetzee during some hours of the day, correct?  That was your choice?

A.   Yes.

MR. BRUSTIN:

Could we just take an one-minute break.

MS. HOWELL:

Sure.

(Break in proceedings.)

MR. BRUSTIN:

Let's mark this No. 7.

BY MR. BRUSTIN:

a1ceb32d-fd7e-4986-a966-e99ff4772eec

Page 123

A.   Yes.

Q.   All right.  Now, what time during the day
-- you said he asked on at least two
occasions?

A.   Yes.

Q.   What time during the day did Mr. Goetzee
ask for your gun?

A.   Before the first -- before lunch.

Q.   Both times were before lunch?

A.   Yes.

Q.   Yes?

A.   Yes, yes.

Q.   And just to be clear, you never heard Mr.
Goetzee say he was okay, only that he
didn't want to go to TP5, correct?

A.   Yeah.

Q.   Do you remember anything else that Johnson
or Bargky said to you other than "Keep an
eye on him"?

A.   No.

Q.   All right.  Let's take a look -- let's go
back to Page 15 -- 5143 of Exhibit 7.

A.   I'm there.

Q.   Okay.  The paragraph beginning with, "The
detective then conducted an audio/video

a1ceb32d-fd7e-4986-a966-e99ff4772eec

Page 212

Q.   He seemed confused much of the time,
     correct?

A.   Not really.  Most of the time, like I said,
     he was lying down, but you know -- and when
     he ate, he didn't seem confused either.  So
     I guess it just came and went sometimes.

Q.   All right.  Anything else -- anything else
     other than asking for the gun that made you
     think he was -- he was confused?

A.   No, nothing I can recall.

Q.   The only interaction, verbal interaction
     that you remember with Mr. Goetzee was him
     asking for your gun at least twice?

A.   No.  I also had to tell him to get up to be
     evaluated, told him to turn around so I
     could put the handcuffs on him, and then,
     you know, tell him to walk to the nurses
     office.

Q.   Okay.  Do you remember him saying anything
     to you other than, "Give me your gun"
     twice?

A.   He spoke to me, but I don't remember what
     he said.

Q.   The only thing you remember is "Give me
     your gun."  Is that right?

a1ceb32d-fd7e-4986-a966-e99ff4772eec

# Exhibit

# 27

| | ORLEANS PARISH CRIMINAL SHERIFF'S OFFICE | INDEX#: 401.3 | PAGE: 1 of 1 |
|---|---|---|---|
| | | UPDATED: 09/01/2004 | |
| | CHAPTER: Training And Staff Development | | |
| | SUBJECT: Peace Officer Skills Training ("P.O.S.T.") For Security Personnel | | |

## POLICY:

It is the policy of the Orleans Parish Criminal Sheriff's Office to have a written policy and procedure that requires that ell security personnel complete Peace Officer Standards Training (hereinafter "P.O.S.T.") training prior to completion of the first year of employment.

## PURPOSE:

To ensure adequate knowledge of correctional procedures for eny Deputy Recruit who has inmete contact.

## PROCEDURE:

A. All Deputy Recruits (security personnel having regular or daily inmate contact) will report to the Training Academy and receive 90 hours of intensive classroom training for a P.O.S.T. Jail Officer Certificetion. Recruits will then receive several weeks of On the Job training and return to the Training Academy to receive 218 hours of training. Upon completion, Recruits will be certified as a Besic P.O.S.T. Correctional Officer. P.O.S.T. certification courses will include, but are not limited to, the following topics:

History of corrections
Functions of the jail
Law and legal issues
Rights and responsibilities of inmates
Supervision of inmates
Medical treatment end suicide prevention
First Aid and CPR
Emergency procedures and fire safety
Use of firearms
Disciplinary and administretive remedy procedures

B. All Deputy Recruits receiving P.O.S.T. certification shall adhere to the policies and procedures contained in the Peace Officer Standerds Treining Manual, of which all deputies shall receive a copy.

OPS04740

# Exhibit

# 28



| | | INDEX#: 401.3 | PAGE: 1 of 1 |
|---|---|---|---|
| | **ORLEANS PARISH SHERIFF'S OFFICE** | UPDATED: 9/03/2009 | REVIEWED: 8/28/2009 |
| | **CHAPTER: Training And Staff Development** | | |
| | **SUBJECT: Peace Officer Standards and Training ("P.O.S.T.") For Security Personnel** | | |

## POLICY:

It is the policy of the Orleans Parish Sheriff's Office to have a written policy and procedure that requires that all security personnel complete Peace Officer Standards Training (hereinafter "P. O.S.T.") training prior to completion of the first year of employment.

## PURPOSE:

To ensure adequate knowledge of correctional procedures for any Deputy Recruit who has inmate contact.

## PROCEDURE:

**A.** All Deputy Recruits (security personnel having regular or daily inmate contact) will report to the Training Academy and receive 90 hours of intensive classroom training for a P.O.S.T. Jail Officer Certification. Recruits will then receive several weeks of on the job training and return to the Training Academy to receive 218 hours of training. Upon completion, Recruits will be certified as a Basic P.O.S.T. Correctional Officer.

**B.** All Deputy Recruits receiving P.O.S.T. certification shall adhere to the policies and procedures contained in the Peace Officer Standards Training Manual, of which all deputies shall receive a copy.

OPS04915

# Exhibit

# 29



**POST COUNCIL**

WISDOM
TRAINING
KNOWLEDGE
PROFESSIONALISM

BC    05743

# State of Louisiana

### Peace Officer Standards & Training Council

#### hereby certifies

## WILLIAM A. THOMPSON

*as a*

## BASIC CORRECTIONAL PEACE OFFICER

*for having completed a Certified Correctional Officer Training Course*

*as provided for in the laws of the State of Louisiana*

issued this _____Third_____ day of _____July_____, in the year _Two thousand seven_

_____GOVERNOR_____

This certificate remains the property of the State of Louisiana,
and is subject to be revoked at any time.

_____CHAIRMAN_____

WT000278

# Exhibit

# 30

# Louisiana POST Jail & Corrections Training Curriculum
*Table of Contents*

## Topic / Section  (Page)

Written – Compiled – Edited  (3)
Acknowledgements  (4)
Authorization to Reproduce  (5)
Introduction & Purpose  (6)
Audiovisual Aids  (7)
Curriculum (Overview)  (8)

I. **Basic Issues  (13)**
   a. History of Corrections  (14)
   b. Functions of the Jail  (22)
   c. Role of the Correctional Officer  (31)
   d. Stress  (44)
   e. LSA-DOC Guidelines  (53)

II. **Supervision of Inmates  (72)**
   a. Principles & Skills of Supervision  (73)
   b. Staff-Inmate Relations  (89)
   c. Supervision of Inmate Activities  (102)

III. **Inmate Discipline & ARP  (123)**
   a. Disciplinary Procedures  (124)
   b. Administrative Remedy Procedure  (142)

IV. **Law and the Corrections Officer  (165)**
   a. LA Criminal Code & Code of Criminal Procedure  (166)
   b. Inmate Rights  (193)
   c. Officer Liability  (217)
   d. Courtroom Demeanor  (230)

V. **Security  (240)**
   a. Booking, Classification, & Release  (241)
   b. Principles of Jail Security, Security Checks & Hardware  (263)
   c. Tool, Key, and Weapon Control  (295)
   d. Fire Emergency  (309)
   e. Searches – Cell & Body  (336)
   f. Emergency Procedures  (360)
   g. Transporting Inmates  (373)

VI. **Special Procedures  (391)**
   a. First Aid & Adult CPR  (392)
   b. Medical Treatment  (394)
   c. Special Inmates  (409)
   d. Health, Sanitation, Food Service  (422)
   e. Suicide Prevention  (439)
   f. Bloodborne Pathogens  (464)

*(Cont. Next Page)*

OPS01990

VII.    Inmate Services  (466)
VIII.   Report Writing (493)
IX.     Defensive Tactics  (512)
X.      Orientation – Familiarization to Shotgun  (513)
XI.     Certification in Chemical Agent  (515)
XII.    Electives  (528)
XIII.   Testing  (530)
XIV.    Trainer-Course Evaluations (547)
XV.     Bibliography & Resources  (551)

OPS01991

**CURRICULUM**
**(Minimum)**

**LOUISIANA POST CORRECTIONS COURSE**

**90-HOUR CORRECTIONS OFFICERS SCHOOL**

***89 HOURS - REQUIRED CORE CURRICULUM***
***1 HOUR   - REQUIRED ELECTIVES***
***90 HOURS - TOTAL REQUIRED MINIMUM HOURS***

**BASIC ISSUES ---------- (8 HOURS – REQUIRED)**
HISTORY OF CORRECTIONS – (1 HR.).  Each training center should provide an introduction to the history and philosophy of Corrections in America, and from where it evolved.  The student should be familiar with the Criminal Justice System.
FUNCTIONS OF THE JAIL – (1 HR.).  Each training center should familiarize the student with the functions that provide care, custody, and control of all persons detained at the facility.
ROLE OF THE CORRECTIONAL OFFICER – (2 HRS.).  Each training center should provide an overview pertaining to the Corrections Officer of present day society.
STRESS – (1 HR.). Each training center should provide an insight into various forms of stress encountered by Correctional Officers.
LSA-DOC PARISH JAIL GUIDELINES – (3 HRS.).  Each training center should provide in depth training of these guidelines, approved by the Louisiana Sheriff's Association – Department of Public Safety and Corrections, and the United States District Court, Middle District, State of Louisiana.

**SUPERVISION OF INMATES – (7 HOURS – REQUIRED)**
PRINCIPLES AND SKILLS OF SUPERVISION – (2 HRS.) Each training center should provide an insight into basic procedures involving the care, custody, and control of inmates, which aid in the maintenance or order and prevention of escapes.
STAFF/INMATE RELATIONS – (2 HRS.) Each training center should provide an insight into areas of staff/inmate relations on a daily basis.
SUPERVISION OF INMATE ACTIVITIES – (3 HRS.) Each training center should provide an overview of what is necessary in the placement, cleanliness, and maintenance of order within the facility and also provide an overview of supervised functions within and outside of the facility.

**INMATE DISCIPLINE & ADMINISTRATIVE REMEDY PROCEDURE (4 HRS. REQUIRED)**

DISCIPLINARY PROCEDURES – (2 HRS.)  Each training center should provide an overview that explains in depth the Disciplinary Procedure and Administrative Segregation Procedure, and the formal process of each. This is termed by the Federal Courts as "Due Process".

ADMINISTRATIVE REMEDY PROCEDURE – (2 HRS.)  Each training center should provide in depth training which explains the Administrative Remedy Procedure (ARP) adopted by the Louisiana Sheriff's Association and approved by the Louisiana Department of Public Safety and Corrections; by which an inmate may file a grievance concerning conditions, incidents, etc. concerning staff and other inmates, on the existing facility, if the inmate filing the grievance is affected personally.

**LAW AND THE CORRECTIONAL OFFICER – (7 HRS. REQUIRED)**

LOUISIANA CRIMINAL CODE & CODE OF CRIMINAL PROCEDURE –(3 HRS.)  Each training center should familiarize the student with offenses particular to Corrections and an overview of the Louisiana Code of Criminal Procedure pertaining to Corrections.

INMATE RIGHTS – (2 HRS.)  Each training center should provide an overview of laws pertaining to constitutional guarantees, exploring the difference between inmate rights and inmate privileges.

OFFICER LIABILITY – (1 HR.)  Each training center should provide an overview of laws pertaining to possible officer liability.

COURTROOM DEMEANOR – (1 HR.)  Each training center should brief students on how to prepare for courtroom testimony.  The student should also understand factors which will have an effect on his testimony.

**SECURITY – (16 HRS. REQUIRED)**

BOOKING, CLASSIFICATION, AND RELEASE – (2 HRS.)  Each training center should provide a complete scope of inmate movement from the time of entrance to the time of release.

PRINCIPLES OF JAIL SECURITY, SECURITY CHECKS & HARDWARE -- (2 HRS.)  Each training center should provide an examination of techniques and equipment used to promote security within and around the perimeter of the existing facility.

TOOL, KEY, AND WEAPON CONTROL – (1 HR.)  Each training center should provide the student with the knowledge and understanding of the meaning of the word "Control" when discussing tool, key, and weapon control.

FIRE EMERGENCY – (4 HRS.)  Each training center should provide the student with the methods used to protect the inmates and staff, in case of a fire emergency.  Students should have hands on experience in the use of emergency equipment in relation to a fire in the facility.

SEARCHES – CELL AND BODY – (3 HRS.)  Eech training center should provide the student with training in the proper and effective methods for conducting cell and body searches.

EMERGENCY PROCEDURES – (2 HRS.)  Each training center should provide the student with emergency procedures concerning incidents such as riots, hostage situations, and other emergencies.

TRANSPORTING INMATES – (2 HRS.)  Each training center should provide the student with treining in the propar and effective methods used when transporting prisoners.

**SPECIAL PROCEDURES – (17 HRS. REQUIRED)**

FIRST AID AND ADULT CPR – (8 HRS.)  In order to reduce the amount of civil liability and to be covered by the "Good Samaritan Law", each student should meet the requirements to receive a "Basic First Aid" and "Adult CPR" Certification.  Re-certification should be conductad as tha Basic First Aid and Adult CPR certifications expire.  This should be done on an ongoing basis.  Students attending class that have a current "Basic First Aid" and/or "Adult CPR" certification that has six (6) months or more before expiration, then that student/s may be axempt from retaking this certification at this time.  A copy of the certification cards showing the expiration date must ba retained in the instructor's records with the other student's scores.

MEDICAL TREATMENT – (2 HRS.)  Each training center should provide the student with the understanding of an inmate's right to necessary medical treatment and the Correctional Officer's responsibility in providing that treatment.

SPECIAL INMATES:  (I.E., VIOLENT, UNCOOPERATIVE, ALCOHOLIC, PHYSICALLY ILL, MENTALLY ILL, DRUG ADDICT, HOMOSEXUAL, JUVENILE, SUICIDAL) – (1 HR.)  Each training center should provide the student with proper training to effectively control inmates having these special needs or issues that may present a problem in the jail environment.

HEALTH, SANITATION, FOOD SERVICE – (1 HR.)  Each training center should provide the student with training in conducting daily inspections throughout the facility to enforce policies and procedures regarding health, sanitation, and food service.

SUICIDE PREVENTION – (3 HRS.)  Each training center should provide the student with training in recognition in policies and procedures for an inmate that may be possibly considering suicide or initial medical screening for an inmate that may be a possible suicide risk upon that inmate being booked into the jail.  Training also needs to be provided to the student on "Suicide Watch Techniques" once an inmate is considered a suicide risk.

OPS01999

BLOOD BORNE PATHOGENS – (2 HRS.)  Each training center should provide the student with training in procedures about Blood Borne and Air Borne Pathogens, within the existing facility.

**INMATE SERVICES – (MAIL, TELEPHONES, WORK RELEASE PROGRAMS, EDUCATION AND COMMISSARY/CANTEEN) – (2 HRS. REQUIRED)**
MAIL.  Each training center should provide the student with the understanding of inmate rights affecting the proper handling of inmate correspondence, with special emphasis on legal mail.  Legal mail is defined in the LSA-DOC Parish Jail Guidelines.
TELEPHONES.  Each training center should provide the student with the understanding of the inmate's rights vs. privileges about telephone use in the facility.  Students should also be trained in the importence of telephone privileges to the inmate and the need for proper control of these privileges.
WORK RELEASE PROGRAMS.  Each training center should familiarize the student with procedures and guidelines for work release programs.
EDUCATION.  Each training center should familiarize the student with various forms of rehabilitation services pertaining to the education of inmates.
COMMISSARY/CANTEEN.  Each training center should familiarize the student with the optional food and canteen services within the facility.

**REPORT WRITING – (4 HRS. REQUIRED).**  Eech training center should teach the student the importance and mechanics of report writing.  The student should also be familier with the characteristics of a well-written report, including organization and spelling.

**DEFENSIVE TACTICS – (14 HRS. REQUIRED).**  Each student must be <u>certified</u> in a POST approved self-defense course.  This training should be directed toward "Defensive" and not "Offensive" tactics. This section of instruction must be done by POST Certified Defensive Tactics Instructors, aided by the POST Corrections Instructor.
BATON HANDLING. Each student should be trained in how to use the police baton.
PSYCHOMOTOR SKILLS (HAND TECHNIQUES).  Each student should be trained in hand techniques to better defend himself in unarmed encounters.
HANDCUFFING TECHNIQUES.  Each student should be exposed to at least two (2) methods of handcuffing.  They should also be familiar with the techniques necessary for safely uncuffing an inmate.

OPS02000

**ORIENTATION/FAMILIARIZATION TO SHOTGUN – (6 HRS. REQUIRED).** Each student should be instructed in the operation and handling of the police shotgun. The student should fire, if practical, the POST "Shotgun Course" that is in this curriculum, in order to become familiarized with the actual firing of the shotgun. Note: Although the pump shotgun is most common, students should be familiarized with all types of shotgun actions. *This section of instruction must be done by POST Certified Firearms Instructor/s, aided by the POST Certified Corrections Instructor.*

**CERTIFICATION IN THE USE OF CHEMICAL AGENT—(4 HRS. REQUIRED).** Certification in the use of chamical agents by Corrections Officers should be presented. This should also include Oleoresin Capsicum and other commonly used Lew Enforcement Chemical Agents. *Note: The use of any type of chemical agents on any student/s is not allowed, in this section of training unless part of the Certification course.*

**ELECTIVES – (1 HR. REQUIRED)** The instructor may choose at his/her discretion, from One (1) elective subject to complete the POST Basic Corrections Course. For Example: The instructor may choose One (1) subject that is completed in One (1) hour OR may choose to add One (1) hour to existing curriculum hours. A lesson plan that will comply with the requirements of this curriculum must be turned in to the POST Council with the student's test scores.
    EXAMPLES OF ELECTIVES:
- Cultural Awareness
- Extend or Elaborate on an existing subject in this course.

As stated, these are just examplas of electives that the instructor may use. There may be other subjects that a particular instructor at a particular facility may want to use as an elective subjact.

**TESTING**
- Each student must complete the POST Basic Corrections Course with a minimum of 70% on the test. Below 70% is not a passing score.
- No oral exams are allowed.
- There must be One (1) test given at the end of the first 40 hours of a 90 hour course. Thare must be One (1) test given at the and of the 90 hour course.

OPS02001

## _Basic Issues_
History of Corrections
Functions of the Jail
Role of the Corrections Officer
Stress
LSA-DOC Jail Guidelines

OPS02002

Show visual titled: "Valid Defenses".
Visual reads:

**Valid Defenses**
**Reasonable Action**
**Acceptable Documents**
**Actions-Valid Authority**

Discuss "Valid Defenses" as:
- Good faith actions coupled with **reasonable action**.
- **Acceptable** beginning **documents** (Incident reports, Disciplinary reports, ARP, Policy Manuals, Maintenance Records, Log books or grievances)
- **Actions** based upon what reasonably appeared to be **valid authority**.

Tell students:  There are three invalid defenses to a "1983" action.

Show visual titled: "Invalid Defenses 1983".
Visual reads:

**Invalid Defenses 1983**
**Budgetary**
**Unreasonable Conduct**
**Words Alone**

Discuss "Invalid Defenses 1983" as:
- **Budgetary** Defense – "we don't have enough funds to provide adequate training to correctional officers". (A lack of money is not a defense)
- Clearly **unreasonable** or outrageous **conduct**.
- Mere **words alone** – "I told the maintenance man to fix those toilets".

Tell students:  Some examples of torts that may occur in a correctional facility:
- Assault – Threatening an inmate with physical harm.
- Battery – Striking an inmate with no cause.
- Wrongful Death – Failure to observe an inmate on suicide watch or allowing an inmate to overdose on medications that have been smuggled into the facility. Allowing an inmate to save or stockpile medications then overdose, etc.
- Intentional Infliction of Emotional Distress – Willfully causing emotional distress, to cause the inmate to be in fear, etc.
- Failure to provide safety, medical care, etc. – Failure to provide medical care when an inmate needs that care.

## Guided Practice

Distribute case study titled "Unfortunate Joe".

- Allowing _____ courts (inmates trying inmates)
- Cruel & unusual punishment:
- Treatment from officers (beatings, torture, etc.)
- Inadequate jail conditions – the severity of one condition or the totality of circumstances of two or more less severe conditions.
- Overcrowding can be an example for _____ action if no steps are taken to alleviate these conditions.

4. Valid Defenses
- _____
- Acceptable Documents
- _____

- Good faith actions coupled with reasonable action
- Some acceptable beginning documents (Incident reports, Disciplinary reports, Log books or grievances)
- Actions based upon what reasonably appeared to be valid authority.

5. Invalid Defenses "1983"
- Budgetary
- _____
- Words Alone

- Budgetary Defense – "we don't have enough funds to provide adequate training to correctional officers. (A lack of money is not a defense)
- Clearly unreasonable or outrageous conduct.
- Mere words alone – I thought he was going to, so I did it first.

6. Five Types of Torts:
- _____ – Threatening an inmate with physical harm.
- _____ – Striking an inmate with no cause.
- _____ – Failure to observe an inmate on suicide watch or allowing an inmate to overdose on medications that have been smuggled in or allowing an inmate to save / horde medications then overdose, etc.
- Intentional Infliction of Emotional Distress – Willfully causing emotional distress, to cause the inmate to be in fear, etc.
- Failure to provide safety, medical care, etc. – Failure to provide medical care when an inmate needs that care.

OPS02213

- Allowing **kangaroo** courts (inmates trying inmates)
- Cruel & unusual punishment:
- Treatment from officers (beatings, torture, etc.)
- Inadequate jail conditions – the severity of one condition or the totality of circumstances of two or more less severe conditions.
- Overcrowding can be an example for **1983** action if no steps are taken to alleviate these conditions.

4. Valid Defenses
- **Reasonable Action**
- Acceptable Documents
- **Actions-valid authority**

- Good faith actions coupled with reasonable action
- Some acceptable beginning documents (Incident reports, Disciplinary reports, Log books or grievances)
- Actions based upon what reasonably appeared to be valid authority.

5. Invalid Defenses "1983"
- Budgetary
- **Unreasonable Conduct**
- Words Alone

- Budgetary Defense – "we don't have enough funds to provide adequate training to correctional officers. (A lack of money is not a defense)
- Clearly unreasonable or outrageous conduct.
- Mere words alone – I thought he was going to, so I did it first.

6. Five Types of Torts:
- **Assault** – Threatening an inmate with physical harm.
- **Battery** – Striking an inmate with no cause.
- **Wrongful Death** – Failure to observe an inmate on suicide watch or allowing an inmate to overdose on medications that have been smuggled in or allowing an inmate to save / horde medications then overdose, etc.
- Intentional Infliction of Emotional Distress – Willfully causing emotional distress, to cause the inmate to be in fear, etc.
- Failure to provide safety, medical care, etc. – Failure to provide medical care when an inmate needs that care.

OPS02215

## Instructional Input

Tell students:  To classify special needs inmates, special consideration to certain conditions must be given when classifying them to a housing assignment.

Show visual titled: "Special Needs Inmates".
Visual raads:

### SPECIAL NEEDS INMATES
**Medical**
**Alcoholic**
**Substance Abuse**
**Mental Illness**
**Homosexuals**
**Physically Impaired**
**Suicidal**
**Child Sex Offenders**
**Protective Custody**
**Juveniles**

Discuss "Special Needs Inmates" As:
- **Medical**
  - ° Inmates with communicable diseases.
  - ° (i.e. Aids, Hepatitis, T.B.)
- **Alcoholic**
- **Substance Abuse**
- **Mental Illness**
  - ° May injura themselves.
  - ° May attempt suicida.
- **Homosexuals**
  - ° Should be segregated.
- **Physically Impaired**
  - ° In housing areas designed to American Disabilities Act (ADA) standards, (if applicable).
- **Suicidal**
  - ° Should be housed in a designatad "Suicide Watch" araa.
- **Child Sex Offenders**
  - ° Should be segregated from the general population.
  - ° Protection from other inmates.
- **Protective Custody**
  - ° Placed in segregation for their own protection.
  - ° May be a police informant.
  - ° Prior Law Enforcement Officer.
  - ° May be a Material Witness.
- **Juveniles**
  - ° Separated from adults by sight and sound.
  - ° Unless adjudicated to be held over as an adult.
  - ° Considaration to inmate's physical stature.

OPS02240

Visual reads:

### Juveniles
### Special Considerations
### Incarcerated as Adults

Discuss "Juveniles" as:

- **Special Considerations:** When a juvenile is housed in an adult Correctional Facility, the juvenile must be protected from any contact with adult inmates (sight or sound). Only juveniles fourteen (14) years of age or older can be adjudicated as an adult. The judicial system has the legal responsibility to decide when a juvenile is housed as an adult. It is the moral responsibility of the Corrections Fecility to ensure the juvenile's safety and well being. Special considerations made to determine eppropriate housing for juveniles must be based on the juvenile's size and demeanor. Juveniles must be monitored closely for changes in mood or behavior as incarcerated Juveniles commonly become suicidal. Much more responsibility is involved for the Corrections Officer that is monitoring an incarcerated Juvenile.
- **Incarcerated as Adults:** Most adult Correctional Facilities are prohibited from housing juveniles. However, if a juvenile hes committed a serious crime and is remanded to be housed as an edult, special considerations may be made on his behalf. For example: if the juvenile is very young or small, for his safety, he may be kept in isolation for the duration of his incarceration. Protective Custody or Close Observation are other classifications juveniles are generally housed under when placed in an adult facility.

Show visual titled: "Suicidal Inmates"
Visual reads:

### Suicidal Inmates
### Signs & Symptoms
### Myths
### Guidelines

Discuss "Suicidal Inmates" as:

- **Signs and Symptoms:** Inmates that ere at risk of becoming suicidal are generally under the influence of drugs or alcohol; returning inmates with a history of suicide; those facing a crisis situation, such as long term incarceration, loss of children or spouse, etc. Some signs to wetch for that may indicate suicidal tendencies or intentions: depression; withdrawn; overly anxious; manipulative or impulsive, or simply making suicidal comments. Additionally, if the inmate begins to demonstrate changes in physical appearance such as becoming unkempt, or avoids eye contact, sleeps excessively or is apathetic, mey also be indications of depression end possibly lead to suicide.
- **Myths:** The greatest myths in regard to Suicide ere: "People who make suicidel threats don't commit suicide". And "You can't stop someone who is truly set on killing themselves".
- **Guidelines:** It is the Corrections Officer's responsibility to watch for and react to any inmate that is displaying suicidal tendencies. Every threat of suicide must be taken seriously and eppropriate actions taken by the Corrections Officer to prevent

any inmate from harming himself. There are many different guidelines associated with suicide prevention. Some of the most common guidelines are:

- o Placing the inmate in a "paper" gown or suit
- o Isolating the inmate in a "safe" cell
- o Conducting frequent checks and documenting behavior
- o Recommending psychiatric evaluation

Suicidal comments or threats should never be ignored under any circumstances.    It is the Corrections Officer's responsibility to ensure the safety of the inmate, even if that means protecting him from himself.

## Guided Practice

The instructor will divide the class into small groups. Each group will be given a scenario that they have to role-play in front of the class. The scenarios will involve handling e "Special Inmate". The group will have three (3) minutes to act out the scenario. The instructor will allow the class to identify what type of "Special Inmate" was portrayed in each scenario. The class will also discuss what could have been done differently for better results, in each scenario.

## Independent Practice

Have each student give an example of a situation involving a "Special Inmate". Then have the student relate some ways of dealing with the situation using techniques and information taught in class. Be prepared to clarify or expound on any of their responses. Make sure they know that they have only three (3) minutes to respond.

## Summary & Evaluation

Have students follow along es the note-taking guide is reviewed.

OPS02400

**Program Title:**    Basic Jail Training

**Lesson Title:**    Suicide Prevention

**Duration:**    Three (3) hours

**Prepared by:**    Master Class 2007

**Date:**    July 2007 (Revised October 2009)
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Target Audience:**  POST Corrections Cadets

**Size of Group:**    Up to 50

**Room Size:**    Standard classroom

**Materiels Required:** Writing material, note taking guide, handout material as specified in the design, flip charts and markers

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Rationale:**  Suicide attempts, both real and otherwise, are a major problem in jails today.  Jail confinement can lead to loneliness, depression, and desperation.  This lesson will teach the Corrections Officer how to house and control inmates with suicidal tendencies.

## Performance Objectives
Upon completion of this period of instruction, each participant will:
1.  List eight (8) types of individuals that can be identified as a suicide risk.
2.  List ten (10) signs of serious depression.
3.  List the three (3) key times for observation of new inmates
4.  Identify suicide watch procedures.
5.  List five (5) common myths about suicide.

## Anticipatory Set
The instructor will conduct a role-play that demonstrates the effect an inmate suicide could have on a Corrections Officer.  The instructor will utilize a co-instructor or a volunteer student to assist in the role-play.  The volunteer student or the co-instructor will preferably be of the opposite sex from the instructor because he/she will be playing the role of the instructor's spouse. The instructor will be seated in a chair in the front of the classroom.  He will have his face in his hands and appear to be very upset, maybe crying.  The volunteer student/co-instructor will walk into the room and notice the instructor sitting with his face in his hands.  The volunteer student/co-instructor then walks up to the instructor.
*Volunteer: "Honey, what is wrong?"*
Instructor: "Nothing" (hands still in face).
*Volunteer:  "You sure?  You can talk to me if you want to."*

OPS02422

Instructor: "Well, (looks up from hands), I hed a bad day. One of my inmates killed himself today."

Volunteer: "Oh my God! What heppened?"

Instructor: (Very shook up) "Well, I was doing a check, when I saw something hanging off the towel hook. I opened the cell door end saw that it was a jumpsuit so I wes going to get it and write up the inmate who left it there. I walked inside the cell and grabbed it, and when I did, a body swung to where its face was looking right et me! I pulled him down and called for help. I gave him CPR for what seemed like forever. (Instructor starts to pantomime spitting on the ground) I can't get the throw up taste out of my mouth. I tried to bring him beck, but he was dead. His eyes, God they were staring right through me. Then, I had to inventory his stuff. Turns out we went to high school together. He hed a little girl the same age as ours. He was only looking at a couple of years if he wes convicted. I don't get it. What brings a guy to make that kind of choice? I can't get his face out of my head. Seeing that guy dead like that, I don't know if I can do this anymore…I, I … (end role play).

Process Questions

Ask students: What was the role-play about?
Desired Response: A Corrections Officer extremely upset about dealing with an inmate who committed suicide.

Ask students: How would you handle that situation if something similar happened to you?
Desired Response: Expect a variety of responses. Instructor should be prepared to clarify any responses that do not coincide with the objectives of the course.

## Instructional Input

Tell students: In jails today, suicide attempts are a significant problem. The stress of confinement or the circumstances that led to the individual's arrest can lead to feelings of desperation and depression. These feelings can often prompt a person to attempt suicide. One of your jobs as a Corrections Officer is to try to prevent these attempts. In this class, you will learn to identify a potential suicide risk, key times to watch new inmates, signs of depression, suicide wetch plans, and common myths associated with suicide.

First, we will talk about individuals at risk.

Show visual titled: "Individuals at Risk"
Visual reads:

### Individuals at Risk
**Under the Influence of Drugs or Alcohol**
**Returning Inmates with Suicidal History**
**Withdrawn or Distant**
**Overly Anxious**

Discuss "Individuals at Risk" as:

- **Drugs or alcohol:** Drugs and alcohol are mind eltering substances. They affect

an inmate's ability to reason and make proper decisions.

- **Returning Inmates with Suicidal History:** Anybody who has previously been incarcerated in your facility and attempted suicide while they were there should be treated as suicidal until it is proven that they are not.
- **Withdrawn or Distant:** An inmate who appears withdrawn or distant may be contemplating suicide.
- **Overly Anxious:** An inmate who seems like he is waiting for something big to happen.

Show visual titled: "More Individuals at Risk"
Visual reads:

<div align="center">

**More Individuals at Risk**
**Suicidal Comments**
**Facing Crisis**
**Manipulative/Impulsive**
**Law Enforcement Officers**
**Depressed**

</div>

Discuss "More Individuals at Risk" as:

- **Suicidal Comments:** Any inmate who makes suicidal comments must be treated as suicidal.
- **Facing a Crisis:** Any inmate who is in the midst of a crisis or about to be in the midst of a crisis. Examples could be illness, professionals (pastor, clergy, priest, teachers, law enforcement officers, government officials) divorce, family death, trial, court appearances, sentencing, transfer inmates, and new inmates.
- **Manipulativa/Impulsive Inmates:** Inmates who are manipulative may attempt suicide just to seek revenge on a Corrections Officer who they are mad at. Impulsive inmates may commit suicide by accident.
- **Law Enforcement Officers:** Peace officers who have been arrested and incarcerated are very likely to attempt suicide out of feelings of shame and guilt.
- **Depressed:** This is the single most telltale sign that a person is suicidal.

## Guided Practice
Hand out case study titled "Here We Go Again"

OPS02424

**"Here We Go Again"**
(Instructor Version)

Deputy Jones has been a Corrections Officer at the local jail for the past five years. He loves his job and is considered a very good employee. One day, he is working in booking when a familiar face is brought in. Inmate Bricktown has been coming to jail for years. He is known as a troublemaker and a 'user of the system'. He is also known to just 'go crazy' sometimes. This time around, he has clearly been drinking when he is brought to booking. Deputy Jones tells Bricktown, "Here we go again, huh. Bricktown, go on over to the drunk tank and sleep it off." Bricktown says, "I'm suicidal, I ain't got to." Deputy Jones figures Bricktown is just using the system as normal so he tells Bricktown, "I don't care if you're suicidal or not, you're going." Bricktown walks to the tank but yells at Jones as he is going in, "I'll show you I'm serious."

Later on that evening, the next shift finds Bricktown hanging from the fire sprinkler, dead.

You have ten (10) minutes to discuss the following questions with your group and write down your answers. Be prepared to discuss them with the rest of the class.

1.  What did Deputy Jones do wrong?
    *Desired response:  He ignored a suicidal comment.*

2.  What Risk factors did Inmate Bricktown exhibit?
    *Desired response: Intoxicated with Drugs or Alcohol, suicidal comments, manipulative inmate.*

3.  What could Deputy Jones have done differently?
    *Desired response: Placed Bricktown on suicide watch; refer to a professional. Examples could be mental health staff, a Doctor, nurse (RN or LPN), paramedic, or EMT.*

**"Here We Go Again"**
(Student Version)

Deputy Jones has been a Corrections Officer at the local jail for the past five years. He loves his job and is considered a very good employee. One day, he is working booking when a familiar face is brought in. Inmate Bricktown has been coming to jail for years. He is known as a troublemaker and a 'user of the system'. He is also known to just "go crazy" sometimes. This time around, he has clearly been drinking when he is brought through booking. Dep. Jones tells Bricktown, "Here we go again, huh. Bricktown, go on over to the drunk tank and sleep it off." Bricktown says, "I'm suicidal, I ain't got to." Dep. Jones figures Bricktown is just using the system as normal so he tells Bricktown, "I don't care if you're suicidal or not, you're going." Bricktown walks to the tank but yells at Jones as he is going in, "I'll show you I'm serious."

Later on that evening, the next shift finds Bricktown hanging from the fire sprinkler, dead.

You have ten (10) minutes to discuss the following questions with your group and write down your answers. Be prepared to discuss them with the rest of the class.

1. What did Dep. Jones do wrong?

2. What Risk factors did Inmate Bricktown exhibit?

3. What could Dep. Jones have done differently?

OPS02426

**Instructional Input**

Tell students:  Since depression is **a** major sign of a suicidal inmate, we are now going to cover some signs of depression.

Show visual titled: "Signs of Depression"
Visual reads:

<div align="center">

**<u>Signs of Depression</u>**
**Chenges in Sleeping Patterns**
**Un-Tidy Physical Appearance**
**Sluggish Walk**
**Easily Fatigued**
**Change in Eating Patterns**
**Sitting Alone**
**Fetal position**

</div>

Discuss "Signs of Depression" as:

- **Chenges is sleeping patterns:** This could be aither sleeping more or less than normal
- **Un-Tidy physical appearance:** Hair uncombed, unsheven, wearing dirty clothes for several days in a row.
- **Sluggish walk:** Inmate may walk with shoulders slumped or he may drag his feet.
- **Easily fatigued:** May become tired after very little physical activity.
- **Chenge in eating patterns:**  This could ba either over or under eating.
- **Sitting alone:** The inmate may sit by himself and will not interact with other inmates or staff.
- **Fetal position:** The inmate may lay with his knees and arms tucked into chest.

Show visual titled: "More Signs of Depression"
Visual reads:

<div align="center">

**<u>More Signs of Depression</u>**
**Avoids Eye Contact**
**Monotone Voice**
**Apathy**
**Unrealistic Talk of Being Released from Jail**
**Gives Away Possessions**

</div>

Discuss "More Signs of Depression" as:

- **Avoids Eye Contact:** Will not look at you either when you speak to him or when he walks by.
- **Monotone Voice:** Never changes the pitch of voice when talking.
- **Apathy:** Does not care about anything.
- **Unrealistic Talk of Being Released from Jail:** The inmate may talk unrealistically of getting out of jail.  To that inmate, suicide is release from incarceration.
- **Gives Away Possessions:** This is a huge sign.  This may happen when an inmate receives a long prison santance or a call from home.

OPS02427

Show visual titled: "More Signs of Depression #2"
Visual reads:

**More Signs of Depression #2**
**Sudden Behavior Changes**
**Prior Suicidal History**
**Difficulty Concentrating**
**Cries Frequently**
**Talks of Suicide**

Discuss "More Signs of Depression #2" as:
- **Sudden Behavior Changes:** Any drastic changes in the way an inmate normally acts.  Happy to sad or sad to happy
- **Prior Suicidal History:** The inmate may have a history of suicide attempts.
- **Difficulty Concentrating:** The inmate may have trouble with normal routine activities.
- **Cries Frequently:** Cries for no reason and at odd times.
- **Talks of Suicide:**  If the inmate talks or threatens suicide.

**Guided Practice**

Hand out case study titled "Inmate Doolittle"

OPS02428

**"Inmate Doolittle"**
(Instructor Version)

Inmate Doolittle has been in jail at the local correctional center for 2 years. During that time, he has been on and off suicide watch severel times. He also is known to suffer from depression. Recently, however, he has been a model inmate. He has even been an inmate worker now and then.

Today, inmate Doolittle went to court and was found guilty. He was sentenced to 20 years in prison without the possibility of parole. When he returned, he didn't talk to anyone and just went beck to his cell. Later that day, he gave his entire commissary to his cellmate and was seen crying while staring at the wall.

You have ten (10) minutes to discuss the following questions with your group and write down your answers. Be prepared to discuss them with the rest of the class.

1. What might inmate Doolittle be thinking?
   *Desired response: Inmate Doolittle may be contemplating suicide.*

2. What are some signs thet inmate Doolittle may be thinking about suicide?
   *Desired response: Past history, suffers from depression, gave away commissary, crying.*

3. Whet would be a good course of action in dealing with Inmate Doolittle and his behavior?
   *Desired response: Placa inmate Doolittle on suicide watch.*

OPS02429

**"Inmate Doolittle"**
(Student Version)

Inmate Doolittle has been in jail at the local correctional center for 2 years. During that time, he has been on and off suicide watch several times. He also is known to suffer from depression. Recently, however, he has been a model inmate. He has even been an inmate worker now and then.

Today, inmate Doolittle went to court and was found guilty. He was sentenced to 20 years in prison without the possibility of parole. When he returned, he didn't talk to anyone and just went back to his cell. Later that day, he gave his entire commissary to his cellmate and was seen crying while staring at the wall.

You have ten (10) minutes to discuss the following questions with your group and write down your answers. Be prepared to discuss them with the rest of the class.

1. What might inmate Doolittle be thinking?

2. What are some signs that inmate Doolittle may be thinking about suicide?

3. What would be a good course of action in dealing with Inmate Doolittle and his behavior?

OPS02430

**Instructional Input**

Tell students:  There are also some key times to observe inmates for possible suicidal behavior.  These times are important because of the inmate's possible state of mind and the opportunity for a successful suicide attempt.

Show visual titled: "Key Times for Observation"
Visual reads:

<div align="center">

**Key Times for Observation**
**First 24 to 72 Hours**
**During Booking**
**During Transport**
**Prior To/After Transfer**
**Prior To/After Trial or Sentencing**
**Release**

</div>

Discuss "Key Times for Observation" as:

- **First 24 to 72 hours:**  This is a key time because the inmete's emotions may run high end he also may be coming off drugs or alcohol. Watch for signs of suicidal behavior.
- **During Booking:** New inmates must come through booking.  You will have many different personality types and this is a key time to observe behavior.
- **During Transport:** Transporting inmates requires a heightened sense of awareness because of the dangers essociated with transport.
- **Prior To/After Transfer:** This is a highly emotional time for inmates because of their change of location.  The realization of what is happening in their life may trigger them to attempt suicide.
- **Prior To/After Trial or Sentencing:**  This is a highly stressful time for inmates.  Emotions may run high and an inmate may contemplate suicide.
- **Release:**  This is normally thought of as a happy time for inmates.  However, they may be feerful of facing their victims, family of victims, loved ones or even returning to society.

**Guided Practice**

Process Questions

Ask students:  What are the three key times for observing inmates?
*Desired Response: First 24 to 72 hours, during booking, during transport*

Ask students:  Why are these times so important?
*Desired response: The inmate's possible state of mind and the opportunity for the inmate to be successful in a suicide attempt is greater.*

Ask students:  Why is the first 24 to 72 hours so important for observation?
*Desired response:  Inmate emotions may be high or he may be coming off drugs or alcohol.*

OPS02431

**Instructional Input**

Tell students:  Once you have identified an inmete as a suicide risk, they must be placed on suicide watch.  This is to protect the inmate from himself as well as you and your organization from liability.  The attempt here is to evoid the allegation of Deliberate Indifference.  **Deliberate Indifference** is broadly defined as "an act or failure to act coupled with whet eppears to be an uncaring attitude".  When taken together could have led to the action or the outcome.  Here are some acceptable watch plans.

Show visual titled: "Wetch Plan #1"
Visual reads:

<div align="center">

**Watch Plan #1**
**Isolate Inmate In Suicide Cell**
**Remove Items**
**Remove Clothes**
**Clothe in Suicide Gown**
**Finger Foode**
**Start Log**
**Observe Every 3-4 Minutes**

</div>

Discuss "Watch Plan #1" as:

- The inmate must be placed in a **suicide resietant cell by himeelf**.
- The cell must be **cleared of ALL items** prior to the inmate entering.
- The only items the inmate will be ellowed is a **paper, suicide resistant gown**, a mattress free from tears, and a suicide resistant blanket.
- The inmate will be served **"finger foods"** during meal times.  Finger foods are defined as food that can be eaten without utensils.
- A **suicide wetch log should be started**.  It will contain the inmate's name, the date, the shift, the time the inmate is observed, the name of the Correctional Officer observing the inmate, and the condition of the inmete at the time of observation.
- Inmate must be **obeerved every three to four minutes** without fail.

Show visual titled: "Watch Plan #2"
Visual reads:

<div align="center">

**Watch plen #2**
**Inmate in Cell With 2 or 3 Other Inmates**
**Observe Every 10 Minutes**
**Log Kept**

</div>

Discuss "Watch Plan #2" as:

- The suicide risk inmate is placed in e **regular cell with two to three other inmates**. This is recommended only if the inmate cannot be constantly observed by staff.
- The other inmates will serve as companions and can call for help if an emergency arises.
- The suicide risk inmate should be **observed every ten minutes** by staff.
- A **suicide watch log should be started**.  It will contain the inmate's name, the date, the shift, the time the inmate is observed, the name of the Corrections Officer observing the inmate, and the condition of the inmate at the time of observation.

OPS02432

Show visual titled: "Watch Plan #3"
Visual reeds:

**Watch Plan #3**
**Inmata Isolatad**
**Items and Clothas Ramoved**
**Inmate Worker Observea**
**Staff Checks**
**Log Kept**
**Finger Foods**

Discuss "Watch Plen #3" as:
- The inmate is housed in a **suicide resistant cell**.
- The cell must be **claared of ALL itams** prior to the inmate entering.
- The only items the inmate will be allowed is a **paper, suicide resistent gown**, a mattress free from tears, and a suicide resistant blanket.
- An **inmate worker** is placed in a position to **constantly observe** the inmate.
- The Corrections Officer **checks** on the inmete every 15-30 minutes.
- A **suicide watch log should be started**. It will contain the inmate's name, the date, the shift, the time the inmate is observed, the name of the Correctional Officer observing the inmate, the name of the inmate worker, and the condition of the suicidal inmate at the time of observation.
- The suicide risk inmate is fed **"finger foods"** et meal times.

Show visual titled: "Watch Plan #4"
Visual reads:

**Watch Plan #4**
**Isolate Inmate**
**Items and Clothes Removed**
**Staff Observes**
**Log Kept**
**FIngar Foods**

Discuss "Watch Plen #4" as:
- The suicide risk inmate is placed in a **suicide resistant cell**.
- The cell must be **claared of ALL itams** prior to the inmate entering.
- The only items the inmete will be allowed is a paper, suicide resistant gown, a mattress free from tears, and a suicide resistant blanket.
- A Corrections Officer **observes** the inmate **every fiftaan minutes**.
- A **suicide watch log should be started**. It will contain the inmate's neme, the date, the shift, the time the inmate is observed, name of the Corrections Officer observing the inmate, end the condition of the inmate at the time of observation.
- The suicide risk inmate is fed **"finger foods"** at meal times.

Show visual titled: "Watch Plan #5"
Visual reads:

OPS02433

### Watch Plan #5
### Direct Observation by Staff
### No Threat to Staff
### General Temporary Intervention Strategy

Discuss "Watch Plan #5" as:
- The suicide risk inmate must be in **constant observation by staff**.
- The suicide risk inmate is **no threat to staff**.
- This is a **temporary** watch plan and is not intended for long periods of time.
- A log should be considered as a means of justifying this plan.

### Guided Practice

Process Questions

Ask students:  What suicide watch plan has an inmate worker observing a suicide risk inmate?
*Desired response: Number three*

Ask students:  What suicide watch plan has the correctional officer observing the suicide risk inmate every fifteen minutes?
*Desired response:  Number four*

Ask students:  What is the definition of finger foods?
*Desired response: Food that can be eaten without utensils*

Ask students:  What suicide watch plan is the only plan where the suicide risk inmate keeps his clothes?
*Desired response: Number two*

Ask students:  What items can a suicide risk inmate have in his cell in plans 1, 3, and 4?
*Desired response: A mattress free from tears, suicide resistant blanket, and suicide resistant gown.*

### Instructional Input
Tell students:  These are some common myths about suicide.

Show visual titled: "Common Myths"
Visual reads:

### Common Myths
**Make Threats / Don't Commit Suicide
Happens Suddenly
Tried it Before
Intent on Dying
All are Mentally ill
Don't Talk About It**

OPS02434

## You Can Tell
## You Can't Stop Someone

Discuss "Common Myths" as:

- **People who make suicidal threats don't commit suicide:** Very often the people who make the threats are very intent on killing themselves
- **Suicide happens suddenly and without warning:** Suicide is often a very long process.
- **People who have previously attempted suicide won't do it again:** People truly intent on dying will attempt to kill themselves until they are successful.
- **Suicidal people are intent on dying:** Suicidal people are often looking for a reason to live.
- **All suicidel people are mentally ill:** Most suicidal people are depressed but not mentally ill.
- **Talking about or discussing an inmate's suicidal thoughts or behavior will cause him to kill himself:** Very often talking to a suicidal inmate will make him think twice about killing himself. Do not ignore the inmate. Be open, honest and encourage verbalization.
- **Inmates who are truly suicidel can be easily distinguished from those who simply manipulate the system:** It is impossible to tell the difference. All inmates who are a suicide risk must be placed on suicide watch.
- **You can't stop someone who is truly set on killing themselves:** You can isolate the inmate and offer programs to deter suicidal behavior.

### Guided Practice

Ask students:  Are most suicidal people mentally ill?  Why?
*Desired response: No. Most suicidal people suffer from depression but are not mentally ill.*

Ask students:  You should ignore suicidal threats because they are a method inmates use to manipulate the system. Why or Why not?
*Desired response: No, it is impossible to tell the difference. All inmates who threaten suicide must be placed on suicide watch.*

Ask students:  How can we attempt to stop a person who is truly set on killing themselves?
*Desired response: Expect a variety of answers but make sure they correspond with those given in class.*

Ask students:  We should never talk to a suicidal person about his suicidal thoughts or behavior. Why or why not?
*Desired response: A person could be prevented from killing themselves simply by talking to him. Do not ignore the inmate. Be open, honest and encourage verbalization.*

OPS02435

**Independent Practice**

Independent practice will not occur in the classroom. Independent practice will occur when the student encounters a potentially suicidal inmate while on duty in a correctional facility and is evaluated by his supervisor.

**Summary & Evaluation**

Tell students: At this time, a note-taking guide will be passed out and reviewed in class. Fill in the appropriate blanks as they are discussed in class.

OPS02436

## "SUICIDE PREVENTION"
(Instructor Version)

### Individuals at Risk

Under the Influence of Drugs or Alcohol
Returning Inmates with Suicidal History
Withdrawn or Distant
Overly Anxious
Suicidal Comments

Facing Crisis
Manipulative/Impulsive
Law Enforcement Officers
Depressed

- Drugs or alcohol:  Drugs and alcohol are **mind altering** substances.  They affect your ability to **reason** and make proper decisions.
- Returning inmates with suicidal history: Anyone who has previously **been incercerated** in your facility and **attempted suicide** while they were there should be treated as **suicidal** until it is proven that they are not.
- Withdrawn or distant: An inmate who appears withdrawn or distant may be **contemplating suicide.**
- Overly anxious: An inmate who seems like they are waiting for **something big** to happen.
- Suicidal comments: Any inmate who makes suicidal comments must be **treated**  es suicidal.
- Facing a crisis: Any inmate who is in the **midst** of a crisis or about to be in the midst of a crisis.  Examples could be illness, professionals (pastor, clergy, priest, teachers, **lew enforcement officers**, government officials) divorce, **family death**, trial, court eppearances, sentencing, **transfer inmates**, and naw inmetes
- Manipulative/impulsive inmates:  Inmates who are manipulative may attempt suicide **just to seek revenge** on a Correctional Officer who they are mad at.  Impulsive inmates may commit **suicide by accident**.
- Law enforcement officers:  Peace officers who have been arrested and incarcerated are **very likely** to attempt suicide out of feelings of **shame and guilt.**
- Depressed:  This is the single most **telltale sign** that a person is suicidal.

### Signs of Depression

Changes in Sleeping Patterns
Sad Un-Tidy Physical Appearance
Sluggish Walk
Easily Fatigued
Change in Eating Patterns
Avoids Eye Contact
Monotone Voice
Apathy
Unrealistic Talk of Getting Released
from Jail

Gives Away Possessions
Sudden Behavior Changes
Prior Suicidal History
Difficulty Concentrating
Cries Frequently
Sitting alone
Fetal position
Talks of suicide

OPS02437

- Changes sleeping patterns: This could be either sleeping **more or less** than normal
- Un-Tidy physical appearance: Hair uncombed, unshaven, wearing **dirty clothes** for several days in a row.
- Sluggish walk: Inmate may walk with **shoulders slumped** or he may **drag** his feet.
- Easily fatigued: May become tired after very little **physical activity**
- Change in eating patterns: This could be either **over or under eating.**
- Avoids eye contact: Will not look at you either when **speaking or walking** by
- Monotone voice: Never changes the **pitch** of voice when talking.
- Apathy: Does not **care** about anything.
- Unrealistic Talk of being Released from Jail: They inmate may talk unrealistically of **getting out of jail**. To that inmate, suicide is **release from incarceration**.
- Gives Away Possessions: This is a **huge** sign. This may happen when the inmate receives a **long prison sentence** or a call from home.
- Sudden behavior Changes: Any **drastic changes** in the way an inmate normally acts.
- Prior Suicidal History: The inmate may have a **History** of suicide attempts.
- Difficulty concentrating: The inmate may have trouble with **normal routine activities.**
- Cries frequently: Cries for **no reason** and at odd times.
- Sitting alone: The inmate may sit **by himself** and will not interact with other inmates or staff.
- Fetal position: The inmate may lay with his **knees and arms** tucked into chest.
- Talks of suicide: If the inmate talks or **threatens** suicide.

### Key Times for Observation
First 24 to 72 hours
During Booking
During Transport
Prior To/After Transfer
Prior To/After Trial or sentencing
Release

- First 24 to 72 hours: This is a key time because the inmate's emotions may **run high** and he also may be coming off **drugs or alcohol.** Watch for signs of suicidal behavior.
- During booking: New inmates must come through **booking.** You will have many different personality types and this is a key time to **observe behavior.**
- During Transport: Transporting inmates requires a **heightened sense of awareness** because of the dangers associated with transport.
- Prior To/after Transfer: This is a **highly emotional** time for inmates because of their change of location. The realization of what is happening in their life may **trigger** them to attempt suicide.
- Prior To/After Trial or sentencing: This is a **highly stressful** time for inmates. Emotions may run high and an inmate may contemplate suicide.

OPS02438

- Release: This is normally thought of as a **happy** time for inmates. However, they may be fearful of facing their **victims,** family of victims, loved ones or even returning to society.

### Watch Plan #1
Isolate Inmate in Suicide Cell
Remove Items
Remove Clothes
Clothe in Suicide Gown
Finger Foods
Start Log
Observe Every 3-4 Minutes

- The inmate must be placed in a **suicide resistant cell** by himself.
- The cell must be cleared of **ALL** items prior to the **inmate entering**.
- The only items the inmate will be allowed is e paper, **suicide resistant gown**, a mattress free from tears, and a suicide resistant blanket.
- The inmete will be served **"finger foods"** during meal times. Finger foods are defined as food that can be eaten without utensils.
- A **suicide watch log** should be started. It will contain the inmate's name, the date, the shift, the time the inmate is observed, the name of the correctional officer observing the inmate, and the condition of the inmete at the time of observation.
- Inmate must be observed every **three to four minutes** without fail.

### Watch Plan #2
Inmate in Cell with 2 or 3 Other Inmates
Observe Every 10 Minutes
Log Kept

- The suicide risk inmate is placed in a **regular cell** with two to three other inmates. This is recommended only if the **inmate cannot be constantly observed** by staff.
- The other inmates will serve as companions and can call for help if en **emergency arises.**
- The suicide risk inmate should be observed every **ten minutes** by staff.
- A suicide watch log should be started. It will contain the inmate's name, the date, the shift, the time the inmate is observed, the name of the correctional officer observing the inmate, and the condition of the inmate at the time of observation.

### Watch Plan #3
Inmate Isolated
Items and Clothes Removed
Inmate Worker Observes
Staff Checks
Log Kept
Finger Foods

OPS02439

- The inmate is housed in a **suicide resistant cell.**
- The cell must ba cleared of **all** items prior to the inmate entering.
- The only items the inmate will be allowed is a paper, suicide resistant gown, a mattress free from tears, and a suicide resistant blanket.
- An inmate worker is placed in a position to **constantly observe** the inmate.
- The correctional officer checks on the inmate every **15-30 minutes**.
- A suicide watch log should be started. It will contain the inmate's name, the date, the shift, the time the inmate is observed, the name of the correctional officer observing the inmate, the inmate worker's name and the condition of the suicidal inmate at the time of observation.
- The suicide risk inmate is fed **"finger foods"** at meal times.

## Watch Plan #4
Isolate Inmate
Items and Clothes Removed
Staff Observes
Log Kept
Finger Foods

- The suicide risk inmate is placed in a suicide resistant cell.
- The cell must be cleared of **ALL** items prior to the inmate entering.
- The only items the inmate will be allowed is a paper, suicide resistant gown, a mattress free from tears, and a suicide resistant blanket.
- A correctional officer observes the inmate every **fifteen minutes**.
- A suicide watch log should be started. It will contain the inmate's name, the date, the shift, the time the inmate is observed, name of the correctional officer observing the inmate, and the condition of the inmate at the time of observation.
- The suicide risk inmate is fed "finger foods" at meal times.

## Watch Plan #5
Direct Observation by Staff
No Threat to Staff
General Temporary Intervention Strategy

- The suicide risk inmate must be in **constant** observation by staff.
- The suicide risk inmate is no **thraat to staff**.
- This is a **temporary** watch plan and is not intended for long periods of time.
- A log should be **considered** as a means of justifying this plan.

## Common Myths
Make Threats / Don't Commit Suicide
Happens Suddenly
Tried it Before
Intent on Dying
All are Mentally ill

OPS02440

Don't Talk About it
You Can Tell
You Can't Stop Someone

- People who make suicidal threats don't commit suicide:  Very often the people who make the threats are **very intent** on killing themselves
- Suicide happens suddenly and without warning: Suicide is often a very **long** process
- People who have previously attempted suicide won't do it again: People truly intent on dying will attempt killing themselves **until** they are successful.
- Suicidal people are intent on dying: Suicidal people are often **looking** for a reason to live
- All Suicidal people are mentally ill: Most suicidal people are **depressed** but not mentally ill
- Talking about or discussing an inmate's suicidal thoughts or behavior will cause him to kill himself:  Very often talking to a suicidal inmate will make him **think twice** about killing himself. Do not ignore the inmate.  Be open, **honest** and encourage verbalization.
- Inmates who are truly suicidal can be easily distinguished from those simply manipulating the system: It is **impossible** to tell the difference.  All inmates who are a suicide risk must be placed on **suicide watch**.
- You can't stop someone who is truly set on killing themselves: You can **isolate** the inmate and offer **programs** to deter suicidal behavior.

OPS02441

## "SUICIDE PREVENTION"
(Student Version)

### Individuals at Risk

Under the Influence of Drugs or Alcohol          Facing Crisis
Returning Inmates with Suicidal History         Manipulative/Impulsive
Withdrawn or Distant                            Law Enforcement Officers
Overly Anxious                                  Depressed
Suicidal Comments

- Drugs or alcohol:  Drugs and alcohol are _____substances.  They affect your ability to _____end make proper decisions.
- Returning inmates with suicidal history: Anyone who has previously _____in your facility and _____while they were there should be treated as _____until it is proven that they are not.
- Withdrawn or distant: An inmate who appears withdrawn or distant may be _____.
- Overly anxious: An inmate who seems like they are waiting for _____to happen.
- Suicidal comments: Any inmate who makes suicidal comments must be_____ as suicidal.
- Facing a crisis: Any inmate who is in the _____of a crisis or about to be in the midst of a crisis.  Examples could be illness, professionals (pastor, clergy, priest, teachers, _____, government officials) divorce, _____, trial, court appearances, sentencing, _____, and new inmates.
- Manipulative/impulsive inmates:  Inmates who are manipulative may attempt suicide _____on a Correctional Officer who they are mad at.  Impulsive inmates may commit_____.
- Law enforcement officers:  Peace officers who have been arrested and incarcerated are _____to attempt suicide out of feelings of _____Depressed:  This is the single most _____that a person is suicidal.

### Signs of Depression

Changes in Sleeping Patterns          Unrealistic Talk of Getting Released
Un-Tidy Physical Appearance                     from Jail
Sluggish Walk                         Gives Away Possessions
Easily Fatigued                       Sudden Behavior Changes
Chenge in Eeting Patterns             Prior Suicidal History
Avoids eye Contact                    Difficulty Concentrating
Monotone voice                        Cries Frequently
Apathy                                Sitting alone
Fetel Position                        Talks of Suicide

OPS02442

- Changes is sleeping patterns: This could be either sleeping _____ than normal
- Un-Tidy physical appearance: Hair uncombad, unshaven, wearing _____ for several days in a row.
- Sluggish walk: Inmate may walk with _____ or he may _____ his feet.
- Easily fatigued: May become tired after very little _____.
- Change in eating patterns: This could ba aither _____.
- Avoids eye contact: Will not look at you either when _____ by
- Monotona voice: Naver changes the _____ of voice when talking.
- Apathy: Does not _____ about anything.
- Unraalistic Talk of being Released from Jail: They inmate may talk unrealistically of _____. To that inmate, Suicide is _____.
- Gives Away Possessions: This is a _____ sign. This may happen when the inmate receives a _____ or a call from home.
- Sudden behavior Changes: Any _____ in the way an inmate normally acts.
- Prior Suicidal History: The inmata may have a _____ of suicide attempts.
- Difficulty concentrating: the inmate may hava troubla with _____ Cries frequently: Cries for _____ and at odd times.
- Sitting alone: The inmate may sit _____ and will not interact with other inmates or staff.
- Fetal position: The inmate may lay with his _____ tucked into chest. .
- Talks of suicide:  If the inmata talks or _____ suicide.

## Key Times for Observation
First 24 to 72 Hours
During Booking
During Transport
Prior To/After Transfer
Prior To/After Sentencing
Release

- First 24 to 72 hours:  This is a key time because the inmate's amotions may _____ and he also may be coming off _____ Watch for signs of suicidal behavior.
- During booking: New inmatas must come through _____ You will have many different parsonality types and this is a key time to _____
- During Transport: transporting inmates requires a _____ because of the dangers associated with transport.
- Prior To/after Transfer: This is a _____ time for inmates because of their change of location.  The realization of what is happening in their life may _____ them to attempt suicide.
- Prior To/After Trial or sentencing:  This is a _____ time for inmatas. Emotions may run high and an inmate may contemplate suicide.
- Release:  This is normally thought of as a _____ time for inmates.  However, they may be fearful of facing their _____ , family of victims, loved ones or even raturning to society.

OPS02443

**Watch Plan #1**
Isolate Inmate in Suicide Cell
Remove Items
Remove Clothes
Clothe in Suicide Gown
Finger Foods
Start Log
Observe Every 3-4 Minutes

- The inmate must be placed in a _____by himself.
- The cell must be cleared of **ALL** items prior to the_____.
- The only items the inmate will be allowed is a paper, _____, a mattress free from teers, and a suicide resistant blanket.
- The inmate will be served _____during meal times. Finger foods are defined as food that can be eaten without utensils.
- A _____should be started. It will contain the inmate's name, the date, the shift, the time the inmate is observed, the name of the corrections officer observing the inmate, and the condition of the inmate et the time of observation.
- Inmate must be observed every _____without fail.

**Watch plan #2**
Inmate in Cell with 2 or 3 Other Inmates
Observe Every 10 Minutes
Log Kept

- The suicide risk inmate is placed in a _____with two to three other inmates. This is recommended only if the _____by staff.
- The other inmates will serve as companions and can call for help if an _____The suicide risk inmate should be observed every _____by staff.
- A suicide watch log should be started. It will contain the inmate's name, the date, the shift, the time the inmate is observed, the name of the corrections officer observing the inmete, and the condition of the inmate at the time of observetion.

**Watch Plan #3**
Inmate Isolated
Items and Clothes Removed
Inmate Worker Observes
Staff Checks
Log Kept
Finger Foods

- The inmate is housed in a _____.
- The cell must be cleared of ____ items prior to the inmate entering.
- The only items the inmate will be allowed is a paper, suicide resistent gown, a mattress free from tears, and a suicide resistant blenket.
- An inmate worker is placed in a position to _____the inmate.

OPS02444

- The corrections officer checks on the inmate every_____.
- A suicide watch log should be started.  It will contain the inmate's name, the date, the shift, the time the inmate is observed, name of the corrections officer observing the inmate, the inmate worker's name, and the condition of the suicidal inmate at the time of observation.
- The suicide risk inmate is fed _____at meal times.

### Watch Plan #4
Isolate Inmate
Items and Clothes Removed
Staff Observes
Log Kept
Finger Foods

- The suicide risk inmate is placed in a suicide resistant cell.
- The cell must be cleared of _____items prior to the inmate entering.
- The only items the inmate will be allowed is a paper, suicide resistant gown, a mattress free from tears, and a suicide resistant blanket.
- A corrections officer observes the inmate every_____.
- A suicide watch log should be started.  It will contain the inmate's name, the date, the shift, the time the inmate is observed, name of the corrections officer observing the inmate, and the condition of the inmate at the time of observation.
- The suicide risk inmate is fed "finger foods" at meal times.

### Watch Plan #5
Direct Observation by Staff
No Threat to Staff
General Temporary Intervention Strategy

- The suicide risk inmate must be in _____observation by staff.
- The suicide risk inmate is no _____.
- This is a _____watch plan and is not intended for long periods of time.
- A log should be _____as a means of justifying this plan.

### Common Myths
Make Threats / Don't Commit Suicide
Happens Suddenly
Tried it Before
Intent on Dying
All are Mentally ill
Don't Talk About It
You Can Tell
You Can't Stop Someone

- People who make suicidal threats don't commit suicide:  Very often the people who make the threats are _____on killing themselves

OPS02445

- Suicide happens suddenly and without werning: Suicide is often a very _____process.
- People who have previously attempted suicide won't do it agein: People truly intent on dying will ettempt killing themselves _____they ere successful.
- Suicidal people are intent on dying: Suicidal people are often _____for a reason to live
- All Suicidal people are mentally ill: Most suicidal people are _____but not mentelly ill
- Talking about or discussing an inmate's suicidal thoughts or behavior will cause him to kill himself: Very often talking to a suicidal inmate will make him _____about killing himself. Do not ignore the inmete. Be open, _____and encourage verbalization.
- Inmates who are truly suicidal can be easily distinguished from those simply manipulating the system: It is _____to tell the difference. All inmetes who are a suicide risk must be placed on_____.
- You can't stop someone who is truly set on killing themselves: You can _____ the inmate and offer _____to deter suicidal behevior.

OPS02446

# Exhibit

# 31

# OATH OF OFFICE

STATE OF LOUISIANA

PARISH OF _Orleans_

_William Thompson_ ,do solemnly swear (or affirm) that I will support the Constitution

and Laws of the United States and the Constitution and laws of this state; and that I will faithfully and impartially discharge

and preform all the duties incumbent on me as

# DEPUTY SHERIFF

according to the best of my ability and understanding. So help me God.

Sworn to and subscribed before me this ___3___ day of ___July___ , ᵗᵒ _2007_

_Director Of Personnel_
Title of Official Administering Oath

_[signature]_                                          _William A. Thompson_
                                                        SIGNATURE

_[signature]_
Administrator's Signature                               _100 346_
                                                        EMPLOYEE NUMBER

                                                        _Templeman Phase 5_
                                                        PRESENT ASSIGNMENT

| ITEM | DESCRIPTION | NEW ✓ ( ) | Check One |
|------|-------------|-----------|-----------|
| | | RENEW ( ) | |
| Badge No. | 1264 | | |
| Commission No. | 16294 | | |
| | | | |
| | | | |

RECEIVED BY: _William C. Thompson_          NAME AND TITLE: (PRINT)
_William A. Thompson_                        _William A. Thompson_

WT000271

# Exhibit 32



Office of the Criminal Sheriff
*Parish Of Orleans • State Of Louisiana*

# Marlin N. Gusman
*Sheriff*

## INTEROFFICE MEMORANDUM

| | |
|---|---|
| **Date:** | 15 October 2007 |
| **To:** | Security and Medical Personnel |
| **From:** | Sheriff Marlin N. Gusman |
| **Subject:** | Observation of Suicidal Inmates |

Starting immediately, all inmates with active suicidal ideation are to be <u>directly</u> observed by the Security staff at all times.

Inmates who've expressed the intent to harm themselves can do so in a matter of minutes. Physical restraints are occasionally an inadequate solution, as determined inmates can free themselves enough to do harm. Periodic monitoring is also a suboptimal solution...the few moments required to successfully commit suicide oecessitates continuous, direct observation.

Any time an inmate is deemed "suicidal", direct observatioo must commence <u>immediately</u>. This is necessary in all levels of incarceratioo: in IPC, on the tiers, and upon transfer to HOD-10. When encountering a possibly suicidal inmate, immediately involve the Medical Staff for evaluation. Initiate direct observation at that time...and continue until a physician or psychiatrist concludes the inmate is no longer actively suicidal. While under direct observation, restrained inmates must receive the current, routine monitoring, with the appropriate documentation.

Thank you for your attentioo to this important matter.


Marlin N. Gusman
Sheriff
O.P.C.S.O.

1

OPS00693