UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

MARGARET GOETZEE NAGLE, ET AL.                    CIVIL ACTION

VERSUS                                            NO: 12-1910

SHERIFF MARLIN GUSMAN, ET AL.                     SECTION: R

### ORDER AND REASONS

On July 23, 2012, Margaret Goetzee Nagle and John Eric Goetzee (plaintiffs) filed this section 1983 civil rights suit and state law wrongful death and negligence suit against numerous employees of the Orleans Parish Sheriff's Office, including Sheriff Marlin Gusman and Deputy William Thompson.[1] Plaintiffs are the siblings and next of kin of William Wesley Goetzee (Mr. Goetzee).[2] Mr. Goetzee was a commander in the United States Coast Guard Reserve and a civilian employee of the Coast Guard who committed suicide on August 7, 2011 while being held as a pretrial detainee on the tenth floor of the House of Detention at Orleans Parish Prison (OPP) on charges related to a suicide attempt five days earlier.[3] On the day of Mr. Goetzee's death,

---

[1]    R. Doc. 1.
[2]    *See* R. Doc. 68-2 at ¶ 15 (Plaintiffs' Rule 56.1 Statement of Undisputed Facts). Defendants have not contested any of the facts in Plaintiffs' 56.1 Statement. Therefore, the facts are deemed admitted for the purposes of this motion. *See* E.D. La. Local Rule 56.2.
[3]    *See id.* at ¶¶ 8, 9, 11 & 13.

1

Thompson, the guard who had been assigned to maintain direct observation of Mr. Goetzee, repeatedly left his post.[4]  It was during one of these absences that Mr. Goetzee committed suicide.[5]

All defendants except for Thompson answered plaintiffs' complaint.[6]  On January 4, 2013, plaintiffs moved for an entry of default against Thompson.[7]  The Court entered a default against Thompson that same day.[8]  Plaintiffs now move the Court to enter a default judgment against Thompson for their state law tort claims and section 1983 claim.[9]  In the alternative, plaintiffs move for summary judgment against Thompson.[10]

In addition, plaintiffs move for partial summary judgment against Defendant Sheriff Gusman on their state law claim for vicarious liability for Thompson's tortious misconduct and on part of their federal claim against Gusman, in his official capacity, under 42 U.S.C. § 1983 and *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

For the following reasons, the Court GRANTS the motion for partial summary judgment against Thompson and the motion for partial summary judgment against Sheriff Gusman.

---

[4]    *See id.* at ¶¶ 42–47.
[5]    *See id.* at ¶¶ 50–52.
[6]    R. Docs. 3 & 29.
[7]    R. Doc. 6.
[8]    R. Doc. 7.
[9]    R. Doc. 64.
[10]   R. Doc. 68.

I.    **BACKGROUND**

This action arises out of the August 7, 2011 suicide of plaintiffs' brother, Mr. Goetzee, while he was in custody at OPP as a pretrial detainee on charges related to a suicide attempt five days earlier.[11]

Plaintiffs allege that Mr. Goetzee experienced a "profound mental health crisis and breakdown" while working in "highly responsible and high-stress positions with the Coast Guard,"[12] including "working around the clock during and following both Hurricane Katrina and the BP oil spill."[13]   On the morning of August 2, 2011, Mr. Goetzee approached a marked Federal Protective Services vehicle occupied by a uniformed law-enforcement officer.[14]   Mr. Goetzee opened the front passenger door, entered the vehicle, and seated himself in the front passenger seat.[15]   The officer asked Mr. Goetzee why he thought he could just sit down in his vehicle.[16]   At that point, Mr. Goetzee took several deep breaths and lunged for the officer's service weapon, exclaiming, "I want to kill myself, give me your gun."[17]   The officer, with the assistance of several other

---

[11]    *See* R. Doc. 68-2 at ¶¶ 8, 9, 11 & 13.
[12]    R. Doc. 1 at 2.
[13]    R. Doc. 68-1 at 7.
[14]    *See id.* at ¶¶ 17-18.
[15]    *See id.* at ¶ 19.
[16]    *See* R. Doc. 68-4 at 108 (Pls.' Ex. 6: Criminal Complaint and Affidavit of F.B.I. Special Agent Patrick Strawn).
[17]    *See* R. Doc. 68-2 at ¶¶ 20-21.

federal law enforcement officers, subdued Mr. Goetzee and placed him in handcuffs.[18]   Mr. Goetzee was then transferred by ambulance to Tulane Medical Center.[19]

After Mr. Goetzee received treatment for physical injuries related to his encounter with the federal officers, Tulane Medical Center released him.[20]   Plaintiffs allege that while Mr. Goetzee's fiancee was in the process of arranging for appropriate mental health care for him at East Jefferson Hospital, federal agents picked Mr. Goetzee up and transported him to OPP.[21]   Mr. Goetzee was booked into OPP at approximately 9:00 P.M. on August 2, 2011.[22]

The next day, prison officials brought Mr. Goetzee to federal court for his initial appearance on charges related to his conflict with the federal officer during his suicide attempt the day before.[23]   At Mr. Goetzee's initial appearance, Mr. Goetzee's attorney explained to the court that when he had tried to meet with Mr. Goetzee before the appearance, "[h]e was unresponsive and obviously having mental issues."[24]   That same day, while still in custody, Mr. Goetzee was admitted to

---

18   *See id.* at ¶ 22.
19   *See id.* at ¶¶ 23-24.
20   *See* R. Doc. 1 at 14.
21   *See id.* at 14-15.
22   *See* R. Doc. 68-2 at ¶ 25.
23   *See id.* at ¶ 27.
24   *See* R. Doc. 68-4 at 117 (Pls.' Ex. 9: Initial Appearance transcript).

4

University hospital to "rule out delirium."[25]  He was discharged
two days later on August 5, 2011 with a diagnosis of psychosis
and transferred back to OPP.[26]  At OPP, Mr. Goetzee was placed on
the tenth floor of the House of Detention, where OPP housed all
of its inmates on suicide watch.[27]

On August 6 and 7, 2011, Mr. Goetzee was under direct
observation and suicide watch.[28]  This meant that an Orleans
Parish Sheriff's Office employee was required to "maintain direct
and constant observation" of Mr. Goetzee at all times.[29]  Orleans
Parish Sheriff's Office training materials taught that one of the
two "greatest myths" about suicide is the myth that "[y]ou can't
stop someone who is truly set on killing themselves."[30]  Orleans
Parish Sheriff's Office training materials also indicated that
failure to observe a suicide watch inmate would be an example of
a "wrongful death" tort.[31]  In addition, at the time of the
events giving rise to this action, it was Orleans Parish
Sheriff's Office policy that "all inmates with active suicidal

---

[25]   *See* R. Doc. 68-2 at ¶ 28.
[26]   *See id.* at ¶ 31.
[27]   *See id.* at ¶¶ 10, 32.
[28]   *See id.* at ¶ 33.
[29]   *See id.* at ¶ 41; R. Doc. 68-4 at 22 (Pls.' Ex. 3:
Defendants' Responses to Requests for Admission at #23).
[30]   *See* R. Doc. 68-2 at ¶ 73; R. Doc. 68-4 at 244 (Pls.'
Ex. 30: Orleans Parish Sheriff's Office Peace Officer Skills
Training - Jail and Corrections Training Curriculum (OPSO POST
Curriculum)).
[31]   *See* R. Doc. 68-2 at ¶ 77; R. Doc. 68-4 at 240, 242
(Pls.' Ex. 30: OPSO POST Curriculum).

ideation . . . be <u>directly</u> observed by the Security staff at all times" because "the few moments required to successfully commit suicide necessitates continuous, direct observation."[32]

On the morning of August 7, 2011, Thompson, a commissioned deputy with the Orleans Parish Sheriff's Office, was assigned to conduct direct supervision (a.k.a. suicide watch) of Mr. Goetzee.[33]  During his suicide watch shift, Thompson left his post at least three times, leaving Mr. Goetzee unobserved each time: first, to help another employee distribute meals to other inmates; second, to take a restroom break; and third, to visit the nurses' station.[34]  During these absences, Mr. Goetzee went unobserved for an hour and a half, fifteen minutes, and two hours respectively.[35]  No other staff took Thompson's place observing Mr. Goetzee during the times when Thompson abandoned his post.[36]

During Thompson's final absence, which he spent in the nurses' station, an inmate notified another on-duty officer that Mr. Goetzee was lying on the floor of his cell, unresponsive.[37] When New Orleans Emergency Medical Services personnel arrived, they were unable to revive him.  He was then pronounced dead at

---

[32]     *See* R. Doc. 68-2 at ¶ 80; R. Doc. 68-4 at 274 (Pls.' Ex. 32: Office of the Criminal Sheriff Interoffice Memo re: Observation of Suicidal Inmates, October 15, 2007) (emphasis in original).
[33]     *See* R. Doc. 68-2 at ¶¶ 35-36, 42.
[34]     *See id.* at ¶¶ 44-47.
[35]     *See id.* at ¶ 58.
[36]     *See id.* at ¶ 48
[37]     *See id.* at ¶ 50.

LSU Interim Hospital.  Mr. Goetzee had asphyxiated after his airway became blocked by a wad of toilet paper.[38]  When the coroner autopsied Mr. Goetzee, he found toilet paper in at least four locations in Mr. Goetzee's body.[39]  Specifically, the coroner recovered a "bolus of toilet paper" that obstructed Mr. Goetzee's airway and "residual masticated paper" from Mr. Goetzee's mouth, esophagus, and stomach.[40]

After Mr. Goetzee died, the OPSO Mental Health Director, Dr. Higgins, performed a "Psychological Autopsy" in which he assessed the events surrounding Mr. Goetzee's death.  He concluded: "Mr. Goetzee was treated appropriately by the OPSO Medical Department. He was ordered Direct Observation. . . . Medical had continued the order for direct observation up until the time of his death; however security failed to provide the continuous observation allowing Mr. Goetzee to kill himself."[41]

As a result of these events, Thompson later pleaded guilty to the felony crime of malfeasance in office.  While under oath, and as part of his plea, Thompson accepted the state's factual basis for the charge.  The factual basis specified that Mr. Goetzee was under suicide watch on August 7, 2011; that OPSO

---

[38]     *See id.* at ¶ 53.
[39]     *See* R. Doc. 68-4 at 2, 6 (Pls.' Ex. 1: Coroner's Report).
[40]     *Id.*
[41]     *See* R. Doc. 68-2 at ¶ 54; R. Doc. 68-4 at 186 (Pls.' Ex. 23: OPSO Medical Department, Psychological Autopsy).

policy required detainees under suicide watch to be continuously monitored and for an "observations and restraint checklist" to be maintained for each such detainee; that Thompson was assigned to continuously monitor Mr. Goetzee beginning at 10:20 A.M. on August 7, 2011; that Thompson left his post three times during his assigned shift for one and half hours, fifteen minutes, and two hours, respectively; that Mr. Goetzee was discovered unconscious by another inmate at around 5:45 P.M., when Thompson was not monitoring him; that Mr. Goetzee died of swallowing toilet paper; and that Thompson had fraudulently submitted his observation checklist for August 7, 2011, because the checklist indicated that Thompson had continuously monitored Mr. Goetzee all day when in fact Thompson had not done so.[42]

Defendant Thompson has also given a deposition in this case. At his deposition, Thompson stated that during the times when he was observing Mr. Goetzee, he never saw him with toilet paper.[43] Instead, he expressed the belief that it was during the time when he was not observing Mr. Goetzee that Mr. Goetzee swallowed the toilet paper.[44]

---

[42]    *See id.* at ¶ 58; R. Doc. 68-4 at 195-97 (Pls.' Ex. 24: Transcript of Boykin Examination Hearing in *State of Louisiana v. William Thompson*, Case No. 510-225).

[43]    *See* R. Doc. 79-4 at 5 (Pls.' Ex. 33: Excerpts from Thompson Deposition) ("Q: So at least during the times when you saw Mr. Goetzee on the day he died, you didn't see him with toilet paper? A: No.").

[44]    *See id.* at 6 ("Q: . . . [I]t's your belief that it was during that hour and a half when Mr. Goetzee swallowed a roll of

8

## II.  LEGAL STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *E.E.O.C. v. Simbaki, Ltd.*, 767 F.3d 475, 481 (5th Cir. 2014).  When assessing whether a dispute as to any material fact exists, the Court considers "all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence."  *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398–99 (5th Cir. 2008).  All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment." *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985); *see also  Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).  "No genuine dispute of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Simbaki*, 767 F.3d at 481.

## III. DISCUSSION

### A.   The Admissibility of Defendant Thompson's Deposition

---

toilet paper and killed himself? A: Yes.").

9

Before addressing the merits of this dispute, the Court must attend to a preliminary evidentiary matter.  Defendants argue that Thompson's deposition testimony, attached to plaintiffs' motion for summary judgment, is inadmissible because the deposition is "incomplete."[45]  The Court concludes that despite its technical incompleteness, the Court may consider the deposition in the same fashion as a sworn affidavit.

 Defendants explicitly agree[46] that the Court has discretion to determine whether the use of incomplete deposition testimony is permissible, provided that "customary standards of admissibility have been met and if no unfairness inheres." *Daigle v. Maine Med. Ctr., Inc.*, 14 F.3d 684, 692 (1st Cir. 1994) (citing *Lentomyynti Oy v. Medivac, Inc.*, 997 F.2d 364, 371 (7th Cir. 1993)).  The Fifth Circuit has not addressed the question of whether incomplete depositions may be used to support a motion for summary judgment.  Two decisions by the Ninth Circuit, however, provide persuasive authority that they may.

In *Hoover v. Switlik Parachute Co.*, the Ninth Circuit held that deposition testimony that had not been subject to cross-examination by the party opposing its introduction could be considered for summary judgment purposes so long as it met the requirements for an affidavit.  663 F.2d 964, 966 (9th Cir.

---

[45]   R. Doc. 76 at 1.
[46]   *See* R. Doc. 76 at 2.

1981).   There, one defendant, Pioneer, sought to use deposition testimony against a co-defendant, Switlik, even though Pioneer had taken the depositions before Switlik had been added to the litigation.   The court observed that the statements in the depositions had been "made on personal knowledge and set forth facts that were admissible in evidence." *Id.*   Therefore, the "depositions were the equivalents of affidavits" and the court would consider them.  *Id.*

Next, in *In re Sunset Bay Associates*, the Ninth Circuit confronted the precise issue raised by defendants here: whether a court may rely upon deposition testimony that has not been completed or signed when deciding a motion for summary judgment. *See* 944 F.2d 1503, 1509 (9th Cir. 1991).   The defendants argued that the incomplete status of the deposition denied them a chance to cross-examine the deponent.   The court rejected that argument. Relying on *Hoover*, the court held that even an unsigned deposition could be admitted as an affidavit when the deponent was sworn.  *Id.* at 1510.  The court explained: "Because there is no reason to believe that the sworn answers to questions are less reliable than an affidavit, to the extent that the content of the deposition testimony is otherwise admissible, that testimony should be admissible on summary judgment." *Id.*

Here, Thompson was sworn, and the statements the Court relies upon from Thompson's deposition are based on his own

11

personal knowledge of what happened and set out facts that would
be admissible into evidence at trial in the form of his own
testimony.  Thus, under the logic of *In re Sunset Bay Associates*,
it is a reasonable exercise of the Court's discretion to consider
Thompson's incomplete, unsigned deposition as though it were a
sworn affidavit.  Accordingly, the Court will consider Thompson's
deposition testimony in deciding this motion.

### B.   State Law Negligence Claim Against Defendant Thompson

Plaintiffs assert claims under Louisiana's general
negligence statute, La. C.C. art. 2315.  Louisiana courts conduct
a duty-risk analysis to determine whether to impose liability
under Article 2315.  *Lemann v. Essen Lane Daiquiris, Inc.*, 923
So. 2d 627, 632-633 (La. 2006).  Under Louisiana law, "[t]he
duty-risk analysis is the standard negligence analysis employed
in determining whether to impose liability."  *Audler v. CBC
Innovis Inc.*, 519 F.3d 239, 249 (5th Cir. 2008) (quoting *Lemann*,
923 So. 2d at 633).  A plaintiff must prove each of five
elements: (1) the defendant had a duty to conform his conduct to
a specific standard of care (the duty element); (2) the
defendant's conduct failed to conform to the appropriate standard
of care (the breach element); (3) the defendant's substandard
conduct was a cause-in-fact of the plaintiff's injuries (the
cause-in-fact element); (4) the defendant's substandard conduct
was a legal cause of the plaintiff's injuries (the scope-of-duty

element); and (5) actual damages (the damages element). *See S.J. v. Lafayette Parish Sch. Bd.*, 41 So. 3d 1119, 1125 (La. 2010); *see also Knight v. Kellogg Brown & Root Inc.*, 333 F. App'x 1, 6 (5th Cir. 2009) (applying Louisiana law). A plaintiff's failure to prove any one of these elements results in a determination of no liability. *Knight*, 333 F. App'x at 6.

### 1. Duty

The first element is duty. Under Louisiana law, "a sheriff . . . owes a general duty to a prisoner to save him from harm and the officer is liable for the prisoner's injury or death resulting from a violation of such a duty." *Manuel v. City of Jeanerette*, 702 So. 2d 709, 712 (La. Ct. App. 1997) (citing *Barlow v. City of New Orleans,* 241 So. 2d 501, 504 (La. 1970)). This duty "extends to protecting inmates from self-inflicted injury." *Misenheimer v. W. Baton Rouge Parish Sheriff's Office*, 677 So. 2d 159, 161 (La. Ct. App. 1996) (citing *Scott v. State,* 618 So. 2d 1053 (La. Ct. App. 1993)). Specifically, "prison authorities owe a duty to use reasonable care to protect inmates from harm" including "self-inflicted injury." *Scott*, 618 So. 2d at 1059. "This duty is not absolute, but depends upon the circumstances of the particular case." *Id.; see also Manuel*, 702 So. 2d at 712 (citing *Griffis v. Travelers Ins. Co.*, 273 So. 2d 523, 526 (La. 1973)) ("[T]he . . . officer must only do what is reasonable under the circumstances[.]").

13

Here, it is undisputed that prison authorities, including Thompson, were aware that Mr. Goetzee was a suicide risk. Mr. Goetzee arrived at OPP as a result of his own suicide attempt, and he was on suicide watch at the time of his death.[47] In addition, during his deposition, Thompson explicitly agreed that he "knew that Mr. Goetzee was at substantial risk of hurting or killing himself if allowed."[48] Thus, under Louisiana law, Thompson had a duty to "take reasonable measures" to protect Mr. Goetzee from self-inflicted harm, including death. *Scott*, 618 So. 2d at 1058.

2. *Breach*

"[B]reach of a duty is the failure to exercise reasonable care under the circumstances." *D.C. v. St. Landry Parish Sch. Bd.*, 802 So. 2d 19, 22 (La. Ct. App. 2001) (citing Frank L. Maraist & Thomas C. Galligan, Louisiana Tort Law § 6-1, at 139 (1996)). In order to determine if a prison officer breached his duty to use reasonable care to protect an inmate from harm, the officer's actions must be evaluated "in light of the circumstances that existed at the time of the alleged negligence." *Scott*, 618 So. 2d at 1059. Plaintiffs can prove breach by proving that "the operators of the facility knew or

---

[47]     R. Doc. 66-2 at ¶ 33.
[48]     R. Doc. 68-4 at 221 (Pls.' Ex. 26: Excerpts from Thompson Deposition).

should have known of [a] risk" and "failed take reasonable measures to prevent the harm." *Id.* at 1058.

In *Manuel*, the Louisiana Third Circuit Court of Appeal approved the trial court's conclusion that a prison officer's "failure to provide adequate, and indeed any, observation" of a prisoner who committed suicide while unobserved constituted a "breach of the duty owed to the prisoner." 702 So. 2d at 713. Here, it is undisputed that Thompson repeatedly abandoned his post for long periods of time on the day of Mr. Goetzee's death, when he was assigned to continuously observe Mr. Goetzee. Like the officer in *Manuel*, he "fail[ed] to provide adequate, . . . indeed any, observation" of Mr. Goetzee during those times. *Id.* Reasonable minds could not differ that he failed to take reasonable measures to protect Mr. Goetzee from harm during the long periods of time in which he was not observing Mr. Goetzee at all. It was during one of these absences that Mr. Goetzee committed suicide, the very harm that Thompson's assignment was designed to prevent. Thus, the Court concludes that a reasonable fact-finder could only find that here, as in *Manuel*, Thompson's failure to observe Mr. Goetzee constitutes a clear breach of his duty to Mr. Goetzee. When Thompson abandoned his post and left Mr. Goetzee unobserved for hours at a time, Thompson did not take reasonable care to protect Mr. Goetzee from a known risk of harm. Accordingly, the element of breach is met.

### 3. Cause-in-Fact

Louisiana case law is clear that cause-in-fact is usually a "but for" inquiry, "which tests whether the accident would or would not have happened but for the defendant's substandard conduct." *Perkins v. Entergy Corp.*, 782 So. 2d 606, 611 (La. 2001). The "substantial factor" test is applied as an alternative to the but-for test "[w]hen there are concurrent causes of an accident which nevertheless would have occurred in the absence of one of the causes." *Boykin v. Louisiana Transit Co.*, 707 So. 2d 1225, 1232 n.10 (La. 1998). In such a situation, "some other test is needed." *LeJeune v. Allstate Ins. Co.*, 365 So. 2d 471, 477 (La. 1978). The substantial factor test is "similar to the but-for test," except that when more than one party's negligence would have caused the injury in the absence of another party's negligence, "all are held to be causative." *Id.* Plaintiffs contend that there are "multiple causes" for Mr. Goetzee's death, but they do not specify what they mean by this, nor do they explain how this case fits the mold of a concurrent causes case. Thus, the Court concludes that the but-for test is the appropriate test.

The but-for inquiry "focuses on the conduct of the defendant alleged to constitute a breach of duty" and asks "whether the accident would or would not have happened but for the defendant's substandard conduct." *Boykin*, 707 So. 2d at 1230. Thus, the

16

but-for inquiry here is whether Mr. Goetzee's death would not have occurred but for Thompson's failure to remain at his assigned post observing Mr. Goetzee on suicide watch. Plaintiffs are entitled to summary judgment if no reasonable jury could find that even had Thompson stayed at his post in order to observe Mr. Goetzee as assigned, more likely than not Mr. Goetzee would still have died. *Cf. Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986) ("[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden.").

Plaintiffs' present circumstantial evidence in support of their summary judgment motion--none of which is disputed by defendants--to show that Thompson's abandonment of his post was a cause-in-fact of Mr. Goetzee's death. First, plaintiffs' evidence shows that Mr. Goetzee was suffering from psychosis and was suicidal while in the custody of OPP. Second, the evidence shows that Mr. Goetzee was placed on suicide watch and that OPSO's suicide watch policies and training materials explicitly required officers to continuously monitor detainees on suicide watch and to document that they had done so.[49] Third, plaintiffs' evidence establishes that Thompson, although fully aware that Mr. Goetzee was suicidal and that suicidal detainees

---

[49] *See* R. Doc. 68-4 at 274 (Pls.' Ex. 32: Office of the Criminal Sheriff Interoffice Memo re: Observation of Suicidal Inmates, October 15, 2007).

17

required constant monitoring, nevertheless chose to abandon his post at least three times on August 7, 2011. Fourth, plaintiffs' evidence shows that it was during one of Thompson's extended absences, when Mr. Goetzee was not under observation by any OPSO staff, that Mr. Goetzee succeeded in killing himself. Therefore, plaintiffs argue that they have shown through circumstantial evidence that Thompson's substandard conduct was a cause-in-fact of the harm to Mr. Goetzee. Plaintiffs point out that OPSO's own mental health director, Dr. Higgins, in his analysis of the events surrounding Mr. Goetzee's suicide, arrived at an identical theory of causation: "security failed to provide . . . continuous observation allowing Mr. Goetzee to kill himself."[50]

After reviewing the evidence on summary judgment, the Court concludes that no reasonable jury could find it more probable than not that even if Thompson had remained at his post in order to observe Mr. Goetzee as assigned, Mr. Goetzee would still have committed suicide. In addition to the circumstantial argument outlined by plaintiffs, the evidence also shows that when Mr. Goetzee was autopsied, the coroner found toilet paper in at least four locations in Mr. Goetzee's body.[51] Specifically, the coroner recovered a "bolus of toilet paper" that obstructed Mr.

---

[50]   *See* R. Doc. 68-4 at 186 (Pls.' Ex. 23: OPSO Medical Department, Psychological Autopsy).

[51]   *See* R. Doc. 68-4 at 2, 6 (Pls.' Ex. 1: Coroner's Report).

Goetzee's airway and "residual masticated paper" from Mr. Goetzee's mouth, esophagus, and stomach.[52]   Although items may move quickly from one's mouth to one's stomach, the presence of toilet paper separately in Mr. Goetzee's mouth *and* esophagus *and* stomach and *trachea* indicates that he did not simply ingest one piece of toilet paper at one discrete moment in time.   To the contrary, the only reasonable inference that can be drawn from these facts is that Mr. Goetzee ingested the toilet paper across a period of time: enough time to chew and swallow, to chew some more, and then, at some point, to direct some of the toilet paper toward his trachea.   Presented with these facts, no reasonable jury could conclude that had Thompson remained at his observation post, he could have missed seeing Mr. Goetzee ingesting the toilet paper, which Mr. Goetzee could have ingested only in multiple pieces and over a period of time.   Thus, the Court concludes that the only reasonable inference to be drawn from the facts in the record is that, had Thompson been at his post and continuously observing Mr. Goetzee as assigned, he would have seen Mr. Goetzee with the toilet paper and thus could have intervened to stop Mr. Goetzee before he ingested enough paper to seriously harm himself.

In opposition, defendants appear to argue that *even had* Thompson remained at his post and maintained continuous

---

[52]   *Id.*

observation of Mr. Goetzee, Thompson still might not have intervened to stop Mr. Goetzee from swallowing toilet paper, which they characterize as "a seemingly harmless act."[53]   This is a strange argument.   Surely defendants are not suggesting that there would be no breach if Thompson had sat and watched without taking any action as Mr. Goetzee repeatedly ingested pieces of toilet paper.

In any event, the predicate for this argument is wrong. According to defendants, Thompson's deposition testimony indicates that Thompson "knew . . . Goetzee was chewing toilet paper throughout the day, possibly for a period of several hours," and nevertheless did nothing to intervene.[54]   Thompson's deposition testimony indicates precisely the opposite.   The Court reproduces the relevant testimony here:

> Q: Okay. So at least during the times when you saw Mr. Goetzee on the day he died, you didn't see him with toilet paper?
>
> A: No.[55]

Thompson confirmed again that he had not seen Mr. Goetzee with toilet paper during the day:

> A: . . . I don't -- I don't think he was chewing it throughout the day. That's what I'm saying.

---

[53]   R. Doc. 76 at 4.
[54]   *Id.*
[55]   R. Doc. 79-4 at 5 (Pls.' Ex. 33: Excerpts from Thompson Deposition).

> Q: Okay. You think it was a period -- it may have been
> a period of hours, but it wasn't throughout the day?
>
> A: Yes.[56]

Finally, Thompson testified that he believed that it was during
one of the times when he was away from his post that Mr. Goetzee
killed himself:

> Q: . . . it's your belief that it was during that hour
> and a half when Mr. Goetzee swallowed a roll of toilet
> paper and killed himself?
>
> A: Yes.[57]

Thus, Thompson's own deposition testimony explicitly indicates
that Thompson *never* saw Mr. Goetzee with toilet paper at any of
the times when he was at his post and observing Mr. Goetzee as
assigned.

Moreover, nothing in Thompson's testimony supports
defendants' suggestion that Thompson might not have sought to
intervene had he in fact seen Mr. Goetzee with toilet paper.  To
the contrary, Thompson agreed during his deposition that he knew
"from training and common sense" that one way a person could kill
themself was by "swallowing bad things."[58]  He further testified
that he had not provided Mr. Goetzee with any toilet paper that
day and that he would not have been permitted to provide him with

---

[56]    R. Doc. 68-4 at 219 (Pls.' Ex. 26: Excerpts from
Thompson Deposition).
[57]    R. Doc. 79-4 at 6.
[58]    *Id.* at 9.

toilet paper either.[59]   Accordingly, Thompson's testimony provides no support for defendants' strained suggestion that Thompson might have done nothing to intervene even if he had remained at his post the entire time.  Defendants are entitled to have all *reasonable* inferences drawn in their favor on summary judgment.  Nevertheless, the limit is reasonable inferences.  No reasonable jury could draw the inference defendants seek from these facts.

Second, defendants argue that plaintiffs have not introduced evidence showing that "the paper which caused his self-inflicted asphyxiation could have been removed, nor that . . . Goetzee could have regained consciousness or survived" had Thompson been present the entire time.[60]  This argument misses the point: the only reasonable inference to be drawn from the facts in the record is that had Thompson remained at his post to observe Mr. Goetzee as assigned, Mr. Goetzee either would not have obtained the toilet paper in the first place, or if he had, Thompson would have seen him with it and could have intervened *before* Mr. Goetzee had the chance to cause himself serious harm.  Thus, the Court need not inquire into how quickly the prison could have responded *after* discovering an unconscious inmate, or how quickly a medical team would have needed to arrive to save someone from

---

[59]   *See id.* at 7.
[60]   *Id.*

22

asphyxiating who had *already* ingested enough toilet paper to cause serious harm.

In sum, the Court finds that the but-for test is satisfied here. The only reasonable inference to be drawn from the facts in the record is that, had Thompson been at his post and continuously observing Mr. Goetzee as assigned, he could have prevented Mr. Goetzee from obtaining and swallowing enough toilet paper to harm himself. Accordingly, the cause-in-fact element is met.

### 4. Scope of Duty

The fourth element, scope of duty (sometimes called "legal cause"), asks whether the plaintiff's injury was one of the risks encompassed by the rule of law that imposed the duty. *See Fowler v. Roberts*, 556 So. 2d 1, 6 (La. 1989). As the Louisiana Supreme Court has explained:

> The scope of the duty inquiry is ultimately a question of policy as to whether the particular risk falls within the scope of the duty. Rules of conduct are designed to protect some persons under some circumstances against some risks. The scope of protection inquiry asks whether the enunciated rule extends to or is intended to protect this plaintiff from this type of harm arising in this manner. In determining the limitation to be placed on liability for defendant's substandard conduct, the proper inquiry is often how easily the risk of injury to plaintiff can be associated with the duty sought to be enforced.

*Faucheaux v. Terrebonne Consol. Gov't*, 615 So. 2d 289, 293-94 (La. 1993) (citations omitted).

Seizing upon the "in this manner" language from the Louisiana test, defendants argue that plaintiffs have not established the scope of duty element. They contend that the test for scope of duty is foreseeability, and that Thompson's duty did not extend to the precise harm that befell Mr. Goetzee, as plaintiffs have not provided evidence "that this risk of suicide . . . could be reasonably foreseen to occur *in this manner*; specifically, by ingestion of toilet paper."[61] Defendants have misunderstood the relevant inquiry for scope of duty. Foreseeability "is neither always reliable nor the only criterion for comparing the relationship between a duty and a risk." *Todd v. State Through Dep't of Soc. Servs., Office of Cmty. Servs.*, 699 So. 2d 35, 39 (La. 1997). "The ease of association of the injury with the rule of conduct that is urged . . . is the proper inquiry." *Id.*

Here, the association between the duty imposed by law on the prison authorities, including Thompson, and the injury sustained by Mr. Goetzee is straightforward. Louisiana law establishes a duty owed by prison authorities "to a prisoner to save him from harm." *Manuel*, 702 So. 2d at 712. Louisiana courts have held that as a matter of law, this duty "extends to protecting inmates from self-inflicted injury." *Misenheimer*, 677 So. 2d at 161. "This duty is not absolute, but depends upon the circumstances of

---

[61]     R. Doc. 76 at 6 (emphasis in original).

the particular case." *Scott*, 618 So. 2d at 1059.  Specifically, the duty to protect a prisoner from harm only extends to self-harm when the "facility knew or should have known of the risk." *Id.* at 1058.   Here, it is undisputed that OPP authorities, including Thompson, were well aware that Mr. Goetzee was a suicide risk.   They needed only to be aware that he was at risk of self-harm; they did not need to contemplate the precise form that self-harm might take. *See Cay v. State, Dep't of Transp. & Dev.*, 631 So. 2d 393, 399 (La. 1994).   Thus, under the undisputed facts before the Court, the duty to protect Mr. Goetzee from harm extended to the risk that he would come to harm as a result of his own actions.   Accordingly, the scope-of-duty element is met.

### 5. Damages

Finally, it is uncontested that Mr. Goetzee committed suicide.   Thus, plaintiffs have demonstrated actual damages. *Cf. Berg v. Zummo*, 786 So. 2d 708, 710, 716 (La. 2001) (concluding that "actual damages were proven" when plaintiff had suffered "serious bodily injury").

### 6. Conclusion

For the forgoing reasons, plaintiffs are entitled to summary judgment on their negligence claim against Defendant Thompson.

## C.   Vicarious Liability Against Defendant Gusman

Plaintiffs also move for summary judgment on their vicarious liability claim against Sheriff Gusman.   The principle of

vicarious liability or respondeat superior is codified in Louisiana Civil Code article 2320. This article provides that an employer is liable for the tortious acts of its employees "in the exercise of the functions in which they are employed." Thus, the issue for the Court is whether Thompson's alleged tortious conduct against Mr. Goetzee was sufficiently employment-related that vicarious liability should attach.

The Louisiana Supreme Court has outlined the parameters of the test for vicarious liability as follows:

> While the course of employment test refers to time and place, the scope of employment test examines the employment-related risk of injury. The inquiry requires the trier of fact to determine whether the employee's tortious conduct was "so closely connected in time, place and causation to his employment-duties as to be regarded a risk of harm fairly attributable to the employer's business, as compared with conduct motivated by purely personal considerations entirely extraneous to the employer's interests."

*Russell v. Noullet*, 721 So. 2d 868, 871 (La. 1998) (quoting *LeBrane v. Lewis*, 292 So. 2d 216, 218 (La. 1974)). In *Lebrane*, the Louisiana Supreme Court identified four factors to be considered in determining vicarious liability: (1) whether the tortious act was primarily employment rooted; (2) whether the tortious act was reasonably incidental to the performance of the employee's duties; (3) whether the act occurred on the employer's premises; and (4) whether it occurred during the hours of employment. *LeBrane*, 292 So. 2d at 218; *see also Baumeister v.*

*Plunkett*, 673 So. 2d 994, 996 (La. 1996).  It is not necessary that all four *Lebrane* factors be met in order to find vicarious liability.  *See Bates v. Caruso*, 881 So. 2d 758, 762 (La. Ct. App. 2004).

Each case must be decided on its specific facts.  *Id.* Generally, an employee's actions are within the course and scope of his employment if "the conduct is of the kind that he is employed to perform, occurs substantially within the authorized limits of time and space, and is activated at least in part by a purpose to serve the employer." *Orgeron v. McDonald*, 639 So. 2d 224, 226-27 (La. 1994).  That the primary motive of the employee is to benefit himself does not prevent the tortious act of the employee from falling within the scope of his employment. *Ermert v. Hartford Ins. Co.*, 559 So. 2d 467, 477 (La. 1990).  If the purpose of serving the employer's business actuates the employee to any appreciable extent, the employer is liable. *Richard v. Hall*, 874 So. 2d 131, 137-38 (La. 2004).  In addition, "[t]he scope of risks attributable to an employer increases with the amount of authority and freedom of action granted to the servant in performing his assigned tasks." *Id.* at 139.  In negligence cases, the focus is on the employee's general activity at the time of the incident, not on the specific alleged negligent act. *Ermert*, 559 So. 2d at 478; *Richard*, 874 So. 2d at 139. Importantly, "that the act is proscribed or performed in a

27

forbidden manner does not remove the act from the scope of employment." *Price v. La. Dept. Of Transp. and Development*, 608 So. 2d 203, 210 (La. App. 4th Cir. 1992) (citing *Lebrane*, 292 So. 2d 216).

Defendants' primary argument against holding Sheriff Gusman vicariously liable is that plaintiffs have not established that Thompson acted tortiously.  Notably, their brief does not argue that Thompson was not acting within the course and scope of his employment at the time of his allegedly tortious conduct.

Applying the *LeBrane* factors to the facts of this case, the Court finds that Thompson's allegedly tortious conduct occurred in the workplace during the hours of Thompson's employment. Thus, the third and fourth factors set forth in *LeBrane* are met. The Court must therefore determine if the alleged acts were primarily employment rooted and/or reasonably incidental to the performance of Thompson's duties.

A tortious act will be deemed primarily employment rooted if "serving the employer's business actuates the employee to any appreciable extent." *Baumeister*, 673 So. 2d at 999.  Defendants do not dispute that Thompson's regular duties and assignments at OPP included "monitoring the tiers for inmate staff safety, directly supervising inmates placed on suicide watch, assisting other jail staff, [and] distributing meals to inmates ('feed

28

up')."[62]   On August 7, 2011, the day of Mr. Goetzee's suicide, it was within Thompson's duties to conduct direct supervision of Mr. Goetzee.[63]   That day, he took three breaks: one to help another employee distribute meals, one to use the restroom, and one to go to the nurses' station.[64]   Thus, one of his absences from his post was to assist with a separate work duty: helping to distribute meals.   It is clear that "serving the employer's business actuate[d]" his conduct to an appreciable extent during that absence.   *Id.*

The other absences, during which he used the restroom and took a break, are the sorts of behaviors that an employer could anticipate as being "reasonably incidental" to the performance of an employee's duties.   *LeBrane*, 292 So. 2d at 218.   That Thompson was not authorized to take these breaks does not affect the analysis, which does not turn on whether "the act is proscribed or performed in a forbidden manner."   *Price*, 608 So. 2d at 210 (citing *Lebrane*, 292 So. 2d 216).   Accordingly, the *LeBrane* factors support the conclusion that Thompson was acting within the scope and course of his duties when he abandoned his post. Thus, his employer, Sheriff Gusman, may be held vicariously liable for his conduct.   Because Thompson was acting within the course and scope of his employment at the time of his tortious

---

[62]   68-2 at ¶ 38.
[63]   *Id.* at ¶ 42.
[64]   *Id.* at ¶¶ 44-47.

conduct, the Court finds that plaintiffs are entitled to summary judgment on vicarious liability against Sheriff Gusman.

### D.   Section 1983 Claim Against Thompson

Plaintiffs also move for summary judgment on their 42 U.S.C. § 1983 claim against Thompson for violating Mr. Goetzee's rights under the Fourteenth Amendment.   The elements of a § 1983 cause of action are: (1) a deprivation of rights secured by federal law (2) that occurred under color of state law, and (3) was caused by a state actor.   *See Victoria W. v. Larpenter*, 369 F.3d 475, 482 (5th Cir. 2004).

#### 1.   Deprivation of Constitutional Right

"The State's exercise of its power to hold detainees . . . brings with it a responsibility under the U.S. Constitution to tend to essentials of their well-being." *Hare v. City of Corinth (Hare III)*, 74 F.3d 633, 638-39 (5th Cir. 1996) (en banc). Accordingly, pretrial detainees have a right to "constitutional essentials" such as safety and medical care. *Jacobs v. West Feliciana Sheriff's Dep't*, 228 F.3d 388, 393 (5th Cir. 2000). "Unlike convicted prisoners, whose rights to constitutional essentials like medical care and safety are guaranteed by the Eighth Amendment, pretrial detainees look to the procedural and substantive due process guarantees of the Fourteenth Amendment to ensure provision of these same basic needs." *Id.* (citing *Bell v. Wolfish,* 441 U.S. 520 (1979)).   "The failure to provide pre-

30

trial detainees with adequate protection from their known suicidal impulses is actionable under § 1983." *Evans v. City of Marlin*, 986 F.2d 104, 107 (5th Cir. 1993) (citing *Rhyne v. Henderson Cty.*, 973 F.2d 386, 391 (5th Cir. 1992)).

Here, plaintiffs argue that Thompson's repeated decision to abandon his post on August 7, 2011, when he admittedly knew Mr. Goetzee was at risk for suicide, violated Mr. Goetzee's right to adequate protection from his known suicidal impulses. When a detainee alleges that a government official's episodic act or omission violated his Fourteenth Amendment due process right to basic human needs, plaintiffs must demonstrate that the official exhibited "deliberate indifference" under *Farmer v. Brennan*, 511 U.S. 825 (1994). *See Hare III*, 74 F.3d at 636, 648–49 (applying *Farmer*'s Eighth Amendment deliberate indifference test to pretrial detainee's Fourteenth Amendment due process claim against state officials); *cf. Doe v. Robertson*, 751 F.3d 383, 387 (5th Cir. 2014) (applying *Farmer*'s Eighth Amendment deliberate indifference test to pretrial detainee's Fifth Amendment due process claim against federal official).

A prison official acts with subjective deliberate indifference when he (1) "knew of" and (2) "disregarded an excessive risk to the [detainee's] health or safety." *Brumfield v. Hollins*, 551 F.3d 322, 331 (5th Cir. 2008) (citing *Gibbs v. Grimmette*, 254 F.3d 545, 549 (5th Cir. 2001)) (alteration in

31

original).   The law is clearly established that "jailers must take measures to prevent inmate suicides once they know of [a] suicide risk." *Jacobs*, 228 F.3d at 394-95 (citing *Hare III*, 135 F.3d at 328-29).   Nevertheless, "*negligent* inaction by a jail officer does not violate the due process rights of a person lawfully held in custody of the State." *Id.* at 395. "Accordingly, to be considered deliberately indifferent to a known suicide risk, an officer's acts must constitute at least more than a mere 'oversight.'" *Id.*   The officer must be "aware of a substantial and significant risk" that the prisoner will commit suicide and "effectively disregard[] it." *Id.; see also Vinson v. Clarke Cnty.*, 10 F. Supp. 2d 1282, 1302 (S.D. Ala. 1998) (failure of prison personnel to take steps to prevent inmate from committing suicide in the face of actual knowledge of suicide risk can satisfy deliberate indifference) (citing *Greason v. Kemp,* 891 F.2d 829, 835-36 (11th Cir. 1990)).

The record before the Court on summary judgment establishes that Thompson had actual knowledge of the suicide risk to Mr. Goetzee.   During the entirety of Thompson's shift, he was assigned to monitor Mr. Goetzee *on suicide watch*.[65]   In addition, Thompson explicitly admitted in his deposition that he "knew that Mr. Goetzee was at substantial risk of hurting or killing himself

---

[65]   R. Doc. 66-6 at ¶ 33.

32

if allowed."[66]  A reasonable jury could not find other than that Thompson had actual knowledge that Mr. Goetzee faced "a substantial and significant risk" of suicide.  *Id.*

Likewise, reasonable minds could only conclude that Thompson "effectively disregarded" the risk to Mr. Goetzee.  *Id.*  Thompson admitted that he knew OPSO's suicide watch policies explicitly required officers to continuously monitor detainees on suicide watch and to document that they had done so.[67]  He also acknowledged that OPSO's policies provided that the reason suicidal detainees must be continuously monitored is because "the few moments required to successfully commit suicide necessitates continuous, direct observation."[68]  He admitted that he knew detainees on suicide watch had the potential to kill themselves.[69]  And yet Thompson, although fully aware both that Mr. Goetzee was suicidal and that suicidal detainees required constant monitoring, chose to abandon his post at least three times on August 7, 2011, leaving Mr. Goetzee unobserved each time.[70]  These three absences meant Mr. Goetzee went unobserved

---

[66]    R. Doc. 68-4 at 221 (Pls.' Ex. 26: Excerpts from Thompson Deposition).

[67]    *Id.* at 213-15.

[68]    *See* R. Doc. 68-4 at 274 (Pls.' Ex. 32: Office of the Criminal Sheriff Interoffice Memo re: Observation of Suicidal Inmates, October 15, 2007).

[69]    *Id.* at 219 (Pls.' Ex. 26).

[70]    *See id.* at 196-98 (Pls.' Ex. 24: Transcript of Boykin Examination Hearing in *State of Louisiana v. William Thompson*, Case No. 510-225).

for an hour and a half, fifteen minutes, and two hours respectively.[71]   Again, the law is settled that "jailers must take measures to prevent inmate suicides once they know of [a] suicide risk." *Id.* at 394-95.   Here, there can be no question that during the times when Thompson left his post he took *no* measures to protect Mr. Goetzee from harm.   Thus, plaintiffs have established that Thompson "effectively disregarded" the risk to Mr. Goetzee. *Id.* at 395.

The Court's conclusion is buttressed by Thompson's guilty plea to Malfeasance in Office under La. Rev. Stat. § 14:134 in connection with these events.   To sustain a conviction under section 14:134, the state must prove "the existence of an affirmative duty delineated by statute or law upon the defendant public officer and that the defendant *intentionally performed that duty in an unlawful manner*." *State v. Davis*, 634 So. 2d 1168, 1170 (La. 1994) (emphasis added).   A defendant must know "exactly what conduct [was] expected of him in his official capacity." *Id.*   Thus, by pleading guilty to malfeasance in office, Thompson affirmed that his disregard of his responsibilities was intentional.   Accordingly, his disregard for Mr. Goetzee's needs may be easily distinguished from the "*negligent* inaction" or "mere oversight" that will not satisfy deliberate indifference. *Jacobs*, 228 F.3d at 394-95.

---

[71]      *See id.* at 196.

2. *Under Color of State Law*

Second, there is no question that Thompson acted under color of state law at the time of the alleged violation of Mr. Goetzee's Fourteenth Amendment due process rights. "[A] public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law." *West v. Atkins*, 487 U.S. 42, 50 (1988). Thompson was a commissioned deputy of the Orleans Parish Sheriff's Office and on duty at the time of the alleged violation. Therefore, the under color of state law prong of plaintiffs' § 1983 claim is satisfied.

3. *Causation*

The third element of plaintiffs' § 1983 claim is a proximate cause requirement. *See Lamb v. Mendoza*, 478 F. App'x 854, 856 (5th Cir.). "Without proof of causation, a plaintiff cannot meet his constitutional burden." *Id.* Section 1983 proximate causation "is evaluated under the common law standard" and is interpreted against the "background of tort liability that makes a person liable for the natural consequences of his actions." *Murray v. Earle*, 405 F.3d 278, 290 (5th Cir. 2005). Thus, for the same reasons that the Court concludes plaintiffs have established the cause-in-fact and scope-of-duty elements of their tort claim against Thompson, the Court concludes that they have established the proximate cause element of their § 1983 claim.

35

### 4. Conclusion

Because plaintiffs have established that there is no issue of material fact for each essential element of their § 1983 claim against Thompson, the Court grants summary judgment in their favor on the issue of Thompson's liability in his individual capacity under § 1983.

### E. Predicate Constitutional Violation for Plaintiffs' *Monell* Claim Against Sheriff Gusman

A suit against a government official such as Sheriff Gusman in his official capacity is the same as a suit against the government entity of which the official is an agent, and victory in such a suit imposes liability on the entity that he represents. *See Burge v. Parish of St. Tammany*, 187 F.3d 452, 468 (5th Cir. 1999) (citing *McMillan v. Monroe Cty., Ala.*, 520 U.S. 781, 785 n.2 (1997)). Here, that entity is Orleans Parish. Municipal liability under § 1983 requires proof of three elements: "(1) an official policy (or custom), of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy or custom." *Pineda v. City of Hous.*, 291 F.3d 325, 328 (5th Cir. 2002) (citing *Piotrowski v. City of Hous.*, 237 F.3d 567, 578 (5th Cir. 2001)). At this time, plaintiffs move for partial summary judgment on the "constitutional violation"

36

component of the third element of their intended *Monell* claim against Sheriff Gusman.

The only argument defendants raise in opposition is that "it is improper" to grant partial summary judgment on a "portion" of a "prong" of a test.[72]   Federal Rule of Civil Procedure 56 directly contradicts this position.   It provides that a party may move for summary judgment "identifying the claim . . . *or the part* of each claim . . . on which summary judgment is sought." Fed. R. Civ. P. 56 (emphasis added).   Thus, it is proper for plaintiffs to move for summary judgment on the constitutional violation component of their *Monell* claim.   As discussed in the section addressing plaintiffs' § 1983 claim against Thompson in his individual capacity, *supra*, plaintiffs have established that Thompson violated Mr. Goetzee's Fourteenth Amendment due process rights.   Accordingly, they are entitled to partial summary judgment on the "constitutional violation" component of the third element of their intended *Monell* claim against Sheriff Gusman.


## IV.   CONCLUSION

For the forgoing reasons, the Court GRANTS summary judgment in favor of plaintiffs on their state law negligence claim against Thompson and their state law vicarious liability claim against Sheriff Gusman.

---

[72]    R. Doc. 76 at 8.

The Court also GRANTS summary judgment on plaintiffs' § 1983 claim against Thompson.  In addition, the Court GRANTS partial summary judgment on the "constitutional violation" component of the third element of plaintiffs' § 1983 claim under *Monell* against Sheriff Gusman.

In light of the Court's grant of summary judgment against Defendant Thompson, plaintiffs' motion for a default judgment against Defendant Thompson is moot.


New Orleans, Louisiana, this 17th day of November, 2014.


SARAH S. VANCE

UNITED STATES DISTRICT JUDGE