UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**MARGARET GOETZEE NAGLE,**      **CIVIL ACTION NO. 12-1910**
**ET AL**

     **SECTION "R"**

**VERSUS**

     **JUDGE VANCE**

**SHERIFF MARLIN GUSMAN,**
**ET AL**      **MAGISTRATE WILKINSON**

**MEMORANDUM IN SUPPORT OF DEFENDANT'S
MOTION IN LIMINE TO EXCLUDE TESTIMONY AND REPORT
OF PLAINTIFFS' PROPOSED EXPERT ELIZABETH FORD, M.D.**

MAY IT PLEASE THE COURT:

Dr. Charles Higgins ("Defendant") submits this Memorandum in Support of his Motion in Limine to Exclude the testimony and/or report of the plaintiffs' proposed expert, Elizabeth Ford, M.D. Dr. Ford's expert opinion, offered both in testimony and report, is outside the purview of appropriate testimony by experts and therefore, invades the province of the jury; presents cumulative evidence and is speculative, not reliable or supported by any reliable evidence. As such, and is more fully explained below, the entirety of her report, deposition testimony and any possible trial testimony should be excluded.

**I. PROCEDURAL AND FACTUAL BACKGROUND**

     **A. Basic Facts**

This action arises out of the August 7, 2011 suicide of the plaintiffs' brother while he was in the custody of the Orleans Parish Prison as a pretrial detainee on charges related to a suicide attempt five days earlier.[1]

---

[1] Rec. Doc. 68-2, paragraphs 8, 9, 11 and 13.

1

Goetzee worked with the Coast Guard, and, as the plaintiffs allege, he experienced a "profound mental health crisis and breakdown" while working in a position with the Coast Guard including "working around the clock during and following Hurricane Katrina and the BP oil spill."[2] On August 2, 2011, Goetzee approached a marked Federal Protective Services vehicle that was occupied by a uniformed law enforcement officer. According to the evidence, Goetzee opened the front passenger door, got in the vehicle and sat in the front seat.[3] Goetzee had a conversation with the officer and then lunged for his service weapon, exclaiming "I want to kill myself, give me your gun."[4] Goetzee was subdued, placed in handcuffs and then transferred by ambulance to Tulane Medical Center.[5]

Goetzee was released from Tulane after he received treatment for his physical injuries.[6] Federal agents then picked up Goetzee and transported him to Orleans Parish Prison.[7] Goetzee was booked on August 2, 2011 at 9:00 p.m.[8] He made his initial appearance when his attorney informed the Court that Goetzee appeared "unresponsive and obviously was having mental issues."[9] As a result of this statement, Goetzee was transferred to University Hospital and discharged two days later on August 5, 2011 with a diagnosis of psychosis. He was transferred back to OPP.[10]

Upon his return to OPP, Goetzee was placed on the 10th floor of the House of Detention

---

[2] Rec. Doc. 68-1 at paragraph 7.
[3] Rec. Doc. 68-1 at paragraphs 17, 18 and 19.
[4] Rec. Doc. 68-2 at paragraphs 20-21.
[5] *Id.* at paragraphs 22-24.
[6] Rec. Doc. 1 at 14.
[7] *Id.* at paragraphs 14-15.
[8] Rec. Doc. 68-2 at paragraph 25.
[9] Rec. Doc. 68-4 at paragraph 117.
[10] Rec. Doc. 68-2 at paragraph 31.

at OPP, the floor where all suicide watch prisoners were placed.[11] On August 6th and 7th, Goetzee was placed under direct supervision and suicide watch.[12] Thompson, a commissioned Depty with the Orleans Parish Sheriff's Office, was assigned suicide watch upon Goetzee.[13] The Court has previously determined that Thompson left his post three times that day, essentially leaving Goetzee unobserved.[14]

During Thompson's absence, another inmate notified officers that Goetzee was unresponsive and lying on a cell floor.[15] New Orleans Emergency Medical Services arrived, could not revive him and pronounced him dead at LSU Interim Hospital. The cause of death was asphyxiation after his airway was blocked by a wad of toilet paper.[16]

After Goetzee died, Orleans Parish Sheriff's Office Medical Health Director, Dr. Charles Higgins, performed a "Psychological Autopsy" assessing the events surrounding the death; Higgins concluded that Goetzee was treated appropriately by Orleans Parish Sheriff's Office Medical Department. Dr. Higgins observed that he was "ordered direct observation . . . medical had continued the order for direct observation up until the time of death; however, security failed to provide continuous observation allowing Goetzee to kill himself."[17]

### B. Procedural History and Current Procedural Posture

This case has been pending for quite some time; the Plaintiffs filed their Petition for Damages on or around July 23, 2012. The parties have participated in the discovery process and a number of dispositive motions filed with the Court. On January 4, 2013, the plaintiffs moved

---

[11] Rec. Doc. 68-2 paragraphs 10 and 32.
[12] Rec. Doc. 68-2 at paragraph 33.
[13] Rec. Doc. 68-2 paragraphs 35-36, 42.
[14] Rec. Doc. 68-2, paragraphs 44-47, 58 and Doc. 113.
[15] Rec. Doc. 68-2 at paragraph 50.
[16] Rec. Doc. 68-2 at paragraph 58.
[17] Rec. Doc. 68-2 paragraph 54; Doc. 68-4 at paragraph 186, exhibit 23 OPSO Medical Department Psychological Autopsy.

for an entry of default against Thompson, the deputy guard who had been assigned to maintain direct observation of Goetzee. The Court entered a default against Thompson that same day.

Additionally, the Court has reviewed and ruled on the Plaintiffs' Motion for Partial Summary Judgment. The Plaintiffs moved for summary judgment against Thompson for their state law tort claims and section 1983 claims. Moreover, the plaintiffs moved for partial summary judgment against Defendant Sheriff Gusman on their state law claim for vicarious liability for Thompson's tortious misconduct and on part of their federal claim against Gusman, in his official capacity, under 42 U.S.C. 1983 and *Monell v. Department of Social* Services, 436 U.S. 658 (1978). The Court granted the summary judgment in favor of the plaintiffs on the state law claims against Thompson and the state law vicarious liability claim against Sheriff Gusman. The Court also found that Thompson violated Goetzee's 14th Amendment Due Process Rights and therefore granted the plaintiffs' partial summary judgment on the "constitutional violation" component of the third element of the *Monell* claim.[18]

The plaintiffs have hired Elizabeth Ford, M.D. as one of several experts in this matter. According to the CV attached to her report, she is Board Certified in Psychiatry and Neurology with an added qualification in forensic psychiatry. Dr. Ford provided a report in this matter on December 1, 2015[19] and was deposed by the parties on January 12, 2016. At the time of the filing of this Motion in Limine, the final transcript of the deposition of Dr. Ford has not been completed.

## II. FACTUAL AND LEGAL ARGUMENT

### A. The *Basic* Standards Required for Admitting An Expert Opinion

---

[18]    Doc. 113 filed on November 18, 2014.
[19]    Exhibit A, Report of Elizabeth Ford, M.D.

4

Federal Rule of Evidence 702 authorizes a "witness qualified as an expert by knowledge, skill, experience, training, or education" to testify as to "scientific, technical, or other specialized knowledge." Testimony is admissible under Fed. R. Evid. 702, if it "rests on a reliable foundation and is relevant."[20] In making its initial determination of reliability, the Court has broad latitude to consider whatever factors the Court finds useful, and the particular factors will depend on the unique circumstances of the expert testimony involved.[21] The primary factors mentioned in *Daubert* and *Kumho* include the following: (1) whether the reasoning or methodology underlying the expert's opinion has been or could be tested; (2) whether the reasoning or methodology has been subject to peer review and publication; (3) the known or potential rate of error; and (4) the level of acceptance of the reasoning or methodology by the relevant professional community.[22]

### B. Elizabeth Ford, M.D.'s Testimony and Report, *In Its Entirety*, Should be Excluded

1. ***Dr. Ford's proposed testimony and report are outside the purview of appropriate testimony permitted by experts and invades the province of the jury.***

When an ultimate fact issue is one on which expert testimony would be helpful to the jury, an expert opinion may nonetheless be excludable if it does not convey information which is in a form useful to the jury.[23]

"Under Rules 701 and 702, opinions must be helpful to the trier of fact, and Rule 403 provides for exclusion of evidence which wastes time. These provisions afford ample assurances against the admission of opinions that would merely tell the jury what result to reach, somewhat

---

[20] See *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).
[21] See *Id.* at 152, 119 S.Ct. 1167
[22] See *Id.* at 149–52, 119 S.Ct 1167; *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592–95, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).
[23] *Specht v. Jensen*, 853 F.2d 805 (10th Cir. 1988).

5

in the manner of the oath-helpers of an earlier day. They also stand ready to exclude opinions phrased in terms of inadequately explored legal criteria."[24] Such expert opinions are excludable not because they tell the jury how to decide the case, but because they do not provide the jury with information the jury needs to make an independent assessment of the ultimate issue. Thus, an opinion couched in inadequately explored legal criteria is not helpful because it uses terminology the meaning of which is not reasonably clear to laymen.[25]

The Federal Rules of Evidence require that an expert's opinion assist the trier of fact in understanding the evidence or determining a fact in issue. In other words, the opinion must be relevant.[26] To be admissible, there must be a valid scientific connection to a specific issue, i.e., the testimony must "fit" the issue.[27] When the party attempting to exclude expert testimony can show that the expert's opinion will not help the trier of fact in understanding the evidence or determining a fact in issue, the court can exclude the testimony.[28]

Presumably Dr. Ford, a board certified physician in both psychiatry and neurology with an added qualification in forensic psychiatry, is intelligent and highly capable of forming expert opinions. However, her report rather reflects more factual conclusions which do not help the jury, which do not offer any insight or medical certainty to the jury. The particularly problematic excerpts of Dr. Ford's report, include

---

[24] Rule 704 advisory committee's note.
[25] See *United States v. Hearst*, 563 F.2d 1331, 1351 (9th Cir.1977); see also 3 Weinstein's Evidence ¶ 704 [01].
[26] *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002).
[27] *Boca Raton Comty. Hosp., Inc. v. Tenet Healthcare Corp.*, 582 F.3d 1227, 1232 (11th Cir. 2009).
[28] F.R.E 401, 702; *See Buckner v. Sam's Club, Inc.,* 75 F.3d 290, 293 (7th Cir. 1996); *Tuli v. Brigham & Women's' Hosp., Inc.,* 592 F.Supp.2d 208, 211-212 & n.4 (D. Mass. 2009*); See e.g., North Am. Specialty Ins. Co.,* 579 F.3d 1106, 1112 (10th Cir. 2009) (expert testimony was not helpful because jury was capable of resolving case without expert's assistance).

a. Based on the available records about Mr. Goetzee's history and reports from available individuals familiar with Mr. Goetzee's life, he did not suffer from a mental illness until symptoms began to emerge in the spring of 2011 in the context of significant and chronic sleep deprivation possibly exacerbated by the motor vehicle accident on June 8 and brief treatment with steroid medications.

b. While his family, his fiancée and his colleagues noted him to be quiet and socially withdrawn, obsessive and occasionally odd at baseline, he was able to maintain stable relationships, excel in his chosen career, and take care of his physical health.

c. Starting in the spring of 2011 and only several months before his death, Mr. Goetzee developed unusual, and then frankly psychotic, thoughts and behaviors that drew the attention of his fiancée, his sister and later, his co-workers.[29]

d. The most obvious and realistic trigger to this psychosis was his consistent lack of sleep, initially a result of a chaotic work schedule involving day-night shift changes but then later also a function of anxiety and insomnia that was most likely worsened by continuing sleep deprivation.

e. Based on the available information, I am not able to make a definitive DSM-V psychiatric diagnosis for Mr. Goetzee at the

---

[29] Exhibit A, Report of Dr. Ford, both subsections a, b, and c, pg. 12.

        time of his death.[30]

    f.    There is not enough clear evidence to seriously consider other potential primary causes of his new onset psychosis, including steroid-induced mania, caffeine, withdrawal, and sequelae from his concussion following the motor vehicle accident, however each of these may have exacerbated his symptoms at various points from the spring of 2011 until the time of his death.[31]

    g.    The associated psychosis can be as severe as with schizophrenia, however, unlike many patients with schizophrenia, treatment of the underlying medical condition (e.g. resolution of the sleep debt) typically results in full resolution of the psychosis.[32]

These excerpts highlighted from Dr. Ford's report reflect information conclusions that the jury can gather on its own; these excerpts, from the conclusion and opinion section of Dr. Ford's proposed expert report, do not require specialized training or knowledge to formulate. Dr. Ford has presented nothing herein that the jury could not determine on its own.

    **2.**    *Even if the Court is able to look past the general conclusions, Dr. Ford's report should still be excluded as it presents cumulative evidence.*

    Federal Rules of Evidence, particularly Rule 403, provide that the court may exclude relevant evidence if its probative value is substantially outweighed by a danger of …needlessly presenting cumulative evidence.[33] It is within the power of the district court to exclude

---

[30]     Exhibit A, pg. 13.
[31]     Exhibit A, pg. 14.
[32]     *Id.*
[33]     *Abbot Point of Care, Inc. v. Epocal, INc.*, 868 F. Supp. 2d 1310 (N.D. Ala. 04/18/12).

testimony that is repetitious and cumulative of testimony already before the court.[34]

After offering an explanation of her methodology and the information gleaned in her preparation of her expert report, Dr. Ford presents the Court with her conclusion and opinion. However, yet again, the conclusion is deficient. Rather than reading as a medically and scientifically sound opinion, the report and testimony offer a recitation of facts already in evidence. For instance, Dr. Ford includes the following in her opinion and conclusion section of her report,

> a. While Mr. Goetzee likely minimized his symptoms to others, it does appear that he was less agitated and psychotic for at least several weeks following his discharge from the psychiatric hospitalization in June.
>
> b. The history most fits the diagnosis of Psychotic Disorder Due to Another Medical Condition, with delusions. In Mr. Goetzee's case, sleep deprivation would be the medical condition involved.
>
> c. Additional factors may exacerbate the symptoms such as treatment with steroids.

These facts are not disputed and are readily presented in Goetzee's medical records. An expert, such as Dr. Ford, is not needed to re-urge the facts to the jury. These cumulative facts further support that Dr. Ford's opinion, both in her report and deposition testimony, should be excluded.

### 3. *Finally, the proposed report and testimony are speculative, at best, and should be excluded as unreliable.*

Speculative, not reliable or supported by any reliable evidence, reports and testimony

---

[34] *Harvey v. Andrist*, 754 F.2d 569, 572 (5th Cir.), cert. denied 471 U.S. 1126, 105 S.Ct. 2659, 86 L.Ed.2d 276 (1985); Fed. R. Evid. 403.

presented by an expert are inadmissible; when expert testimony is demonstrated to be speculative and lacking in scientific validity, trial courts are encouraged to exclude it.[35]

In addition to offering information unhelpful to the jury and re-urging the facts, her opinion reflects a collection of *opinions* couched in "maybes" and "what-ifs."  For example, Dr. Ford states,

    a.    *Even if* he was surreptitiously refusing the medication without the clinical staff becoming aware, the contained environment of the hospital *may have been* enough to help him sleep.

    b.    *If* Mr. Goetzee's psychosis was a result of a chronic mental illness, *it is highly unlikely* that such a short hospitalization and such a short time on medication would have significantly improved his symptoms.

    c.    He felt that the only way to end his suffering was to take his own life.

    d.    Also included on the diagnostic differential is Brief Psychotic Disorder with marked stressors, however the diagnostic requirement that the episode duration be no longer than one month *cannot be* firmly established in this case.

    e.    While Mr. Goetzee was significantly impaired at the time of his arrest on 08/02/11 – agitated, suicidal, violent, delusional to the point where he believed that his death was the only way to relieve his and others' suffering – there were several missed opportunities

---

[35] *In re Vioxx Products Liability Litigation*, 401 F Supp 2d 565 (ED La. 2005) citing *Moore v. Ashland Chem. Inc.,* 151 F3d 269, 279 (5th Cir. 1998).

        for psychiatric interventions following his arrest that *would have had* a meaningful effect on his symptoms and *would have most likely* prevented his suicide.

    f.    *If* Mr. Goetzee had not killed himself, based on the *most likely sources* of his psychosis, his clinical symptoms *would almost certainly have* improved with continued monitoring and treatment, even in jail.

    g.    He could have continued his relationship with his fiancée and family, and if retained in custody, worked closely with an attorney to mount a defense.

    h.    Given his psychosis and suicidal thinking related to the circumstances of his arrest, there is reason to think that his charges *might have been* reduced.

    i.    While a further career in the Coast Guard *might have been* unlikely, Mr. Goetzee was, by all accounts, a highly intelligent and skilled man who could have returned to employment, stable relationships and a good quality of life.[36]

    Emphasis Added.

The prevailing words in these highlighted portions of Dr. Ford's report are "even if; may have; might have; would almost certainly had; it is highly unlikely." These words do not engender any reliability or certainty as is expected from an expert report. Rather, Dr. Ford's opinions are speculative, offering *what ifs or what might have been*, all resulting in an unreliable proposed

---

[36]    Exhibit A, all of above taken from pages 13-14 of Dr. Ford's report.

opinion.

Finally, these issues were discussed in greater detail during Dr. Ford's deposition, and this motion will be supplemented when the deposition transcript is received.

## III.     CONCLUSION

Dr. Ford's proposed expert opinion, both in her oral deposition testimony and written report, fails to comply with federal statutory and jurisprudential pre-requisites. Based on the identified examples and her deviation from the proper standards required of an expert, the defendant, Dr. Charles Higgins, respectfully suggest that the plaintiffs' expert, Dr. Elizabeth Ford's, testimony and written report, all be excluded and stricken from the record and that she further be prevented from testifying at trial.

Respectfully submitted,

*s/Darrel J. Papillion*
Darrel J. Papillion (#23243)
Renee C. Crasto (#31657)
**WALTERS, PAPILLION, THOMAS, CULLENS, LLC**
12345 Perkins Road, Building One
Baton Rouge, LA 70810
Telephone: (225) 236-3636
Fax: (225) 236-3650
Email:  papillion@lawbr.net
          crasto@lawbr.net
***Attorneys for Dr. Charles Higgins***

## **CERTIFICATE OF SERVICE**

      I hereby certify that a copy of the above and foregoing was filed electronically with the Clerk of Court using the CM/ECF system and was transmitted electronically to all counsel of record this 19th day of January, 2016.

                                                                s/Darrel J. Papillion
                                                               **Darrel J. Papillion**