**Elizabeth Ford, MD**
-------------------------------------------------------------------------------------------------------------
Tel: 347-302-4797
elizabeth.ford@nyumc.org


Date: December 1, 2015
Re: William Goetzee (deceased)


Emma Freudenberger, Esq.
Neufeld Scheck and Brustin, LLP
99 Hudson Street
New York, NY  10013


Dear Ms. Freudenberger,

As per your request from November of 2013, I have evaluated the available records and conducted interviews of available individuals as related to the U.S. District Court complaint *Nagle v. Gusman, et al*, involving the death by suicide of Mr. William Goetzee on August 7, 2011 while he was an inmate in the Orleans Parish Prison (OPP) in New Orleans, Louisiana. On July 20, 2012, Margaret Nagle and Eric Goetzee (Mr. Goetzee's siblings) filed a complaint in the United States District Court for the Eastern District of Louisiana against twenty multi-disciplinary (health care and correctional) staff members of the OPP. The complaint alleged that line and leadership staff deprived Mr. Goetzee of constitutional rights, that they inflicted "physical injury and severe emotional, mental and physical pain and suffering upon him," and that the Orleans Parish Sheriff's Office failed to accommodate Mr. Goetzee's mental disability under the American with Disabilities Act. They also claim that they "suffered emotional pain and suffered the loss of love, affection and companionship of their brother…" I was asked to opine about any mental health issues and/or psychiatric diagnoses that may have been present prior to or at the time of his death. I am being retained at an hourly rate of $250/hr for my work on this case, including interviews, record review, report preparation, and any deposition or testimonial duties that may be required.  At the time of this writing I have received compensation of $5,500.

Statement of Confidentiality:

All individuals that I interviewed were informed of the nature of my evaluation and that any information obtained may be used in a report to Ms. Freudenberger and disclosed to all relevant personnel involved in the case.

Sources:

1. Two telephone interviews with Donna Gauthier (Mr. Goetzee's fiancée) on 4/22/14 and
     4/23/14, 2 hours total

<span style="color:red">EXHIBIT A</span>

1

2. In-person interview with Margaret Nagle (Mr. Goetzee's sister) and Eric Goetzee (Mr. Goetzee's brother) on 5/2/14, 2 hours

3. Telephone interview with James Hanzalik (former boss of Mr. Goetzee in the Coast Guard) on 9/30/15, 30 minutes

4. Telephone interview with Kevin Robb (former co-worker of Mr. Goetzee) on 10/21/15, 20 minutes

5. Telephone interview with Rob Porsche (friend of Mr. Goetzee) on 11/16/15, 20 minutes

6. Multiple brief phone conversations and email exchanges with Emma Freudenberger and NSB staff from 12/13 through 10/15

7. Federal complaint filed in U.S. District Court for Eastern District of Louisiana, 7/20/12

8. Personal Note from William Goetzee regarding his sleep patterns prior to a motor vehicle accident in June of 2011, no date

9. Email communication between William Goetzee and Captain Edward Cubans, dated 6/29 6/30/11

10. Email communication between William Goetzee and Captain Vince Weber, dated 6/2/11

11. List of outpatient medications for William Goetzee prior to his death provided by Donna Gauthier, no date

12. Walgreens prescription profile for William Goetzee from 1/1/11- 8/5/11, dated 8/5/11

13. Narrative from Donna Gauthier regarding William Goetzee, describing her recollection of his behavior and patterns during their relationship and leading up to his death, no date

14. Civilian psychiatric/medical records:
    a. East Jefferson General Hospital emergency room records, 6/8/11
    b. Southern Brain and Spine outpatient records, 6/8/11-7/8/11
    c. Outpatient records from Dr. Andrew St. Martin, 6/13/11-7/1/11
    d. River Parishes Hospital emergency room records, 6/13/11
    e. River Oaks Hospital inpatient records 6/13/11-6/17/11

15. Police and jail custody medical records
    a. EMS report, 8/2/11
    b. Tulane Medical Center emergency room records, 8/2/11
    c. Orleans Parish Sheriff's Office (OPSO) records 8/2/11-8/7/11
    d. LSU Health Sciences Center inpatient records from 8/3/11-8/5/11
    e. EMS report, 8/7/11
    f. LSU emergency department physician note, 8/7/11

16. Other relevant jail records
    a. OPSO Mortality Review and Psychological Autopsy, dated 9/2/11
    b. OPSO Special Operations Division report on William Goetzee's death, 8/7/11

17. FBI and U.S. Marshall Service Documents
    a. Two email between Coast Guard attorneys, 6/5/11
    b. FBI interview with William Goetzee's captain, 8/2/11
    c. FBI affidavit of Agent Strawn, 8/2/11
    d. FBI Statement of ATF agent, 8/2/11
    e. FBI statement of Federal Protective Service Inspector William Watson, 8/2/11
    f. FBI statements from two bystanders, 8/3/11
    g. FBI report by Agent Strawn, 8/3/11
    h. FBI statement of Federal Protective Service officer, 8/3/11
    i. FBI statement of William Goetzee, 8/3/11

j.   Two US Marshall Use of Force Reports, 8/3/11
k.   FBI statements from five of William Goetzee's coworkers, 8/3-8/4/11
l.   FBI statement of US Marshall, 8/4/11
m.   Statement of US Marshall GH, 8/4/11
n.   Report of US Marshall Scott Perry, 8/5/11
o.   FBI statement from Tulane Medical Center physician, 8/5/11
p.   FBI statements of two Federal Protective Service Officers, 8/8/11
q.   FBI statement of Ms. Gauthier, 8/9/11
r.   Notes from US Marshall Thibodeaux, 8/11/11
s.   US Marshall 129 Detention Report, 8/11/11
t.   US Marshall memo re: suicide, 8/15/11

**Relevant Family, Developmental and Employment History**

Mr. Goetzee was 48 year-old single, white male employed as an environmental protection specialist and reservist by the US Coast Guard. He lived alone and was engaged to Ms. Donna Gauthier.

Mr. Goetzee was the middle of three children born to his biological parents. His sister, Margaret, was born two years before Mr. Goetzee and his brother, Eric, was born two years after. Eric reportedly has an intellectual disability stemming from prenatal injury and several head injuries during childhood. He did not meaningfully participate in an interview with me.

Margaret reported that she was a "straight A" student until she "started drinking and partying" around age 16, coincident with her mother's death in 1976. Margaret got divorced in her 30's and received treatment at that time for depression and anxiety. She reported that since her brother's death, she has been in treatment again and takes anti-depressant medication for depression, anxiety with panic attacks and PTSD. Margaret currently works in the pharmaceutical industry.

Mr. Goetzee's father was a star baseball pitcher in high school, recruited to a minor league team, before a shoulder injury ended his chances at a baseball career. He enlisted in the military and was a fighter pilot in World War II. After the war ended, he married Mr. Goetzee's mother and began work at the American Can Company in New Jersey. He worked there for 42 years until his death from congestive heart failure in 2003. Margaret described her father as a hard worker but always home for dinner each night and very devoted to the care of the family.

Mr. Goetzee's mother had a number of medical conditions including diabetes, obesity, high blood pressure and heart disease. She reportedly developed gangrene in one of her legs as a result of her poorly controlled illnesses. According to Margaret, her mother could be a strict disciplinarian. When she was 41 years old (and Mr. Goetzee was in third grade), she suffered a near fatal heart attack that required an ICU hospitalization for six months. When she returned from the hospital, she continued to be frail. Margaret recalls at least several occasions when she and Mr. Goetzee had to manage their mother's "insulin shock" with orange juice and sugar. Mr. Goetzee's mother passed away from a heart attack in 1976 when she was 47 years old and Mr. Goetzee was 14. According to Margaret, their mother was sitting with Mr. Goetzee at the kitchen table when she suddenly died. Mr. Goetzee told Ms. Gauthier that his mother died "in his arms."

Following the death of his wife, Mr. Goetzee's father worked hard to keep the family together despite pressure to consider familial adoption. Mr. Goetzee's paternal aunt helped out for about six months, then Margaret took over most of the cooking and housework. When she began drinking alcohol and staying out late, her father tried to manage the household on his own.

3

Ms. Gauthier reported that Margaret has "a lot of issues, a lot of remorse and guilt" about not taking on more responsibility for William and Eric following the loss of her mother. Margaret confirmed this account as accurate.

Margaret was the only individual available who could provide a first-hand account of Mr. Goetzee's childhood. She reported that he was creative and artistic, but also very logical and methodological in his thinking. He got average grades in middle school and while he had some friends, she noted that he was "perfectly fine" being by himself.  Mr. Goetzee's academic performance improved considerably in high school; he took Advanced Placement courses and got A's. He was eager to attend West Point for college and completed most of the requirements – endorsement from a politician, physical exam, and grade average – but did not place high enough on his SAT exam. Margaret reported that he was devastated about not being able to attend the school.

He instead received an Associate's Degree in Chemistry from Union County Community College and then worked in various positions before receiving his bachelor's and master's degrees in environmental science at the New Jersey Institute of Technology. He earned these degrees in night school so that he could continue to work as a chemist. Mr. Goetzee joined the Coast Guard and worked as a marine safety specialist as well as duties "standing watch" on 12-hour shifts in the command center. From 2003-2008, he interacted closely with Kevin Robb. Mr. Robb reported that Mr. Goetzee was "an incredibly strong performer," "exceptionally bright," and "always on his game." He also described Mr. Goetzee as being "hard on himself," however clarified that the Coast Guard attracted "type A" personalities and that Mr. Goetzee's character did not stand out as unusual. Mr. Goetzee worked as a dispatcher during Hurricane Katrina in 2005. He lived 15 blocks from the major impact zone of the hurricane and lost most of his possessions, including important paperwork, when his house flooded.

He began working as an environmental protection specialist for the Coast Guard in 2007 and reported to Captain James Hanzalik from 2008-2011, including during efforts from April through August of 2010 related to the BP oil spill. Mr. Hanzalik described Mr. Goetzee as a "run of the mill" person who was very intelligent, responsible and had excellent writing skills. Mr. Hanzalik noted only that Mr. Goetzee "didn't look comfortable" in social situations and would get "nervous" about being on time. He had no disciplinary actions during those three years, no staff complaints about his behavior and no unusual absences or time off. According to co-workers who provided statements following Mr. Goetzee's death, he was described as "conservative, quiet and thoughtful," although "excessively meticulous" and "quirky." Ms. Gauthier similarly described Mr. Goetzee as "shy," "really intelligent," and a "quiet guy."  Rob Porsche, a physical therapist who was Mr. Goetzee's "close friend" in the late 90's when they were neighbors, described Mr. Goetzee as an "introvert but a good guy." He said that Mr. Goetzee was more comfortable in one-on-one conversations than social gatherings but there was "nothing unusual, he was perfectly fine."

Mr. Goetzee never married and had no children. According to Margaret, with some information known to and confirmed by Ms. Gauthier, Mr. Goetzee had three romantic relationships with women prior to his engagement to Ms. Gauthier. At the time that Mr. Goetzee and Ms. Gauthier met, Mr. Goetzee was dating an older, possibly married, woman with whom he had worked previously. He broke off this relationship when Ms. Gauthier told him that he "had to decide" between the two women. Ms. Gauthier was 18 years older than Mr. Goetzee. According to Margaret, Mr. Goetzee liked to date older women "because they don't play games." Ms. Gauthier reported that she had been divorced for thirty years when she met Mr.

Goetzee. She had no children but helped to care for her disabled nephew. Mr. Goetzee was reportedly very nurturing of this nephew and had planned to become his executor.

The only family history of mental illness noted was Margaret's treatment for depression and anxiety and a report by Mr. Goetzee's father to Margaret that her mother had experienced post-partum depression following the births of each of her three children. Neither Margaret nor Donna was aware of any other Goetzee family history of psychiatric treatment, hospitalizations, or attempted or completed suicides.

**Relevant Clinical History**

Margaret reported that Mr. Goetzee was a healthy child. His only notable medical issues were an emergency appendectomy at age 18 and a severe allergic reaction to a spider bite. According to medical records, he also had a small, benign epididymal cyst. He was a long distance runner in high school and continued to run throughout his adulthood. Margaret reported that he was "very sensitive to medications" and tried to avoid them. She said that because of some of his work experience in chemistry and drug testing, he was aware of their mechanism of action (and potential side effects) and "didn't like what they did."

When asked about any unusual behavior prior to the spring of 2011, Ms. Gauthier reported that, in December of 2010, Mr. Goetzee "all of a sudden" became very interested in his father's military career and spent much of his time trying to convince "the military" that his father deserved a medal for his service in the war. During this time, Ms. Gauthier reported that Mr. Goetzee continued to eat and sleep normally, still performed well at his job and continued his regular exercise patterns. Mr. Hanzalik remembered a 2-3 day period during this time when Mr. Goetzee spoke repeatedly about his father's military career, concerns that his father was "ostracized" by his fellow soldiers, and fears that those soldiers were "coming to get him." When Mr. Hanzalik pointed out that those individuals from the war would have to be 80-90 years old by now, Mr. Goetzee replied, "Oh, I never thought of that." According to Mr. Hanzalik, Mr. Goetzee later apologized for his statements and explained that the "paranoia" was a result of taking medication. Ms. Gauthier also temporally linked Mr. Goetzee's unusual beliefs to his development of a "urinary problem" for which he was prescribed Cialis (used to treat an enlarged prostate) and gabapentin (used for nerve pain). She reported that the medication made him "anxious and obsessive" and that these symptoms resolved when he stopped taking it.

There are no reports that Mr. Goetzee abused any substances except possibly caffeine. Margaret reported that he drank up to 24 12 oz. Diet Cokes/day for years, including until the time of his arrest.

In the spring of 2011, Mr. Goetzee got a new reserve position at Scott Air Force Base, a position that required top-secret security clearance. He filed the security clearance paperwork in April of 2011 but was later informed that some of the information was incorrect and that the discrepancies needed to be investigated by the Office of Personnel Management (OPM). Mr. Goetzee had relied on his memory for some of the questions on the clearance forms (since his paperwork was lost in the hurricane) and apparently made some mistakes. Ms. Gauthier reported that Mr. Goetzee was very nervous about the investigation.

According to Mr. Goetzee's report as noted in reviewed documents and later confirmed on interview with Ms. Gauthier, Mr. Goetzee experienced an "unsustainable and dangerous" lack of sleep in the month following notification of the OPM investigation. He had switched from day shift to night assignments and also participated in a 2-week training drill for the reserves. He

estimated that he had been getting, on average, four hours of sleep in any 24-hour cycle for that period of time. Mr. Hanzalik confirmed that Mr. Goetzee was on midnight-8 am watches and, when he worked on weekends, would come to his civilian position on Mondays having slept very little, if at all, for the prior two days.

When he returned from the training trip on May 26, 2011, Ms. Gauthier reported, "I could tell his mind was racing and he was thinking of all types of things that he thought he did wrong." She noted him to be increasingly concerned, perhaps even paranoid, about losing his job over the mistakes in his security clearance application. She recalled several comments he made during that time such as "I'm so tired, I can't sleep, I've got so much to do," and "There's things I can't say, I can't talk about."

On Sunday, June 5, 2011, according to an email from a Coast Guard staff attorney, "Mr. Bill Goetzee walked into my office, starting rambling about "losing both his jobs" and asked for legal help." Later that day another email by the same attorney to Captain Hanzalik noted "Just for your awareness, Mr. Goetzee is still here and stopped by again. It's hard for me to get a read on Mr. Goetzee on a normal day, but it does seem like something is bothering him a lot." According to US Marshall Perry's Field Report and USCG personnel, Mr. Goetzee was directed to seek the guidance of the Employee Assistance Program.

On June 6, according to Mr. Hanzalik, Mr. Goetzee came to his office and said, "I got something to tell you." He then described concerns that he had submitted taxi receipts for travel that might not have been completely accurate and that he owed the Coast Guard money. Mr. Hanzalik said that he was not particularly concerned about this because the amounts were trivial, but that because of Mr. Goetzee's obvious discomfort about the situation, he directed Mr. Goetzee to add up the receipts and donate whatever money he felt he owed to the Coast Guard to charity instead. He then told Mr. Goetzee to "go back home because you aren't getting enough sleep." Mr. Hanzalik reported that Mr. Goetzee returned to work later that evening and had not slept.

On June 7, Mr. Goetzee found Capt. Hanzalik and told him that he had to speak to him in secure room. Once they were inside, Mr. Goetzee reportedly said that he thought he was being listened to in his car through an unused cell phone signal. He said that he was talking to himself while driving and that "someone" might have heard top secret information. Capt. Hanzalik told Mr. Goetzee that he didn't have top secret security clearance yet and that it was impossible to listen through a phone that wasn't on. He ordered Mr. Goetzee to return home to sleep.

Mr. Goetzee returned later that day, went to his USCG Chief of Staff, Capt. Hanzalik's boss, and reported that he thought people were watching him, monitoring him and wanted to kill him. Capt. Hanzalik described that Mr. Goetzee was carrying a notebook with him that had "alien writing, gibberish, it didn't make any sense at all." He also said that Mr. Goetzee thought there was radioactive material leaking out of his leg.

On June 8, Mr. Goetzee reportedly told colleagues, "they are listening to me, they are watching me, they are even sending radio waves that cause my legs to ache." There was some speculation that the "they" in his comments referred to the outstanding OPM investigation. Capt.. Hanzalik was out that day but the covering supervisor called him and reported on Mr. Goetzee's statements and behavior. Capt. Hanzalik ordered him to leave work immediately to get some rest and suggested that he go to a hospital.

On the drive home, Mr. Goetzee was involved in a motor vehicle accident on Interstate 10. He was the only person in the car. The car apparently rolled several times yet he was able to get out on his own. There was no report of a loss of consciousness. According to reports, Mr.

6

Goetzee stated that he might have fallen asleep at the wheel as he had but had only slept 4 out of the prior 48 hours at the time of the accident.

He was taken to East Jefferson General Hospital and was treated for blunt head trauma (no findings on imaging) and an 8 cm laceration to his right leg. He received an injection of haloperidol (an antipsychotic) and lorazepam (an anti-anxiety agent) several hours after arrival when he got up unexpectedly and pulled out his IV's.  He was noted to be "very agitated and confused…yelling out regarding God is the light. Talking about military things." He was discharged with as needed medications of cyclobenzaprine (a muscle relaxant) and oxycodone-acetaminophen (a pain reliever). He appeared to have taken only a few of each of these medications in the following days.

Mr. Goetzee was initially cleared to return to work on 6/12/11, but following an appointment on 6/10/11 with a spine surgeon was excused from work until 7/22/11.  He was prescribed six days of prednisone (an steroid anti-inflammatory agent) and 75 mg of Lyrica (aka pregabalin) for arm tingling and neck pain. According to Ms. Gauthier, Mr. Goetzee continued to have trouble sleeping, so much so that they could not share a room because he was up all night. She wrote in documents provided as part of the investigation that "during the day he was trying to keep busy so his mind would stop racing."

Ms. Gauthier was staying with her nephew on the night of 6/12/11 in order to get some sleep when she received a call from River Parishes Hospital at approximately 0230 on 6/13/11. Mr. Goetzee was evaluated in the River Parishes Hospital ER from 6/12/11-6/13/11. He walked in with the complaint of chest pain and "feeling that he is going to code". According to the ambulance report, "Patient states he wants to speak with the White House situation room concerning a technology that affects the heart…He [feels] he was followed by the FBI in black car as a challenge" and that that led to his car accident on 6/8/11. He also stated "that all police/EMS need to be evaluated b/c he has now exposed us to harmful things. And now he has ruined his life b/c he has told us top-secret clearance info. Pt. is afraid he is going to code due to this information." At the time of his presentation to the ER, he had taken three days' worth of prednisone for a total dosage of 150 mg. Symptoms noted in the ER included flight of ideas (phrases strung together that don't make logical sense) and hallucinations (hearing voices). Mr. Goetzee denied any suicidal or homicidal thoughts. His laboratory results were unremarkable except for an elevated (though not acutely dangerous) blood sugar level. He was diagnosed with Steroid-Induced Psychosis and Anxiety Disorder Not Otherwise Specified, given a dose of alprazolam (an fast-acting anti-anxiety agent), and discharged home on 6/13. He was instructed to discontinue the prednisone. According to medications found by Ms. Gauthier after Mr. Goetzee's incarceration, it appears he followed the doctor's order.

Later that day, Mr. Goetzee saw his primary care physician. During that visit, Mr. Goetzee reportedly began talking again about people reading minds and agreed to sign himself in to River Oaks Hospital (ROH) for a psychiatric admission. According to Ms. Gauthier, he told her that he knew the thoughts he was experiencing "aren't real." He was admitted to that facility on 6/13/11 in the context of paranoia and feeling that the government could read his mind. He also complained of decreased sleep and racing thoughts.  He said that he hadn't slept for 72 hours and was switching from day to night shifts. According to ROH records, Mr. Goetzee stated, "he applied for a top secret clearance job with the government and stated the government could read his mind and record his actions." After discontinuing the prednisone, Mr. Goetzee was started on haloperidol (an antipsychotic) and lithium (a mood stabilizer) for his paranoid and manic symptoms. The haloperidol was stopped on 6/15/11, replaced briefly with risperidone

(another antipsychotic). The risperidone and lithium were both stopped on 6/16/11. Mr. Goetzee was noted to be engaged in his treatment and did not endorse any suicidal thoughts. He was noted to take all medications prescribed. The only medication for which Mr. Goetzee was prescribed upon discharge was for high blood pressure. His discharge psychiatric diagnosis was prednisone-induced mania determined to be treated and resolved. He was encouraged to follow-up with a psychiatrist if symptoms returned.

Following his discharge on 6/17/11, Mr. Goetzee saw his spine surgeon again. An MRI was ordered and the results indicated that surgical intervention was an option. Mr. Goetzee stayed at home until 7/8/11 in the hopes that he could avoid surgical intervention on his neck. After a follow-up appointment with the surgeon on 7/8/11, he declined surgery and underwent several weeks of effective physical therapy with Rob Porsche. Mr. Porsche did not recall anything particularly unusual about the physical therapy sessions however did note that he went out to dinner with Mr. Goetzee a few weeks prior to his death and he "wasn't normal Bill."  He said that Mr. Goetzee was "paranoid" about "some kind of security clearance" and that his behavior seemed "unusual." Ms. Gauthier said that Mr. Goetzee continued to be very worried about his security clearance forms and spoke about "the whole thing being a test…he would say that someone, the government, could read his mind and he had to tell the truth." He was not sleeping well and continued to be very anxious about his physical and mental health. Mr. Goetzee was reportedly ambivalent about receiving mental health care because he did not want to lose his job.

According to a Coast Guard Captain and Ms. Gauthier, Mr. Goetzee returned to work on 7/25/11. According to a Captain's affidavit to the FBI, Mr. Goetzee was noted to tolerate his first week relatively well. His commanding officers reportedly urged him to ease back into his responsibilities and allowed him to skip a reserve training in St. Louis that week. On 7/30/11, Ms. Gauthier noted in her written statements that Mr. Goetzee still "seemed to be extremely anxious" and was not sleeping well. On 7/31/11, he reportedly took "too many" sleeping pills, became unsteady on his feet, and hit his head on the counter after falling in the kitchen. On 8/1/11, Mr. Goetzee stayed home from work because he had not slept the night before. According to the statement from Mr. Goetzee taken after his arrest he estimated that he was still only sleeping a few hours each night even after he returned to work in late July. He attributed this to work that had accumulated during his hospitalizations and time at home.

**History Surrounding Sentinel Event**

Ms. Gauthier reported that in the morning on 8/2/11, Mr. Goetzee seemed "troubled" and "out of it," before he went to work. According to a co-worker affidavit, Mr. Goetzee asked him that morning to help with an external hard drive that he said had been "attacked." Mr. Goetzee seemed agitated, but the co-worker did not note anything particularly out of character. Several hours later, at approximately 0945, Mr. Goetzee called Ms. Gauthier and told her that he was not feeling well and "couldn't function." According to her statement, he "stated he could not focus, he felt everyone was looking at him." Ms. Gauthier drove to the federal building downtown [Mr. Goetzee's work location] and picked him up. They drove around for a bit and Mr. Goetzee said, "Somebody called me from another office and they were asking me things. It really upset me." He said that the colleague questioned him about his mental condition. He then told Ms. Gauthier that he had received his top-secret clearance and would likely only be working days; he seemed

more relaxed and relieved about this. She asked him to take the day off work but he insisted on going back.

Later that morning, Mr. Goetzee was noted to be walking in circles in front of the courthouse. According to investigation reports, he then approached the passenger side of an FBI vehicle (parked there for an ongoing trial) and showed his U.S. Coast Guard badge. He opened the car door and sat down, saying "I want to kill myself, give me your gun!" He reached for an officer's gun and a struggle ensued. Other officers came to assist and pulled Mr. Goetzee out the passenger side window. He was heard yelling, "Shoot me, shoot me, I want to kill myself!" He was eventually subdued by use of a Taser to the chest wall.  At 1113, Ms. Gauthier received a call from a federal officer about the events and was told that Mr. Goetzee was being taken to the hospital.

According to the EMS call sheet from 8/2/11 at approximately 1130, Mr. Goetzee was found sitting cuffed in in the back seat of the car, with low blood pressure and an elevated heart rate. He was given fluids and taken to Tulane Medical Center. He reported to EMS that he had taken sleeping pills before coming to work and that he wanted to kill himself. It is not clear if he had taken the pills as a suicide attempt. In a statement made by Mr. Goetzee the next day, he said that prior to the incident he was "having these strong feelings/sensations that he could not get rid of. [He] could not remember exactly what he was thinking about as he walked toward the police vehicle but he remembered wanting to put a stop to the intense feelings in his body. Goetzee stated he knows what he did concerning the police officer was really bad but that he wanted to take the police officer's gun to kill himself or 'suicide by cop'…Goetzee stated it was so intense [that] morning that he had to take some action against these thoughts so he wouldn't commit treason."

He further explained that since the motor vehicle accident in June he was having feelings in his body that "someone or something was invading his body and possibly reading his mind through the possible use of radar." He also stated that "for the past month, [he] felt that either the U.S. or Chinese Government was conducting some type of 'vetting process' related to the security clearance process he was currently going through. He also said that "the Chinese government may be involved with using this technology, [and he] was concerned about being considered a traitor and possibly giving up 'national security secrets' to a foreign government." He stated, "he did not want to go into a 'secure space' while working in his current capacity with the U.S. Coast Guard knowing that the Chinese Government may be reading his mind and/or invading his body." He said that he was not sure if the unusual body sensations he was having, including ringing in his ears, were a result of the medications he was prescribed or the "vetting process." Mr. Goetzee reported that he had felt like killing himself since June and had minimized his symptoms while hospitalized.

Upon evaluation in the ER, Mr. Goetzee was diagnosed with a concussion sustained from banging his head against the car window following his arrest. His physical work-up was otherwise unremarkable, including lab work, a urine drug screen and head imaging. According to an affidavit to the FBI from the physician who treated Mr. Goetzee in the ER, "a psychological evaluation" was not conducted because the physician felt it was unnecessary/unwarranted based on what he observed. The physician felt the outbursts by Mr. Goetzee were only an "act or ruse" in an attempt to avoid being arrested and taken to jail.

Ms. Gauthier saw Mr. Goetzee in the ER and reported that she was "shocked" that they didn't admit him. She was told by the New Orleans Police that Mr. Goetzee was not going to be arrested, that he would get a summons, and that she could take him home. Ms. Gauthier drove

him home, planning to pick up his medications and take him to another hospital. When they arrived home, Mr. Goetzee became extremely anxious and said he couldn't stop the racing thoughts in his head, [that] he wanted us to be together and happy. He did not want to be tortured and someone was going to torture him."

At approximately 1700, as Ms. Gauthier was trying to get Mr. Goetzee to East Jefferson hospital, the FBI approached and surrounded the car. Mr. Goetzee was then taken into custody.

The intake record from the Orleans Parish Sheriff's Office (OPSO) on 8/2/11 at 23:45 notes that Mr. Goetzee reported suicidal ideation that morning and that he was taking anxiety medication. A comment on the intake form notes "no SI/HI (suicidal ideation/homicidal ideation)" and that Mr. Goetzee was safe to be housed in a general population (GP) setting. There are no notes documenting his behavior from 23:45 on 8/2/11 until the morning of 8/3/11.

Mr. Goetzee was produced in preparation for arraignment on the morning of 8/3/11 on the charge of Assault on a Federal Officer. According to a US Marshall's report, Mr. Goetzee was brought into an interview room at 0740; the interview commenced at 0801. "Goetzee demonstrated an understanding of what a bond meant and asked for Donna [Ms. Gauthier] on several occasions." The Marshall "informed Goetzee that he had a lot to live for. He had a career, job, and people who cared about him." Mr. Goetzee responded, "Even after I confessed to the FBI about what I did?" He began rocking back and forth, would not get out of his chair, and had to be physically removed to another interview room. The Marshall reported that he told his fellow officers to watch Mr. Goetzee closely and that "they must be careful in handling him." The Marshall "also gave instructions that Goetzee would remain restrained the entire day with the exception of the required USMS fingerprinting."

According to a statement made to the FBI on 8/3/11, Mr. Goetzee reported that he "was having very intense feelings or sensations in his body that he could not get rid of.  [He] thought he was being attacked by some type of 'advanced radar, phase array or some type of directed energy source' which caused him to have a pulsing sensation in his ear and his muscles to twitch. [He] stated if he thought of something, the feelings/sensations would be more intense and would cause a 'tangible action' based on the technology."

At 0826, officers returned to Mr. Goetzee and he "immediately became verbally combative." They left and returned again at 0901. When one of his arms was removed from the restraint in order to be fingerprinted, his "agitation increased and he became physically combative." Mr. Goetzee was Taser'ed after verbal and physical de-escalation techniques were unsuccessful.

At 0930, Mr. Goetzee's public defender arrived and spoke with Mr. Goetzee. Once they were finished, Mr. Goetzee was fingerprinted without further incident. Mr. Goetzee then said to the Marshall, "we must challenge each other." The Marshall reportedly said something about respecting each other and then Mr. Goetzee charged at the cell door, hitting it and falling to the floor.

The pre-trial services officer arrived at 1145 however Mr. Goetzee "refused to acknowledge" the delivery of food. He was observed to eventually pull himself up from the floor and eat. At 1215, Mr. Goetzee stood up and began walking around his cell. He took off his pants and began yelling. The officers did not respond, reportedly because they thought that he was trying to provoke a fight. Mr. Goetzee calmed down after about ten minutes. When the officers then entered his cell to go to the courtroom, sometime before 1400, they found him in a puddle of urine. According to several reports, he became combative when approached and was Taser'ed several times in the chest. Even after that he continued to fight, reportedly telling the officers to

"Taze me." A neighboring inmate was overheard to say "that ain't going to work, that guy wants to die anyway." When Mr. Goetzee was eventually subdued, he was shackled to a wheelchair and taken to court. Another US Marshall accompanied Mr. Goetzee to court and said that he "talked about not wanting anymore pain for him or Donna and how he wanted to be with Donna and they both be happy." Mr. Goetzee also said that if he could not be with Donna that he "wanted to die a sudden death."

During the hearing, Mr. Goetzee was very disruptive and violent, lunging at court officers. He was also noted to have urinated on himself. Ms. Gauthier was asked to leave the proceedings because the Marshalls thought that seeing her would be too emotionally upsetting to Mr. Goetzee. That was the last time Ms. Gauthier saw her fiancé. She attempted to provide the federal officers with Mr. Goetzee's medications, but it appears that this transaction did not happen. Mr. Goetzee was transferred into the custody of the OPSO and taken to Orleans Parish Prison where he was housed on the Acute Mental Health Tier in general population. According to the OPSO Inmate Medical History Report, Mr. Goetzee was not prescribed psychiatric medications at that time and was given a "rule out" diagnosis of Generalized Anxiety Disorder.

Later that evening, Mr. Goetzee was referred to the LSU Health Sciences Center in the context of a low-grade fever (100.1) and possibly delirious mental status. According to the admission certificate from 2330 on 8/3/11, signed by a physician, Mr. Goetzee was "diaphoretic (sweaty), tachycardic (fast heart rate), acutely manic; no depressive symptoms…[with] altered mental status, flight of ideas, acute psychosis, suicidal ideations, AH (auditory hallucinations)." He reported to a triage physician, "I became manic after I stopped steroids in June." He was admitted to the medicine service for some EKG changes, an elevated level of an enzyme called CPK (found in heart, brain and skeletal muscle), and blood in his urine. He remained on the service, receiving IV fluids and further tests, until 8/5/11 when he was successfully ruled out for a cardiac event. His physical symptoms were attributed to rhabdomyolysis, a breakdown of muscle tissue that can result following a serious physical struggle. He was discharged with lisinopril (an medication for blood pressure) 40 mg a day.

Mr. Goetzee received a consult from the psychiatry service and reported that he had attempted suicide because he "feels China has the technology to read his thoughts and that suicide was the only way to make them stop." His thoughts were noted to be tangential (unrelated) enough that much of his history could not be fully elucidated. His past psychiatric history was listed as "bipolar/schizophrenia." He was noted to have suicidal ideas without a plan. He was diagnosed with Psychotic Disorder Not Otherwise Specified (psychosis without a clear etiology) and prescribed risperidone (an antipsychotic) 1 mg in the morning and 2 mg at night and hydroxyzine (a sedative agent used for anxiety) 50 mg three times a day.

Mr. Goetzee returned to the OPP in the afternoon on 8/5/11. He received risperidone and was placed back on direct observation (the equivalent of suicide watch). He had his initial psychiatric evaluation on 8/6/11 and was diagnosed with "psychosis and depression." He was written for Risperdal m-tab (dissolvable form of risperidone) 1 mg in the morning and 2 mg at night. He was ordered as well for a suicide smock (a garment designed to be safe for individuals who might otherwise rip up or use their clothing as a noose). The psychiatrist wrote that he would follow-up on 8/7/11 and continued the suicide watch. A nursing note from 8/7/11 at 1420 states that Mr. Goetzee "has things he hears in his head that might convince him to harm himself."

Suicide watch medical assessment notes were reviewed from 8/5/11 at 2000 through 8/7/11 at 1615. The watch note from 8/6/11 at 0500 reads, "states he wants to die." The rest of

the notes generally state that he is lying or sitting on the floor, not voicing any complaints. The notes from overnight 8/6/11 indicate that he was awake for much of the night and able to state that his condition was "ok." The last watch note on 8/7/11 at 1615 notes Mr. Goetzee's condition as "fair" however according to an investigating detective's report, the deputy officer assigned as Mr. Goetzee's suicide watch at that time left his post at 1300 and did not return for the remainder of his shift.

On 8/7/11 at 1820, Mr. Goetzee's cellmate noted him to be unresponsive. He checked Mr. Goetzee's pulse and found toilet paper stuffed in his mouth and nostrils. He removed some of it and asked another inmate to call for help. At 1824, another inmate notified security of Mr. Goetzee's condition. Security personnel found him unresponsive at 1825 and began BLS procedures. His airway was noted be occluded with toilet paper. EMS arrived at 1840. EMT's had to remove tissue from his throat with forceps before he could be intubated. ACLS (Advanced Cardiac Life Support) protocol was performed for 40 minutes en route to the hospital. Upon arrival at the hospital, he was found to have no cardiac activity and was pronounced dead at 1917. According to the medical examiner's report, the cause of death was asphyxiation secondary to airway obstruction by foreign body.

Ms. Gauthier heard of Mr. Goetzee's death when the public defender delivered the news to her at her home. According to Ms. Gauthier, "I started shaking, I couldn't believe it, I thought there was no way he could have done this. I know he loved his family, I know he loved me."

**CONCLUSIONS**

Diagnostic formulation at time of death (DSM-V criteria):

Rule out Psychotic Disorder Due to Another Medical Condition, with delusions (293.81)
Rule out Brief Psychotic Disorder with marked stressors (298.8)
Hypertension
Laceration to thigh and neck pain from motor vehicle accident

Post Mortem Psychiatric Formulation and Risk Assessment

Based on the available records about Mr. Goetzee's history and reports from available individuals familiar with Mr. Goetzee's life, he did not suffer from a mental illness until symptoms began to emerge in the spring of 2011 in the context of significant and chronic sleep deprivation possibly exacerbated by the motor vehicle accident on June 8 and brief treatment with steroid medications. While his family, his fiancée and his colleagues noted him to be quiet and socially withdrawn, obsessive and occasionally odd at baseline, he was able to maintain stable relationships, excel in his chosen career, and take care of his physical health.

Starting in the spring of 2011 and only several months before his death, Mr. Goetzee developed unusual, and then frankly psychotic, thoughts and behaviors that drew the attention of his fiancée, his sister and later, his co-workers. The most obvious and realistic trigger to this psychosis was his consistent lack of sleep, initially a result of a chaotic work schedule involving day-night shift changes but then later also a function of anxiety and insomnia that was most likely worsened by continuing sleep deprivation. For some individuals, particularly those who may be slightly anxious at baseline, sleep deprivation paradoxically makes it difficult to fall

asleep. When Mr. Goetzee showed up agitated and paranoid at the Coast Guard legal office on Sunday, June 5, and in the following days, all noted him to be significantly sleep deprived.

Persistent sleep loss can cause manic and psychotic symptoms as long as the sleep deprivation persists. Studies have also shown that insomnia can lead to paranoia. Depending on the severity and duration of sleep deprivation, it can take weeks of normal sleep to "catch up" in terms of sleep debt and symptom resolution. In Mr. Goetzee's case, the symptoms of his sleep deprivation were likely worsened in the context of taking steroid medication following his motor vehicle accident. Steroids can induce transient severe psychosis in approximately 5% of individuals who take them but reports of lasting psychosis after the cessation of steroids are rare.

Mr. Goetzee's symptoms improved while he was hospitalized at River Oaks. Not only were the steroids stopped but records indicate that he appeared to sleep well for the three nights he was there. His sleep improvement was likely a result of the sedative effect of the psychotropic medication he was taking. Even if he was surreptitiously refusing the medication without the clinical staff becoming aware, the contained environment of the hospital may have been enough to help him sleep. If Mr. Goetzee's psychosis was a result of a chronic mental illness, it is highly unlikely that such a short hospitalization and such a short time on medication would have significantly improved his symptoms. These medications typically take at least a week for the anti-psychotic effect to begin.

Mr. Goetzee's emergency and inpatient records from 6/13-6/17/11 indicate symptoms consistent with psychotic mania such as irritability, racing thoughts, illogical ideas, insomnia and psychosis characterized by paranoia and delusional thoughts. The discharge diagnosis from River Oaks was steroid-induced mania and he was not discharged with any specific psychiatric treatment or follow-up. This is consistent with the interpretation that he did not suffer from chronic mental illness. While Mr. Goetzee likely minimized his symptoms to others, it does appear that he was less agitated and psychotic for at least several weeks following his discharge from the psychiatric hospitalization in June. Symptoms began to again draw the attention of others around the time he was preparing to return to work in mid-later July. The report that he took "too many" sleeping pills on 7/31/11, especially for someone who disliked medication as much as Mr. Goetzee reportedly did, indicates either that he was again having serious sleep issues and/or was trying to kill himself as a result of worsening paranoia and desperation.

Based on the available information, I am not able to make a definitive DSM-V psychiatric diagnosis for Mr. Goetzee at the time of his death. The history most fits the diagnosis of Psychotic Disorder Due to Another Medical Condition, with delusions. In Mr. Goetzee's case, sleep deprivation would be the medical condition involved. The diagnosis is most certain when there is a temporal association between the onset of the medical condition and the psychosis; this appears to be the case with Mr. Goetzee. Additional factors may exacerbate the symptoms such as treatment with steroids. The associated psychosis can be as severe as with schizophrenia, however unlike many patients with schizophrenia, treatment of the underlying medical condition (e.g., resolution of the sleep debt) typically results in full resolution of the psychosis. It appears that Mr. Goetzee's symptoms did seem to improve when he was noted to be sleeping better and markedly worsened when he was not. His symptoms were described as very serious after his arrest and while incarcerated in jail, a setting well-known to be highly anxiety-provoking where restful sleep is close to impossible and the suicide risk is multiple times higher than in the community.

Also included on the diagnostic differential is Brief Psychotic Disorder with marked stressors, however the diagnostic requirement that the episode duration be no longer than one

month cannot be firmly established in this case. Brief psychotic disorder accounts for up to 9% of new onset psychosis and is characterized by the sudden onset (within two weeks) of a psychotic state such as the delusions and paranoia experienced by Mr. Goetzee. According to the DSM-V, "Although the disturbance is brief, the level of impairment may be severe…there appears to be an increased risk of suicidal behavior, particularly during the acute episode." While the symptoms may be severe during the episode, as they were for Mr. Goetzee, the outcome is generally a return to a pre-morbid functional status without residual symptomatology.

There is not enough clear evidence to seriously consider other potential primary causes of his new onset psychosis, including steroid-induced mania, caffeine withdrawal, and sequelae from his concussion following the motor vehicle accident, however each of these may have exacerbated his symptoms at various points from the spring of 2011 until the time of his death.

Regardless of the cause of Mr. Goetzee's psychosis, all of the reasonable diagnostic considerations typically respond very well to appropriate treatment, often to the point of a return to a non-psychotic and "normal" functioning state. While Mr. Goetzee was significantly impaired at the time of his arrest on 8/2/11 - agitated, suicidal, violent, delusional to the point where he believed that his death was the only way to relieve his and others' suffering – there were several missed opportunities for psychiatric interventions following his arrest that would have had a meaningful effect on his symptoms and would have most likely prevented his suicide.

It is generally accepted that at least 90% of individuals who commit suicide are suffering from some form of mental illness, however brief, at the time of their deaths. Appropriate psychiatric assessment and treatment is the most effective intervention and suicide prevention strategy. In addition, environmental considerations such as removing the means with which to commit suicide (e.g. putting up barriers on a bridge, removing belts and shoelaces in a jail) and providing close and constant monitoring are critical. In cases where medication is indicated, as was the case for Mr. Goetzee if only because the origin of his psychosis was unclear, individuals should not be presumed to be at lower risk just because of medication compliance until symptoms start to subside and the clinical assessment improves. For some, slight clinical improvement actually increases the risk of completed suicide. For example, an individual with severe depression may be unable to actually carry out the physical actions necessary to kill themselves until they are treated just enough for their energy levels to return. For individuals who are psychotic, slight improvement can mean a painful and sometimes hopeless realization of the disordered nature of their thoughts. In some cases, improvement may provide just enough clarity of thought to devise and carry out a suicide plan consistent with one's delusional beliefs. In the several months preceding his death, Mr. Goetzee experienced progressively worsening paranoia and delusional thoughts that were accompanied by severe anxiety and fears that he was revealing government secrets and would be tortured and killed as a result. He was unable, in the midst of his psychosis, to understand that no such threat existed. He felt that the only way to end his suffering was to take his own life. The painful nature of Mr. Goetzee's death – asphyxiation by stuffing toilet paper down his throat – and the apparent urgency with which he enacted the plan indicates the level of psychotic desperation he felt at the time.

If Mr. Goetzee had not killed himself, based on the most likely sources of his psychosis, his clinical symptoms would almost certainly have improved with continued monitoring and treatment, even in jail. He could have continued his relationship with his fiancée and family and, if retained in custody, worked closely with an attorney to mount a defense. Given his psychosis and suicidal thinking related to the circumstances of his arrest, there is reason to think that his charges might have been reduced. While a further career in the Coast Guard might have been

14

unlikely, Mr. Goetzee was, by all accounts, a highly intelligent and skilled man who could have returned to employment, stable relationships, and a good quality of life.

I declare under penalty of perjury that the foregoing is true to the best of my knowledge and belief.


Respectfully submitted,

Elizabeth Ford, MD
Board Certified by the American Board of Psychiatry and Neurology with
    Added Qualifications in Forensic Psychiatry

# Exhibit A

**Elizabeth Ford, MD**

-------------------------------------------------------------------------------------------------------------------

55 Water St. 18th floor
New York, NY 10014
Tel: 347-302-4797
elizabeth.ford@nyumc.org

December 3, 2015

Emma Freudenberger, Esq.
Neufeld Scheck & Brustin, LLP
99 Hudson St., 8th Floor
New York, NY 10013

Dear Ms. Freudenberger,

    At your request, I am providing a summary of my qualifications as they pertain to being retained as an expert witness in the U.S. District Court case of *Nagle v. Gusman, et al.*

      I am currently the Chief of Psychiatry for Correctional Health Services for New York City Health and Hospitals. In that role, I am responsible for the mental health care of the men and women aged 16 years of age and older detained in the New York City jail system. I was formerly the Director of the Division of Forensic Psychiatry at Bellevue Hospital Center in New York City and the Training Director for the NYU School of Medicine Forensic Psychiatry Fellowship. I graduated from Yale University with a B.A. in Biology and received my M.D. at the University of Virginia in 2000. I completed a 4-year general psychiatry residency at NYU School of Medicine, during which time I was selected as Chief Resident.  During my residency training, I received three competitive fellowships: the Rappeport Fellowship from the American Academy of Psychiatry and the Law, given to four outstanding residents from around the country with interests in psychiatry and the law; the Laughlin Fellowship from the American College of Psychiatrists, given to 10 residents from around the country deemed likely to make a significant contribution to the field of psychiatry; and the Public Psychiatry Fellowship from the American Psychiatric Association. I then completed a one-year fellowship in forensic psychiatry at NYU in 2005 before taking a position as a psychiatrist in the Division of Forensic Psychiatry at Bellevue Hospital. I have been licensed to practice medicine in the state of New York since 2000, have been board-certified in the field of psychiatry and neurology since 2005, and have been board-certified in the field of forensic psychiatry since 2007.

      Although I maintained a general psychiatric private practice from 2004-2006, the vast majority of my post-training career has been dedicated to the treatment of men with severe mental illness in the custody of the New York City Department of Correction. Since 2005, I have provided individual treatment to well over 500 male patients in this system and conducted over 50 group therapy sessions with these patients focused on the impact of jail incarceration on individuals with mental illness.

In my role as the Training Director at NYU, I was responsible for the education of the NYU psychiatry residents regarding issues related to psychiatry and the law (including ethics, informed consent, civil commitment, and risk assessment) and of the forensic psychiatry fellows at NYU.  Currently, I serve as a clinical supervisor and mentor for psychiatry residents at NYU and Cornell, as well as forensic psychiatry fellows at NYU and a public psychiatry fellow at Columbia. My particular areas of expertise include the diagnosis and treatment of mental illness in jails, research in correctional settings, violence and suicide risk assessments, and psychiatric education. Please see my attached CV for a list of national presentations and lectures related to some of these topics. Attachment #1 lists my publications in the past 10 years. I am a member of multiple professional organizations and was appointed to the American Psychiatric Association's Council on Psychiatry and the Law in 2010. I have been the Co-Chair of the Education Committee of the American Academy of Psychiatry and the Law for the past several years and was inducted into the American College of Psychiatrists in 2015.  Please see Attachment #2 for a list of the legal cases in which I have testified in the past 4 years.

I am being retained at an hourly rate of $250/hr for my work on this case, including interviews, record review, report preparation, and any deposition or testimonial duties that may be required. At the time of this writing I have received compensation of $5,500.

I declare under penalty of perjury that the foregoing is true to the best of my knowledge and belief.

Please do not hesitate to contact me with any questions.


Sincerely,

Elizabeth Ford, M.D.
Diplomate, American Board of Psychiatry and Neurology with
    Added Qualifications In Forensic Psychiatry

ATTACHMENT #1

**Publications, 2005-2015**
**Elizabeth Ford, M.D.**

**Peer-reviewed Journal Publications**

Gosein, V, Stiffler, JD, Frascoia, A & Ford, E. (2015). Life Stressors and Posttraumatic Stress Disorder in a Seriously Mentally Ill Jail Population. *Journal of Forensic Sciences. 2015 Aug 17. doi: 10.1111/1556-4029.12874. [Epub ahead of print]*

Ford, E. (2015). First episode psychosis in the criminal justice system: Identifying a critical intercept for early intervention. *Harvard Review of Psychiatry* 23(3): 167-75.

Tedeschi, F, Ford E. (2015). Outliers in American juvenile justice:  The need for statutory reform in North Carolina and New York. *Int J Adolesc Med Health* 27(2):151-61.

Williams, A.R., Cohen, S. and Ford, E. (2014) Statutory Definitions of Mental Illness for Involuntary Hospitalization as Related to Substance Use Disorders.  *Psychiatric Services*, 65(5): 634-640.

Gray, S., Racine, C., Smith C. and Ford, E. (2014).  Jail Hospitalization of Pre-Arraignment Patient-Detainees with Mental Illness.  *Journal of the American Academy of Psychiatry and the Law*, 42: 75-80.

Aggarwal, NK, Ford, E. (2013) The neuroethics and neurolaw of brain injury. *Behavioral Sciences and the Law*, 31(6): 789-802.

Ford, E, Winkler, B, Barber-Rioja, V, Dell'Anno, C, and Cohen, S. (2009) Competency to beResentenced and the Rockefeller Drug Law Reform Act: How Does it Affect the Mentally Ill? *Journal of the American Academy of Psychiatry and the Law*, 37: 245-249.

Ford E: Lie Detection: Historical, Neuropsychiatric and Legal Dimensions. (2006) *International Journal of Law and Psychiatry*, 29: 159-177.

Ford E. and Billick SB. (2005). Review of: Catalog of the Catalog of the Robert L. Sadoff Library of Forensic Psychiatry and Legal Medicine. *Journal of Forensic Sciences*, 50(3): 755-756.

Ford E, Rosenberg M, Holsten M and Boudreaux T. (2003) Managing Sexual Behavior on Adult Acute Care Inpatient Psychiatric Units.  *Psychiatric Services* 54(3): 346-350.

Ford EB, Calfee DP and Pearson RD. (2001) Delusions of Intestinal Parasitosis. *Southern Medical Journal* 94(5): 545-547.


**Book and Book Chapters**

*Psychiatric Services in Correctional Facilities* (2015).  Trestman, R., Champion M., Ford E., et al. American Psychiatric Association.

*Landmark Cases in Psychiatry and the Law* (2014).  Edited by Elizabeth Ford and Merrill Rotter.  Oxford University
        Press.

Ford, E., Aggarwal, N. (2012) Neuroethics of functional neuroimaging in the courtroom. In Simpson,J (Ed). *Neuroimaging in Forensic Psychiatry: From the Clinic to the Courtroom (pp. 325-341).* London, UK: John Wiley and Sons, Ltd.

Weinstein HC, Bath E, Ford E.B., Lopez-Leon M. and Soloway S.  (2007). Ethical considerations involving psychopathic disorders. In Felhous A (Ed.), *The International Handbook of Psychopathic Disorders and the Law* (pp. 445-460).  West Sussex, U.K,: John Wiley & Sons, Ltd.

Ford E, Colley J. Assessment of Capacity and Other Legal Issues. (2006). In Bernstein CA, Levin Z, Poag M., Rubinstein M.(Eds.), *OnCall Psychiatry, 3rd Edition* (pp.35-44). Philadelphia, PA: Elsevier, Inc.

ATTACHMENT #2

**Cases in which I have testified as an expert witness or been deposed, 2011-2015:**

*Jane Doe v. Anonymous Hospital, Inc., et al,* Elkhart Superior Court, Indiana
Deposition, June 2012

*Halstead and Restivo v. Nassau County, et al.*, Suffolk County, New York
Expert testimony, April 2014