UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| MARGARET GOETZEE NAGLE and JOHN ERIC GOETZEE | CIVIL ACTION |
| VERSUS | NO. 12-1910 |
| SHERIFF MARLIN GUSMAN, ET AL. | SECTION "R" (2) |

### ORDER AND REASONS

Plaintiffs Margaret Goetzee Nagle and John Eric Goetzee move to exclude the testimony of Dr. James F. Hooper under Federal Rule of Evidence 702. Dr. Hooper is the proposed expert of defendant Dr. Charles "Mike" Higgins. For the following reasons, the Court GRANTS IN PART and DENIES IN PART the motion.

### I.   BACKGROUND

#### A.   Factual Background

This action arises out of the August 7, 2011 suicide of William Goetzee, an inmate of Orleans Parish Prison ("OPP"). Following Goetzee's death, Margaret Goetzee Nagle and John Eric Goetzee filed this section 1983 civil rights suit and state-law suit against numerous employees of the Orleans Parish Sheriff's Office, including Dr. Charles "Mike" Higgins.[1] Plaintiffs are

---

[1]   R. Doc. 1.

the siblings of decedent William Goetzee.[2]  Dr. Higgins is a licensed psychiatrist, and at the time of Goetzee's death, Higgins was the Director of Psychiatric Services for the Sheriff's Office.  According to the job description for this position, Dr. Higgins was generally responsible for overseeing the provision of psychiatric services within OPP and for supervising the daily operations of OPP's Mental Health Unit.[3]

Goetzee was a commander in the United States Coast Guard Reserve and a civilian employee of the Coast Guard.  On the morning of August 2, 2011, Goetzee approached a marked Federal Protective Services vehicle occupied by a uniformed law-enforcement officer.  Goetzee opened the front passenger door, entered the vehicle, and seated himself in the front passenger seat.  Goetzee lunged for the officer's weapon, exclaiming, "I want to kill myself, give me your gun."  Federal agents arrested Goetzee and transported him to OPP later that day.

The next day, on August 3, prison officials brought Goetzee to federal court for his initial appearance on charges related to his conflict with the

---

[2]  The Court derives the following factual summary from its earlier summary judgment order.  *See* R. Doc. 113.  The Court has indicated where it relies on newly-supplied information.

[3]  R. Doc. 284, Exhibit B (attached in support of Dr. Higgins's Motion for Summary Judgment).

2

federal officer during his suicide attempt the day before. While at court, Goetzee behaved strangely in the presence of his attorney, federal officers, and the judge. Goetzee's attorney informed the court that he was "obviously having mental issues." Back at OPP, a nurse alerted Dr. Higgins to Goetzee's behavior, and Dr. Higgins ordered that Goetzee be transported to University Hospital to "rule out delirium."[4] Two days later, on August 5, University Hospital discharged Goetzee back to OPP with a diagnosis of psychosis. On August 6, Dr. Higgins conducted an "Initial Psychiatric Evaluation" of Goetzee. From this evaluation, Dr. Higgins ordered that Goetzee be housed in OPP's Mental Health Tier, given a "Suicide Smock," and placed on direct observation.[5] Dr. Higgins's "direct observation" order required a Sheriff's Office employee to "maintain direct and constant observation" of Goetzee at all times, *i.e.*, "suicide watch."

Goetzee was under suicide watch on August 6 and 7, 2011. On the morning of August 7, OPP Deputy William Thompson was assigned to maintain supervision of Goetzee. During his suicide watch shift, Thompson left his post at least three times, leaving Goetzee unobserved each time.

---

[4] R. Doc. 266, Exhibit I (attached in opposition to Defendants' Motions for Summary Judgment).

[5] *Id.*

During these absences, Goetzee went unobserved for an hour and a half, fifteen minutes, and two hours, respectively. During Thompson's final absence, an inmate notified another on-duty officer that Goetzee was lying on the floor of his cell, unresponsive. Apparently, Goetzee had repeatedly swallowed wads of toilet paper while Thompson was not monitoring him and asphyxiated himself.

As a result of these events, Thompson pleaded guilty to the felony of malfeasance in office. While under oath, and as part of his plea, Thompson accepted the state's factual basis for the charge. The factual basis specified that Thompson was assigned to monitor Goetzee continuously; that Thompson left his post three times for one and one-half hours, fifteen minutes, and two hours, respectively; that another inmate discovered Goetzee unconscious while Thompson was not monitoring him; and that Thompson had fraudulently submitted an observation checklist for August 7, 2011, because the checklist indicated that Thompson had continuously monitored Goetzee all day when in fact Thompson had not done so.

In addition, the Court has already granted summary judgment in favor of plaintiffs on their section 1983 and state-law claims against Thompson. The Court has also granted summary judgment against Sheriff Gusman on plaintiffs' state-law vicarious liability claims and partial summary judgment

on plaintiffs' section 1983 claims.

## B. Dr. James Hooper's Proffered Expert Opinion

Dr. Higgins enlisted James F. Hooper, M.D., as an expert witness to testify on his behalf. Dr. Hooper is a board-certified neurologist and psychiatrist who is licensed to practice in Alabama. Dr. Hooper served as the Chief Psychologist for the Tuscaloosa County Jail from 2004 to 2010.[6] Dr. Hooper purports to offer eleven expert opinions about "the reasonableness of the actions and conduct of Dr. Charles M. Higgins and others."[7]

Plaintiffs now move to exclude Dr. Hooper's testimony and expert report for two reasons.[8] First, plaintiffs argue that Dr. Hooper has impermissibly opined on witness credibility. Second, plaintiffs argue that one of Dr. Hooper's opinions purports to offer a legal conclusion about which he cannot testify.

Plaintiffs' arguments regarding witness credibility rely on Dr. Hooper's

---

[6] R. Doc. 246, Exhibit B, at 1.

[7] *See generally id.* Dr. Hooper appears to have misnumbered the last three of his enumerated opinions; regardless, there are eleven total.

[8] R. Doc. 246; R. Doc. 246-1. Plaintiffs also argue in a footnote that Dr. Hooper attempts to offer an expert opinion on Deputy Thompson's conduct and that this opinion is nothing more than a statement of uncontested facts. *See* R. Doc. 264-1 at 2 n. 1. The Court finds this argument unpersuasive. It is true that none of the facts about Thompson's conduct is in dispute given Thompson's guilty plea, the accompanying factual basis, and the summary judgment granted by this Court. Fairly read, however, Dr. Hooper's report relies on Thompson's conduct in forming his opinion about the scope of Dr. Higgins's duties and the reasonableness of his behavior.

5

deposition testimony that he believed that "Dr. Higgins' version of events was more truthful" than an explanation provided by another witness.[9]  At the deposition, plaintiffs' counsel repeatedly asked Dr. Hooper whether he determined that Dr. Higgins was "truthful" or "credible" before forming his expert opinions.  Dr. Hooper responded affirmatively when asked if he "factored" Dr. Higgins's "version of events" into his opinions.[10]

Later in his deposition, Dr. Hooper also explained that he reviewed all of the evidence, but declined to make any credibility determinations. Specifically, Dr. Hooper testified that he did not "give more weight" to or prefer Dr. Higgins's testimony over the testimony of other witnesses.[11]

Plaintiffs also argue that one of Dr. Hooper's opinions is instead a legal conclusion.  In his expert report, Dr. Hooper opines that "Dr. Higgins was not 'deliberately indifferent' to the plight of inmates" at OPP.[12]  He notes as support for this opinion that "Dr. Higgins repeatedly tried to correct the lack of services and staffing" and that "Dr. Higgins was the sole psychiatrist who

---

[9]  R. Doc. 251, Exhibit B.

[10]  *Id.* at 109-12.

[11]  R. Doc. 251, Exhibit A, at 210-12.

[12]  R. Doc. 246, Exhibit B, at 7.

6

stayed after Hurricane Katrina to care for the inmates."[13] At his deposition, Dr. Hooper also testified at length about whether Dr. Higgins was deliberately indifferent.

Dr. Hooper defined "deliberate indifference" as "not car[ing] at all and not do[ing] anything to try to fix things."[14] Dr. Hooper also offered examples of what, in his mind, does and does not constitute deliberate indifference.[15] Finally, Dr. Hooper explained that he bases his understanding of deliberate indifference on his reading of two "landmark" Supreme Court cases. Dr. Hooper also compared the facts of those cases to the conduct of Dr. Higgins.[16]

The Court now analyzes whether Dr. Hooper's opinions are admissible.

## II. LEGAL STANDARD

When expert testimony offered by one party is subject to a *Daubert* challenge, the court must act as a "gatekeeper" under Federal Rule of Evidence 702.

A district court has considerable discretion to admit or exclude expert

---

[13] *Id.*

[14] R. Doc. 251, Exhibit A, at 132.

[15] *Id.* at 132-33, 135, 151.

[16] *Id.* at 209-10.

testimony under Rule 702. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 138-39 (1997); *Seatrax, Inc. v. Sonbeck Int'l, Inc.*, 200 F.3d 358, 371 (5th Cir. 2000). Rule 702, which governs the admissibility of expert witness testimony, provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court held that Rule 702 requires the district court to act as a gatekeeper to ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. at 589; *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (clarifying that the *Daubert* gatekeeping function applies to all forms of expert testimony). The Court's gatekeeping function thus involves a two-part inquiry into reliability and relevance.

First, the Court must determine whether the proffered expert testimony is reliable. The party offering the testimony bears the burden of establishing its reliability by a preponderance of the evidence. *See Moore v. Ashland*

8

*Chem. Inc.,* 151 F.3d 269, 276 (5th Cir. 1998). The reliability inquiry requires the Court to assess whether the reasoning or methodology underlying the expert's testimony is valid. *See Daubert,* 509 U.S. at 592-93. The aim is to exclude expert testimony based merely on subjective belief or unsupported speculation. *See id.* at 590.

The Court in *Daubert* articulated a flexible, non-exhaustive, five-factor test to assess the reliability of an expert's methodology: (1) whether the expert's theory can be or has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the degree to which the technique or theory has been generally accepted in the scientific community. *Id.* at 593-95. The Supreme Court has emphasized, however, that these factors "do not constitute a 'definitive checklist or test.'" *Kumho*, 526 U.S. at 150 (quoting *Daubert*, 509 U.S. at 593). Rather, district courts "must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Id.* at 152.

A district court's gatekeeper function does not replace the traditional adversary system or the role of the jury within this system. *See Daubert*, 509 U.S. at 596. As the Supreme Court noted in *Daubert*: "Vigorous

9

cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* The Fifth Circuit has held that, in determining the admissibility of expert testimony, district courts must accord proper deference to "the jury's role as the proper arbiter of disputes between conflicting opinions. As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." *United States v. 14.38 Acres of Land, More or Less Situated in Leflore Cty., Miss.*, 80 F.3d 1074, 1077 (5th Cir. 1996) (quoting *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987)).

Second, the Court must determine whether the expert's reasoning or methodology is relevant. The question here is whether the reasoning or methodology "fits" the facts of the case and will thereby assist the trier of fact to understand the evidence. *See Daubert*, 509 U.S. at 591. "[F]undamentally unsupported" opinions "offer[] no expert assistance to the jury" and should be excluded. *Guile v. United States*, 422 F.3d 221, 227 (5th Cir. 2005) (citing *Viterbo*, 826 F.2d at 422).

### III. DISCUSSION

Here, plaintiffs do not challenge Dr. Hooper's expert opinion in the classic sense that would require the Court to distinguish between speculative or unreliable scientific methodology and legitimate expertise. Plaintiffs have not argued that Dr. Hooper is unqualified or that his methodology is unsound. Instead, plaintiffs argue that Dr. Hooper' opinion testimony is unhelpful, and therefore inadmissible, because Dr. Hooper has invaded the jury's role by determining witness credibility and reaching legal conclusions.

### A. Dr. Hooper Does Not Purport to Opine on Witness Credibility

Plaintiffs first argue that Dr. Hooper's expert testimony is inadmissible because, according to plaintiffs, his deposition testimony offers an "opinion" on witness credibility.

To be admissible, expert testimony must "help the trier of fact to understand the evidence or determine a fact in issue." Fed. R. Evid. 702. As a general rule, an expert may not opine on another witness's credibility because this testimony does not help the trier of fact, who can make its own credibility determinations. *See, e.g.*, *United States v. Hill*, 749 F.3d 1250, 1260 (10th Cir. 2014) (collecting cases). The jury is "the final arbiter of the facts," and thus testimony about witness credibility or state of mind is unnecessary and unhelpful. *See United States v. Libby*, 461 F. Supp. 2d 3, 7 (D.D.C. 2006)

11

(citation omitted). Accordingly, courts often preclude experts from testifying that, in their expert opinion, a certain witness is or is not believable. *See, e.g.*, *Hill*, 749 F.3d at 1263 (reversing for plain error when expert testified at trial about whether defendant was lying); *Nimely v. City of New York*, 414 F.3d 381, 398 (2d Cir. 2005) (finding abuse of discretion when district court allowed a medical expert to testify about how often he believed police officers lied); *United States v. Wertis,* 505 F.2d 683, 685 (5th Cir. 1974) (affirming district court's exclusion of a psychiatrist offered to testify about a witness's ability to "distinguish[] truth from non-truth").

Here, the Court has reviewed both Dr. Hooper's expert report and his deposition testimony. None of Dr. Hooper's proffered opinions, as articulated in his expert report, amounts to a credibility determination. According to his expert report, as well as his deposition testimony, Dr. Higgins reviewed voluminous evidence to prepare his opinions, including medical records; forms and policies and procedures from OPP; and the deposition transcripts of numerous witnesses, among other documents. Dr. Hooper also testified that he carefully reviewed all of the available evidence and that he equally considered each witness's testimony.

The deposition responses that plaintiffs challenge reflect that Dr. Hooper may have resolved a disputed fact in favor of one party before reaching his

12

opinions. This does not render his testimony inadmissible. While *Daubert*'s reliability analysis applies to "the facts underlying the expert's opinion," expert testimony need only be based on "sufficient facts or data." Fed. R. Evid. 702; *Moore v. Int'l Paint, LLC*, 547 F. App'x 513, 515 (5th Cir. 2013). "When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts." Fed. R. Evid. 702, Advisory Committee Note; *Moore*, 547 F. App'x at 515. Indeed, as plaintiffs argue in support of their own expert,[17] "experts may rely on one version of a disputed fact." *Arnold v. Canal Barge Co., Inc.*, No. 13-4966, 2014 WL 2465313, at *2 (E.D. La. 2014); *accord Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1392 (Fed. Cir. 2003) (noting both sides presenting experts who based their opinions on the hiring party's version of the disputed facts); *Walker v. Gordon*, 46 F. App'x 691, 695-96 (3d Cir. 2002) ("An expert is, nonetheless, permitted to base his opinion on a particular version of disputed facts . . . ."); *Little v. Nat'l R.R. Passenger Corp.*, 865 F.2d 1329, 1988 WL 145095, at *2 (D.C. Cir. 1988) (holding that an expert may assume a disputed fact as true so long as "a factual predicate for the testimony . . . exist[s]"). Questions related to the bases and sources of an expert's opinion affect the weight accorded to that opinion, rather than its

---

[17] R. Doc. 260 at 10 (Plaintiffs' Memorandum in Opposition to Defendants' Motions to Exclude the Opinions of Dr. Jeffrey Metzner).

13

admissibility. *United States v. 14.38 Acres of Land, More or Less Situated in Leflore Cty., Miss.*, 80 F.3d 1074, 1077 (5th Cir. 1996). "[T]he fact-finder is entitled to hear [an expert's] testimony and decide whether it should accept or reject that testimony after considering all factors that weigh on credibility, including whether the predicate facts on which [the expert] relied are accurate." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 250 (5th Cir. 2002).[18]

### B. Dr. Hooper's Opinion that Dr. Higgins Was Not "Deliberately Indifferent" Is an Inadmissible Legal Conclusion

Although an expert's opinion may "embrace an ultimate issue" to be decided by the trier of fact, expert witnesses are not permitted to offer legal conclusions. *See* Fed. R. Evid. 704; *Goodman v. Harris Cty.*, 571 F.3d 388, 399 (5th Cir. 2009); *C.P. Interests, Inc. v. California Pools, Inc.*, 238 F.3d 690, 697 (5th Cir. 2001). An expert who usurps either the role of the judge by instructing the jury on the applicable law or the role of the jury by applying the law to the facts at issue "by definition does not aid the jury in making a decision[.]" *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005) (citations omitted); *see also Burkhardt v. Wash. Metro. Area Transit Auth.*,

---

[18] Nonetheless, the Court will not allow questions regarding whether an expert believes certain witnesses to be "credible" or "truthful." *See Hill*, 749 F.3d at 1256-63 (finding plain error when counsel questioned an expert regarding defendant's truthfulness).

14

112 F.3d 1207, 1212 (D.C. Cir. 1997) ("Expert testimony that consists of legal conclusions cannot properly assist the trier of fact . . . ."). Rather, such an expert "undertakes to tell the jury what result to reach and thus attempts to substitute the expert's judgment for the jury's . . . ." *Nimely*, 414 F.3d at 397 (citation omitted). Accordingly, although "an expert may offer his opinion as to facts that, if found, would support a conclusion that the legal standard at issue was satisfied . . . he may not testify as to whether the legal standard has been satisfied." *Burkhardt*, 112 F.3d at 1212-13.

Here, Dr. Hooper offers as one of his expert opinions that "Dr. Higgins was not 'deliberately indifferent' to the plight of inmates." At his deposition, Dr. Hooper explained this opinion by defining "deliberate indifference," analyzing Supreme Court precedent, and comparing and contrasting Dr. Higgins' conduct to hypothetical examples. "Deliberate indifference" is a legal term. *See Stewart v. Murphy*, 174 F.3d 530, 541 n.9 (5th Cir. 1999). And "[i]t is the responsibility of the court, not testifying witnesses, to define legal terms." *Bradley v. City of Ferndale*, 148 F. App'x 499, 508 (6th Cir. 2005). Dr. Hooper's opinion and testimony regarding "deliberate indifference" plainly constitutes a legal conclusion. It is therefore inadmissible. *See, e.g., Cutlip v. City of Toledo*, 488 F. App'x 107, 120-21 (6th Cir. 2012) (excluding an expert's opinion regarding "conscious indifference"); *Omar v. Babcock*, 177 F.

App'x 59, 63 n.5 (11th Cir. 2006) (excluding portions of an affidavit in which an expert opinion as to whether appellants acted with "deliberate indifference");  *Woods v. Lecureux*, 110 F.3d 1215, 1219-21 (6th Cir. 1997) (excluding expert's testimony on "deliberate indifference").

      To be clear, the Court excludes only Dr. Hooper's opinion on whether Dr. Higgins was deliberately indifferent.  As an expert in psychiatry with experience in correctional facilities, Dr. Hooper may testify at trial about the professional standard of care expected of a prison psychiatrist such as Dr. Higgins, and whether Dr. Higgins's conduct conformed to the applicable standard of care.  Dr. Hooper may also testify about purported staffing inadequacies at OPP and whether Dr. Higgins responded reasonably to those deficiencies.  But Dr. Hooper may not offer a conclusion as to whether Dr. Higgins's conduct amounted to "deliberate indifference."

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART plaintiffs' motion to exclude Dr. James F. Hooper.

New Orleans, Louisiana, this 10th day of February, 2016.

_____

SARAH S. VANCE

UNITED STATES DISTRICT JUDGE