UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| MARGARET GOETZEE NAGLE and JOHN ERIC GOETZEE | CIVIL ACTION |
| VERSUS | NO. 12-1910 |
| SHERIFF MARLIN GUSMAN, ET AL. | SECTION "R" (2) |

## ORDER AND REASONS

Defendant Dr. Charles "Mike" Higgins moves the Court to exclude the testimony and expert report of Dr. Elizabeth Ford under Federal Rule of Evidence 702.[1] Dr. Ford is the proposed psychiatric expert of plaintiffs Margaret Goetzee Nagle and John Eric Goetzee. For the following reasons, the Court GRANTS IN PART and DENIES IN PART the motion.

## I. BACKGROUND

### A. Factual Background

This action arises out of the August 7, 2011 suicide of William Goetzee, an inmate of Orleans Parish Prison ("OPP"). Following Goetzee's death, his siblings, Margaret Goetzee Nagle and John Eric Goetzee, filed this section

---

[1] R. Doc. 234.

1983 civil rights and state-law suit against numerous employees of the Orleans Parish Sheriff's Office.[2]

Goetzee was a commander in the United States Coast Guard Reserve and a civilian employee of the Coast Guard.  On the morning of August 2, 2011, Goetzee approached a marked Federal Protective Services vehicle occupied by a uniformed law enforcement officer.  Goetzee opened the front passenger door, entered the vehicle, and seated himself in the front passenger seat.  Goetzee lunged for the officer's weapon, exclaiming, "I want to kill myself, give me your gun."  Federal agents arrested Goetzee and transported him to OPP later that day.

The next day, on August 3, prison officials brought Goetzee to federal court for his initial appearance on charges related to his conflict with the federal officer during his suicide attempt the day before.  While at court, Goetzee behaved strangely in the presence of his attorney, federal officers, and the judge.  Goetzee's attorney informed the court that he was "obviously having mental issues."  Back at OPP, a nurse alerted Dr. Charles "Mike" Higgins to Goetzee's behavior, and Dr. Higgins ordered that Goetzee be

---

[2]     R. Doc. 1.  The Court derives the following factual summary from its earlier summary judgment order.  *See* R. Doc. 113.  The Court has indicated where it relies on newly-supplied information.

transported to University Hospital to "rule out delirium."[3] Two days later, on August 5, University Hospital discharged Goetzee back to OPP with a diagnosis of psychosis. On August 6, Dr. Higgins conducted an "Initial Psychiatric Evaluation" of Goetzee. From this evaluation, Dr. Higgins ordered that Goetzee be housed in OPP's Mental Health Tier and placed on direct observation.[4] Dr. Higgins's "direct observation" order required a Sheriff's Office employee to "maintain direct and constant observation" of Goetzee at all times, *i.e.*, "suicide watch."

Goetzee was under suicide watch on August 6 and 7, 2011. On the morning of August 7, OPP Deputy William Thompson was assigned to maintain supervision of Goetzee. During his suicide watch shift, Thompson left his post at least three times, leaving Goetzee unobserved each time. During these absences, Goetzee went unobserved for an hour and a half, fifteen minutes, and two hours, respectively. During Thompson's final absence, an inmate notified another on-duty officer that Goetzee was lying on the floor of his cell, unresponsive. Apparently, Goetzee had repeatedly

---

[3]   R. Doc. 266, Exhibit I (attached in opposition to Defendants' Motions for Summary Judgment).

[4]   *Id.*

swallowed wads of toilet paper and asphyxiated himself while Thompson was not monitoring him.

As a result of these events, Thompson pleaded guilty to the crime of malfeasance in office. While under oath, and as part of his plea, Thompson accepted the state's factual basis for the charge. The factual basis specified that Thompson was assigned to continuously monitor Goetzee; that Thompson left his post three times for one and one-half hours, fifteen minutes, and two hours, respectively; that another inmate discovered Goetzee unconscious while Thompson was not monitoring him; and that Thompson had fraudulently submitted an observation checklist for August 7, 2011, because the checklist indicated that Thompson had continuously monitored Goetzee all day when in fact Thompson had not done so.

The Court has already granted summary judgment in favor of plaintiffs on their section 1983 and state-law claims against Thompson. The Court has also granted summary judgment against Sheriff Gusman on plaintiffs' state-law vicarious liability claims and partial summary judgment on plaintiffs' section 1983 claims.

### B. Dr. Elizabeth Ford's Proffered Expert Opinion

Plaintiffs enlisted Elizabeth Ford, M.D., as an expert witness to testify about Goetzee's psychiatric condition. Dr. Ford is a board-certified

psychiatrist, neurologist, and forensic psychiatrist. Dr. Ford currently serves as the Chief of Psychiatry for Correctional Health Services for New York City Health and Hospitals. Her areas of expertise include "the diagnosis and treatment of mental illness in jails, research in correctional settings, violence and suicide risk assessments, and psychiatric education."[5] In addition, Dr. Ford has written and/or contributed to a number of publications regarding psychiatry and the criminal justice system.[6]

Dr. Ford prepared a fifteen-page expert report regarding the "mental health issues and/or psychiatric diagnoses" that Goetzee may have suffered from before or at the time of his death at OPP. In preparing her opinions, Dr. Ford interviewed Goetzee's family, friends, and co-workers and reviewed Goetzee's medical records and jail records.[7] Dr. Ford divided her expert report into four sections: Goetzee's family, development, and employment history; Goetzee's clinical history; the circumstances surrounding Goetzee's August 2, 2011 suicide attempt; and Dr. Ford's expert conclusions.[8]

---

[5]   R. Doc. 234-2 at 17-18.

[6]   *Id.* at 19-20.

[7]   R. Doc. 234-2, Exhibit A (Dr. Ford's Expert Report).

[8]   *See generally id.*

Defendant Dr. Higgins now moves to exclude Dr. Ford's testimony and expert report.[9] According to Dr. Higgins, Dr. Ford reaches factual conclusions that are unhelpful to the jury, presents evidence cumulative of the facts presented in Geotzee's medical records, and offers speculative opinions not supported by reliable evidence.[10] To support his arguments, Dr. Higgins points to excerpts of the "Conclusion" section of Dr. Ford's report that he considers "problematic." For example, Dr. Higgins challenges the following sentences, among others, as factual conclusions that the jury can determine on its own without any specialized expertise:

- Based on the available records . . . [Mr. Goetzee] did not suffer from a mental illness until symptoms began to emerge in the spring of 2011 in the context of significant and chronic sleep deprivation possibly exacerbated by the motor vehicle accident . . . and brief treatment with steroid medications.[11]

- The most obvious and realistic trigger to [Mr. Goetzee's] psychosis was his consistent lack of sleep, initially the result of a chaotic work

---

[9] R. Doc. 234.

[10] *See generally* R. Doc. 234-1.

[11] R. Doc. 234-2 at 12.

schedule . . . but then later also a function of anxiety and insomnia that was most likely worsened by continuing sleep deprivation.[12]

- Based on the available information, I am not able to make a definitive DSM-V psychiatric diagnosis for Mr. Goetzee at the time of his death.[13]

- The associated psychosis can be as severe as with schizophrenia, however unlike many patients with schizophrenia, treatment of the underlying medical condition (e.g., resolution of the sleep debt) typically results in full resolution of the psychosis.[14]

Dr. Higgins also challenges the following statements as cumulative of Goetzee's medical records, therefore rendering Dr. Ford's expert opinion unnecessary and inadmissible:

- While Mr. Goetzee likely minimized his symptoms to others, it does appear that he was less agitated and psychotic for at least several weeks following his discharge from the psychiatric hospitalization in June.[15]

---

12    *Id.*

13    *Id.* at 13.

14    *Id.*

15    *Id.*

- The history most fits the diagnosis of Psychotic Disorder Due to Another Medical Condition, with delusions. In Mr. Goetzee's case, sleep deprivation would be the medical conditions involved. . . . Additional factors may exacerbate the symptoms such as treatment with steroids.[16]

Finally, Dr. Higgins challenges Dr. Ford's expert opinion as speculative and unreliable because, in her expert report, Dr. Ford uses terms such as "if," "likely," "unlikely," and "might." Some of the "problematic" statements include:

- *If* Mr. Goetzee's psychosis was a result of a chronic mental illness, *it is highly unlikely* that such a short hospitalization and such a short time on medication would have significantly improved his symptoms.[17]

- Also included on the diagnostic differential is Brief Psychotic Disorder with marked stressors, however [sic] the diagnostic requirement that the episode duration be no longer than one month *cannot be firmly established* in this case.[18]

---

[16] *Id.*

[17] *Id.* (emphasis added). Here, the Court emphasizes the terms that Dr. Higgins challenges as speculative and therefore unreliable.

[18] *Id.* at 13-14.

- While Mr. Goetzee was significantly impaired at the time of his arrest on 08/02/11 – agitated, suicidal, violent, delusional to the point where he believed that his death was the only way to relieve his and others' suffering – there were several missed opportunities for psychiatric interventions following his arrest that *would have had* a meaningful effect on his symptoms and *would have most likely* prevented his suicide.[19]

- [Mr. Goetzee] could have continued his relationship with his fiancée and family, and if retained in custody, worked closely with an attorney to mount a defense. Given his psychosis and suicidal thinking related to the circumstances of his arrest, there is reason to think that his charges might have been reduced.[20]

According to Dr. Higgins, because Dr. Ford's expert opinion is peppered with the foregoing issues, her expert testimony should be entirely excluded. The Court now analyzes whether Dr. Ford's opinions are admissible.

---

[19]    *Id.* at 14.

[20]    *Id.*

## II. LEGAL STANDARD

When expert testimony offered by one party is subject to a *Daubert* challenge, the court must act as a "gatekeeper" under Federal Rule of Evidence 702.

A district court has considerable discretion to admit or exclude expert testimony under Rule 702. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 138-39 (1997); *Seatrax, Inc. v. Sonbeck Int'l, Inc.*, 200 F.3d 358, 371 (5th Cir. 2000). Rule 702, which governs the admissibility of expert witness testimony, provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court held that Rule 702 requires the district court to act as a gatekeeper to ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. at 589; *see also Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 147 (1999) (clarifying that the *Daubert*

gatekeeping function applies to all forms of expert testimony). The Court's gatekeeping function thus involves a two-part inquiry into reliability and relevance.

First, the Court must determine whether the proffered expert testimony is reliable. The party offering the testimony bears the burden of establishing its reliability by a preponderance of the evidence. *See Moore v. Ashland Chem. Inc.,* 151 F.3d 269, 276 (5th Cir. 1998). The reliability inquiry requires the Court to assess whether the reasoning or methodology underlying the expert's testimony is valid. *See Daubert,* 509 U.S. at 592-93. The aim is to exclude expert testimony based merely on subjective belief or unsupported speculation. *See id.* at 590.

The Court in *Daubert* articulated a flexible, non-exhaustive, five-factor test to assess the reliability of an expert's methodology: (1) whether the expert's theory can be or has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the degree to which the technique or theory has been generally accepted in the scientific community. *Id.* at 593-95. The Supreme Court has emphasized, however, that these factors "do not constitute a 'definitive checklist or test.'" *Kumho*, 526 U.S. at

150 (quoting *Daubert*, 509 U.S. at 593). Rather, district courts "must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Id.* at 152.

A district court's gatekeeper function does not replace the traditional adversary system or the role of the jury within this system. *See Daubert*, 509 U.S. at 596. As the Supreme Court noted in *Daubert*: "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* The Fifth Circuit has held that, in determining the admissibility of expert testimony, district courts must accord proper deference to "the jury's role as the proper arbiter of disputes between conflicting opinions. As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." *United States v. 14.38 Acres of Land, More or Less Situated in Leflore Cty., Miss.*, 80 F.3d 1074, 1077 (5th Cir. 1996) (quoting *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987)).

Second, the Court must determine whether the expert's reasoning or methodology is relevant. The question here is whether the reasoning or methodology "fits" the facts of the case and will thereby assist the trier of fact

to understand the evidence. *See Daubert*, 509 U.S. at 591. "[F]undamentally unsupported" opinions "offer[] no expert assistance to the jury" and should be excluded. *Guile v. United States*, 422 F.3d 221, 227 (5th Cir. 2005) (citing *Viterbo*, 826 F.2d at 422).

## III.   DISCUSSION

The Court begins by noting that Dr. Higgins does not challenge Dr. Ford's expert opinion in the classic sense that would require the Court to distinguish between speculative or unreliable scientific methodology and legitimate expertise. Dr. Higgins does not argue that Dr. Ford is unqualified or that her opinions rest on unsound methodology. Indeed, Dr. Ford's education and experience in psychiatry and forensic psychiatry, especially her experience in corrections facilities, qualify her to offer expert testimony in this case. But Dr. Higgins argues that portions of Dr. Ford's opinions are instead factual conclusions that do not require specialized expertise; Dr. Ford's opinions are cumulative of Goetzee's medical records; and Dr. Ford's opinions are speculative because she uses terms such as "if," "likely," and "might."

### A. Dr. Ford's Testimony Is Properly Grounded in Her Specialized Expertise And Is Not Cumulative of Goetzee's Medical Records

The Court has reviewed Dr. Ford's expert report and deposition testimony and finds Dr. Higgins's arguments for exclusion meritless. First, Dr. Ford's opinion does not merely reflect factual conclusions unrelated to any medical or specialized expertise. Drawing on her psychiatric expertise and experience in correctional facilities, Dr. Ford has opined on, among other things, the likely cause or causes of Goetzee's psychiatric state, the severity of Goetzee's symptoms, and whether Goetzee could have been rehabilitated to normal functioning. None of these opinions falls within the general understanding of the average juror. *See, e.g.*, *United States v. Ebron*, 683 F.3d 105, 136-37 (5th Cir. 2012) ("[T]he distinction between lay and expert witness testimony is that lay testimony results from a process of reasoning familiar in everyday life, while expert testimony results from a process of reasoning which can be mastered only by specialists in the field.").

Many of the statements that Dr. Higgins challenges as "factual" depend on Dr. Ford's expertise.[21] *See, e.g.*, *United States v. Dixon*, 185 F.3d 393, 399

---

[21]   "[Mr. Goetzee] did not suffer from a mental illness until symptoms began to emerge in the spring of 2011 in the context of significant and chronic sleep deprivation . . . ." *Id.* at 12. "The most obvious and realistic triffer to [Mr. Goetzee's] psychosis was his consistent lack of sleep . . . but also a function of anxiety and insomnia that was most likely worsened by

(5th Cir. 1999) ("An expert psychiatrist can assist a jury by giving an opinion in his area of expertise: whether a patient is suffering from a particular mental disease."). Because a jury could not evaluate this evidence using only their common knowledge and experience, Dr. Ford's testimony is sufficiently likely to assist the jury in understanding the scientific evidence relevant to Goetzee's suicide to be admissible. For the same reasons, the Court finds that Dr. Ford's testimony is not cumulative of Goetzee's medical records. The average juror does not have the specialized knowledge or experience necessary to understand or interpret a patient's medical records. *See, e.g.*, *Greeno v. Daily*, 414 F.3d 645, 658 (7th Cir. 2005) (noting that understanding medical records and patient treatment likely requires expert testimony); *Fowler v. Carrollton Pub. Library*, 799 F.2d 976, 982 (5th Cir. 1986) (holding that a district court erred in admitting medical records "with no accompanying expert explanation of their significance"). Her opinion is therefore admissible. *See* Fed. R. Evid. 702.

---

continuing sleep deprivation." *Id.* "The associated psychosis can be as severe as with schizophrenia, however, unlike many patients with schizophrenia, treatment of the underlying medical condition (e.g., resolution of the sleep debt) typically results in full resolution of the psychosis." *Id.* at 13.

To the extent that Dr. Ford makes any factual statements in her report as she explains her expert opinion, this is not impermissible. Expert testimony must be based on sufficient facts or data to be reliable under the Federal Rules of Evidence and *Daubert*. *See* Fed. R. Evid. 702, 703; *Moore v. Int'l Paint, LLC*, 547 F. App'x 513, 515 (5th Cir. 2013). So long as those facts are the type that other experts in the field would reasonably rely on, the expert's opinion based on those facts is admissible. *See Factory Mut. Ins. Co. v. Alon USA LP*, 705 F.3d 518, 523 (5th Cir. 2013) (citing Fed. R. Evid. 703). And an expert may offer her opinion as to facts that, if found, would help the jury resolve a particular issue. *See Burkhardt v. Wash. Metro. Area Transit Auth.*, 112 F.3d 1207, 1212-13 (D.C. Cir. 1997). Dr. Ford has not included facts in the opinion section of her expert report to urge that those facts are necessarily true or correct. Rather, Dr. Ford references the relevant facts which underlie her psychiatric assessment of Goetzee's mental condition at the time of his suicide. Indeed, just as Dr. Higgins's own expert delineates in his report the facts upon which his opinions depend,[22] Dr. Ford does so here as well. This argument is without merit.

---

[22] *See generally* R. Doc. 246-3 (Expert Report of James F. Hooper, M.D., DLFAPA).

### B.     Dr. Ford's Testimony Is Not Speculative or Unreliable

Dr. Higgins also argues that Dr. Ford's expert opinions are speculative and therefore unreliable.  To support this argument, Dr. Higgins points to certain statements in which Dr. Ford does not opine that a particular fact or circumstance is absolutely true.  Instead, Dr. Ford opines, among other things, that it is "highly unlikely" that Goetzee suffered from a chronic mental illness; that Goetzee "most likely" suffered from Brief Psychotic Disorder, but that a necessary symptom "cannot be firmly established in this case"; and that some post-arrest psychiatric intervention "would have" meaningfully improved Goetzee's systems and "most likely" prevented his suicide.

As a general rule, expert testimony "must be grounded in the methods and procedures of science and must be more than unsupported speculation or subjective belief."  *Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 668 (5th Cir. 1999).  However, "absolute certainty is not the goal of expert testimony." *See Tang v. Thomas Trucking, LLC*, No. 6:13-cv-407, 2014 WL 6847652, at *2 (E.D. Tex. Dec. 2, 2014) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)).  "It would be unreasonable to conclude that the subject of scientific testimony must be 'known' to a certainty; arguably, there are no certainties in science."  *Daubert*, 509 U.S. at 590.  This is especially true "when experts attempt to deduce explanations for earlier events based

on their later observations," as Dr. Ford does here. *See Kirkland v. Marriott Int'l Inc.*, 416 F. Supp. 2d 480, 485 (E.D. La. 2006) (citing *Jones v. Otis Elevator*, 861 F.2d 655, 662 (11th Cir. 1988); *Kahn v. United States*, 795 F. Supp. 473, 475 (D.D.C. 1992)).

Dr. Ford has drawn on her psychiatric expertise and experience to arrive at her conclusions about Goetzee's mental diagnosis before his suicide. Based on the evidence she reviewed, Dr. Ford ruled out certain ailments to determine that "psychotic disorder due to another medical condition, with delusions" and "brief psychotic disorder with marked stressors" were the most likely causes of Goetzee's mental distress. Having reached an opinion on the most likely causes of Goetzee's psychosis, Dr. Ford was then opined on whether his condition was treatable or permanently debilitating. Dr. Ford's opinion that it is "highly unlikely" that Goetzee suffered from a chronic mental illness, that Goetzee's symptoms "would almost certainly have" improved, and that psychiatric intervention "would have most likely" prevented his suicide reflect the requisite degree of medical certainty and reliability to make her testimony admissible. Dr. Ford's failure to use certain "magic words," such as "within a reasonable degree of medical certainty," is not fatal to her opinions. *Estate of Sanders v. United States*, 736 F.3d 430,

437 (5th Cir. 2013). Because "the import of the expert's testimony is apparent . . . that is enough." *Id.*

### C. Dr. Ford May Not Opine On the Merits of Goetzee's Criminal Prosecution

Dr. Ford includes in her expert report a brief discussion of Goetzee's criminal charges stemming from his conflict with the federal officer during his suicide attempt on August 2, 2011. Dr. Ford writes, "if retained in custody, [Goetzee could have] worked closely with an attorney to mount a defense. Given his psychosis and suicidal thinking related to the circumstances of his arrest, there is reason to think that his charges might have been reduced."[23] At her deposition, Dr. Ford conceded that she cannot testify about the potential outcome of Goetzee's criminal prosecution.[24] Dr. Ford has no basis for predicting how the criminal charges against Goetzee would have been resolved. This testimony is beyond the scope of Dr. Ford's psychiatric expertise and therefore inadmissible.

---

[23] R. Doc. 234-2 at 14.

[24] R. Doc. 281-9 at 116.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART defendant's motion to exclude Dr. Elizabeth Ford.

New Orleans, Louisiana, this <u>12th</u> day of February, 2016.

_____*Sarah Vance*_____

SARAH S. VANCE
UNITED STATES DISTRICT JUDGE