UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

MARGARET GOETZEE NAGLE and          CIVIL ACTION
JOHN ERIC GOETZEE

VERSUS                              NO. 12-1910

SHERIFF MARLIN GUSMAN, ET AL.       SECTION "R" (2)

## ORDER AND REASONS

This action arises out of the August 7, 2011 suicide of William Goetzee, an inmate of Orleans Parish Prison ("OPP").  Following Goetzee's death, his siblings, Margaret Goetzee Nagle and John Eric Goetzee, filed this section 1983 civil rights and state-law suit against numerous employees of the Orleans Parish Sheriff's Office, including defendant Dr. Samuel Gore.[1]

Goetzee was a commander in the United States Coast Guard Reserve and a civilian employee of the Coast Guard.  Goetzee committed suicide while being held as a pretrial detainee on the mental health tier of the House of Detention at OPP on charges related to a suicide attempt five days earlier. On the day of Goetzee's death, OPP Deputy William Thompson was assigned to maintain "suicide watch" of Goetzee.  Thompson repeatedly left his suicide

---

[1]      R. Doc. 1.

watch post, and it was during one of these absences that Goetzee committed suicide.

Dr. Gore was the Medical Director at OPP when Goetzee died. Plaintiffs contend that Dr. Gore had policymaking authority on matters involving the inmates' medical treatment, including mental health and suicide prevention, within the prison. According to plaintiffs, OPP's suicide prevention practices were grossly inadequate, and Dr. Gore condoned a *de facto* policy of allowing deputies and nurses to leave suicidal inmates unwatched for significant periods of time. For this reason, plaintiffs argue, Thompson was derelict in his duties as the deputy assigned to conduct direct observation of Goetzee, leading to Goetzee's death.

Dr. Gore now moves the Court for summary judgment on plaintiffs' section 1983 and state-law claims.[2] For the following reasons, the Court denies the motion.

---

[2]      R. Doc. 237.

## I.    BACKGROUND

### A.    Goetzee's Arrest, Incarceration, and Suicide

On the morning of August 2, 2011, Goetzee approached a marked Federal Protective Services vehicle occupied by a uniformed law enforcement officer.  Goetzee opened the front passenger door, entered the vehicle, and seated himself in the front passenger seat.  Goetzee lunged for the officer's weapon, exclaiming, "I want to kill myself, give me your gun."[3]  Federal agents arrested Goetzee and transported him to OPP later that day.[4]

The next day, on August 3, prison officials brought Goetzee to federal court for his initial appearance on charges related to his conflict with the federal officer during his suicide attempt the day before.  While at court, Goetzee behaved strangely in the presence of attorneys, federal officers, and the judge.  A representative for Goetzee informed the court that he was "obviously having mental issues."[5]  Back at OPP, a nurse alerted OPP's Chief of Psychiatry, Dr. Charles "Mike" Higgins, to Goetzee's behavior, and Dr. Higgins ordered that Goetzee be transported to University Hospital to "rule

---

[3]      R. Doc. 266, Exhibit AA.

[4]      R. Doc. 248-1 ¶ 6; R. Doc. 265-1 ¶ 68.

[5]      *See* R. Doc. 266, Exhibit ZZ.

out delirium."[6]  Two days later, on August 5, University Hospital discharged Goetzee back to OPP with a diagnosis of psychosis.[7]   On August 6, Dr. Higgins conducted an "Initial Psychiatric Evaluation" of Goetzee.  From this evaluation, Dr. Higgins ordered that Goetzee be housed on OPP's mental health tier and placed on direct observation.[8]   Dr. Higgins's "direct observation" order required a Sheriff's Office employee to "maintain direct and constant observation" of Goetzee at all times, *i.e.*, "suicide watch."[9]

Goetzee was under suicide watch on August 6 and 7, 2011.  On the morning of August 7, Deputy William Thompson was assigned to maintain supervision of Goetzee.  During his suicide watch shift, Thompson left his post at least three times, leaving Goetzee unobserved each time.  During these absences, Goetzee went unobserved for an hour and a half, fifteen minutes, and two hours, respectively.  During Thompson's final absence, an inmate notified another on-duty officer that Goetzee was lying on the floor of his cell, unresponsive.  Apparently, Goetzee had repeatedly swallowed

---

[6]     R. Doc. 266, Exhibit I.

[7]     R. Doc. 248-1 ¶ 11; R. Doc. 265-1 ¶ 73.

[8]     R. Doc. 266, Exhibit J.

[9]     *See, e.g.*, R. Doc. 266, Exhibits D-E.

wads of toilet paper and asphyxiated himself while Thompson was not monitoring him.[10]

As a result of these events, Thompson pleaded guilty to the crime of malfeasance in office. While under oath, and as part of his plea, Thompson accepted the state's factual basis for the charge. The factual basis specified that Thompson was assigned to continuously monitor Goetzee; that he left his post three times for one and one-half hours, fifteen minutes, and two hours, respectively; that another inmate discovered Goetzee unconscious while Thompson was not monitoring him; and that Thompson had fraudulently submitted an observation checklist for August 7, 2011, because the checklist indicated that he had continuously monitored Goetzee all day when in fact Thompson had not done so.[11]

The Court has already granted summary judgment in favor of plaintiffs on their section 1983 and state-law claims against Thompson. The Court has also granted summary judgment against Sheriff Gusman on plaintiffs' state-law vicarious liability claims and partial summary judgment on plaintiffs' section 1983 claims.[12]

---

[10]     *See* R. Doc. 266, Exhibit AA at OPSO 12531.

[11]     *See generally* R. Doc. 248, Exhibit E.

[12]     R. Doc. 113.

**B.     Dr. Gore's Alleged Responsibility for Goetzee's Suicide**

Dr. Gore served as the Medical Director for OPP from August 2006 until 2014.[13]   As Medical Director, Dr. Gore's responsibilities included "supervis[ing] daily operations" at OPP and "integrat[ing] medical services with security functions."[14]   According to Orleans Parish Sheriff Marlin Gusman, Dr. Gore was also responsible for developing OPP's polices "with respect to mental health issues."[15]  Dr. Gore testified at his deposition that, as Medical Director, he was responsible for OPP's medical policies because Sheriff Gusman delegated policymaking authority to him for medical issues.[16]  Regarding mental health issues and suicide prevention specifically, Dr. Gore testified that he worked with Dr. Higgins, OPP's Chief of Psychiatry, to develop appropriate protocols for treating the suicidal inmates.[17]

OPP maintained a written suicide prevention policy founded upon direct observation of suicidal inmates.   Specifically, the written policy required that "all inmates with active suicidal ideation . . . be directly

---

[13]     R. Doc. 266, Exhibit EEE; R. Doc. 266, Exhibit CC at 16.

[14]     R. Doc. 266, Exhibit C at 40-41.

[15]     R. Doc. 266, Exhibit MM at 58.

[16]     R. Doc. 266, Exhibit CC at 38.

[17]     *Id.* at 38-39.

observed by the Security staff at all times."[18]   According to OPP's written policy, "periodic monitoring [was] a suboptimal solution [because] the few moments required to successfully commit suicide necessitates continuous, direct observation."[19]

According to plaintiffs, Dr. Gore was involved in Goetzee's mental health treatment as soon as Goetzee arrived at OPP.   Goetzee's August 2 conflict with the federal officer was reported by various news outlets.   Sheriff Gusman understood Goetzee to have attempted "suicide by cop," and Gusman specifically instructed Dr. Gore to make sure that Goetzee was directly observed while at OPP.[20]   Dr. Gore and OPP's Chief of Security assured the sheriff that Goetzee would be watched.[21]   In addition, while Goetzee received treatment at University Hospital during his incarceration, Dr. Gore notified Sheriff Gusman and other OPP officials about Goetzee's impending return.   Dr. Gore reported, "[Goetzee] is no longer delirious, but

---

[18]   R. Doc. 266, Exhibit D.

[19]   *Id.*

[20]   R. Doc. 266, Exhibit MM at 186.

[21]   *Id.*

has active suicidal ideation. . . . I assume he will be returning [in] 1-2 days . . . ."[22]

Plaintiffs' evidence also suggests that Dr. Gore knew, throughout his tenure as Medical Director, that OPP's approach to mental health treatment was inconsistent with OPP's written policy requiring "continuous, direct observation."  For example, the general layout of OPP's mental health tier, where Goetzee was housed, was not conducive to direct, continuous observation.  According to plaintiffs, regardless of where a direct observation deputy sat or stood on the mental health tier to conduct suicide watch, the deputy was physically unable to view the entirety of the three cells that held suicidal inmates.[23]

Plaintiffs also point to evidence showing that Dr. Gore received complaints from Dr. Higgins and lower-level staff about the deputies on direct observation.  When Dr. Gore assumed the position of Medical Director, Dr. Higgins told him that "frequently there is no deputy to watch [suicidal inmates]."[24]  Nurses and deputies who worked on the mental health tier echoed Dr. Higgins's concerns.  Deputy William Thompson, who left

---

[22]    R. Doc. 266, Exhibit U.

[23]    R. Doc. 266, Exhibit A at 163-64; R. Doc. 266, Exhibit DD at 62-63.

[24]    R. Doc. 266, Exhibit OO at 71-72.

Goetzee unobserved on the day of his death, testified at his deposition that direct observation deputies left suicidal inmates unobserved "all the time" and "everybody knew it."[25]  According to Thompson, these deputies could often be found sleeping in another area of the prison "but nobody cared."[26] Deputy Tyrone Williams similarly testified that both medical and security superiors knew suicidal inmates were often unattended, but "nobody did anything about it."[27]  Nurse David Schaible also testified that when he first started working at OPP, he complained about deputies being unable to directly observe all of the suicidal inmates on the mental health tier.[28] According to Schaible, he stopped complaining after a few months because "nothing changed."[29]

Dr. Gore admitted to receiving his "fair share of phone calls about not having folks on – in place for direct observation. . . . [T]hat has always been the case. I think it has . . . always been a frustration."[30]  He also explained

---

[25]   R. Doc. 266, Exhibit A at 156.

[26]   *Id.* at 162.

[27]   R. Doc. 266, Exhibit GGG at 143-45.

[28]   R. Doc. 266, Exhibit DD at 106-07.

[29]   *Id.*

[30]   R. Doc. 266, Exhibit CC at 225; *see also id.* at 235.

that he knew from 2009 to 2011, OPP "had difficulties" getting deputies to conduct continuous observation because OPP had staffing issues and deputies "weren't put in the right spots to do it."[31]  Dr. Gore again testified that he knew that "periodically" OPP did not maintain enough deputies to continuously observe the suicidal inmates.[32]

According to plaintiffs, Dr. Gore's role as Medical Director empowered him to enforce OPP's written direct observation policy, but Dr. Gore failed to do so.  Dr. Gore admitted that he had a professional and ethical obligation to ensure that actively suicidal inmates, like Goetzee, received adequate medical care and that "the key" was making sure suicidal inmates were directly observed.[33]  Dr. Higgins explained that he reported any lapses in direct observation to Dr. Gore because "[Dr. Gore] could have spoken to security about making sure that the direct observation was done, because he had access to the sheriff."[34]

Based on the foregoing evidence, plaintiffs argue that Dr. Gore was deliberately indifferent to Goetzee's mental health needs and known risk of

---

[31]     *Id.* at 272-73.

[32]     *Id.* at 275.

[33]     *Id.* at 319-20, 327.

[34]     R. Doc. 266, Exhibit OO at 204.

suicide.  For this, plaintiffs seek to hold Dr. Gore liable under 42 U.S.C. § 1983 and Louisiana tort law.

### C.    Dr. Gore's Motion for Summary Judgment

Dr. Gore now moves for summary judgment on plaintiffs' claims.  Dr. Gore argues that plaintiffs undisputedly cannot prevail on their section 1983 claims because, according to Dr. Gore, he was not a policymaker at OPP, he did not know of and disregard the risk that deputies would not directly observe Goetzee, and he is entitled to qualified immunity.  Dr. Gore also argues that plaintiffs undisputedly cannot prevail on their state-law claim of negligence because, according to Dr. Gore, plaintiffs have not retained an expert who can opine on the standard of care applicable to Dr. Gore and plaintiffs cannot prove that Dr. Gore's conduct was the proximate cause of Goetzee's death.

## II.    LEGAL STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).  When assessing whether a dispute as to any material

fact exists, the Court considers "all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008). All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment." *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985); *see also Little*, 37 F.3d at 1075. "No genuine dispute of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *EEOC v. Simbaki, Ltd.*, 767 F.3d 475, 481 (5th Cir. 2014).

## III.   DISCUSSION

As noted, plaintiffs seek to hold Dr. Gore liable for Goetzee's death under both federal and Louisiana law. Dr. Gore argues that he is entitled to summary judgment on all of plaintiffs' claim. The Court addresses each of plaintiffs' theories in turn.

### A.   Plaintiffs' Section 1983 Claims

Plaintiffs sued Dr. Gore under 42 U.S.C. § 1983 in both his individual capacity and official capacity for violating Goetzee's rights under the

Fourteenth Amendment.  The elements of a section 1983 cause of action are: (1) a deprivation of rights secured by federal law (2) that occurred under color of state law, and (3) was caused by a state actor.  *See Victoria W. v. Larpenter*, 369 F.3d 475, 482 (5th Cir. 2004).  Dr. Gore challenges plaintiffs' ability to prove that he deprived Goetzee of his constitutional rights while Goetzee was incarcerated as a pretrial detainee at OPP.

"The State's exercise of its power to hold detainees . . . brings with it a responsibility under the U.S. Constitution to tend to essentials of their well-being."  *Hare v. City of Corinth (Hare III)*, 74 F.3d 633, 638–39 (5th Cir. 1996) (en banc).  Accordingly, pretrial detainees have a right to "constitutional essentials" such as safety and medical care, including a right to protection from self-harm.  *Jacobs v. West Feliciana Sheriff's Dep't*, 228 F.3d 388, 393 (5th Cir. 2000).  "Unlike convicted prisoners, whose rights to constitutional essentials like medical care and safety are guaranteed by the Eighth Amendment, pretrial detainees look to the procedural and substantive due process guarantees of the Fourteenth Amendment to ensure provision of these same basic needs."  *Id.* (citing *Bell v. Wolfish*, 441 U.S. 520 (1979)).  "The failure to provide pre-trial detainees with adequate protection from their known suicidal impulses is actionable under § 1983."  *Evans v.*

*City of Marlin*, 986 F.2d 104, 107 (5th Cir. 1993) (citing *Rhyne v. Henderson Cty.*, 973 F.2d 386, 391 (5th Cir.1992)).

Pretrial detainees may bring constitutional challenges under two alternative theories: first, that a defendant committed an "episodic act or omission" or second, that a general "condition of confinement" violated the detainee's constitutional rights. *See Estate of Henson v. Wichita Cty., Tex.*, 795 F.3d 456, 462 (5th Cir. 2015). Here, plaintiffs have argued both theories in the alternative. *See id.* ("[T]here is no rule barring a plaintiff from pleading both alternative theories, and a court may properly evaluate each separately."); *Shepherd v. Dallas Cty.*, 591 F.3d 445, 452 n.1 (5th Cir. 2009) (noting that a district court is not required to "classify" a section 1983 lawsuit as one or the other theory of liability). If plaintiffs present sufficient factual evidence as to both theories, then both theories may proceed to the jury.

With an episodic-act-or-omission claim, "the complained-of harm is a particular act or omission of one or more officials." *Scott v. Moore*, 114 F.3d 51, 53 (1997) (en banc). A plaintiff in an episodic-act-or-omission case "complains first of a particular act of, or omission by, the actor and then points derivatively to a policy, custom, or rule (or lack thereof) of the municipality that permitted or caused the act or omission." *Id.*

To impose liability on a defendant in his individual capacity in an episodic-act-or-omission case, a pretrial detainee must establish that the defendant acted with *subjective* deliberate indifference. *Id.* A person acts with subjective indifference if (1) "he knows that an inmate faces a substantial risk of serious bodily harm," and (2) "he disregards that risk by failing to take reasonable measures to abate it." *Anderson v. Dallas Cty., Tex.*, 286 F. App'x 850, 860 (5th Cir. 2008) (citing *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006)).

To impose liability on a defendant in his official capacity, and thus hold a municipality accountable for the constitutional violation, the detainee "must show that the municipal employee's act resulted from a municipal policy or custom adopted or maintained with *objective* deliberate indifference to the detainee's constitutional rights." *Scott*, 114 F.3d at 54; *see also Sibley v. Lemaire*, 184 F.3d 481, 488 (5th Cir. 1999) (requiring plaintiff to show objective deliberate indifference "[t]o hold superiors liable"). Objective indifference "considers not only what the policy maker actually knew, but what he should have known, given the facts and circumstances surrounding the official policy and its impact on the plaintiff's rights." *Corley v. Prator*, 290 F. App'x 749, 750 (5th Cir. 2008) (citing *Lawson v. Dallas Cty.*, 286 F.3d 257, 264 (5th Cir. 2002)).

By contrast, a condition-of-confinement case "is a constitutional attack on general conditions, practices, rules, or restrictions of pretrial confinement." *Scott*, 114 F.3d at 53 (quoting *Hare v. City of Corinth, Miss. (Hare III)*, 74 F.3d 633, 644 (5th Cir. 1996) (en banc)). "[I]n some cases, a condition may reflect an unstated or *de facto* policy, as evidenced by a pattern of acts or omissions sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by [jail] officials . . . ." *Estate of Henson v. Wichita Cty., Tex.*, 795 F.2d 456, 463 (5th Cir. 2015) (quoting *Shepherd v. Dallas Cty.*, 591 F.3d 445, 452 (5th Cir. 2009)). Traditional examples of condition-of-confinement cases include challenges to prison overcrowding, restrictions on inmate privileges, and disciplinary segregation, among other things. *See Scott*, 114 F.3d at 53 & n.2.

"Because a state may not punish a pretrial detainee, conditions of confinement for [a pretrial] inmate that amount to 'punishment' violate the Constitution." *Duvall v. Dallas Cty., Tex.*, 631 F.3d 203, 206 (5th Cir. 2011). To prevail on a condition-of-confinement claim, a plaintiff must show that the condition "has no reasonable relationship to a legitimate governmental interest" and caused the complained-of constitutional violation. *See id.* at 206-07 (citing *Bell v. Wolfish*, 441 U.S. 520 (1979)). The plaintiff is not required to show deliberate indifference, although "the reasonable-

relationship test employed in conditions cases is functionally equivalent to the deliberate indifference standard employed in episodic cases." *Id.* at 207 (quoting *Scott*, 114 F.3d at 54). The Fifth Circuit has at least suggested that condition-of-confinement claims are cognizable against individual actors only in their official capacities. *See Estate of Allison v. Wansley*, 524 F. App'x 963, 970 n.4 (5th Cir. 2013) ("Appellees' claim against the individual defendants is properly analyzed as an 'episodic act or omission case,' rather than 'condition of confinement' case."); *Jacobs v. W. Feliciana Sheriff's Dep't*, 228 F.3d 388, 393 n.3 (5th Cir. 2000) (same); *see generally Estate of Henson v. Wichita Cty., Tex.*, 795 F.2d 456, 463 (5th Cir. 2015) (noting plaintiffs alleged a condition-of-confinement claim against a municipality); *Shepherd v. Dallas Cty.*, 591 F.3d 445, 453 (5th Cir. 2009) (upholding condition-of-confinement claim against a municipality).

### 1.    Plaintiffs' Constitutional Challenge to Dr. Gore's Alleged Episodic Acts or Omissions

Initially, the Court notes that Dr. Gore's summary judgment motion addresses plaintiffs' episodic-act-or omission claim against him only in his individual capacity. Dr. Gore contends that "an episodic act or omission claim governs allegations against a jail official in his individual capacity,"[35]

---

[35]    R. Doc. 237-1 at 5.

without reference to the above-cited authorities explaining that a pretrial detainee may also maintain an official capacity claim on the additional showing of "objective deliberate indifference." *See generally Scott v. Moore*, 114 F.3d 51, 54 (1997) (en banc).  Focusing only on plaintiffs' individual capacity claim, Dr. Gore argues that there is no evidence that he knew deputies failed to abide by OPP's written policy requiring direct observation of suicidal inmates, and thus no reasonable jury could find Dr. Gore "deliberately indifferent."[36]

As explained, a prison official acts with subjective indifference if (1) "he knows that an inmate faces a substantial risk of serious bodily harm," and (2) "he disregards that risk by failing to take reasonable measures to abate it."  *Anderson v. Dallas Cty., Tex.*, 286 F. App'x 850, 860 (5th Cir. 2008) (citing *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006)).  In inmate suicide cases, the defendant must be aware of a substantial and significant risk that the inmate will commit suicide and "effectively disregard[] it." *Jacobs*, 228 F.3d at 395.  Although "the law is clearly established that jailers must take measures to prevent inmate suicides once they know of the suicide risk," it is not clearly established "as to what those measures must be."  *Id.*

---

[36]    *Id.* at 9.

Here, plaintiffs have presented sufficient evidence to create a genuine dispute of material fact as to Dr. Gore's knowledge and alleged deliberate indifference to Goetzee's risk of suicide. First, certain evidence shows that Dr. Gore knew Goetzee was a suicide risk. Goetzee's "suicide-by-cop" attempt was reported in the news,[37] and jail officials understood that Goetzee's altercation with a federal agent landed him in OPP.[38] Because of Goetzee's notoriety, Sheriff Gusman specifically directed Dr. Gore to put Goetzee on direct observation, and Dr. Gore assured the sheriff that Goetzee would be monitored.[39] Further, Dr. Gore himself notified other jail officials about Goetzee's "active suicidal ideation."[40] *See id.* at 396 (finding evidence supported deliberate indifference because official "was fully aware that [inmate] had actually attempted suicide once before [and] regarded her as a suicide risk at all times during her detention"); *cf. Flores v. Cty. of Hardeman*, 124 F.3d 736, 738-39 (5th Cir. 1997) (finding sheriff did not act

---

[37]   R. Doc. 266, Exhibit VV; R. Doc. 266, Exhibit WW; R. Doc. 266, Exhibit XX; R. Doc. 266, Exhibit YY.

[38]   *See* R. Doc. 266, Exhibit MM at 186.

[39]   *Id.* at 186-87.

[40]   R. Doc. 266, Exhibit U; R. Doc. 266, Exhibit CC at 153-54.

with subjective deliberate indifference because inmate never gave any indication of suicidal tendencies).

Plaintiffs also point to evidence suggesting that Dr. Gore knew the deputies responsible for directly observing suicidal inmates like Goetzee often eschewed their duties without repercussion. As a general matter, the layout of OPP's mental health tier physically precluded a deputy from constantly monitoring every suicidal inmate, as required by OPP's written suicide prevention policy. No matter where a deputy sat or stood on the mental health tier to conduct direct observation, he or she could not simultaneously observe all three cells where the suicidal inmates were housed.[41] *See Jacobs*, 228 F.3d at 396 (explaining that detaining a suicidal inmate in a cell with a "blind spot" and other hazards was "obviously inadequate"). Additionally, nurses and deputies alike testified at their depositions that the medical supervisors, including Dr. Gore, were aware that suicidal inmates went unobserved for long periods of time.[42] According to these sources, no one addressed their complaints about the deputies'

---

[41]   R. Doc. 266, Exhibit A at 163-64; R. Doc. 266, Exhibit DD at 62-63.

[42]   *See, e.g.*, R. Doc. 266, Exhibit A at 155-56; R. Doc. 266, Exhibit DD at 50-52, 102-110; R. Doc. 266, Exhibit GGG at 144, 153.

failing to conduct direct observation properly.[43]  *See Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001) (noting that "ignor[ing] complaints" may amount to deliberate indifference).

Dr. Gore also admitted to receiving his "fair share of phone calls about not having folks on – in place for direct observation."[44]  According to Dr. Gore, "that has always been the case" and has "always been a frustration."[45]  The evidence also suggests that Dr. Gore knew about at least two other inmate suicides that occurred when the inmates were not directly observed.[46]  According to plaintiffs, one of these suicides prompted Dr. Gore to issue an "Intra Departmental Memorandum" regarding OPP's written direct observation policy, which required staff to watch suicidal inmates "at all times."[47]  *See Rhyne v. Henderson Cty.*, 973 F.2d 386, 393 (5th Cir. 1992) (noting that evidence of other suicide attempts "would have alerted [a prison official] to the need for more frequent suicide checks").

---

[43]    *See, e.g.*, R. Doc. DD at 106-07; R. Doc. 266, Exhibit GGG at 150-51.

[44]    R. Doc. 266, Exhibit CC at 225; *see also id.* 235.

[45]    *Id.* 225, 235.

[46]    *Id.* at 366-67; R. Doc. 266, Exhibit FFF; R. Doc. 266, Exhibit GGG at 219-21.

[47]    R. Doc. 266, Exhibit E; *see* R. Doc. 266, Exhibit AAA (indicating the inmate's date of death).

Finally, plaintiffs have presented evidence that there were precautions that Dr. Gore could have taken with respect to Goetzee, but did not. Dr. Gore testified at his deposition that as Medical Director, he had a professional and ethical obligation to ensure that actively suicidal inmates, like Goetzee, received adequate medical care, which included an obligation "to help make sure that they're medically observed."[48] Specifically, Sheriff Gusman expected Dr. Gore "to make sure that [Goetzee] was on direct observation."[49] Sheriff Gusman also noted that he considered Dr. Gore the jail's "lead person" on addressing inmate suicides and that he expected both security staff and medical staff to ensure compliance with direct observation orders.[50] At least one deputy testified consistently with Sheriff Gusman's expectation, stating that security and medical staff "worked seamlessly together" on the mental health tier, including with regard to direct observation inmates.[51]

According to OPP's Chief of Psychiatry Dr. Higgins, he specifically reported lapses in direct observation to Dr. Gore because Dr. Gore "had access to the sheriff," and Dr. Gore "could have spoken to security about

---

[48]    R. Doc. 266, Exhibit CC at 319-20, 327.

[49]    R. Doc. 266, Exhibit MM at 186-87.

[50]    *Id.* at 84-86, 341-42.

[51]    R. Doc. 266, Exhibit LL at 194-95.

making sure that the direct observation was done."[52]  Dr. Gore also worked with the security staff to implement OPP's suicide prevention procedures.[53] At least one member of the security staff explained that he understood medical staff to share the responsibility of enforcing OPP's written direct observation policy.[54]

In light of this testimony by other witnesses, plaintiffs point to Dr. Gore's inaction with respect to Goetzee as evidence that he effectively disregarded Goetzee's known suicidal impulses.  Dr. Gore testified that he would expect someone to take "corrective action" against a deputy who left his direct observation post, but that he, as Medical Director, had no authority to discipline the security staff.[55]  Though Dr. Gore admitted that he could discipline nurses for failing to report a deputy who shirked his direct observation duties, there is no evidence that he ever did so.[56]  Dr. Gore also admitted that he did not take any steps to ascertain whether his staff

---

[52]    R. Doc. 266, Exhibit OO at 204.

[53]    *Id.* at 13.

[54]    *See* R. Doc. 266, Exhibit RR at 112-13, 143.

[55]    R. Doc. 281-3, Deposition of Dr. Samuel Gore, October 9, 2014, at 76-80.

[56]    *Id.* at 73-74.

complied with OPP's written suicide prevention policy, which required medical staff to formally report lapses in direct observation.[57]   Dr. Gore further admitted that even after he was aware that deputies neglected their direct observation responsibilities, it "never occurred" to him to use OPP's tier logs (which tracked the comings and goings of suicide watch deputies), nursing forms, or other direct observation forms to ensure that OPP's staff followed his suicide prevention directives.[58]

Taken together, this evidence plausibly supports plaintiffs' contention that Dr. Gore was aware of Goeztee's risk of suicide and knew suicide watch deputies were often derelict in their duties, but nonetheless failed to take additional precautions or otherwise ensure that Goetzee was directly observed.  This evidence is sufficient to preclude summary judgment on Dr. Gore's liability in his individual capacity.   *See Jacobs v. W. Feliciana Sheriff's Dep't*, 228 F.3d 388, 396 (5th Cir. 2000) (affirming denial of summary judgment when jail official knew that an inmate "exhibited a serious risk of suicide and placed her in conditions he knew to be obviously inadequate").

---

[57]     *Id.* at 106-108.

[58]     R. Doc. 266, Exhibit CC at 210-11.

Although Dr. Gore does not formally address plaintiffs' episodic-act-or-omission claim against him in his official capacity, Dr. Gore does argue that he cannot be held liable in his official capacity because Sheriff Gusman is the only official policymaker for OPP.[59]

While the parish sheriff is undoubtedly "the keeper of the public jail of his parish," *see* La. Rev. Stat. §§ 13:5539(C), 15:704, the issue here is whether Dr. Gore maintained policymaking authority regarding the mental health treatment of OPP's inmates.  "An official may be a policymaker . . . in a particular area or on a particular issue."  *Beattie v. Madison Cty. Sch. Dist.*, 254 F.3d 595, 602 (5th Cir. 2001); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) ("[T]he challenged action must have been taken pursuant to a policy adopted by the official or officials responsible under state law for making policy in *that area* of the city's business.").  Generally, a prison physician "shall attend the prisoners who are confined in parish jails whenever they are sick."  La. Rev. Stat.15:703(A).  Here, Sheriff Gusman

---

[59]     In arguing his position, Dr. Gore relies on *Quatroy v. Jefferson Parish Sheriff's Office*, Nos. 04-451, 04-1425, 2009 WL 1380196 (E.D. La. 2009).  There, the Court determined that, between the Sheriff and the parish governing authority, the Sheriff had final policymaking authority on managing the provision of healthcare within the jail.  *Id.* at *5-6.  The facts here are dissimilar because the Court must determine whether the Sheriff delegated policymaking authority on matters of medical care to the Medical Director of the jail.

testified that the OPP's Medical Director "made policies with respect to mental health issues."[60]  Dr. Gore similarly explained that Sheriff Gusman "delegated policy-making authority to [Dr. Gore] with respect to medical issues," including matters of mental health.[61]  Accordingly, this argument is without merit.  *Cf. Jackson v. Ford*, 544 F. App'x 268, 272 (5th Cir. 2013) (noting that sheriff declared in a sworn affidavit that he did not delegate policymaking authority and prison official testified that she had not been given policymaking authority).

## 2. Plaintiffs' Constitutional Challenge to Goetzee's Conditions of Confinement Against Dr. Gore

Dr. Gore relies on two arguments to prove that there is no dispute of material fact on plaintiffs' condition-of-confinement claim against him. First, Dr. Gore argues that he is not a policymaker at OPP and therefore cannot be liable in his official capacity.  Second, Dr. Gore argues that the undisputed facts show that OPP maintained sufficient suicide-prevention policies for its inmates.

Dr. Gore's policymaker argument here fails for the same reasons explained above.  As to Dr. Gore's argument that OPP's suicide prevention

---

[60]    R. Doc. 266, Exhibit MM at 58.

[61]    R. Doc. 266, Exhibit CC at 38.

policies were adequate, plaintiffs have marshaled enough evidence in the record to withstand summary judgment on this point.

To maintain a condition-of-confinement claim, a plaintiff must show (1) a condition of an inmate's confinement that is (2) not reasonably related to a legitimate governmental interest and that (3) violated the inmate's constitutional rights. *See Edler v. Hockley Cty. Comm'rs Court*, 589 F. App'x 664, 668 (5th Cir. 2014). A "condition of confinement" can be a rule, restriction, practice, or general condition of pretrial confinement. *Id.*; *Scott v. Moore*, 114 F. 3d 51, 53 (5th Cir. 1997) (en banc). If the plaintiff seeks to base his or her constitutional claim on an *unstated* rule or policy, however, the plaintiff must show that one or more jail officials' "acts or omissions were sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by other officials, to prove an intended condition or practice." *Estate of Hensen v. Wichita Cty., Tex.*, 795 F.3d 456, 465 (5th Cir. 2015).

In challenging plaintiffs' summary judgment evidence, Dr. Gore relies on OPP's written policy, which required "all inmates with active suicidal ideation . . . to be directly observed . . . at all times."[62] According to Dr. Gore,

---

[62]    R. Doc. 266, Exhibit D; R. Doc. 266, Exhibit E.

OPP trained its deputies to abide by this policy, and Deputy Thompson knowingly abandoned his post when he left Goetzee unattended.  Dr. Gore argues that there is no evidence that OPP's written policy of providing direct, continuous observation of suicidal inmates violated Goetzee's constitutional rights.

Dr. Gore's arguments here miss the point.  Plaintiffs do not challenge OPP's written policy of direct observation as unconstitutional.  Rather, plaintiffs argue that OPP maintained an unstated or *de facto* policy of intermittent or periodic observation, instead of the direct, continuous observation that plaintiffs believe these suicidal inmates required.  Indeed, Dr. Gore admitted that an unenforced written policy is "kind of worthless."[63]

To prevail on this *de facto* policy theory, plaintiffs must demonstrate that Dr. Gore's conduct was "sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by other officials."  *See id.*  As outlined in the preceding section, plaintiffs have presented sufficient evidence that deputies routinely failed to conduct direct, continuous observation of the inmates on suicide watch, and that medical staff—both lower-level nurses and superiors like Dr. Gore—knew about it.  Plaintiffs

---

[63]      R. Doc. 266, Exhibit CC at 37-38.

argue that Dr. Gore perpetuated the problem by failing to take corrective action against security and medical staff who did not comply with OPP's written policy. Therefore, plaintiffs have presented sufficient disputed facts to survive summary judgment on their condition-of-confinement claim.

### 3.   Dr. Gore's Assertion of Qualified Immunity

Dr. Gore's final argument on plaintiffs' section 1983 claims is that the doctrine of qualified immunity protects him from liability because plaintiffs fail to establish that he violated Goetzee's constitutional rights.

Qualified immunity shields government agents, sued in their individual capacities, "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Behrens v. Pelletier*, 516 U.S. 299, 305 (1996) (citation omitted). The defense of qualified immunity is unavailable in a suit against a state actor in his official capacity. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). Here, plaintiffs sue Dr. Gore in both his individual and official capacity.

If a party asserts the defense of absolute or qualified immunity in good faith, the burden shifts to the nonmovant to rebut it. *Disraeli v. Rotuna*, 489 F.3d 628, 631 (5th Cir. 2007). To rebut an absolute or qualified immunity defense, the plaintiff may not simply rely on allegations in the pleadings, but

must produce competent summary judgment evidence raising a genuine issue of material fact. *Morales v. Boyd*, 304 F. App'x 315, 318 (5th Cir. 2008). Specifically, the plaintiff must identify facts supporting the conclusion that (1) "the defendant's conduct violated [the plaintiff's] constitutional right" and (2) the "defendant's conduct was objectively unreasonable in light of clearly established law at the time of the violation." *Terry v. Hubert*, 609 F.3d 757, 761 (5th Cir. 2010) (citation omitted). Importantly, "the very action in question need not previously have been held unlawful for a constitutional violation to be clearly established." *Id.* at 763. Instead, the "unlawfulness [of the defendant's conduct] must be apparent," and "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.*

At the time of the alleged violation here, Fifth Circuit law "clearly established" that pretrial detainees like Goetzee have a right to "constitutional essentials" such as safety and medical care, including the right to protection against self-harm. *Jacobs v. W. Feliciana Sheriff's Dep't*, 228 F.3d 388, 393 (5th Cir. 2000). The Fifth Circuit has also clearly established that "[t]he failure to provide pre-trial detainees with adequate protection from their known suicidal impulses is actionable under § 1983." *Evans v. City of Marlin*, 986 F.2d 104, 107 (5th Cir. 1993) (citing *Rhyne v.*

*Henderson Cty.*, 973 F.2d 386, 391 (5th Cir. 1992)). As the Court has explained, plaintiffs present sufficient evidence to create a dispute of fact about whether Dr. Gore violated Goetzee's right to safety and medical care. Plaintiffs point to evidence that Dr. Gore knew Goetzee was suicidal and knew deputies poorly performed direct observation of suicidal inmates like Goetzee, but, according to plaintiffs, Dr. Gore nonetheless did nothing to ensure that Goetzee, or any other suicidal inmate, was appropriately observed. Because there is a sufficient evidence for a jury to determine that Dr. Gore acted with deliberate indifference, the Court cannot conclude that Dr. Gore's conduct was "objectively reasonable." Therefore, summary judgment on Dr. Gore's defense of qualified immunity is unwarranted. *See Jacobs*, 228 F.3d at 395 ("[T]o defeat qualified immunity, the plaintiffs must establish that the officers in this case were aware of a substantial and significant risk that [the inmate] might kill herself, but effectively disregarded it."); *see also Matis v. Johnson*, 262 F. App'x 671, 673 (5th Cir. 2008) (affirming court's refusal to grant qualified immunity when a fact issue as to deliberate indifference remained for the jury).

### B.    Plaintiffs' State-Law Claim for Negligence

Beyond plaintiffs' federal law claims, Dr. Gore also argues that plaintiffs cannot sustain their claim for negligence under Louisiana law

because plaintiffs have not retained a "Louisiana licensed physician."   Dr. Gore also argues that plaintiffs cannot demonstrate that Dr. Gore's conduct was the proximate cause of Goetzee's death because Deputy Thompson left Goetzee unattended and the Court found Thompson to be a proximate cause of Goetzee's death.  The Court finds each of these arguments unavailing.

Under Louisiana's general negligence statute, Louisiana Civil Code article 2315, courts conduct a "duty-risk analysis" to determine whether to impose liability.  *See Audler v. CBC Innovis Inc.*, 519 F.3d 239, 249 (5th Cir. 2008) (quoting *Lemann v. Essen Lane Daiquiries, Inc.*, 923 So. 2d 627, 632-33 (La. 2006)).   A plaintiff must prove each of five elements: (1) the defendant had a duty to conform his conduct to a specific standard of care (the duty element); (2) the defendant's conduct failed to conform to the appropriate standard of care (the breach element); (3) the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope-of-duty element); and (5) actual damages (the damages element).  *See S.J. v. Lafayette Par. Sch. Bd.*, 41 So. 3d 1119, 1125 (La. 2010); *see also Knight v. Kellogg Brown & Root Inc.*, 333 F. App'x 1, 6 (5th Cir. 2009) (applying Louisiana law).  A plaintiff's failure to prove

any one of these elements results in a determination of no liability. *Knight*, 333 F. App'x at 6.

In claims against medical providers, Louisiana law requires the plaintiff to prove first, "the degree of care ordinarily exercised by physicians . . . licensed to practice in the state of Louisiana . . . in a similar community or locale and under similar circumstances"; second, "that the defendant . . . failed to use reasonable care and diligence"; and third, "that as a proximate result of . . . the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred."   La. Rev. Stat. 9:2794(A)(1) – (3).  To satisfy this burden, the plaintiff must retain a medical expert who, among other things, "is licensed to practice medicine by the Louisiana State Board of Medical Examiners . . ., is licensed to practice medicine by any other jurisdiction in the United States, or is a graduate of [an accredited] medical school . . . ." La. Rev. Stat. 9:2794(D)(1)(d).

Here, plaintiffs have retained medical expert Dr. Jeffrey L. Metzner. Though Dr. Metzner is not licensed to practice medicine in the state of Louisiana, he is licensed to practice in at least four other states: Colorado, California, New Mexico, and Pennsylvania[64]—"other jurisdiction[s] in the

---

[64]   R. Doc. 244-2 at 17 (Curriculum Vitae of Jeffrey L. Metzner, M.D.).

United States" under Louisiana Revised Statute 9:2794(D)(1)(d). Accordingly, Dr. Gore's argument that a medical expert must be licensed in Louisiana fails.

As to Dr. Gore's argument that his conduct was not "the" proximate cause of Goetzee's suicide, plaintiffs have presented sufficient evidence to create an issue of fact on this point. First, under Louisiana law, there can be more than one cause of a victim's harm. *See Rando v. Anco Insulations Inc.*, 16 So. 3d 1065, 1088 (La. 2009); *Shepard ex rel. Shepard v. Scheeler*, 701 So. 2d 1308, 1312 (La. 1997). Thus, the Court's finding of liability as to Deputy Thompson does not preclude the jury from finding other actors liable, as Dr. Gore suggests. As noted, plaintiffs' theory is that Dr. Gore's position as Medical Director of OPP, as well as his ethical and professional responsibilities as a physician generally, required him to ensure that OPP staff, like Thompson, properly carried out direct observation orders. Plaintiffs suggest that this is especially true with regard to Goetzee, whom Dr. Gore knew to be acutely suicidal, because Dr. Gore assured Sheriff Gusman that Goetzee would be watched in accordance with OPP's written direct observation policy. According to plaintiffs, Dr. Gore's failure to do so ultimately led to Thompson's leaving his post and Goetzee's committing suicide in OPP custody. Resolution of these factual issues is best left for jury.

## IV.   CONCLUSION

After reviewing the evidence in a light most favorable to plaintiffs, the Court finds that there are sufficient facts for plaintiffs to proceed to trial against Dr. Gore.  For the foregoing reasons, the Court DENIES Dr. Gore's motion for summary judgment.[65]

New Orleans, Louisiana, this  26th  day of February, 2016.

_____

SARAH S. VANCE
UNITED STATES DISTRICT JUDGE

---

[65]     R. Doc. 237.