UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

MARGARET GOETZEE NAGLE and       CIVIL ACTION
JOHN ERIC GOETZEE

VERSUS                           NO. 12-1910

SHERIFF MARLIN GUSMAN, ET AL.    SECTION "R" (2)

## ORDER AND REASONS

This action arises out of the August 7, 2011 suicide of William Goetzee, an inmate of Orleans Parish Prison ("OPP").  Following Goetzee's death, his siblings, Margaret Goetzee Nagle and John Eric Goetzee, filed this section 1983 civil rights and state-law suit against numerous employees of the Orleans Parish Sheriff's Office, including defendant Dr. Charles "Mike" Higgins.[1]

Goetzee was a commander in the United States Coast Guard Reserve and a civilian employee of the Coast Guard.  Goetzee committed suicide while being held as a pretrial detainee on the mental health tier of the House of Detention at OPP on charges related to a suicide attempt five days earlier.  On the day of Goetzee's death, OPP Deputy William Thompson was assigned to maintain "suicide watch" of Goetzee.  Thompson repeatedly left his suicide

---

[1]     R. Doc. 1.

watch post, and it was during one of these absences that Goetzee committed suicide.

Dr. Higgins was the Chief of Psychiatry at OPP when Goetzee died. Plaintiffs contend that not only did Dr. Higgins help to develop OPP's approach to mental health care and suicide prevention, but also that Dr. Higgins was directly involved in Goetzee's psychiatric treatment at OPP. According to plaintiffs, OPP's suicide prevention practices were grossly inadequate, and Dr. Higgins condoned a *de facto* policy of allowing deputies and nurses to leave suicidal inmates unwatched.  For this reason, plaintiffs argue, Thompson was derelict in his duties as the deputy assigned to conduct direct observation of Goetzee, leading to Goetzee's death.

Dr. Higgins now moves the Court for summary judgment on plaintiffs' section 1983 and state-law claims.[2]  For the following reasons, the Court denies the motion.

---

[2]     Dr. Higgins filed two separate motions for summary judgment – one addressing plaintiffs' substantive claims, and one addressing plaintiffs' claim for punitive damages.  *See* R. Doc. 236; R. Doc. 248.  Dr. Higgins relies on the same arguments in both motions, so the Court resolves both motions in this order.

# I.   BACKGROUND

## A.   Goetzee's Arrest, Incarceration, and Suicide

On the morning of August 2, 2011, Goetzee approached a marked Federal Protective Services vehicle occupied by a uniformed law enforcement officer.  Goetzee opened the front passenger door, entered the vehicle, and seated himself in the front passenger seat.  Goetzee lunged for the officer's weapon, exclaiming, "I want to kill myself, give me your gun."[3]  Federal agents arrested Goetzee and transported him to OPP later that day.[4]

The next day, on August 3, prison officials brought Goetzee to federal court for his initial appearance on charges related to his conflict with the federal officer during his suicide attempt the day before.  While at court, Goetzee behaved strangely in the presence of attorneys, federal officers, and the judge.  A representative for Goetzee informed the court that he was "obviously having mental issues."[5]  Back at OPP, a nurse alerted Dr. Higgins to Goetzee's behavior, and Dr. Higgins ordered that Goetzee be transported to University Hospital to "rule out delirium."[6]  Two days later, on August 5,

---

[3]    R. Doc. 266, Exhibit AA.

[4]    R. Doc. 248-1 ¶ 6; R. Doc. 265-1 ¶ 68.

[5]    *See* R. Doc. 266, Exhibit ZZ.

[6]    R. Doc. 266, Exhibit I.

University Hospital discharged Goetzee back to OPP with a diagnosis of psychosis.[7]   On August 6, Dr. Higgins conducted an "Initial Psychiatric Evaluation" of Goetzee.   From this evaluation, Dr. Higgins ordered that Goetzee be housed on OPP's mental health tier and placed on direct observation.[8]   Dr. Higgins's "direct observation" order required a Sheriff's Office employee to "maintain direct and constant observation" of Goetzee at all times, *i.e.*, "suicide watch."[9]

Goetzee was under suicide watch on August 6 and 7, 2011.   On the morning of August 7, Deputy William Thompson was assigned to maintain supervision of Goetzee.   During his suicide watch shift, Thompson left his post at least three times, leaving Goetzee unobserved each time.   During these absences, Goetzee went unobserved for an hour and a half, fifteen minutes, and two hours, respectively.   During Thompson's final absence, an inmate notified another on-duty officer that Goetzee was lying on the floor of his cell, unresponsive.   Apparently, Goetzee had repeatedly swallowed

---

[7]     R. Doc. 248-1 ¶ 11; R. Doc. 265-1 ¶ 73.

[8]     R. Doc. 266, Exhibit J.

[9]     *See, e.g.*, R. Doc. 266, Exhibits D-E.

wads of toilet paper and asphyxiated himself while Thompson was not monitoring him.[10]

As a result of these events, Thompson pleaded guilty to the crime of malfeasance in office.  While under oath, and as part of his plea, Thompson accepted the state's factual basis for the charge.  The factual basis specified that Thompson was assigned to continuously monitor Goetzee; that he left his post three times for one and one-half hours, fifteen minutes, and two hours, respectively; that another inmate discovered Goetzee unconscious while Thompson was not monitoring him; and that Thompson had fraudulently submitted an observation checklist for August 7, 2011, because the checklist indicated that he had continuously monitored Goetzee all day when in fact Thompson had not done so.[11]

The Court has already granted summary judgment in favor of plaintiffs on their section 1983 and state-law claims against Thompson.  The Court has also granted summary judgment against Sheriff Gusman on plaintiffs' state-law vicarious liability claims and partial summary judgment on plaintiffs' section 1983 claims.[12]

---

[10]    *See* R. Doc. 266, Exhibit AA at OPSO 12531.

[11]    *See generally* R. Doc. 248, Exhibit E.

[12]    R. Doc. 113.

## B.   Dr. Higgins's Alleged Involvement and Responsibility for Goetzee's Suicide

As Director of Psychiatry at OPP, Dr. Higgins was responsible for "overseeing psychiatric services" within the prison and "integrating psychiatric services with medical and security functions."[13]   His responsibilities also included supervising daily operations on OPP's mental health tier where Goetzee was housed.[14]

While Goetzee was incarcerated, OPP undoubtedly maintained a written suicide prevention policy founded upon direct observation of suicidal inmates.  Specifically, the written policy required that "all inmates with active suicidal ideation . . . be directly observed by the Security staff at all times."[15] The written policy further provided that "periodic monitoring [was] a suboptimal solution [because] the few moments required to successfully commit suicide necessitates continuous, direct observation."[16]

According to plaintiffs, despite OPP's written policy, the observation that suicidal inmates actually received was intermittent or periodic at best,

---

[13]   R. Doc. 248-2 at 20-21.

[14]   *See id.* at 21.

[15]   R. Doc. 266, Exhibit D.

[16]   *Id.*

and Dr. Higgins knew about it.  For example, the general layout of OPP's mental health tier, where Goetzee was housed, was not conducive to direct, continuous observation.  According to plaintiffs, regardless of where a direct observation deputy sat or stood on the mental health tier to conduct suicide watch, the deputy was physically unable to view the entirety of the three cells that held suicidal inmates.[17]  Additionally, nurses and deputies who worked on the tier testified at their depositions that Dr. Higgins was aware that suicidal inmates often frequently went unobserved for long periods of time.[18] According to Deputy William Thompson, there was "no question that Dr. Higgins knew" that suicidal inmates were left unobserved.[19]  According to Nurse David Schaible, he regularly complained about the direct observation deputies, but eventually gave up because "nothing changed."[20]  Schaible also stated that "Dr. Higgins was well aware that it was a problem."[21]

---

[17]    R. Doc. 266, Exhibit A at 163-64; R. Doc. 266, Exhibit DD at 62-63.

[18]    *See, e.g.*, R. Doc. 266, Exhibit A at 155-56; R. Doc. 266, Exhibit DD at 50-52, 102-110; R. Doc. 266, Exhibit GGG at 144, 153.

[19]    R. Doc. 266, Exhibit A at 160.

[20]    R. Doc. 266, Exhibit DD at 206-07.

[21]    *Id.* at 211-12.

According to plaintiffs, Dr. Higgins's role as Chief of Psychiatry empowered him to enforce OPP's written direct observation policy, but Dr. Higgins failed to do so.  Dr. Higgins admitted that, as Chief of Psychiatry, he regarded suicide prevention as his "highest priority" and that he had an ethical obligation to "address [OPP's] suicide prevention practices."[22] Further, Sheriff Gusman expected OPP's security and medical staff to work together to ensure compliance with any direct observation orders.[23] According to OPP Sergeant Nicole Harris, the security and medical staff "worked seamlessly together" on the mental health tier, including with regard to direct observation inmates.[24]

Although Dr. Higgins suggests that he had no authority to "control security" after issuing a direct observation order,[25] OPP Deputy Tyrone Williams regarded Dr. Higgins as "in charge" on the mental health tier.[26] Williams explained that if Dr. Higgins gave a deputy an order, "it got

---

[22]    R. Doc. 266, Exhibit Z at 79, 200.

[23]    R. Doc. 266, Exhibit MM at 84-86, 341-42.

[24]    R. Doc. 266, Exhibit LL at 194-95.

[25]    R. Doc. 248-2 at 19.

[26]    R. Doc. 266, Exhibit GGG at 31.

followed."[27]  According to Williams, Dr. Higgins never expressed any concern about the way deputies carried out direct observation, but if he had, Williams "would have done whatever Dr. Higgins told [Williams] to do."[28]

Based on the foregoing evidence, plaintiffs argue that Dr. Higgins was deliberately indifferent to Goetzee's mental health needs and known risk of suicide.  For this, plaintiffs seek to hold Dr. Higgins liable under 42 U.S.C. § 1983 and Louisiana tort law.

### C.    Dr. Higgins's Motion for Summary Judgment

Dr. Higgins now moves for summary judgment on plaintiffs' claims. Dr. Higgins argues that plaintiffs undisputedly cannot prevail on their section 1983 claims because, according to Dr. Higgins, plaintiffs cannot show that Dr. Higgins violated Goetzee's constitutional rights.  Dr. Higgins also argues that plaintiffs cannot satisfy the burden required to sustain a claim for punitive damages under section 1983.[29]  Finally, Dr. Higgins argues that plaintiffs cannot prevail on their state-law negligence claims.

---

[27]    *See id.* at 32.

[28]    *Id.* at 98.

[29]    Dr. Higgins also argues that plaintiffs cannot prevail on their claim for punitive damages under Louisiana law, but plaintiffs do not appear to seek punitive damages on their Louisiana negligence claims.  *See generally Arabie v. CITGO Petroleum Corp.*, 89 So. 3d 307, 317 (La. 2015) (noting

## II.   LEGAL STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).  When assessing whether a dispute as to any material fact exists, the Court considers "all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence."  *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008).   All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment."  *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985); *see also Little*, 37 F.3d at 1075.  "No genuine dispute of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  *EEOC v. Simbaki, Ltd.*, 767 F.3d 475, 481 (5th Cir. 2014).

---

the Louisiana Legislature generally disallowed punitive damages, except in specific situations).  Accordingly, the Court will not address this argument.

# III.   DISCUSSION

As noted, plaintiffs seek to hold Dr. Higgins liable for compensatory and punitive damages under section 1983 and for compensatory damages under Louisiana tort law.  The Court addresses each theory in turn.

## A.    Plaintiffs' Section 1983 Claims

The elements of a section 1983 cause of action are: (1) a deprivation of rights secured by federal law (2) that occurred under color of state law, and (3) was caused by a state actor.  *See Victoria W. v. Larpenter*, 369 F.3d 475, 482 (5th Cir. 2004).

As the Court explained in an earlier summary judgment order,[30] "[t]he State's exercise of its power to hold detainees . . . brings with it a responsibility under the U.S. Constitution to tend to essentials of their well-being."  *Hare v. City of Corinth (Hare III)*, 74 F.3d 633, 638–39 (5th Cir. 1996) (en banc). Accordingly, pretrial detainees, like Goetzee, have a right to "constitutional essentials" such as safety and medical care, including protection against the risk of self-harm.  *Jacobs v. West Feliciana Sheriff's Dep't*, 228 F.3d 388, 393 (5th Cir. 2000).  "Unlike convicted prisoners, whose rights to constitutional essentials like medical care and safety are

---

[30]      *See* R. Doc. 113.

guaranteed by the Eighth Amendment, pretrial detainees look to the procedural and substantive due process guarantees of the Fourteenth Amendment to ensure provision of these same basic needs." *Id.* (citing *Bell v. Wolfish*, 441 U.S. 520 (1979)). "The failure to provide pre-trial detainees with adequate protection from their known suicidal impulses is actionable under § 1983." *Evans v. City of Marlin*, 986 F.2d 104, 107 (5th Cir. 1993) (citing *Rhyne v. Henderson Cty.*, 973 F.2d 386, 391 (5th Cir.1992)).

Here, plaintiffs sued Dr. Higgins under section 1983 in both his individual capacity and official capacity.  Plaintiffs also proceed on two alternative theories: first, that Dr. Higgins is liable for an "episodic act or omission" that deprived Goetzee of his constitutional rights and second, that Dr. Higgins is responsible for a general "condition of confinement" that deprived Goetzee of his constitutional rights.[31]

In his motion for summary judgment, Dr. Higgins argues that plaintiffs cannot prevail on their section 1983 claims under the Seventh Circuit's application of the Eighth Amendment, which does not apply here.  In addition, Dr. Higgins addresses only plaintiffs' episodic-act-or-omission claim.  Because the standard applicable to a Fourteenth Amendment

---

[31]     *See* R. Doc. 265 at 20.

episodic-act-or-omission claim by a pretrial detainee is similar to the standard applicable to an Eighth Amendment claim by a convicted prisoner, the Court will nonetheless address Dr. Higgins's arguments on this point. *See Ard v. Rushing*, 597 F. App'x 213, 218-19 (5th Cir. 2014) (citing *Hare v. City of Corinth (Hare III)*, 74 F.3d 633, 638-39 (5th Cir. 1996) (en banc)).

With an episodic-act-or-omission claim, "the complained-of harm is a particular act or omission of one or more officials." *Scott v. Moore*, 114 F.3d 51, 53 (1997) (en banc). A plaintiff in an episodic-act-or-omission case "complains first of a particular act of, or omission by, the actor and then points derivatively to a policy, custom, or rule (or lack thereof) of the municipality that permitted or caused the act or omission." *Id.*

To impose liability on a defendant in his individual capacity in an episodic-act-or-omission case, a pretrial detainee must establish that the defendant acted with *subjective* deliberate indifference. *Id.* A person acts with subjective indifference if (1) "he knows that an inmate faces a substantial risk of serious bodily harm," and (2) "he disregards that risk by failing to take reasonable measures to abate it." *Anderson v. Dallas Cty., Tex.*, 286 F. App'x 850, 860 (5th Cir. 2008) (citing *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006)). In inmate suicide cases, the defendant must be aware of a substantial and significant risk that the inmate will commit

suicide and "effectively disregard[] it." *Jacobs v. W. Feliciana Sheriff's Dep't*, 228 F.3d 388, 395 (5th Cir. 2000).  Although "the law is clearly established that jailers must take measures to prevent inmate suicides once they know of the suicide risk," it is not clearly established "as to what those measures must be." *Id.*

To impose liability on a defendant in his official capacity, and thus hold a municipality accountable for the constitutional violation, the detainee "must show that the municipal employee's act resulted from a municipal policy or custom adopted or maintained with *objective* deliberate indifference to the detainee's constitutional rights." *Scott*, 114 F.3d at 54; *see also Sibley v. Lemaire*, 184 F.3d 481, 488 (5th Cir. 1999) (requiring plaintiff to show objective deliberate indifference "[t]o hold superiors liable"). Objective indifference "considers not only what the policy maker actually knew, but what he should have known, given the facts and circumstances surrounding the official policy and its impact on the plaintiff's rights." *Corley v. Prator*, 290 F. App'x 749, 750 (5th Cir. 2008) (citing *Lawson v. Dallas Cty.*, 286 F.3d 257, 264 (5th Cir. 2002)).

As to plaintiffs' individual capacity claim, Dr. Higgins admits that he "was aware of Goetzee's suicidal tendencies [and] knew he was at risk [of

committing suicide.]"[32]   Therefore, the only issue for the Court is whether plaintiffs have presented sufficient evidence of Dr. Higgins "disregard[ing] that risk by failing to take reasonable measures to abate it."   *See Anderson*, 286 F. App'x at 860.   Dr. Higgins argues that once he determined Goetzee required direct observation, "security step[ped] in . . . and [Dr. Higgins] did not have authority to control security."[33]   Similarly, Dr. Higgins argues that aside from ordering direct observation, there was nothing he could do to prevent Goetzee's suicide.[34]

Plaintiffs present sufficient evidence to withstand summary judgment here.   Dr. Higgins testified at his deposition that, as Chief of Psychiatry, suicide prevention at OPP was his "highest priority" and that he had an ethical obligation as a psychiatrist to "address [OPP's] suicide prevention practices."[35]   Certain evidence also shows that Dr. Higgins knew that the direct observation deputies often eschewed their responsibilities.   First, the layout of OPP's mental health tier physically precluded a direct observation deputy from constantly monitoring every suicidal inmate, as required by

---

32      R. Doc. 248-2 at 15.

33      *Id.* at 16.

34      *Id.* at 22.

35      R. Doc. 266, Exhibit Z at 79, 100.

OPP's written suicide prevention policy.  No matter where a deputy sat or stood on the mental health tier, he or she could not simultaneously observe all three cells where the suicidal inmates were housed.[36]  *See Jacobs*, 228 F.3d at 396 (explaining that detaining a suicidal inmate in a cell with a "blind spot" and other hazards was "obviously inadequate").

Additionally, nurses and deputies alike testified that the medical supervisors, including Dr. Higgins, were aware that suicidal inmates were often ignored for long periods of time.[37]  Deputy William Thompson testified that there was "no question that Dr. Higgins knew" that suicidal inmates were left unobserved.[38]  Nurse David Schaible similarly testified that he complained about deputies not properly conducting direct observation, but stopped voicing his concerns after a few months because "nothing changed."[39]  According to Schaible, "[Dr. Higgins] was well aware that it was a problem."[40]  *See Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752,

---

[36]     R. Doc. 266, Exhibit A at 163-64; R. Doc. 266, Exhibit DD at 62-63.

[37]     *See, e.g.*, R. Doc. 266, Exhibit A at 155-56; R. Doc. 266, Exhibit DD at 50-52, 102-110; R. Doc. 266, Exhibit GGG at 144, 153.

[38]     R. Doc. 266, Exhibit A at 160.

[39]     R. Doc. 266, Exhibit DD at 206-07.

[40]     *Id.* at 211-12.

756 (5th Cir. 2001) (noting that "ignor[ing] complaints" may amount to deliberate indifference).

Plaintiffs argue that the evidence also shows that despite Dr. Higgins's knowledge of the frequent lapses in direct observation, he did nothing to remedy the problem. Sheriff Gusman testified at his deposition that he expected both security staff and medical staff, which included Dr. Higgins, to ensure compliance with direct observation orders.[41] Sergeant Nicole Harris similarly explained that security and medical staff "worked seamlessly together" on the mental health tier, including with regard to direct observation inmates.[42]

At least one deputy testified at his deposition that "Dr. Higgins was . . . in charge" on OPP's mental health tier.[43] According to Deputy Tyrone Williams, if Dr. Higgins gave a deputy an order, "it got followed."[44] Williams also explained that Dr. Higgins never told him that he was concerned about deputies failing to follow direct observation orders; had Dr. Higgins expressed any concern, Williams "would have done whatever Dr. Higgins

---

[41]   *See* R. Doc. 266, Exhibit MM at 84-86, 341-42.

[42]   R. Doc. 266, Exhibit LL at 194-95.

[43]   R. Doc. 266, Exhibit GGG at 31.

[44]   *Id.* at 32.

told [Williams] to do."[45]  Thus, according to plaintiffs, because Dr. Higgins knew about the significant lapses in direct observation, but did nothing to ensure his direct observation orders were properly carried out, Dr. Higgins effectively disregarded Goetzee's known suicide risk by subjecting Goetzee to mental health care that Dr. Higgins knew to be "obviously inadequate."  *See Jacobs v. W. Feliciana Sheriff's Dep't*, 228 F.3d 388, 397 (5th Cir. 2000) (denying sheriff qualified immunity because he may have acted with deliberate indifference by "plac[ing] [a suicidal inmate] in conditions he knew to be obviously inadequate"); *Lewis v. Parish of Terrebonne*, 894 F.2d 142, 146 (5th Cir. 1990) ("[A] detainee with suicidal tendencies . . . requires [] protective action in that the detainee presents a risk of damage to himself and other inmates.").  Accordingly, summary judgment is not warranted on plaintiffs' episodic-act-or omission claim against Dr. Higgins in his individual capacity.

Although Dr. Higgins's motion for summary judgment appears to address plaintiffs' section 1983 claim against him in his official capacity, he merely repeats his argument that there is no evidence that Dr. Higgins

---

[45]     *Id.* at 98.

disregarded Goetzee's risk of suicide.[46]   Dr. Higgins fails to address the elements of an official capacity claim.   Therefore, for the same reasons the Court denies summary judgment on plaintiffs' individual capacity claim, the Court also denies summary judgment on plaintiffs' official capacity claim.

### B.   Plaintiffs' Claim for Punitive Damages Under Section 1983

Under section 1983, plaintiffs also seek punitive damages for Dr. Higgins's alleged constitutional violation.

Punitive damages may be awarded in a section 1983 action "only when the defendant's conduct is motivated by evil intent or demonstrates reckless or callous indifference to a person's constitutional rights."   *Williams v. Kaufman Cty.*, 352 F.3d 994, 1015 (5th Cir. 2003) (citing *Smith v. Wade*, 461 U.S. 30, 56 (1983)).   The "reckless or callous indifference" standard requires "recklessness in its subjective form"—that is, "a subjective consciousness of a risk of injury or illegality and a criminal indifference to civil obligations." *Id.*   In the Fifth Circuit, it is "fair to say that acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk."   *Campbell v. Miles*, 228

---

[46]   Indeed, Dr. Higgins appears to have simply copied-and-pasted substantial portions of his arguments into the separate subsections of his brief.   *See* R. Doc. 248-2.

F.3d 409, 2000 WL 1056131, at *3 (5th Cir. 2000) (quoting *Sibley v. Lemaire*, 184 F.3d 481, 489 (5th Cir. 1999)).

Because plaintiffs have presented sufficient evidence to withstand summary judgment on their deliberate indifference claim, plaintiffs also survive summary judgment on their claim for punitive damages. Even if plaintiffs bore a higher burden of proof to recover punitive damages, there is enough evidence in the record for a jury to find that Dr. Higgins acted with reckless or callous indifference as well.

### C.    Plaintiffs' State-Law Claim for Negligence

Finally, Dr. Higgins argues that plaintiffs cannot prevail on their claim of negligence or medical malpractice under Louisiana law. As Dr. Higgins correctly points out, deliberate indifference is a much higher standard than negligence or medical malpractice.[47] *See Hood v. Montgomery Cty., Tex.*, 584 F. App'x 238, 238-39 (5th Cir. 2014) (noting deliberate indifference requires a showing of intent that is unnecessary to sustain a claim for negligence or medical malpractice). Accordingly, because summary judgment is not warranted on plaintiffs' deliberate indifference claim,

---

[47]    *Id.* at 22-23.

neither is summary judgment warranted on their state-law claim for negligence or malpractice.

## IV.   CONCLUSION

After reviewing the evidence in a light most favorable to plaintiffs, the Court finds that there are sufficient facts for plaintiffs to proceed to trial against Dr. Higgins.   For the foregoing reasons, the Court DENIES Dr. Higgins's motions for summary judgment.[48]

New Orleans, Louisiana, this 26th day of February, 2016.

_Sarah Vance_
_____

SARAH S. VANCE
UNITED STATES DISTRICT JUDGE

---

[48]     R. Doc. 236; R. Doc. 248.